**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 17-17-42267 (659) |
| | ) | CHAPTER 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | Hearing Date: April 5, 2017 |
| | ) | Hearing Time: 1:30 P.M. |
| | ) | Hearing Location: Courtroom 7 North |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):[2]

[1] The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978];PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182] and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc. 3231 SE 6th Avenue Topeka, KS 66607 United States.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Michael Schwindle in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## **Relief Requested**[3]

1. By this Motion, and pursuant to sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Missouri (the "Local Bankruptcy Rules") the Debtors seek entry of interim and final orders (the "Proposed Interim Order" and "Proposed Final Order," respectively),[4] (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, subject to the caps and limits set forth herein; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## **Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81.901(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri. The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined

---

[3] Capitalized terms used, but not otherwise defined in this Motion shall have the meanings ascribed to such terms elsewhere in this Motion or in the First Day Declaration, as applicable.

[4] A copy of the Proposed Interim Order and Proposed Final Order will be provided to the Notice Parties (as defined below) and made available on the Debtors' case information website at https://cases.primeclerk.com/payless.

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4. The Debtors and their non-Debtor affiliates (together, the "Company"), comprise the largest specialty family footwear retailer in the Western Hemisphere, offering a wide range of shoes and accessory items at affordable prices. The Company has more than 4,000 stores in more than 30 countries. The Debtors are headquartered in Topeka, Kansas, but their operations are extensive and span across Asia, the Middle East, Latin America, Europe, and the United States.

5. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

6. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly trained personnel who are not easily

replaced. Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts will be jeopardized.

7. The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing rank-and-file incentive programs. Consequently, the relief requested herein is necessary and appropriate.

8. The Debtors employ: (a) approximately 17,900 individuals in the United States, Puerto Rico, the U.S. Virgin Islands, Saipan, and Guam (collectively, the "U.S. Employees");[5] (b) approximately 2,100 individuals in Canada (collectively, the "Canada Employees"); and (c) approximately 25 individuals in Taiwan (collectively, the "Asia Employees," and together with the U.S. Employees and Canada Employees, the "Employees"), serving in a number of capacities supporting the Debtors' operations at either the corporate offices or in the field (the "Corporate Employees"), distribution center (the "DC Employees"), or retail store level (the "Retail Employees"). The Employees are comprised of approximately 8,000 full-time employees (collectively, the "Full-Time Employees") and 12,000 part-time employees (collectively, the "Part-Time Employees"). The overwhelming majority of the Part-Time Employees are employed at one of the Debtors' various retail store locations, with a small number working in either a corporate capacity or at one of the Debtors' distribution centers

[5] The Debtors' Employees include: (a) Employees not represented by any collective bargaining unit are subject to the minimum wage and overtime standards of the U.S. Federal Labor Standards Act (the "FLSA" and the "Non-Exempt Employees", respectively); (b) Employees not represented by a bargaining unit that are also exempt from the FLSA (the "Exempt Employees" and, together with the Non-Exempt Employees, the "Non-Represented Employees"); and (c) Employees that are represented by various bargaining units, as discussed further below (the "Represented Employees").

(the "Eastern Distribution Center" and "Western Distribution Center," respectively, and collectively, the "Distribution Centers"). The Full-Time Employees are employed at all levels of the Debtors' business operations.

9. While the substantial majority of the Debtors' Employees are not represented by a labor union (the "Non-Represented Employees"), the Debtors are party to two collective bargaining agreements (together, the "CBAs" and each, a "CBA") with respect to approximately 93 Employees (the "Represented Employees"). Of the Debtors' Represented Employees, approximately 85 are employed under a CBA with the United Food and Commercial Workers Union, Local No. 655 (the "UFCW Local 655"), and the remaining Represented Employees are covered by a CBA with the United Food and Commercial Workers Union, Local No. 536 (the "UFCW Local 536"). With respect to these Represented Employees, and as discussed in detail below, the Debtors seek authority (but not direction) to continue to provide compensation and benefits to the Represented Employees under the CBAs in the ordinary course of business and consistent with past practice.[6]

10. In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Workers") from approximately 11 different staffing agencies (collectively, the "Temporary Staffing Agencies"). Currently, the Debtors employ approximately 11 Independent Contractors, though this number fluctuates based on the Debtors' specific needs at any given time. Presently, approximately 150 Temporary Workers provide services to the Debtors. The Independent Contractors, the Temporary Staffing

[6] By requesting authority to honor obligations relating to any CBA in this Motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the CBAs and the Debtors reserve all of their rights with respect thereto.

Agencies and the Temporary Workers they provide, are a critical supplement to the efforts of the Debtors' Employees.

**Employee Compensation and Benefits**

11. To minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes, and 401(k) contributions), health insurance, workers' compensation benefits, paid time-off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, business travel insurance, short- and long-term disability coverage, employee assistance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

12. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

13. The Debtors estimate that the following prepetition Employee and Compensation Benefit amounts are outstanding as of the Petition Date:

| Employee-Related Obligations | Approx. Amount Outstanding[7] | Interim Amount | Final Amount |
|---|---|---|---|
| **U.S. Employee Compensation and Withholding Obligations** | | | |
| U.S. Employee Compensation | $10,000,000.00 | $10,000,000.00 | $10,000,000.00 |
| Independent Contractor Compensation and Temporary Staffing Agency Payments | $3,300,000.00 | $3,300,000.00 | $3,300,000.00 |
| U.S. Withholding Obligations | $3,800,000.00 | $3,800,000.00 | $3,800,000.00 |
| U.S. Reimbursable Expenses | $200,000.00 | $200,000.00 | $200,000.00 |
| U.S. Relocation Expenses | $55,000.00 | $55,000.00 | $55,000.00 |
| U.S. Corporate Card Expenses | $200,000.00 | $200,000.00 | $200,000.00 |
| **Canada Employee Compensation and Withholding Obligations** | | | |
| Canada Employee Compensation | $975,000.00 | $975,000.00 | $975,000.00 |
| Canada Withholding Obligations | $285,000.00 | $285,000.00 | $285,000.00 |
| Canada Payroll Processing | $10,000.00 | $10,000.00 | $10,000.00 |
| Canada Reimbursable Expenses | $31,000.00 | $31,000.00 | $31,000.00 |
| **Asia Employee Compensation and Withholding Obligations** | | | |
| Asia Employee Compensation | $5,000.00 | $0.00 | $5,000 |
| Asia Withholding Obligations | $0.00 | $0.00 | $0.00 |
| Asia Reimbursable Expenses | $113.00 | $113.00 | $113.00 |
| **U.S. Additional Compensation Opportunities** | | | |
| Non-Insider Annual Incentive Plan | N/A | $0.00 | Ordinary Course |
| U.S. Store Leader Extreme Rewards Incentive Program | N/A | $0.00 | Ordinary Course |
| U.S. Store Closing Incentive Program | N/A | $0.00 | Ordinary Course |
| U.S. Group Leader Incentive Program | N/A | $0.00 | Ordinary Course |
| Distribution Center Incentive Plans | $13,000.00 | $13,000.00 | $13,000.00 |
| **Canada Additional Compensation Opportunities** | | | |
| Canada Non-Insider Annual Incentive Plan | N/A | $0.00 | Ordinary Course |
| Canada Store Leader Extreme Rewards Incentive Program | N/A | $0.00 | Ordinary Course |
| Canada Group Leader Incentive Plan | N/A | $0.00 | Ordinary Course |
| **Asia Additional Compensation Opportunities** | | | |
| Asia Non-Insider Annual Incentive Plan | N/A | $0.00 | Ordinary Course |
| Asia Employee Holiday Bonuses | $65,000.00 | $0.00 | $65,000.00 |
| **U.S. Employee Health and Welfare Benefits** | | | |
| U.S. Health Insurance Programs | $1,700,000.00 | $1,700,000.00 | $1,700,000.00 |
| Health Savings Account Administrative Fees | $5,000.00 | $5,000.00 | $5,000.00 |
| Flexible Spending Account Administrative Fees | $10,000.00 | $10,000.00 | $10,000.00 |
| COBRA Obligations | $2,200.00 | $2,200.00 | $2,200.00 |
| U.S. Life and AD&D Insurance | $52,000.00 | $52,000.00 | $52,000.00 |
| U.S. Disability Benefits | $51,000.00 | $51,000.00 | $51,000.00 |
| U.S. Workers' Compensation Program | Ordinary Course | Ordinary Course | Ordinary Course |
| Business Travel Insurance | $0.00 | $0.00 | $0.00 |
| 401(k) Plan | Ordinary Course | Ordinary Course | Ordinary Course |
| U.S. Time-Off Benefits (Represented Employees) | $27,000.00 | $0.00 | Ordinary Course |

[7] The use of "N/A" in this chart applies to Employee Compensation and Benefits that cannot be quantified as of the Petition Date. By this Motion, and as discussed more fully herein, the Debtors seek to pay such Employee Compensation and Benefits in the ordinary course of business.

| Employee-Related Obligations | Approx. Amount Outstanding[7] | Interim Amount | Final Amount |
|---|---|---|---|
| U.S. Time-Off Benefits (Non-Represented Employees) | $4,470,000.00 | $0.00 | Ordinary Course |
| Non-Insider U.S. Severance Programs | $1,800,000.00 | $0.00 | $1,800,000.00 |
| **Canada Employee Health and Welfare Benefits** | | | |
| Canada Extended Health Insurance Programs | $40,000.00 | $40,000.00 | $40,000.00 |
| Canada Life and AD&D Insurance | $2,700.00 | $2,700.00 | $2,700.00 |
| Canada Disability Benefits | $13,500.00 | $13,500.00 | $13,500.00 |
| Canada Workers' Compensation Program | Ordinary Course | Ordinary Course | Ordinary Course |
| Registered Retirement Savings Plan | $4,500.00 | $4,500.00 | $4,500.00 |
| Canada Time-Off Benefits | $850,000.00 | $0.00 | Ordinary Course |
| Non-Insider Canada Severance Program | $26,400.00 | $26,400.00 | $26,400.00 |
| **Asia Employee Health and Welfare Benefits** | | | |
| Asia Group Insurance Plan | $0.00 | $0.00 | $0.00 |
| Asia Time-Off Benefits | $8,000.00 | $0.00 | $8,000.00 |
| Asia Pension Obligations | $366,000.00 | $363,000.00 | $366,000.00 |
| Non-Insider Asia Severance Program | $0.00 | $0.00 | $0.00 |
| **Supplemental Employee Benefits** | $333,100.00 | $275,000.00 | $333,100.00 |
| Administrator Fees | $0.00 | $0.00 | $0.00 |
| **Total** | $28,700,513.00 | $21,414,413.00 | $23,353,513.00 |

14. The Debtors do not believe there are amounts owed to any individuals on account of the Employee Compensation and Benefits that exceed the $12,850 priority expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $12,850 pursuant to the Proposed Interim Order. The Debtors do, however, seek authority to pay amounts in excess of $12,850, solely pursuant to the Final Order, in the event it is determined that payment of certain prepetition amounts owed on account of the Employee Compensation and Benefits are in excess of $12,850.

## I. Employee Compensation, Withholding Obligations, and Additional Compensation Opportunities

### A. U.S. Employee Compensation and Withholding Obligations

#### 1. U.S. Employee Compensation

15. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to the U.S. Employees (collectively, the

"U.S. Employee Compensation"). The Debtors pay their U.S. Employees' wage and salary obligations (the "U.S. Wages") on a weekly and biweekly basis, one week in arrears.[8] The Debtors pay approximately $10 million after U.S. Withholding Obligations (as defined below) on a biweekly basis on account of the U.S. Employee Compensation in the aggregate.

16. Because all U.S. Wages are paid in arrears, certain U.S. Employees may be owed accrued but unpaid U.S. Wages as of the Petition Date. U.S. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that U.S. Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such U.S. Employees.

17. As of the Petition Date, the Debtors believe they owe approximately $10 million on account of unpaid U.S. Wages (the "Unpaid U.S. Wages") (excluding U.S. Withholding Obligations, U.S. Reimbursable Expenses, U.S. Time-Off Benefits, and any payments provided under the U.S. Additional Compensation Opportunities and U.S. Non-Insider Severance Programs), each of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts on account of the Unpaid U.S. Wages in the ordinary course of business and consistent with past practice, and to continue paying U.S. Wages on a postpetition basis in the ordinary course of business.

**2. Independent Contractors and Temporary Staff Compensation**

18. The Debtors rely on Independent Contractors and Temporary Workers provided by Temporary Staffing Agencies in the ordinary course of their business. Currently, the Debtors employ approximately 11 Independent Contractors and contract with approximately 11

[8] The Debtors process payroll internally and do not utilize a third-party processor.

Temporary Staffing Agencies to provide the Debtors with the Temporary Workers, though these numbers fluctuate based on current needs. These Independent Contractors and Temporary Workers perform a wide range of services critical to the Debtors' operations, including IT- and marketing-related support and assistance at the Debtors' corporate office and the Distribution Centers. The Debtors' Employees rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and the Temporary Workers to fill short-term assignments that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and Temporary Staffing Agencies is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors pay approximately $544,000 per month in compensation to Independent Contractors and to Temporary Staffing Agencies (collectively, the "Independent Contractor and Temporary Staffing Agency Fees").

19. As of the Petition Date, the Debtors believe they owe approximately $3.3 million on account of the Independent Contractor and Temporary Staffing Agency Fees to approximately 11 Independent Contractors and 11 Temporary Staffing Agencies, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Independent Contractor and Temporary Staffing Agency Fees, and to continue paying the Independent Contractor and Temporary Staffing Agency Fees on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**3. U.S. Withholding Obligations**

20. During each applicable pay period, the Debtors routinely deduct certain amounts from their U.S. Employees' paychecks for, among other things, garnishments, child support, medical child support, and other pre-tax and after-tax deductions payable pursuant to certain of

the U.S. Health and Welfare Programs (as defined below) (collectively, the "U.S. Deductions"). Certain of the U.S. Deductions are forwarded to various third-party recipients. On a biweekly basis, the Debtors deduct approximately $1.5 million in the aggregate from their U.S. Employees' paychecks on account of the U.S. Deductions.

21. The Debtors are also required by law to withhold from the U.S. Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "U.S. Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the U.S. Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "U.S. Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "U.S. Payroll Taxes"). The U.S. Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time as the U.S. Employees' payroll checks are disbursed. On a biweekly basis, the Debtors remit approximately $5.6 million in the aggregate on account of the U.S. Payroll Taxes.

22. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid U.S. Deductions and U.S. Payroll Taxes (together, the "U.S. Withholding Obligations") is approximately $3.8 million, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid U.S. Withholding Obligations and to continue to honor the U.S. Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

**B. Canada Employee Compensation and Withholding Obligations**

**1. Canada Employee Compensation**

23. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to the Canada Employees (collectively, the "Canada Employee Compensation"). The Debtors pay their Canada Employees' wage and salary obligations (the "Canada Wages") on a biweekly basis, one week in arrears. The Debtors pay approximately $810,000 (after Canada Withholding Obligations (as defined below)) on a biweekly basis on account of the Canada Employee Compensation in the aggregate.

24. Because all Canada Wages are paid in arrears, certain Canada Employees may be owed accrued but unpaid U.S. Wages as of the Petition Date. Canada Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Canada Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Canada Employees.

25. As of the Petition Date, the Debtors believe they owe approximately $710,000 on account of accrued but unpaid Canada Wages (the "Unpaid Canada Wages") (excluding Canada Withholding Obligations, Canada Reimbursable Expenses, Canada Time-Off Benefits, and any payments provided under the Canada Additional Compensation Opportunities and Canada Severance Program, each as defined below), all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts on account of the Unpaid Canada Wages in the ordinary course of business and consistent with past practice, and to continue paying Canada Wages on a postpetition basis in the ordinary course of business.

**2. Canada Withholding Obligations**

26. During each applicable pay period, the Debtors routinely deduct certain amounts from their Canada Employees' paychecks for, among other things, garnishments and other required levies and benefit premiums pursuant to certain of the Canada Health and Welfare Programs (as defined below) (collectively, the "Canada Deductions"). Certain of the Canada Deductions are forwarded to various third-party recipients. On a biweekly basis, the Debtors deduct approximately $30,000 in the aggregate from their Canada Employees' paychecks on account of the Canada Deductions.

27. The Debtors are also required by law to withhold from the Canada Employees' Compensation amounts related to, among other things, payroll taxes and government-mandated benefits for remittance to appropriate federal, provincial, and local authorities (collectively, the "Canada Employee Payroll Taxes"). The Debtors are also required to pay, from their own funds, additional amounts mandated by federal and provincial authorities for government-mandated benefits, workers compensation, and employment insurance (the "Canada Employer Payroll Taxes," and together with the Canada Employee Payroll Taxes, the "Canada Payroll Taxes"). The Canada Payroll Taxes are generally processed and forwarded to the appropriate federal, provincial, or local taxing authority at the same time Canada Employees' payroll checks are disbursed. On a biweekly basis, the Debtors remit approximately $210,000 in the aggregate on account of the Canada Payroll Taxes.

28. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Canada Deductions and Canada Payroll Taxes (together, the "Canada Withholding Obligations") is approximately $285,000, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid Canada Withholding Obligations and to continue to

honor the U.S. Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

**3. Canada Payroll Processing**

29. The Debtors contract with Automatic Data Processing, Inc. ("ADP"), a third-party payroll service, to process and administer their payroll and reimbursements in Canada. Each biweekly pay period, the Debtors calculate the Canada Employee Compensation for each Canada Employee and transfer funds sufficient to satisfy such obligations to ADP in advance of each applicable pay period. ADP then distributes the Canada Employee Compensation to the Canada Employees on behalf of the Debtors.

30. On average, the Debtors pay approximately $20,000 per month to ADP for the payroll-related services that it provides to the Debtors and related administrative costs (the "Canada Payroll Fees"). As of the Petition Date, approximately $10,000 has accrued and remains unpaid on account of Canada Payroll Fees. Failure to pay the Canada Payroll Fees in the future could lead to delayed disbursement of Canada Employee Compensation and related benefits to the appropriate Canada Employees to the detriment of the Canada Employees and the Debtors' operations. As a result, the Debtors seek to pay any unpaid Canada Payroll Fees that have accrued prior to the Petition Date and to continue administering payroll for Canada Employees in the ordinary course of business consistent with the Debtors' historical practices.

**C. Asia Employee Compensation and Withholding Obligations**

**1. Asia Employee Compensation**

31. In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries, and other compensation owed to the Asia Employees (collectively, the "Asia Employee Compensation"). The Debtors pay their Asia Employees' wage and salary obligations (the "Asia Wages") on a monthly basis on the 25th day of each month. The Debtors

pay approximately $60,000 (net of Asia Withholding Obligations (as defined below)) on a monthly basis on account of the Asia Employee Compensation in the aggregate.

32. As of the Petition Date, the Debtors believe they owe approximately $7,000 on account of unpaid Asia Wages (the "Unpaid Asia Wages") (excluding Asia Withholding Obligations, Asia Reimbursable Expenses (as defined below), Asia Time-Off Benefits (as defined below), and any payments provided under the Asia Additional Compensation Opportunities (as defined below) and Asia Severance Programs (as defined below)), none of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts on account of the Unpaid Asia Wages in the ordinary course of business and consistent with past practice, and to continue paying Asia Wages on a postpetition basis in the ordinary course of business.

**2. Asia Withholding Obligations**

33. During each applicable pay period, the Debtors routinely deduct certain amounts from their Asia Employees' paychecks for, among other things, government mandated deductions for labor insurance, national health insurance, Labor Pension Act contributions, where applicable, and payroll taxes (collectively, the "Asia Employee Deductions"). Additionally, the Debtors are required by law to pay, from their own funds, additional amounts mandated by federal authorities for government-mandated benefits and pensions with respect to the Asia Employees (the "Asia Employer Contributions," and, together with the Asia Employee Deductions, the "Asia Withholding Obligations"). On a monthly basis, the Debtors deduct approximately $5,000 with respect to the Asia Employee Deductions and approximately $9,000 with respect to the Asia Employer Contributions, in the aggregate.

34. As of the Petition Date, the Debtors believe they owe approximately $1,500 on account of the Asia Withholding Obligations, none of which will become due and owing within

the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authority to pay all outstanding prepetition amounts with respect to the Asia Withholding Obligations and to continue paying Asia Withholding Obligations arising in the ordinary course of business and consistent with historical practice.

**D. Reimbursement Obligations**

**1. U.S. Reimbursement Obligations**

**a. U.S. Reimbursable Expenses**

35. The Debtors reimburse U.S. Employees for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, car rentals, parking, and fuel costs, and other qualifying expenses (collectively, the "U.S. Reimbursable Expenses"). Except for those U.S. Employees who are issued a Corporate Card (as defined below), U.S. Employees pay for incurred U.S. Reimbursable Expenses by using either a personal credit card or cash (alternatively, some U.S. Employees with Corporate Cards may still incur U.S. Reimbursable Expenses for items such as mileage or charges incurred for vendors who do not accept the Corporate Cards). U.S. Employees then submit paper receipts to request reimbursement, and if approved in accordance with internal policies and procedures, the U.S. Reimbursable Expenses are processed through the Debtors' accounts payable system. Without continued reimbursement of the U.S. Reimbursable Expenses, U.S. Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship. On average, the Debtors pay approximately $400,000 per month in U.S. Reimbursable Expenses.

36. As of the Petition Date, the Debtors believe they owe approximately $200,000 on account of U.S. Reimbursable Expenses, all of which will become due and owing within the first 21 days of these chapter 11 cases. Additionally, although the Debtors ask that reimbursement

requests be submitted promptly, sometimes submission delays occur. U.S. Employees may therefore submit reimbursement requests for prepetition U.S. Reimbursable Expenses after the Petition Date. By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the U.S. Reimbursable Expenses, including unfiled amounts by U.S. Employees, and to continue paying the U.S. Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**b. U.S. Relocation Expenses**

37. The Debtors pay for certain expenses to U.S. Employees who are transferred in connection with their job (the "U.S. Relocation Expenses"). The majority of U.S. Relocation Expenses are billed directly to the Debtors by the Debtors relocation provider, Altair Global Relocation, including, but not limited to, household goods movement, eligible home sale expenses, temporary living accommodations, and other covered expenses. U.S. Relocation Expenses may also be paid directly to U.S. Employees to cover relocation-related travel and incidental relocation expenses. U.S. Relocation Expenses are generally paid within two weeks of submission. U.S. Relocation Expenses are subject to a repayment agreement that requires repayment of the full relocation amount if the U.S. Employee voluntarily terminates employment prior to the completion of a specified period of service.

38. As of the Petition Date, the Debtors believe they owe approximately $55,000 on account of U.S. Relocation Expenses, all of which may become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of U.S. Relocation Expenses and to continue paying U.S. Relocation Expenses on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**c. U.S. Corporate Card Expenses**

39. U.S. Employees pay for the majority of the U.S. Reimbursable Expenses they incur through a combination of commercial credit card accounts and related contractual arrangements with U.S. Bank, N.A. ("US Bank"). The Debtors provide five Debtor-guaranteed US Bank corporate Visa credit cards to U.S. Employees for ordinary course expenses that such U.S. Employees incur in performing their job functions (collectively, the "Corporate Credit Cards"). Corporate Credit Cards are used by U.S. Employees to charge business-related travel and marketing expenses. It is critical to the Debtors' business operations that the Debtors continue reimbursing, or making direct payments on behalf of, U.S. Employees for such expenses.

40. Additionally, the Debtors require U.S. Employees to use Debtor-guaranteed U.S. Bank-issued purchasing cards to pay for the Debtors' procurement of items, such as office supplies (the "Corporate Purchasing Cards"), which are used in the ordinary course of the operation of Debtors' businesses. Currently, the Debtors utilize approximately 11 Corporate Purchasing Cards. The Debtors also utilize two travel cards issued by US Bank, which are used by the Debtors to book travel for U.S. Employees (the "Travel Cards," and, together with the Corporate Credit Cards and Corporate Purchasing Cards, the "Corporate Cards")

41. Use of the Corporate Cards is integral to the Debtors' cash management and account functions, and continuation of the U.S. Employees' ability to use the Corporate Cards for procurement of office supplies and the like and travel-related purposes is essential to the Debtors' business operations. On average, the Debtors pay approximately $236,000 per month for amounts incurred on the Corporate Cards.

42. As of the Petition Date, the Debtors believe they owe approximately $200,000 in Reimbursable Expenses charged to Corporate Cards, all of which will become due and owing

within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on the Corporate Cards, and to continue the Corporate Card programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**2. Canada and Asia Reimbursable Expenses**

43. The Debtors also reimburse Canada Employees and Asia Employees for business expenses under the same criteria applicable to the U.S. Reimbursable Expenses (the "Canada Reimbursable Expenses" and the "Asia Reimbursable Expenses," respectively, and collectively, the "Canada/Asia Reimbursable Expenses"). Canada Employees and Asia Employees pay for incurred Canada/Asia Reimbursable Expenses by using either a personal credit card or cash. Canada Employees and Asia Employees then submit paper receipts to request reimbursement, and if approved in accordance with internal policies and procedures, the Canada/Asia Reimbursable Expenses are processed through the Debtors' accounts payable system. Without continued reimbursement of the Canada/Asia Reimbursable Expenses, Canada Employees and Asia Employees relying on these benefits would be saddled with additional costs, causing personal financial hardship. On average, the Debtors pay approximately $38,000 per month in Canada Reimbursable Expenses and $1,300 per month in Asia Reimbursable Expenses, respectively.

44. As of the Petition Date, the Debtors believe they owe approximately $31,000 on account of the Canada Reimbursable Expenses and $113 on account of Asia Reimbursable Expenses, all of which will become due and owing within the first 21 days of these chapter 11 cases. Additionally, although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur. Canada Employees and Asia Employees may therefore submit reimbursement requests for prepetition Canada/Asia Reimbursable Expenses

after the Petition Date. By this Motion, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the Canada/Asia Reimbursable Expenses, including unfiled amounts by Canada Employees and Asia Employees, and to continue paying the Canada/Asia Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**E. U.S. Additional Compensation Opportunities**

45. The Debtors have five additional compensation programs for U.S. Employees (the "U.S. Additional Compensation Programs"):

- the U.S. Non-Insider Annual Incentive Plan;
- the U.S. Store Leader Extreme Rewards Incentive Program;
- the U.S. Store Closing Incentive Program;
- the U.S. Group Leader Extreme Rewards Incentive Program; and
- the Distribution Center Incentive Plans.

46. Each of these programs is an integral part of the Debtors' U.S. Employee Compensation and Benefits. By this Motion, the Debtors are not seeking to make any payments to insiders ("Insiders")[9] under any of the U.S. Additional Compensation Programs.[10]

**1. Non-Insider Annual Incentive Plan**

47. Historically, the Debtors have offered an annual incentive program that provides eligible non-insider Corporate Employees with an opportunity to receive meaningful awards based on their overall performance and contributions to the Debtors' business results (the "Non-Insider Annual Incentive Plan"). The Non-Insider Annual Incentive Plan is tied to

---

[9] The term Insiders shall have the meaning set forth in 11 U.S.C. § 101(31).

[10] To the extent the Debtors propose to make prepetition payments to any potential Insiders under an Additional Compensation Program, the Debtors will seek separate approval from the Court with respect to such payments or Additional Compensation Programs.

financial metrics, typically annual EBITDA. Any payments under the Non-Insider Annual Incentive Plan are made after the completion of the fiscal year. The Debtors failed to reach the financial milestones necessary to trigger payments under the Annual Incentive Plan for either of their last two fiscal years.

48. The Non-Insider Annual Incentive Plan for Fiscal Year 2017[11] remains tied to EBITDA performance, but eligible Corporate Employees now have the opportunity to earn semi-annual payouts (based on spring and fall season EBITDA, respectively) with a year-end true-up based on full-year EBITDA. Presently, there are approximately 439 Corporate Employees who are eligible to participate in the Non-Insider Annual Incentive Plan. For Fiscal Year 2017, the Debtors project that they will pay out approximately $9.1 million under the Non-Insider Annual Incentive Plan.

49. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Non-Insider Annual Incentive Plan. By this Motion, the Debtors request authorization to pay obligations under the Non-Insider Annual Incentive Plan on a postpetition basis in the ordinary course of business upon entry of the Final Order. To be sure, the Debtors do not propose to make any payment on account of the Non-Insider Annual Incentive Plan to Insiders.

**2. U.S. Store Leader Extreme Rewards Incentive Program**

50. The Debtors offer a quarterly incentive program (the "U.S. Store Leader Extreme Rewards Incentive Program") to all U.S. Employees who serve as store managers ("U.S. Store Leaders"). The U.S. Store Leader Extreme Rewards Incentive Program is tied to gross revenues at individual retail stores and is calculated based on one of two metrics. For

[11] The Debtors utilize the retail fiscal year ("Fiscal Year"). For 2016, the end of the Debtors' Fiscal Year was January 28, 2017. For 2017, the Fiscal Year will end on February 3, 2018.

established stores ("Established Stores"),[12] rewards are based on a year-over-year comparison of quarterly gross sales. For new or relocated stores (collectively, "New Stores"),[13] rewards are based on a store's quarterly gross sales versus an established sale metric. If a store meets a specified threshold level of performance for the quarter, U.S. Store Leaders may qualify for one of three payout levels under the U.S. Store Leader Rewards Program (Bronze, Silver, and Gold). The maximum payment that can be earned under the U.S. Store Leader Extreme Rewards Incentive Program for Established Stores is 15% of a U.S. Store Leader's quarterly gross earnings. For New Stores, the maximum payment amount is 11% of a U.S. Store Leader's gross earnings.

51. As of the Petition Date, approximately 2,330 U.S. Store Leaders qualify to participate in the U.S. Store Leader Extreme Rewards Incentive Program. For the Debtors' 2016 Fiscal Year, 934 stores had sales sufficient to trigger payments under the U.S. Store Leader Extreme Rewards Incentive Programs in at least one quarter, with such quarterly payments averaging out to approximately $875 per qualifying U.S. Store Leader. As of the Petition Date, the Debtors are unable to quantify amounts due on account of the U.S. Store Leader Extreme Rewards Incentive Program for the first quarter of the Debtors' 2017 Fiscal Year, as such awards will not be determined until the completion of that quarter (*i.e.*, April 30, 2017). First quarter payments for the 2016 Fiscal Year, however, were approximately $575,000 in the aggregate. No prepetition amounts will become due and owing in the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Store Leader Extreme Rewards Incentive Program and to

---

[12] Established Stores are stores that have been open for a minimum of 14 months.

[13] New Stores are stores that have either been opened or relocated within the last 14 months.

continue paying obligations under the U.S. Store Leader Extreme Rewards Incentive Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, in each case upon entry of the Final Order. To be sure, the Debtors do not propose to make any payment on account of the U.S. Store Leader Extreme Rewards Incentive Program to Insiders.

**3. U.S. Store Closing Incentive Program**

52. U.S. Store Leaders managing stores that will be closed in conjunction with these chapter 11 cases will become ineligible for U.S. Store Leader Extreme Rewards Incentive Program, and accordingly, such U.S. Store Leaders will instead be placed in a separate sales-focused incentive program for the duration of the store closing process (the "U.S. Store Closing Incentive Program"). If the U.S. Store Leader position is vacant during the closing period, another Retail Employee at the store may be designated to manage the store, and may also become eligible for the Store Closing Incentive. The U.S. Store Leaders, or designated Retail Employee (as discussed above), will only be eligible for compensation under the U.S. Store Closing Incentive Program if the U.S. Store Leader remains actively employed by the Debtors through the final store closure date and the entire group of closing stores achieves a specified aggregate sales goal. The maximum payment that can be earned by amenable U.S. Store Leader under the Store Closing Incentive Program is $1,000.

53. As of the Petition Date, the Debtors are unable to quantify amounts due on account of the U.S. Store Closing Incentive Program, as such awards will not be determined until the store closing process completes. No prepetition amounts, however, will become due and owing in the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Store Closing Incentive Program and to continue paying obligations under the U.S. Store Closing

Incentive Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, in each case upon entry of the Final Order. To be sure, the Debtors do not propose to make any payment on account of the U.S. Store Closing Incentive Program to Insiders.

**4. U.S. Group Leader Incentive Program**

54. The Debtors offer a quarterly incentive program (the "U.S. Group Leader Incentive Program") to multi-store leaders who directly manage 1 store (the "Home Store") and oversee approximately six other stores ("U.S. Group Leaders"). The U.S. Group Leader Incentive Program is based on the sales performance of each store in the U.S. Group Leader's group. The Group Leader's payout is determined by averaging the U.S. Store Leader Extreme Rewards payout earned by each of the Group Leader's seven stores. The Group Leader is not eligible for an Extreme Rewards payout for the Home Store, but the sales performance of this store is factored into the Group Leader Incentive award calculation. A payout matrix determines the Group Leader's actual payout, and no award is payable if the combined Extreme Rewards payout average for the Group Leader's stores is less than 3%. The maximum payment under the U.S. Group Leader Incentive Program is 20% of such U.S. Group Leader's quarterly gross earnings.

55. As of the Petition Date, approximately 153 U.S. Group Leaders qualify to participate in the U.S. Group Leader Incentive Program. The U.S. Group Leader Incentive Program is newly instituted for the Debtors' 2017 Fiscal Year, and thus, no metrics from the Debtors' 2016 Fiscal Year are available. Based on previous years' performance and year-to-date sales, however, the Debtors expect that the total payments under the U.S. Group Leader Incentive Program are unlikely to exceed $600,000 for Fiscal Year 2017. As of the Petition Date, the Debtors are unable to quantify amounts due on account of the U.S. Group Leader

Incentive Program for the first quarter of the Debtors' 2017 Fiscal Year, as such incentive awards will not be determined until the completion of that quarter (*i.e.*, April 30, 2017). No prepetition amounts, however, will become due and owing in the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to continue paying obligations under the U.S. Group Leader Incentive Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices upon entry of the Final Order. To be sure, the Debtors do not propose to make any payment on account of the U.S. Group Leader Incentive Program to Insiders.

**5. Distribution Center Incentive Plans**

56. The Debtors also offer incentive plans for the hourly Full-Time DC Employees at the Debtors' Distribution Centers (the "Eastern DC PRIDE Plan" and "Western DC PRIDE Plan," respectively, and collectively, the "DC PRIDE Plans"), which are tied to the achievement of productivity goals based on established standards at the Distribution Centers (*i.e.*, receiving, shipping, packing). Eligible DC Employees qualify for the DC PRIDE Plans on a weekly basis with such amounts being paid in the following week's paycheck. The maximum amount that an individual hourly DC Employee can accumulate is $3.01 per hour worked under the Eastern DC PRIDE Plan and $3.77 per hour worked under the Western DC PRIDE Plan. In addition, Eastern DC Employees who earn awards under the Eastern DC PRIDE Plan over multiple consecutive weeks, thus achieving "elite" status, earn points that may be redeemed for merchandise; the Debtors incur expense of approximately $750 per month for this supplemental program.

57. As of the Petition Date, approximately 300 hourly DC Employees qualify for the DC PRIDE Plans. The Debtors pay approximately $8,900 in the aggregate per week on account of the DC PRIDE Plans. For the Debtors' 2016 Fiscal Year, they paid approximately $463,000 on account of the DC PRIDE Plans. As of the Petition Date, the Debtors believe they owe

approximately $13,000 on account of the DC PRIDE Plans, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the DC PRIDE Plans and to continue paying obligations under the DC PRIDE Plans on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, in each case upon entry of the Final Order. The Debtors do not propose to make any payment on account of the DC PRIDE Plans to Insiders.

**F. Canada Additional Compensation Opportunities**

58. The Debtors have three additional compensation programs for Canada Employees (the "Canada Additional Compensation Opportunities"):

- the Non-Insider Annual Incentive Plan (as defined above) for Canada Employees;
- the Store Leader Extreme Rewards Incentive Program (as defined above) for Canada Store Leaders; and
- the Group Leader Extreme Rewards Incentive Program (as defined above) for Canada Group Leaders.

59. Each of these programs is an integral part of the Debtors' Canada Employee Compensation and Benefits. By this Motion, the Debtors are not seeking to make any payments to Insiders under any of the Canada Additional Compensation Opportunities.[14]

**1. Canada Non-Insider Annual Incentive Plan**

60. Approximately 12 Canada Employees are eligible to participate in the Non-Insider Annual Incentive Plan (as described above) (the "Canada Non-Insider Annual Incentive Plan"). For the Debtor's 2017 Fiscal Year, the target payout for all eligible Canada

[14] To the extent the Debtors propose to make prepetition payments to any potential Insiders under a Canada Additional Compensation Program, the Debtors will seek separate approval from the Court with respect to such payments or Additional Compensation Programs.

Employees under the Canada Non-Insider Annual Incentive Plan is approximately $235,000. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Canada Non-Insider Annual Incentive Plan to eligible Canada Employees. By this Motion, the Debtors request authorization to pay obligations under the Canada Non-Insider Annual Incentive Plan on a postpetition basis in the ordinary course of business upon entry of the Final Order. As previously indicated, the Debtors do not propose to make any payment on account of the Canada Non-Insider Annual Incentive Plan to Insiders.

**2. Canada Store Leader Extreme Rewards Incentive Program and Canada Group Leader Incentive Program**

61. Store Leaders and Group Leaders employed in Canada (the "Canada Store Leaders," and "Canada Group Leaders," respectively) also qualify for the Store Leader Extreme Rewards Incentive Program (described above) (the "Canada Store Leader Extreme Rewards Incentive Program") and the Group Leader Incentive Program (described above) (the "Canada Group Leader Incentive Program"). As of the Petition Date, approximately 205 Canada Store Leaders and 15 Canada Group Leaders qualify to participate in the Canada Store Leader Extreme Rewards Incentive Program and Canada Group Leader Incentive Program, respectively.

62. The Debtors are currently unable to quantify amounts due on account of the Canada Store Leader Extreme Rewards Incentive Program and the Canada Group Leader Incentive Program for the first quarter of the Debtors' 2017 Fiscal Year, as such incentive awards will not be determined until the completion of that quarter (*i.e.*, April 30, 2017). Based on the Debtors' projections, however, awards under the Canada Store Leader Extreme Rewards Incentive Program and the Canada Group Leader Incentive Program are unlikely to exceed approximately $190,000 and $35,500 on account of the programs, respectively. No prepetition

amounts will become due and owing in the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to continue paying obligations under the Canada Store Leader Extreme Rewards Incentive Program and the Canada Group Leader Incentive Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices upon entry of the Final Order. To be sure, the Debtors do not propose to make any payment on account of the Canada Store Leader Extreme Rewards Incentive Program and the Canada Group Leader Incentive Program to Insiders.

### G. Asia Additional Compensation Opportunities

63. The Debtors have two additional compensation programs for Asia Employees (the "Asia Additional Compensation Opportunities," and, collectively with the U.S. Additional Compensation Opportunities and Canada Additional Compensation Opportunities, the "Additional Compensation Opportunities"):

- the Non-Insider Annual Incentive Plan (as defined above) for Asia Employees; and
- the Asia Holiday Bonuses (as defined below).

64. Each of these programs is an integral part of the Debtors' Asia Employee Compensation and Benefits. By this Motion, the Debtors are not seeking to make any payments to insiders ("Insiders")[15] under any of the Asia Additional Compensation Programs.[16]

#### 1. Asia Non-Insider Annual Incentive Plan

65. All 27 Asia Employees are eligible to participate in the Non-Insider Annual Incentive Plan (described above) (the "Asia Non-Insider Annual Incentive Plan"). For the

[15] The term Insiders shall have the meaning set forth in 11 U.S.C. § 101(31).

[16] To the extent the Debtors propose to make prepetition payments to any potential Insiders under an Asia Additional Compensation Program, the Debtors will seek separate approval from the Court with respect to such payments or Additional Compensation Programs.

Debtor's 2017 Fiscal Year, the target payout for all Asia Employees under the Asia Non-Insider Annual Incentive Plan is approximately $115,000. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Asia Non-Insider Annual Incentive Plan to eligible Asia Employees. By this Motion, the Debtors request authorization to pay obligations under the Asia Non-Insider Annual Incentive Plan on a postpetition basis in the ordinary course of business upon entry of the Final Order. As previously indicated, the Debtors do not propose to make any payment on account of the Asia Non-Insider Annual Incentive Plan to Insiders.

**2. Asia Employee Holiday Bonuses**

66. All Asia Employees are also eligible for two separate holiday bonuses, one for New Year's ("New Year Bonuses") and the other for the Mid-Autumn Festival ("Mid-Autumn Festival Bonuses," and, together with the New Year Bonuses, the "Asia Employee Holiday Bonuses"). The New Year Bonuses are paid on December 31st of each calendar year to all then-currently employed Asia Employees in an amount equal to one-month's salary, or, if an eligible Asia Employee has not worked for the Debtors for the full calendar year, the applicable New Year's Bonus is prorated. The Mid-Autumn Festival Bonuses are paid each year to all Asia Employees employed by the Debtors at the end of the Mid-Autumn Festival (typically late-September). The Mid-Autumn bonuses generally amount to approximately $33.

67. As of the Petition Date, the Debtors believe they owe approximately $65,000 on account of the Asia Employee Holiday Bonus Opportunities, none of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts on account of the Asia Employee Holiday Bonus Opportunities in the ordinary course of business and consistent with past practice, and to continue paying Asia Employee Holiday Bonus Opportunities on a postpetition basis in

the ordinary course of business. To be sure, the Debtors do not propose to make any payment on account of the Asia Employee Holiday Bonus Opportunities to Insiders.

## II. Employee Benefits and Supplemental Benefits Programs

### A. U.S. Employee Benefits Programs

#### 1. U.S. Health and Welfare Programs

68. The Debtors offer a comprehensive employee benefits package to eligible U.S. Employees for medical, dental, prescription, and vision care coverage and certain other welfare benefits, including Health Savings Accounts, Flexible Spending Accounts, Life and AD&D Insurance Benefits, Disability Benefits, Workers' Compensation Benefits, Business Travel Insurance, and a 401(k) Plan (collectively, the "U.S. Health and Welfare Programs").

69. The Debtors offer Full-Time U.S. Employees the opportunity to participate in a variety of health benefit plans, including the medical plans, dental plans, prescription coverage plans, and the vision plans (collectively, the "U.S. Health Benefits"). The Debtors do not offer the U.S. Health and Welfare Programs for Part-Time U.S. Employees.[17] The U.S. Health Benefits are customary for similarly-sized companies and the Full-Time U.S. Employees and their dependents have come to rely on the U.S. Health Benefits. Without the U.S. Health Benefits, the Full-Time U.S. Employees would be forced to obtain potentially expensive out-of-pocket insurance coverage, which would likely adversely affect Full-Time U.S. Employee morale and retention. By this Motion, the Debtors request authorization to pay or remit all outstanding prepetition amounts incurred on account of the U.S. Health Benefits and to continue paying the U.S. Health Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

---

[17] It is possible that certain of the Debtors' Part-Time Employees have access to the Health Benefits as a result of the lookback provisions of the Affordable Care Act or where required by state law.

**a. U.S. Health Insurance Plans**

70. The Debtors offer a variety of medical, dental, and vision coverages to both Represented and Non-Represented Full-Time U.S. Employees (collectively, the "U.S. Health Insurance Plans"). The Debtors' medical plans (the "U.S. Medical Plans"), dental plans (the "U.S. Dental Plans"), and vision plans (the "U.S. Vision Plans") for U.S. Employees located in the United States are offered through the Aon Active Health Exchange (the "AAHE"), which is an online insurance marketplace where Full-Time U.S. Employees can shop for coverage from multiple insurance carriers. The Debtors' prescription drug coverage is embedded in the U.S. Medical Plans. Through the AAHE, Full-Time U.S. Employees are given the opportunity to choose from several plan levels, a variety of insurance carriers, and a range of costs. Based on the marketplace nature of the AAHE, coverage options for Full-Time U.S. Employees vary depending on geographical location.

71. All of the Debtors' U.S. Health Insurance Plans through the AAHE are fully-insured products. Fully-insured health plans for the Debtors' U.S. Employees in Puerto Rico, Virgin Islands, Guam, and Saipan are not offered through the AAHE.[18] Instead, health plans for these U.S. Employees are offered by the Debtors through arrangements with individual insurance carriers in those specific geographies with similar premium-sharing arrangements.[19]

72. The Debtors and the participating Full-Time U.S. Employees share in the cost of premiums for the U.S. Medical and U.S. Dental Plans, with the Debtors paying a fixed amount based on geographic area and coverage tier (single, family, etc.) and the participating Full-Time U.S. Employee paying (through payroll deduction) the remainder, which amount varies

[18] Employee benefits programs for the Debtors' Employees in Asia are discussed separately in this Motion below.

[19] The Debtors also offer fully-insured Health Plans to eligible Full-Time Employees on expatriate assignments outside the U.S. (currently two). Such Employees may elect to participate in a Cigna International plan specifically designed for this purpose.

depending on the type of plan selected, geographic area, and coverage tier. U.S. Vision Plan premiums are fully paid by the participating Full-Time U.S. Employee through payroll deduction. On average, the Debtors pay approximately $1.7 million per month on account of the U.S. Health Insurance Plans, in addition to premiums paid on behalf of participating U.S. Employees pursuant to the U.S. Withholding Obligations described above.

73. As of the Petition Date, the Debtors believe they owed approximately $1.7 million on account of their portion of the premiums with respect to U.S. Health Insurance Plans to cover all premiums for the U.S. Health Insurance Plans, all of which may become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Health Insurance Plans, and to continue paying premiums for the U.S. Health Insurance Plans on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

**b. Health Savings Accounts**

74. Eligible Full-Time U.S. Employees who participate in a high-deductible U.S. Health Plan through the AAHE may also contribute a portion of their U.S. Employee Compensation into a health savings account (the "HSA"), administered by Aon Hewitt and its affiliates ("Aon") (the "HSA Program"). Part-Time U.S. Employees are not eligible for the HSA Program. Full-Time U.S. Employees may make pre-tax contributions (collectively, the "HSA Deductions") to their HSA through payroll deductions to cover qualified health expenses up to the maximum amount permitted by the Internal Revenue Service. The Debtors pay Aon a monthly administration fee of approximately $2,500 (the "HSA Administration Fee") depending on the level of participation by the Debtors' U.S. Employees. Currently, approximately 470 Full-Time U.S. Employees contribute to a Debtor-sponsored HSA, and on average, the Debtors deduct approximately $71,000 in the aggregate from Full-Time U.S. Employees' Employee

Compensation on account of Full-Time U.S. Employee contributions to their respective HSAs on a monthly basis (the "Employee HSA Deductions").

75. As of the Petition Date, the Debtors believe they owe approximately $5,000 on account of the HSA Administration Fee, all of which will become due and owing within the first 21 days of these chapter 11 cases. Amounts to be paid with respect to the Employee HSA Deductions are contained in the projections for Withholding Obligations discussed above. By this Motion, the Debtors request authorization to remit any prepetition amounts outstanding under the HSA Program to the extent necessary and continue honoring their obligations under the HSA Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**c. Flexible Spending Accounts**

76. To allow Full-Time U.S. Employees to set aside pre-tax income to be used for qualified expenses, the Debtors provide Full-Time U.S. Employees with a number of flexible spending (reimbursement) account options (the "FSA Programs") through payroll deductions, which include: (a) a flexible spending account for health care (the "Healthcare Flexible Spending Account") to pay qualified health care expenses; (b) a limited flexible spending account for health care (the "Limited Purpose Flexible Spending Account") to pay for qualified healthcare expenses; and (c) a flexible spending account to pay for qualified expenses related to care for eligible dependents (the "Dependent-Care Flexible Spending Account," and together with the Health Care Flexible Spending Account and the Limited Purpose Flexible Spending Account, the "FSAs"). The Debtors do not offer FSAs to Part-Time U.S. Employees. The FSA Programs are administered by Aon for a monthly fee of approximately $4,800, depending on participation rates by eligible U.S. Employees, which is paid by the Debtors (the "FSA

Administration Fee").[20] Currently, approximately 850 Full-Time U.S. Employees contribute to the FSAs. On average, the Debtors deduct, in the aggregate, approximately $53,000 from Full-Time U.S. Employees' Employee Compensation on account of Full-Time U.S. Employee contributions to their respective FSAs on a monthly basis (the "Employee FSA Deductions").

77. As of the Petition Date, the Debtors believe they owe approximately $10,000 on account of the FSA Administration Fee, all of which will become due and owing within the first 21 days of these chapter 11 cases. Amounts to be paid with respect to the Employee FSA Deductions are contained in the projections for Withholding Obligations discussed above. By this Motion, the Debtors request authorization to remit any prepetition amounts outstanding under the FSA Programs to the extent necessary and continue honoring their obligations under the FSA Programs on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**d. COBRA**

78. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain former Full-Time U.S. Employees of the Debtors (the "COBRA Participants") may continue insurance coverage under the Medical Plan, Dental Plan, Vision Plan, and HSA and certain FSA Programs (the "COBRA Benefits"). More specifically, COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment. Approximately 15 COBRA Participants per COBRA Benefit elect to continue coverage through COBRA. COBRA Participants are responsible for paying all premium costs associated with the COBRA Benefits.

[20] The approximately $4,800 paid to Aon each month is inclusive of administration fees paid in connection with the Commuter Benefits Program described below.

79. The Debtors use COBRAGuard to assist in the administration of the COBRA Benefits, including but not limited to all required notifications, collection of premiums, coordination of enrollment information with the AAHE insurers, and customer service and support for COBRA Participants. On average, the Debtors pay COBRAGuard administrative fees of approximately $2,200 monthly for these services.

80. As of the Petition Date, the Debtors estimate that they owe approximately $2,200 for prepetition administrative service fees to COBRAGuard. The Debtors request the authority to (a) pay all outstanding prepetition amounts incurred on account of the COBRA Benefits, upon entry of the Final Order, (b) continue to offer the COBRA Benefits, including to those U.S. Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis in the ordinary course of business and consistent with their prepetition practices, and (c) continue to pay fees related to the COBRA Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**e. U.S. Life and AD&D Insurance**

81. The Debtors offer life and accidental death and dismemberment insurance coverage (collectively, the "U.S. Basic Life and AD&D Insurance") to eligible Full- and Part-Time U.S. Employees, which provides benefits up to one times such U.S. Employees' covered pay. Full-Time U.S. Employees also have the option to purchase additional life insurance up to an amount equal to four times a Full-Time U.S. Employee's total annual earnings (the "U.S. Optional Life Insurance"). The maximum coverage for U.S. Employees is $1 million under both the U.S. Basic Life & AD&D Insurance and the U.S. Optional Life Insurance. The U.S. Basic and U.S. Optional Life and AD&D Insurance are fully insured products through

Cigna. The Debtors pay approximately $26,000 per month with respect to their portion of the premiums for the U.S. Basic Life and AD&D Insurance.

82. As of the Petition Date, the Debtors estimate that they owe approximately $52,000 on account of accrued and unpaid premiums for the U.S. Basic Life and AD&D Insurance, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the U.S. Basic Life and AD&D Insurance, and to continue honoring their obligations under the U.S. Basic Life and AD&D Insurance on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**f. U.S. Disability Benefits**

83. The Debtors provide Full-Time U.S. Employees with both short-term disability benefits (the "U.S. Short-Term Disability Benefits") and long-term disability benefits (the "U.S. Long-Term Disability Benefits," and together with the U.S. Short-Term Disability Benefits, collectively, the "U.S. Disability Benefits"). Under the U.S. Short-Term Disability Benefits program, eligible Full-Time U.S. Employees are entitled to, among other things, continuation of 60 percent of their weekly base-wages for the first 13 weeks of their covered disability, including a 14 calendar day elimination period. Full-Time Retail Employee U.S. Short-Term Disability premiums are paid in full by eligible Full-Time Retail Employees. U.S. Short-Term Disability Benefits for Full-Time Corporate Employees are self-insured by the Debtors with benefits being fully funded. U.S. Short-Term Disability Benefits for Full-Time DC Employees, in turn, are fully-insured, with benefits being paid by Cigna and premiums being fully-funded by the Debtors.

84. Following the period of the U.S. Short-Term Disability Benefits, Full-Time U.S. Employees are eligible to receive U.S. Long-Term Disability Benefits, which are offered through Cigna. Under the U.S. Long-Term Disability Benefits program, eligible Full-Time U.S. Employees are entitled to receive 60 percent of their monthly wages, up to a monthly maximum of $20,000 for exempt U.S. Employees and $3,000 for non-exempt U.S. Employees. The U.S. Long-Term Disability Benefits begin after a Full-Time U.S. Employee is absent from work for 90 consecutive days following a covered disability and continue for an initial period of two years, which can be extended if such Full-Time U.S. Employee's disability deems the Full-Time U.S. Employee unable to perform any occupation for which the Full-Time U.S. Employee is qualified by education, training, or experience.

85. If a Full-Time U.S. Employee is eligible, U.S. Long-Term Disability Benefits continue indefinitely, but are reduced by other income sources, including Social Security and U.S. Workers' Compensation. U.S. Long-Term Disability Benefits are voluntary and fully paid by participating Full-Time U.S. Employees, but the Debtors do partially fund U.S. Long-Term Disability Benefits for select Corporate Employees. The Debtors pay Cigna approximately $8,000 per month in premiums with respect to the U.S. Long-Term Disability Benefits.

86. As of the Petition Date, the Debtors: (a) believe that they owe approximately $35,000 on account of the U.S. Short-Term Disability Benefits and premiums, all of which will become due and owing within the first 21 days of these chapter 11 cases and (b) believe they owe approximately $16,000 on account of the U.S. Long-Term Disability Benefits and premiums accruing as of the Petition Date, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the U.S. Disability Benefits, and to continue

honoring their obligations on account of the U.S. Disability Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

### g. U.S. Workers' Compensation Program[21]

87. The Debtors maintain workers' compensation insurance for U.S. Employees at the levels required by law in the states and territories in which the Debtors operate (the "U.S. Workers' Compensation Program"). Currently, the Debtors maintain coverage under the U.S. Workers' Compensation Program for U.S. Employees in the United States, Guam, and Saipan through Zurich American Insurance Company ("Zurich") and Pacific Indemnity Insurance Company ("Pacific," and together with Zurich, the "U.S. Workers' Compensation Policies"), each of which is is administered by Gallagher Basset ("Gallagher Basset").

88. Premiums on account of the U.S. Workers' Compensation Policies are paid in advance on an annual basis and depend substantially on the Debtors' payroll, the Debtors' risk profile (claims history), and the U.S. Employee's workers' compensation classification. The Debtors paid approximately $575,000 in premiums for 2016 on account of the U.S. Workers' Compensation Policies. The U.S. Workers' Compensation Policies are subject to a per-claim deductible in the amount of $1.0 million, and the Debtors paid approximately $6.0 million for 2016 on account of such deductibles. The U.S. Workers' Compensation Premiums are then subject to adjustment following an audit of the Debtors' actual payroll for the applicable policy year.

89. Additionally, the Debtors do business in certain states and territories that require workers' compensation insurance be purchased through their state/territorial workers'

---

[21] Contemporaneously herewith, the Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Supplement, or Purchase Insurance Policies* (the "Insurance Motion") in which the Debtors are not seeking relief related to workers' compensation.

compensation programs (the "State Coverage Policies"). An overview of the State Coverage Policies follows:

- **Wyoming.** Specifically, coverage under the U.S. Workers' Compensation Program for U.S. Employees in Wyoming is maintained through the Wyoming Department of Workforce Services, for which the Debtors pay approximately $4,500 each year in the aggregate.

- **North Dakota.** Coverage under the U.S. Workers' Compensation Program for U.S. Employees in North Dakota is maintained through North Dakota Workforce Safety and Insurance, for which the Debtors pay approximately $6,000 each year in the aggregate.

- **Washington.** Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Washington is maintained through the Washington State Department of Labor and Industries, for which the Debtors pay approximately $175,000 each year in the aggregate.

- **Ohio.** Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Ohio is through Ohio Bureau of Workers' Compensation, for which the Debtors pay approximately $550,000 each year in the aggregate. In Ohio, there is a $10,000 deductible for stores and a $100,000 deductible for the Debtors' distribution center.

- **Virgin Islands.** Coverage under the U.S. Workers' Compensation Program for U.S. Employees in the Virgin Islands is maintained through the Virgin Islands Department of Labor, Division of Workers' Compensation, for which the Debtors pay approximately $8,200 each year in the aggregate.

- **Puerto Rico.** Coverage under the U.S. Workers' Compensation Program for U.S. Employees in Puerto Rico is maintained through Corporación del Fondo del Seguro del Estado, for which the Debtors pay approximately $132,000 each year in the aggregate.

90. The Debtors make payments on account of State Coverage Policies on a yearly, quarterly, or bi-monthly basis. The Debtors do not yet know the precise amounts that will be owed on account of the State Coverage Policies until such time as the next assessment is received from the applicable state or territory.

91. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the U.S. Workers' Compensation Program without regard to

whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[22] Currently, there are approximately 260 open claims under the U.S. Workers' Compensation Program that must be addressed in this fashion.

92. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their statutory and contractual obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the U.S. Workers' Compensation Program during these chapter 11 cases. In addition, to the extent any U.S. Employees assert claims arising under the U.S. Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the U.S. Employees to proceed with their claims under the U.S. Workers' Compensation Program.

93. Because the Debtors are statutorily and/or contractually obligated to maintain the U.S. Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process. Thus, the Debtors request authority to (a) pay all outstanding prepetition amounts incurred on account of the U.S. Workers' Compensation Program and the State Coverage Policies, (b) maintain the U.S. Workers' Compensation Program and continue to honor their obligations thereunder on a postpetition basis in the ordinary course of business and consistent with past practices, and (c) modify the automatic stay to allow U.S. Employees to assert claims under the U.S. Workers' Compensation Program to the extent applicable.

---

22 The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

**h. Business Travel Insurance**

94. The Debtors provide various benefits to U.S. Employees who are injured or experience a medical emergency while traveling on a company-paid and/or approved business or relocation trip. Specifically, the Debtors contract with Chubb Corporation and International SOS (collectively, the "Business Travel Insurers") to provide all U.S. Employees with business travel accident insurance (the "Business Travel Insurance"). Business Travel Insurance is provided by the Debtors to U.S. Employees at no cost to the U.S. Employees and provides coverage of up to three times the U.S. Employee's annual salary, up to a maximum amount of $3 million (and provides coverage of up to $150,000 for a spouse or $10,000 for any child traveling with the U.S. Employee on an approved business trip), as well as related travel accident and medical insurance.

95. The Debtors pay approximately $91,000 per year to the Business Travel Insurers for fees related to the Business Travel Insurance (the "Business Travel Insurance Fees"). As of the Petition Date, the Debtors do not believe they owe any Business Travel Insurance Fees. However, out of an abundance of caution, by this Motion, the Debtors request authority to pay any outstanding prepetition Business Travel Insurance Fees upon entry of the Final Order and to continue paying the Business Travel Insurance Fees on a postposition basis in the ordinary course of business and consistent with their prepetition practices.

**i. 401(k) Plan**

96. The Debtors provide eligible Part-Time and Full-Time U.S. Employees with the ability to participate in a 401(k) defined contribution plan (the "401(k) Plans"). U.S. Employees become eligible to participate in the 401(k) Plan, as a contributor, upon the date of hire subject to certain minimum age requirements. The 401(k) Plan generally provides for deductions of compensation up to limits set by the Internal Revenue Code and consistent with certain plan limit

pre- and post-tax contribution deduction percentages. Each U.S. Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and thereafter transferred by the Debtor to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). Amounts to be remitted by the Debtors as of the Petition Date are included in the projections for Withholding Obligations discussed above.

97. The Debtors match the U.S. Employees' 401(k) Plan contributions on a discretionary dollar-for-dollar basis up to 2.5% of the Debtors' net pre-tax profits to the 401(k) Plans on up to 5% of a participating Full-Time U.S. Employee's pay (the "401(k) Matching Contributions"). Due to the Debtors' recent financial hardships, however, the Debtors have not made any 401(k) Matching Contributions for the 2015 and 2016 plan years.

98. The 401(k) Plans are currently administered by Wells Fargo Bank, N.A. and certain of its affiliates ("Wells Fargo"). The 401(k) Plans also incur annual costs associated with Wells Fargo's administration of the 401(k) Plans (the "401(k) Administrative Fees"), but such costs are borne directly by the U.S. Employees and charged to the U.S. Employee's account through the trust established for the U.S. Employees participating in the 401(k) Plans. The Debtors are not directly responsible for such amounts. The Debtors do pay certain trust fees to Banco Popular with respect to 401(k)'s offered to U.S. Employees in Puerto Rico as well as certain settlor function fees related to the 401(k) Plans, from time to time as incurred.

99. Many U.S. Employees' retirement savings solely consists of their 401(k) Plan. As such, the Debtors believe that continuing the 401(k) Plans and the 401(k) Matching Contributions are essential to maintaining U.S. Employee morale and protecting U.S. Employees expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in a trust by the Debtors and are not property of their estates. Therefore, the Debtors request the

authority to (a) pay all outstanding prepetition amounts incurred on account of the 401(k) Plans, (b) remit any unpaid prepetition 401(k) Deductions, and (c) to continue honoring their obligations related to the 401(k) Plans and 401(k) Matching Contributions, to the extent such obligations arise, on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**2. U.S. Time-Off Benefits**

100. The Debtors offer several paid and unpaid time-off benefits for U.S. Full-Time Corporate and Retail Employees, including Vacation Time, Sick Leave, Personal/Community Service Days, Paid Time Off, Leave of Absence Benefits, and Other Paid Leave (each as defined below, and collectively, the "U.S. Time-Off Benefits"), which U.S. Time-Off Benefits increase based on an U.S. Employee's tenure with the Debtors. DC Employees receive Paid Time Off ("PTO") benefits in lieu of separate Vacation Time, Sick Leave, and Personal/Community Service Days.

101. As of the Petition Date, the Debtors believe they owe approximately $4.5 million on account of accrued but unpaid U.S. Time-Off Benefits, the majority of which will not become due unless a U.S. Employee eligible for such U.S. Time-Off Benefit is terminated. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the U.S. Time-Off Benefits (each as defined more fully below), and to continue paying the U.S. Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**a. U.S. Represented Employee Vacation Time**

102. In the ordinary course of business, the Debtors provide Represented Employees with vacation time ("U.S. Represented Employee Vacation Time"). Represented Employees accrue between one and four weeks of U.S. Represented Employee Vacation Time per year

depending on their length of service with the Debtors. For those Represented Employees covered under the UFCW Local 655 CBA, unused U.S. Represented Employee Vacation Time is paid out to such Represented Employee no later than 30 days after the conclusion of the Represented Employees anniversary year. For those Represented Employees that have been employed by the Debtors for more than one year and are covered under the UFCW Local 536 CBA, such Represented Employees are entitled to be paid for any accrued, but unused, Vacation Time at the time of the Represented Employee's termination. As of the Petition Date, the Debtors estimate their current cash obligations for U.S. Represented Employee Vacation Time is approximately $25,000 (the "U.S. Represented Employee Accrued Vacation Time").

**b. U.S. Represented Employee Sick Leave**

103. In the ordinary course of business, the Debtors provide Represented Employees covered under the local UFCW 536 CBA with sick leave ("Sick Leave"). Such Represented Employees accrue three or six days of Sick Leave per year depending on their length of service with the Debtors. Such Represented Employees are entitled to be paid for any accrued, but unused, Sick Leave at the end of each year of employment. As of the Petition Date, the Debtors estimate their current cash obligations for Sick Leave for Represented Employees is approximately $2,000 (the "U.S. Represented Employee Accrued Sick Leave").

**c. U.S. Represented Employee Paid Time Off**

104. In the ordinary course of business, the Debtors provide Represented Employees covered under the local UFCW 655 CBA with PTO. Such Represented Employees receive three PTO days (for Part-Time Represented Employees) or eight PTO days (for Full-Time Represented Employees) per calendar year. Such Represented Employees are entitled to be paid for a maximum of three days of unused PTO at the end of the calendar year, with any remaining

days being forfeited. Upon termination, all unused PTO days are forfeited. As of the Petition Date, the Debtors have no current cash obligations for PTO for Represented Employees.

**d. DC Full-Time Employee Paid Time Off**

105. In the ordinary course of business, the Debtors provide DC Full-time Employees with PTO in lieu of vacation time, sick leave, and personal/community service days. PTO is accrued on a monthly basis, with such amounts of PTO being dependent on the eligible Employee's tenure with the Debtor. Upon termination, all accrued, but unused PTO is paid out to Employees. As of the Petition Date, the Debtors estimate their current cash obligations for PTO for DC Full-time Employees is approximately $470,000.

**e. U.S. Non-Represented Employee Vacation Time**

106. The Debtors also provide vacation time for Corporate Employees and non-represented Full-Time Retail Employees ("U.S. Non-Represented Employee Vacation Time"). Eligible Employees accrue up to four weeks of U.S. Non-Represented Employee Vacation Time per year depending on the amount of time such U.S. Employees have worked for the Debtors. U.S. Employees who leave the Debtors with accrued, but unused, U.S. Non-Represented Employee Vacation Time are entitled to a cash payment equal to such unused U.S. Non-Represented Employee Vacation Time. As of the Petition Date, the Debtors estimate their current cash obligations for U.S. Non-Represented Employee Vacation Time is approximately $4.0 million (the "U.S. Non-Represented Employee Accrued Vacation Time").

**f. U.S. Non-Represented Employee Sick Leave**

107. In the ordinary course of business, the Debtors provide sick-days ("U.S. Non-Represented Employee Sick Leave") to Non-Represented Corporate and Full-Time Retail Employees as a U.S. Time-Off Benefit. Full-time U.S. Employees are allotted up to six days of U.S. Non-Represented Employee Sick Leave, and certain Part-Time U.S. Employees

(excluding Part-Time Retail Employees) are allotted U.S. Non-Represented Employee Sick Leave of up to three days, with such amounts of U.S. Non-Represented Employee Sick Leave being dependent on a U.S. Employee's tenure with the Debtors. U.S. Non-Represented Employee Sick Leave is accrued on a monthly basis and may be used for personal illness, wellness and healthcare appointments, and for similar leave for U.S. Employees' immediate family members. Non-Represented Employees who are terminated or resign are not entitled to a cash payment in lieu of the accrued but unused U.S. Non-Represented Employee Sick Leave. If a U.S. Employee is absent for more than one work week as a result of illness, such U.S. Employee must apply for a U.S. Non-Represented Employee Leave of Absence (described more fully below).

**g. Non-Represented Employee Personal/Community Service Days**

108. In the ordinary course of business, the Debtors provide personal/community service days ("U.S. Non-Represented Personal/Community Service Days") to the U.S. Non-Represented Employees as a U.S. Time-Off Benefit. Full-time Retail Employees are allotted up to thirteen U.S. Non-Represented Employee Personal/Community Service Days, and Full-Time Corporate Employees, are allotted up to seven U.S. Non-Represented Employee Personal/Community Service Days. U.S. Non-Represented Employee Personal/Community Service Days are prorated if a U.S. Employee begins work for the Debtors mid-year. U.S. Non-Represented Employee Personal/Community Service Days can be used for any purpose, including volunteer or community service commitments as well as additional days off. U.S. Employees who are terminated or resign are not entitled to a cash payment in lieu of the accrued but unused U.S. Non-Represented Employee Personal/Community Service Days.

**h. Medical Leave of Absence Benefits**

109. In the ordinary course of business, the Debtors provide medical leave of absence benefits ("U.S. Medical Leave of Absence Benefits") to eligible U.S. Employees to cover extended illnesses, injuries, maternity leave, and other family needs. The Debtors also provide eligible U.S. Employees with personal leave of absence benefits ("U.S. Personal Leave of Absence Benefits," and together with U.S. Medical Leave of Absence Benefits, the "U.S. Leave of Absence Benefits"). Whether a U.S. Employee is entitled to U.S. Leave of Absence Benefits is handled by the Debtors on a case-by-case basis.

**i. Other Paid Leave**

110. The Debtors also permit all of their Full-Time U.S. Employees to take certain other paid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Full-Time U.S. Employees for certain missed work time in the ordinary course of business for bereavement leave and jury duty or court attendance (the "U.S. Other Paid Leave"). Full-Time U.S. Employees are not entitled to any separate cash payments in addition to their normal compensation for the U.S. Other Paid Leave.

**3. Non-Insider U.S. Severance Programs**

111. In the ordinary course of business the Debtors maintain a variety of severance programs to non-Insider U.S. Employees[23] in the event of a termination by the Debtors that is not for "cause" (the "Non-Insider U.S. Severance Programs"). Under the Non-Insider U.S.

[23] The Debtors believe that none of the Employees proposed to be paid on account of the Non-Insider U.S. Severance Program are Insiders of the Debtors for purposes of section 503(c) of the Bankruptcy Code. To wit, none of the Employees: (a) participate in the management of the Debtors; (b) have decision making authority with respect to policies of the Debtors; (c) report directly to the Debtors' Board of Directors; (d) were appointed by the Debtors' Board of Directors; (e) qualify as an Insider pursuant to Rule 16a-1(f) of the Securities Exchange Act; (f) undertake budget control over the Debtors' business operations; (g) are compensated in the form of equity in the Debtors; and (h) are relatives of any Insider of the Debtors. As with the Additional Compensation Programs, to the extent the Debtors propose to make a severance payment to, or implement a severance program for, any Insiders, the Debtors will seek separate approval from the Court with respect to such payments or programs.

Severance Program, U.S. Employees receive, upon termination, severance in the form of either a lump-sum payment or continuation of salary depending on the former U.S. Employee's salary, seniority, and tenure at the Debtors at the time of termination. A brief breakdown of the Non-Insider U.S. Severance Programs follows:

1. **Corporate/Distribution Center Employees**

   a. **Vice President-level Employees** — Severance for U.S. Employees at this level is governed by individual employment agreements. In certain instances, employment agreements call for lump-sum payments. In others, U.S. Employees receive a continuation of salary.

   b. **Department Director-level Employees** — U.S. Employees at this level receive a minimum severance benefit of 12 weeks of continuation of salary and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

   c. **Manager-level Employees** — U.S. Employees at this level receive a minimum severance benefit of eight weeks of continuation of salary and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

   d. **Other Exempt-level Employees** — U.S. Employees at this level receive a minimum severance benefit of six weeks of continuation of salary and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

   e. **Nonexempt Employees** — U.S. Employees at this level receive a minimum severance benefit of two weeks of continuation of salary and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

2. **Store Level Employees**

   a. **Store Leaders** — U.S. Employees at this level receive a minimum severance benefit of eight weeks of continuation of salary if the termination is the result of a reduction in force and six weeks of continuation of salary if their termination is the result of a store

closure. The maximum continuation of salary benefit for U.S. Employees at this level is one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

b. **Full-Time Associates** — U.S. Employees at this level receive a minimum severance benefit of one week regardless of whether their termination is the result of a reduction in force or store closure and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

c. **Part-Time Associates** — U.S. Employees at this level receive a minimum severance benefit of one week regardless of whether their termination is the result of a reduction in force or store closure and a maximum continuation of salary benefit of one week per year of employment if such U.S. Employee's total service exceeds the state minimum severance benefit.

112. Upon the later of the lump-sum severance payment or the end of the salary continuation period, participants in the Non-Insider U.S. Severance Program are eligible to enroll in health benefit continuation coverage through the COBRA benefits discussed above. Additionally, the Non-Insider U.S. Severance Programs entitle eligible former Corporate Employees to receive career transition services through Right Management ranging from a single workshop to a six-month program, depending on such eligible Corporate Employees' position. The cost of this service ranges from $400 to $3,500 per eligible former U.S. Employee. While not every eligible former U.S. Employee opts to take advantage of this benefit, the Debtors estimate that they will spend approximately $50,000 on account of career transition services over the next two months.

113. The Debtors believe that the Non-Insider U.S. Severance Program has been critical to maintaining U.S. Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. Furthermore, as a

condition to receiving benefits under the Non-Insider U.S. Severance Program, the Debtors typically require that each eligible former U.S. Employee execute a release agreement, whereby the eligible former U.S. Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider U.S. Severance Program will help reduce the time and expense that could arise in the absence of the Non-Insider U.S. Severance Program to defend the assertion of claims by any severed U.S. Employees.

114. The Debtors spent approximately $2 million in the aggregate on account of the Non-Insider U.S. Severance Program from November 2016 up to the Petition Date. As of the Petition Date, the Debtors estimate that there is approximately $1.8 million in unpaid obligations under the Non-Insider U.S. Severance Program. The Debtors seek to pay any prepetition amounts and to continue the Non-Insider U.S. Severance Programs in the ordinary course of business and consistent with historical practice. For the avoidance of doubt, the Debtors are only seeking authority to continue the Non-Insider U.S. Severance Program, and will exercise their discretion as to which U.S. Employees receive benefits under such program.

**B. Canada Employee Health and Welfare Benefits**

**1. Canada Extended Health Insurance Programs**

115. The Debtors offer "extended" healthcare coverage (which includes medical, prescription drug, and vision coverage) and dental coverage to Full-Time Canada Employees (collectively, the "Canada Extended Health Plans") through Sun Life Financial ("Sun Life"). The Canada Extended Health Plans serve as a supplement to the already available national healthcare offered in Canada under the Canada Health Act. The Canada Extended Health Plans are fully-insured products. The Debtors work with a third-party broker, Mercer Canada, to benchmark their offerings under the Canada Extended Health Plans and to evaluate premiums,

carriers, and plan designs on an annual basis. Mercer Canada is not paid a direct fee by the Debtors, but instead receives commission from Sun Life.

116. The Debtors and the participating Canada Employees share in the cost of premiums for the Canada Extended Health Plans. On average, the Debtors pay approximately $40,000 per month on account of the Canada Extended Health Plans, in addition to premiums collected from participating Canada Employees pursuant to the Withholding Obligations described above. As of the Petition Date, the Debtors believe they owe approximately $40,000 on account of their portion of the premiums with respect to Canada Extended Health Plans, all of which may become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Extended Health Plans, and to continue paying premiums for the Canada Extended Health Plans on a postpetition basis in the ordinary course of business and consistent with prepetition practices.

**2. Canada Life and AD&D Insurance**

117. The Debtors offer life and accidental death and dismemberment insurance coverage (collectively, the "Canada Basic Life and AD&D Insurance") to eligible Full-Time Canada Employees, which provides benefits up to one times such Canada Employees' covered pay. Part-Time Canada Employees are not eligible for the Canada Basic Life and AD&D Insurance. Full-Time Canada Employees also have the option to purchase additional life insurance up to an amount equal to two times a Full-Time Canada Employee's total annual earnings (the "Canada Optional Life Insurance"). The maximum coverage for Canada Employees is CAD 250,000, or approximately $187,000, under both the Canada Basic Life and the Canada Optional Life Insurance. The maximum coverage does not apply to coverage under the Canada AD&D Insurance. The Canada Basic Life and AD&D Insurance and Canada

Optional Life and AD&D Insurance are fully insured products through Sun Life. The Debtors pay approximately $2,700 per month with respect to their premiums for the Basic Life and AD&D Insurance.

118. As of the Petition Date, the Debtors estimate that they owe approximately $2,700 on account of accrued and unpaid premiums for the Canada Basic Life and AD&D Insurance, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Canada Basic Life and AD&D Insurance, and to continue honoring their obligations under the Canada Basic Life and AD&D Insurance on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**3. Canada Disability Benefits**

119. The Debtors provide Full-Time Canada Corporate Employees and Canada Store Leaders with short-term disability benefits (the "Canada Short-Term Disability Benefits") and long-term disability benefits to all Full-Time Canada Employees (the "Canada Long-Term Disability Benefits," and together with the Short-Term Disability Benefits, collectively, the "Canada Disability Benefits") through Sun Life. Under the Canada Short-Term Disability Benefits, Full-Time Canada Corporate Employees and Canada Store Leaders are entitled to, among other things, continuation of 60 percent of their weekly base Canada Wages for the first 17 weeks of their covered disability, including a seven calendar day elimination period. Canada Short-Term Disability Benefits are fully-insured, with benefits being paid by Sun Life and premiums (the "Canada Short-Term Disability Premiums") being fully-funded by the Debtors.

120. Full-Time Canada Employees are eligible to elect Canada Long-Term Disability Benefits, which are also offered through Sun Life. Under the Canada Long-Term Disability

Benefits, eligible Full-Time Canada Employees are entitled to receive 60 percent of their monthly Canada Wages, up to a monthly maximum of CAD 3,500, or approximately $2,600, or CAD 7,500, or approximately $5,600, based on job classification. The Canada Long-Term Disability Benefits begin after a 120-day waiting period. Canada Long-Term Disability Benefits are voluntary and fully paid by participating Full-Time Canada Employees (approximately 400 Canada Employees as of the Petition Date). The Debtors remit approximately $9,000 per month to Sun Life on account of such electing Canada Employees (the "Canada Long-Term Disability Premiums")

121. As of the Petition Date, the Debtors: (a) believe that they owe approximately $4,500 on account of the Canada Short-Term Disability Premiums, all of which will become due and owing within the first 21 days of these chapter 11 cases and (b) believe they owe approximately $9,000 on account of the Canada Long-Term Disability Premiums as of the Petition Date, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Canada Disability Benefits, and to continue honoring their obligations on account of the Canada Disability Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**4. Canada Workers' Compensation Program**

122. The Debtors maintain workers' compensation insurance for Canada Employees at the levels required by law in the Canadian provinces in which the Debtors operate (the "Canada Workers' Compensation Program"). Similar to the jurisdictions covered by the State Coverage Policies described above, the Canadian provinces in which the Debtors operate are also considered "monopolistic" territories. An overview of the Canada Workers' Compensation Program by province follows:

- **Alberta**. Coverage under the Canada Workers' Compensation Program for Canada Employees in Alberta is maintained through Workers' Compensation Board of Alberta, for which the Debtors pay approximately $26,000 each year in the aggregate.

- **British Columbia**. Coverage under the Canada Workers' Compensation Program for Canada Employees in British Columbia is maintained through Worksafe BC, for which the Debtors pay approximately $52,000 each year in the aggregate.

- **Manitoba**. Coverage under the Workers' Compensation Program for Canada Employees in Manitoba is maintained through Workers' Compensation Board of Manitoba, for which the Debtors pay approximately $3,100 each year in the aggregate.

- **New Brunswick**. Coverage under the Workers' Compensation Program for Canada Employees in New Brunswick is maintained through Worksafe NB, for which the Debtors pay approximately $5,700 each year in the aggregate.

- **Newfoundland**. Coverage under the Workers' Compensation Program for Canada Employees in Newfoundland is maintained through Workplace Health, Safety & Compensation Commission of Newfoundland and Labrador, for which the Debtors pay approximately $3,600 each year in the aggregate.

- **Nova Scotia**. Coverage under the Workers' Compensation Program for Canada Employees in Nova Scotia is maintained through Workers' Compensation Board of Nova Scotia, for which the Debtors pay approximately $14,600 each year in the aggregate.

- **Ontario**. Coverage under the Workers' Compensation Program for Canada Employees in Ontario is maintained through Workplace Safety and Insurance Board, for which the Debtors pay approximately $234,800 each year in the aggregate.

- **Prince Edward Island**. Coverage under the Workers' Compensation Program for Canada Employees in Prince Edward Island is maintained through Workers' Compensation Board of Prince Edward Island, for which the Debtors pay approximately $3,000 each year in the aggregate.

- **Quebec**. Coverage under the Workers' Compensation Program for Canada Employees in Quebec is maintained through Commission des normes, de l'équité, de la santé et de la sécurité du travail (CNESST), for which the Debtors pay approximately $10,000 each year in the aggregate.

- **Saskatchewan.** Coverage under the Workers' Compensation Program for Canada Employees in Saskatchewan is maintained through Saskatchewan Workers' Compensation Board, for which the Debtors pay approximately $9,000 each year in the aggregate.

123. Similar to the U.S. Workers' Compensation Program the Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Canada Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[24] Indeed, for the claims administration process to operate in an efficient manner, and to ensure that the Debtors comply with their statutory and contractual obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the Canada Workers' Compensation Program during these chapter 11 cases. The Debtors also request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Canada Employees to proceed with the claims under the Canada Workers' Compensation Program.

124. Because the Debtors are statutorily and/or contractually obligated to maintain the Canada Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process. Thus, the Debtors request authority to (a) pay all outstanding prepetition amounts incurred on account of the Canada Workers' Compensation Program, (b) maintain the Canada Workers' Compensation Program and continue to honor their obligations thereunder on a postpetition basis in the ordinary course of business and consistent with past practices, and (c) modify the automatic stay

[24] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

to allow Canada Employees to assert claims under the Canada Workers' Compensation Program to the extent applicable.

**5. Canada Business Travel Insurance**

125. Canada Employees who are injured or experience a medical emergency while traveling on a company paid and/or approved business or relocation trip are also covered by Business Travel Insurance (described above) (the "Canada Business Travel Insurance"). All obligations with respect to the Canada Business Travel Insurance are included in the description of the benefit for U.S. Employees.

**6. Registered Retirement Savings Plan**

126. The Debtors provide eligible Part-Time and Full-Time Canada Employees with the ability to participate in a group registered retirement savings plan (the "RRSP Plan"). Canada Employees become eligible to participate in the RRSP Plan, as a contributor, upon completing one year of continuous employment with the Debtors. The RRSP Plan generally provides for deductions of compensation up to limits set by the Income Tax Act (Canada). Each Canada Employee's contributions under the RRSP Plan are deducted automatically from each paycheck and thereafter transferred by the Debtor to a group annuity policy established under the RRSP Plan (collectively, the "RRSP Deductions"). Amounts to be remitted by the Debtors as of the Petition Date are included in the projections for Canada Withholding Obligations discussed above.

127. The Debtors match the Canada Employees' RRSP Plan Deductions at 50% on the first 1% - 5% of a Canada Employees' earnings up to 2.5% of earnings (the "RRSP Matching Contributions"). Contributions are made to eligible Canada Employees' actively employed on December 31 of each calendar year. The RRSP Matching Contributions are typically credited to

eligible Canada Employees' accounts in March of the following calendar year. For the 2016 plan year, the Debtors' matching contribution was approximately $100,000.

128. The RRSP Plans are currently administered by Sun Life. The RRSP Plans also incur annual costs associated with Sun Life's administration of the RRSP Plans (the "RRSP Administrative Fees"), with such costs (approximately $6,000) being borne by the Debtors. As of the Petition Date, the Debtors believe they owe approximately $500 in RRSP Administrative Fees to Sun Life, all of which may become due and owing within the first 21 days of these chapter 11 cases.

129. Many Canada Employees' retirement savings solely consists of their RRSP Plan. As such, the Debtors believe that continuing the RRSP Plans and the RRSP Matching Contributions are essential to maintaining Canada Employee morale and protecting Canada Employees' expectations. In addition, similar to the 401(k) Plan for U.S. Employees described above, the Debtors believe that the RRSP Deductions are generally held in a trust by the Debtors and are not property of their estates. Therefore, the Debtors request the authority to (a) pay all outstanding prepetition amounts incurred on account of the RRSP Plans, (b) remit any unpaid prepetition RRSP Deductions, and (c) to continue honoring their obligations related to the RRSP Plans and RRSP Matching Contributions, to the extent such obligations arise, on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**7. Canada Time-Off Benefits**

130. Canada Employees receive Time-Off Benefits in the form of Vacation Time, Sick Leave, Personal Days, Leaves of Absence and other miscellaneous paid leaves required by law or local custom including marriage, maternity/parental, and funeral leaves (the "Canada Time-Off Benefits"). With the exception of Vacation Time, no Canada Time-Off Benefits are paid out upon termination of a Canada Employee's employment.

131. As of the Petition Date, the Debtors believe they owe approximately $850,000 on account of accrued but unpaid Canada Time-Off Benefits, the majority of which will not become due unless a Canada Employee eligible for such Canada Time-Off Benefit is terminated or leaves the Debtors' employ. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Canada Time-Off Benefits (each as described more fully below), and to continue paying the Canada Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**a. Canada Vacation Time**

132. As required under Canadian law, Canada Employees receive vacation time of up to four weeks per year depending on the amount of time such Canada Employees have worked for the Debtors (the "Canada Vacation Time"). Canada Employees who leave the Debtors with accrued, but unused, Canada Vacation Time are entitled to a cash payment equal to such unused Canada Vacation Time. As of the Petition Date, the Debtors estimate that their current potential cash obligation for Canada Vacation Time is approximately $850,000 (the "Canada Accrued Vacation Time").

**b. Canada Sick Leave**

133. In the ordinary course of business, the Debtors provide Sick Leave (as defined above) to eligible Full-Time Canada Employees as a Canada Time-Off Benefit. Full-time Canada Employees are allotted up to six days of Sick Leave with such amounts being dependent on tenure. Sick Leave is accrued on a monthly basis and may be used for personal illness, wellness and healthcare appointments, and for similar leave for Canada Employees' immediate family members. Canada Employees who are terminated or resign are not entitled to a cash payment in lieu of the accrued but unused Sick Leave. If a Canada

Employee is absent for more than one work week as a result of illness, such Canada Employee must apply for a Leave of Absence (described more fully below).

**c. Canada Personal Days**

134. In the ordinary course of business, the Debtors provide Personal Days (as defined above) to eligible Full-Time Canada Employees as a Canada Time-Off Benefit. Full-time Canada Employees are eligible for six Personal Days each year. Canada Employee Personal Days are prorated if a Canada Employee begins work for the Debtors mid-year. Personal Days can be used for any purpose, including volunteer or community service commitments, as well as for additional days off. Canada Employees who are terminated or resign are not entitled to a cash payment in lieu of accrued but unused Personal Days.

**d. Canada Medical Leave of Absence Benefits**

135. In the ordinary course of business, the Debtors provide eligible Canada Employees with Medical Leave of Absence Benefits (defined above) (the "Canada Medical Leave of Absence Benefits"). Whether a Canada Employee is entitled to Canada Medical Leave of Absence Benefits is handled by the Debtors on a case-by-case basis.

**e. Canada Other Paid Leave**

136. The Debtors also permit all Full-Time Canada Employees to take Other Paid Leave (as defined above) (the "Canada Other Paid Leave"). Full-Time Canada Employees are not entitled to any separate cash payments in addition to their normal compensation for the Canada Other Paid Leave.

**f. Non-Insider Canada Severance Program**

137. Canada Employees are entitled to statutorily required severance under applicable Canadian federal and provincial law if there employment is "severed" (*i.e.*, terminated without cause) (the "Non-Insider Canada Severance Program"). Non-Insider Canada Severance Program

is not payable if a Canada Employee voluntarily resigns or if a Canada Employee is terminated for cause. Additionally, Canada Employees typically have to work for the Debtors for a defined number of years under applicable provincial law before being eligible for the Non-Insider Severance Program. The formula for determining amounts under the Non-Insider Canada Severance Program varies based on how long an eligible Canada Employee has worked for the Debtors.

138. As of the Petition Date, the Debtors believe they owe approximately $26,400 on account of the Non-Insider Canada Severance Program, all of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay any outstanding prepetition amounts incurred on account of the Non-Insider Canada Pension Program and to continue honoring amounts under the Non-Insider Canada Pension Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## C. Asia Employee Benefits Programs

### 1. Asia Health and Welfare Programs

139. The Debtors offer all Full-Time Asia Employees a supplemental, fully-insured group insurance plan (the "Asia Group Insurance Plan"). The Asia Group Insurance Plan provides life, accidental death and dismemberment, critical illness, and medical insurance to all Full-Time Asia Employees and, where applicable, to their eligible dependents. The Asia Group Insurance Plan is provided through Nan Shan Life at a cost to the Debtors of approximately $27,500 per year (the "Asia Group Insurance Plan Premium").

140. The Asia Group Insurance Premium is paid annually in advance. Accordingly, the Debtors do not believe that there are any amounts outstanding in connection with the Asia Group Insurance Plan as of the Petition Date. By this Motion, however, the Debtors request to

pay any amounts that may be outstanding under the Asia Group Insurance Plan as of the Petition Date and to continue paying obligations arising under the Asia Group Insurance Plan in the ordinary course of business and consistent with historical practice.

**2. Asia Time-Off Benefits**

141. Asia Employees receive time-off benefits in the form of annual leave, sick leave, and other miscellaneous paid leaves required by law or local custom including marriage, maternity, paternity, and funeral leaves (the "Asia Time-Off Benefits"). The Asia Time-Off Benefits are granted at the beginning of each calendar year, with the number of days based on tenure with the Debtors. With the exception of unused annual leave, no Asia Time-Off Benefits are paid out upon termination of an Asia Employee's employment.

142. As of the Petition Date, the Debtors owe approximately $8,000 on account of the Asia Time-Off Benefits, none of which will become due and owing within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay all outstanding prepetition amounts incurred on account of the Asia Time-Off Benefits, and to continue honoring their obligations on account of the Asia Time-Off Benefits on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**3. Asia Business Travel Insurance**

143. Asia Employees who are injured or experience a medical emergency while traveling on a company paid and/or approved business or relocation trip are covered by Business Travel Insurance (described above) (the "Asia Business Travel Insurance"). All obligations with respect to the Asia Business Travel Insurance are included in the description of the benefit for U.S. Employees.

**4. Asia Pension Obligations**

144. All Asia Employees participate in a pension plan under either the Labor Standards Act (Taiwan) (the "Old Pension Scheme") or the Labor Pension Act (Taiwan) (the "New Pension Scheme"), depending on their tenure with the company. Asia Employees who joined the Debtors prior to July 1, 2005 (or, who did not choose to join the New Pension Scheme after July 1, 2005) participate in the Old Pension Scheme. Asia Employees who joined the Debtors after July 1, 2005, participate in the New Pension Scheme.

**a. Old Pension Scheme**

145. Under the Old Pension Scheme, an eligible Asia Employee may retire if he or she has: (a) has worked for at least 15 years and reached the age of 55; (b) has worked for 25 years, or (c) has worked for at least 10 years and reached the age of 60. The Old Pension Scheme is a Debtor-paid, pension plan that generally provides participating Asia Employees with a lump-sum pension payment following retirement as a statutory benefit (the "Old Pension Scheme Payments"). The Old Pension Plan Payments are determined based on a defined formula which factors in a participating Asia Employee's years of service with the Debtors and the average monthly wage for the participating Asia Employee for the six-month period prior to retirement.

146. Under the Old Pension Scheme, Old Pension Scheme Payments are fixed on the effective date of participating Asia Employees' retirements, and are generally payable within thirty (30) days of such effective date. As of the Petition Date, the Debtors have five participants in the Old Pension Scheme. The Old Pension Scheme also requires the Debtors to establish a monthly appropriation to fund 2% to 15% of the average monthly Asia Wages of participating Asia Employees to a designated reserve fund (the "Old Pension Scheme Reserve Fund") and for an annual make-up appropriation to address any appropriation gap between the Old Pension

Scheme Reserve Fund and the potential Old Pension Scheme Payments payable to participating Asia Employees who are entitled to retire in the following year.

147. As of the Petition Date, the amount of the Old Pension Scheme Reserve Fund for the Old Pension Scheme is approximately $600,000 and the Debtors believe approximately $363,000 will be due and payable within the first 21 days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Old Pension Scheme, including any prepetition amounts owed in connection with the Old Pension Scheme Reserve Fund, and to continue honoring their obligations on account of the Old Pension Scheme on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**b. New Pension Scheme**

148. The New Pension Scheme is a pension plan into which participating Asia Employees may make a voluntary contribution of up to 6% of their monthly Asia Wages into an individual retirement account (the "New Pension Scheme Retirement Accounts"), with such contributions being capped at approximately $4,890 per year. The Debtors, in turn, are required to contribute 6% of each participating Asia Employee's monthly Asia Wages into New Pension Scheme Retirement Accounts, which contributions are also capped at approximately $4,920. Benefits under the New Pension Scheme become payable at age 60. In total, the Debtors contribute approximately $3,000 per month into the New Pension Scheme Retirement Accounts of 22 Asia Employees. Currently, the 22 Asia Employees participating in the New Pension Scheme do not deduct any amounts from their Asia Wages to contribute to their New Pension Scheme Retirement Accounts.

149. As of the Petition Date, the Debtors believe they owe approximately $3,000 on account of the New Pension Scheme, none of which will be due and payable within the first 21

days of these chapter 11 cases. By this Motion, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the New Pension Scheme and to continue honoring their obligations on account of the New Pension Scheme on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**5. Non-Insider Asia Severance Program**

150. Asia Employees are entitled to statutorily required severance if they are terminated by prior notice (*i.e.*, without cause) (the "Non-Insider Asia Severance Program," and, collectively with the Non-Insider U.S. Severance Program and Non-Insider Canada Severance Programs, the "Non-Insider Severance Programs"). Non-Insider Asia Severance Program is not payable if an Asia Employee voluntarily resigns or if an Asia Employee is terminated for cause. The formula for determining amounts under the Non-Insider Asia Severance Program varies based on whether an Asia Employee participates in the Old Pension Scheme or New Pension Scheme, with obligations under Non-Insider Asia Severance Program typically ranging from half a month to one month of salary for each full year of service for Asia Employees.

151. As of the Petition Date, the Debtors believe they do not owe any amounts on account of the Non-Insider Asia Severance Program. By this Motion, however, the Debtors request authorization to pay any *de minimis* outstanding prepetition amounts incurred on account of the Non-Insider Asia Pension Program and to continue honoring amounts under the Non-Insider Asia Pension Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**D. Supplemental Employee Benefits**

152. The Debtors offer supplemental employee benefits (collectively, the "Supplemental Benefits") to substantially all of their Full-Time U.S. Employees, including:

- Employee vehicle leasing;

- auto/home and pet insurance;
- commuter benefits;
- National Merit Scholarship program;
- charitable giving programs
- Employee assistance, counseling, and adoption assistance;
- new hire bonuses; and
- referral bonuses.

Canada Employees are also able to participate in the Choose to Give Program (defined below).

153. The Debtors provide the Supplemental Employee Benefits as an elective benefit. Amounts for the Commuter Program (as defined below) are funded in full through deductions from the individual U.S. Employees' Wages. All other Supplemental Employee Benefits premiums are paid directly by the participating Full-Time U.S. Employee, with the exception of the Vehicle Program (as defined below). The Debtors seek authority to pay any unpaid amounts due under the Supplemental Benefits, which they estimate total $493,100 in the aggregate, and to continue the Supplemental Benefits postpetition in the ordinary course of business.

**1. Vehicle Program**

154. The Debtors offer certain U.S. Employees the ability to participate in a vehicle lease program whereby the Debtors contract with a third party, Emkay, to lease vehicles for use by U.S. Employees working in the field (the "Vehicle Program"). The vehicles are largely used by eligible U.S. Employees for business, but may also be used for personal purposes. To the extent an eligible U.S. Employee utilizes a vehicle for personal use, personal use charges are assessed to the U.S. Employees for their personal use. In connection with the provision of a leased vehicle to an eligible U.S. Employee, the U.S. Employee is also given a fuel card by

Emkay to charge fuel costs for the leased vehicle that are associated with business travel. These costs are a part of the administrative cost Debtor is obligated to pay to Emkay.

155. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Vehicle Program. Out of an abundance of caution, however, the Debtors request authority to pay any prepetition outstanding amounts associated with the Vehicle Program and to continue the Vehicle Program in the ordinary course of business consistent with historical practice.

**2. Auto/Home & Pet Insurance**

156. The Debtors offer Full-Time U.S. Employees automobile, home, and pet insurance ("Additional Insurance Benefits"), under which the Debtors offer U.S. Employees access to coverage from Liberty Mutual, MetLife, and Travelers. The Additional Insurance Benefits are paid entirely by the participating Full-Time U.S. Employee and are not an obligation of the Debtors.

**3. Commuter Benefits**

157. The Debtors offer both Full- and Part-Time U.S. Employees the ability to utilize a portion of their pre-tax income to purchase a commuter pass, which Full-Time U.S. Employees, in turn, can then utilize to pay for bus, light rail, regional rail, and streetcar passes (the "Commuter Program"). The Commuter Program does not allow participating U.S. Employees to pay for gas, tolls, tickets, and certain other commuting related expenses. The Debtors deduct approximately $1,100 on a monthly basis on account of the Commuter Program from the roughly 10 participating Full-Time U.S. Employees.

158. The Debtors do not believe they owe any prepetition amounts on account of the Commuter Program as of the Petition Date. Moreover, the Debtors believe that the amounts under the Commuter Program generally are held in trust by the Debtors and are not property of

their estates. However, out of an abundance of caution, the Debtors request the authority to remit any outstanding prepetition amounts incurred on account of the Commuter Program upon entry of the Final Order and to continue paying the amounts under the Commuter Program on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

**4. Charitable Giving Programs**

159. The Debtors support, and encourage U.S. Employees and Canada Employees to support, their local communities through various charitable giving programs, including an annual U.S. Employee and Canada Employee giving campaign (the "Choose to Give Program"), and the National Merit Scholar Program (together, the "Charitable Giving Programs").

**a. Choose to Give Program**

160. On an annual basis, the Debtors provide all U.S. Employees and Canada Employees an opportunity to make a one-time or recurring donation to a selected group of eligible 501(c)(3) charitable organizations through payroll deduction (the "Choose to Give Program"). The Debtors then disburse these payroll deductions to the designated charitable organizations, generally on a quarterly basis. The Debtors deduct approximately $62,500 per month on account of the Choose to Give Program from approximately 4,900 U.S. Employees and 415 Canada Employees. As of the Petition Date, the Debtors have approximately $285,000 of payroll deductions to be disbursed to designated charitable organizations.

**b. National Merit Scholar Program**

161. The Debtors also fund a number of four-year scholarships for the children of their Full-Time U.S. Employees through the National Merit Scholarship Corporation (the "National Merit Scholarship Program"). Presently, the Debtors offer two National Merit Scholarships for a yearly stipend of $1,000. As part of their agreement with the National Merit Scholar

Corporation, the Debtors are also required to fund a yearly grant of $180, as basic support for the National Merit Scholarship Program.

162. As of the Petition Date, the Debtors owe approximately $58,100 on account of the National Merit Scholarship Program, none of which will become due and owing within the first 21 days of these chapter 11 cases. However, out of an abundance of caution, the Debtors request the authority to pay all outstanding prepetition amounts incurred on account of the National Merit Scholarship Program upon entry of the Final Order and to continue funding the National Merit Scholarship Program on a postposition basis in the ordinary course of business and consistent with their prepetition practices.

**5. Employee Assistance, Counseling and Adoption Assistance**

163. The Debtors also offer their U.S. Employees a confidential counseling service to help address personal issues that U.S. Employees and their dependents may be facing (the "Counseling Program"). Cigna, the current provider of Basic Life, AD&D, and Disability insurance to the Debtors, provides this program at no additional cost to the Debtors, with the exception of critical incident support that is charged on a fee-for-service basis. In addition, the Debtors offer Full-Time U.S. Employees with an adoption assistance program (the "Adoption Program," and together with the Counseling Program the "Wellness Programs") under which the Debtors will reimburse certain Qualified Adoption Expenses (as such term is defined in the Internal Revenue Code) for the adoption of a child. As of the Petition Date, the Debtors believe they have no outstanding payment obligations with respect to the Wellness Programs. Out of an abundance of caution, however, the Debtors request authority to pay any prepetition outstanding amounts associated with the Wellness Programs and to continue the Wellness Programs in the ordinary course of business consistent with historical practice.

### 6. Attraction Awards

164. On a selective basis, the Debtors offer certain attraction awards to Full-Time U.S. Employees when they begin working for the Debtors (the "Attraction Awards"), such as a signing bonus to help offset incentive compensation or other awards that a newly-hired U.S. Employee may forfeit upon resigning his or her current position. Attraction Awards are typically paid within 90 days of the U.S. Employee's hire date and are subject to claw-back in full if the U.S. Employee voluntarily resigns in the first two years of employment. For Fiscal Year 2016, the Debtors paid approximately $110,000 with respect to Attraction Awards. As of the Petition Date, the Debtors do not believe that there are any amounts outstanding in connection with the Attraction Awards. By this Motion, however, the Debtors request to pay any *de minimis* prepetition Attraction Award amounts that may be outstanding and to continue paying Attraction Awards arising in the ordinary course of business and consistent with historical practice.

### 7. Employee Referral Program

165. The Debtors provide a one-time bonus ranging from $500–$2,500 to eligible non-insider U.S. Employees who refer external candidates to fill specified vacant Full-Time employment positions in the Debtors' business operations (the "Referral Program"). Bonuses under the Referral Program are paid to the referring U.S. Employee once the referred candidate has completed 30 days of employment with the Debtors. For Fiscal Year 2016, the Debtors paid approximately $3,000 with respect to the Referral Program. As of the Petition Date, the Debtors do not believe that there are any amounts outstanding in connection with the Referral Program. By this Motion, however, the Debtors request to pay any *de minimis* prepetition amounts that may be outstanding under the Referral Program and to continue paying amounts arising under the Referral Program in the ordinary course of business and consistent with historical practice.

## III. Administrator Fees

166. As part of the effective and efficient administration of the Employee Compensation and Benefits, the Debtors use certain administrators to disburse Employee payments (collectively, the "Administrators").

### A. Benefits Processing Services

167. As discussed above, Aon administers the Debtors' pre-tax FSA and HSA Programs, and the Debtors pay monthly per-participant fees for these services, which fees are largely recouped through a reduction in Debtors' FICA obligations on these pre-tax deductions (the "Aon Administration Services"). Additionally as discussed above, the Debtors utilize COBRAGuard to administer the Debtors' COBRA benefits (the "COBRAGuard Administration Services," and collectively with the Aon Administration Services, the "Benefits Processing Services").

### B. Benefits Administration Services

168. The Debtors use Cigna Health Insurance ("Cigna") to administer claims for Disability Benefits and Gallagher Bassett for claims against the Workers' Compensation Policies ("GB," and together with Cigna, the "Benefits Administrators"). The Debtors pay the Benefits Administrators certain administration fees in the amount of approximately $22,000 per month (the "Benefits Administration Fees") to administer claims for Disability Benefits, FMLA claims, and claims against the Workers' Compensation Policies. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Benefits Administration Fees.

169. In addition, the Debtors have contracted with Aon to administer coverage under the Debtors' Health Plans. The Debtors do not pay Aon directly for these services; rather, these costs are included in the premiums paid to Aon on account of the Health Plan.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors To Honor the Employee Compensation and Benefit Obligations

#### A. Certain of the Employee Compensation and Benefits Are Entitled To Priority Treatment

170. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $12,850 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law

171. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' Wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' Wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold

certain tax payments from Employees' Wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (holding that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'") (citation omitted); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Similarly, the Eighth Circuit has established that a debtor does not have an equitable interest in the property held in trust for another, but rather that the trustee "[holds] bare legal title to the trust res subject to a duty to reconvey it to the rightful owner." *See Chiu v. Wong*, 16 F.3d 306, 310 (8th Cir. 1994) (allowing plaintiff to impose a constructive trust on former debtor's estate to recover amount former debtor had previously invested). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

172. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. *See, e.g.* Mo. Stat. § 287.280 (requirement that companies maintain a workers' compensation program). If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II. Payment of the Employee Compensation and Benefits Is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity

173. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, No. 15-649, 2017 WL 1066259, at *12 (U.S. Mar. 22, 2017) (citing favorably to the entry of "first day orders" authorizing the payment of prepetition wages where doing so would, among other things, "enable a successful reorganization"); *In re Falcon Prods., Inc.*, No. 07-01495, 2008 WL 363045, at *10 (Bankr. E.D. Mo. Feb. 8, 2008) (affirming the bankruptcy court's decision that the provider of employee health benefits was entitled to administrative priority status); *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 105(a), 363(b), 507, 1107(a), and 1108 of the Bankruptcy Code.

174. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 900 (8th Cir. 2007). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *See CoServ* at 497. Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

175. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *see also Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) of the Bankruptcy Code and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

176. In addition, this Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit preplan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, this Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. §105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor."); *see also In re NVR L.P.,* 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

177. Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) of the Bankruptcy Code in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus., Inc.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 of the Bankruptcy Code empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor). In particular, courts have authorized the payment of non-Insider severance obligations to union employees. *See In re Sunedison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. May 20, 2016) (approving Final and Interim Orders permitting Debtors' paying approximately $1.7 million in prepetition and postpetition severance obligations to 70 former non-insider union employees); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del. Feb. 24, 2016) (approving Final Order permitting Debtors' paying approximately $3.3 million in prepetition and postpetition severance obligations to former non-insider union employees of the Debtors).

178. This flexible approach is particularly critical where prepetition creditors, here Employees and related third parties, provide vital goods or services to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. For example, in *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id.* (citation omitted). The court explained that "a *per se* rule proscribing the

payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

179. The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003. Paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

180. In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Furthermore, if this Court does not authorize the Debtors to honor their various

obligations under the insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

181. The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this circuit and other jurisdictions, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. July 26, 2016) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Apr. 14, 2016) (same); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (same); *In re Magnetation, LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. May 7, 2015) (same); *In re Bakers Footwear Group, Inc.*, No. 12-49658-705 (CER) (Bankr. E.D. Mo. Oct. 10, 2012) (same).[25] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

[25] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## III. The Additional Compensation Opportunities and Non-Insider Severance Programs Are Reasonable and a Sound Exercise of the Debtors' Business Judgement

### A. The Additional Compensation Opportunities and Non-Insider Severance Programs are Authorized Under Section 363(c)(1) of the Bankruptcy Code.

182. The Debtors further request that they be allowed to continue to honor the Additional Compensation Opportunities and Non-Insider Severance Programs in the ordinary course of business. The Debtors submit that the Additional Compensation Opportunities and Non-Insider Severance Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Additional Compensation Opportunities and Non-Insider Severance Programs are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of the Additional Compensation Opportunities or Non-Insider Severance Programs. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).

### B. The Additional Compensation Opportunities and Non-Insider Severance Programs are Authorized Under Sections 363(b) and 503(c)(3) of the Bankruptcy Code.

183. Alternatively, to the extent that the Additional Compensation Opportunities and Non-Insider Severance Programs are not authorized under section 363(c)(1) of the Bankruptcy Code, the Debtors submit that payment of the Additional Compensation Opportunities and Non-Insider Severance Obligations is also authorized under sections 363(b) and 503(c) of the Bankruptcy Code. Importantly, because the Debtors do not propose to pay any Insiders on account of the Additional Compensation Opportunities and Non-Insider Severance Programs, the Additional Compensation Opportunities and Non-Insider Severance Programs are not subject to the heightened standards of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code. *See* 11 U.S.C. § 503(c)(1) and (2) (applying only to insiders).

184. Instead, pursuant to section 503(c)(3) of the Bankruptcy Code, the Additional Compensation Opportunities and Non-Insider Severance Programs only require a showing that they are "justified by the facts and circumstances of" the Debtors' chapter 11 cases. *See* 11 U.S.C. § 503(c)(3). This standard, in turn, is essentially the same as the the business judgment standard that is applied under section 363(b) of the Bankruptcy Code. *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Global Home Prods. LLC,* 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

185. The Debtors submit that continuing to maintain the Additional Compensation Opportunities and Non-Insider Severance Programs for non-Insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the Additional Compensation Opportunities and Non-Insider Severance Programs are a long-standing component of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize and protect the Employees in the ordinary operations of the Debtors' business operations. Moreover, at least with respect to the Non-Insider Canada Severance Program and the Non-Insider Asia Severance Program, the Debtors are required by law to make such payments. The Debtors, therefore, believe that it is necessary to continue these programs for non-insiders on a postpetition basis. Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue the Additional Compensation Opportunities and Non-Insider Severance Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

## IV. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate in this case

186. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

187. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

188. The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits in the ordinary course of business. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize, but not direct, all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Employee Compensation and Benefits; provided that sufficient

funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

189. Pursuant to Bankruptcy Rule 6003, this Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. As described above, the Debtors' Employees and Contractors are vital to the Debtors' operations. Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 21 days of these chapter 11 cases will jeopardize their loyalty and trust, causing Employees and the Contractors to leave the Debtors' employ, severely disrupting the Debtors' operations at a critical juncture.

190. Moreover, the Debtors' Employees and Contractors rely on the Employee Compensation and Benefits to pay their living expenses and the Debtors' inability to satisfy such obligations in the ordinary course of business could be financially ruinous to Employees. Accordingly, the Debtors submit they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Compensation and Benefits.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

191. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

192. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' or any other party-in-interest's rights to dispute any claim, or an approval or assumption of any agreement,

contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

193. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agent; (d) counsel to certain Prepetition ABL Lenders; (e) counsel to the Prepetition First Lien Term Loan Agent and the DIP Term Loan Agent; (f) counsel to the Prepetition First Lien Term Loan Steering Committee; (g) counsel to the Prepetition Second Lien Term Loan Agent; (h) the DIP ABL Agent; (i) co-counsel to the DIP ABL Agent, Choate, Hall & Stewart (Attn: Kevin J. Simard, Esq. and Douglas R. Gooding, Esq.) and Thompson Coburn LLP (Attn. Mark V. Bossi, Esq.); (j) the Tranche A-1 Agent; (k) counsel to the Tranche A-1 Agent, Schulte, Roth & Zabel, LLP (Attn: Adam C. Harris, Esq.); (l) the United States Attorney's Office for the Eastern District of Missouri; (m) the Internal Revenue Service; (n) the United States Securities and Exchange Commission; (o) the state attorneys general for all states in which the Debtors conduct business; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

194. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: April 4, 2017
St. Louis, Missouri

/s/ *Steven N. Cousins*

Steven N. Cousins MO 30788
Erin M. Edelman MO 67374
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
Email: scousins@armstrongteasdale.com
Email: eedelman@armstrongteasdale.com

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Cristine F. Pirro (*pro hac vice* pending)
Jessica Kuppersmith (*pro hac vice* pending)
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue
New York, NY 10021
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: nicole.greenblatt@kirkland.com
Email: cristine.pirro@kirkland.com
Email: jessica.kuppersmith@kirkland.com

James H.M. Sprayregen, P.C.
William A. Guerrieri (*pro hac vice* pending)
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: will.guerrieri@kirkland.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*