# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Case No. 17-42267 (659) |
| | ) CHAPTER 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | ) |
| | ) (Joint Administration Requested) |
| | ) |
| Debtors. | ) Hearing Date:  April 5, 2017 |
| | ) Hearing Time:  1:30 P.M. |
| | ) Hearing Location:  Courtroom 7 North |
| | ) |

## DEBTORS' MOTION SEEKING
## ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING THE DEBTORS TO (A) HONOR
## CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND PARTNERS
## AND (B) CONTINUE CERTAIN CUSTOMER AND PARTNER PROGRAMS IN
## THE ORDINARY COURSE OF BUSINESS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):[2]

---

[1] The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is:  c/o Payless ShoeSource Inc. 3231 SE 6th Avenue Topeka, KS 66607 United States.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Michael Schwindle in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## Relief Requested[3]

1.      By this Motion, and pursuant to sections 105(a), 363, 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of interim and final orders (the "Proposed Interim Order" and "Proposed Final Order,") respectively):[4] (a) authorizing, but not directing, the Debtors to maintain and administer their Customer Programs and honor certain prepetition obligations to customers in the ordinary course of business consistent with past practice and in the Debtors' sound business judgment; and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81.901(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms elsewhere in this Motion or in the First Day Declaration, as applicable.

[4]     A copy of the Proposed Order will be provided to the Notice Parties (as defined below) and made available on the Debtors' case information website at https://cases.primeclerk.com/payless.

2

## Background

4.      The Debtors and their non-Debtor affiliates (collectively, the "Company") comprise the largest specialty family footwear retailer in the Western Hemisphere, offering a wide range of shoes and accessory items at affordable prices.  The Company has more than 4,000 stores in more than 30 countries.  The Debtors are headquartered in Topeka, Kansas, but their operations are extensive and span across Asia, the Middle East, Latin America, Europe, and the United States.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Customer Programs

6.      The Company has a broad geographic footprint, serving more than 60 million customers worldwide, approximately 47 million of which are located in North America.  Prior to the Petition Date, both in the ordinary course of the Debtors' business and as is customary in the industry, the Debtors offered and engaged in certain customer and other programs and practices. The programs include, but are not limited to, the following (as described in detail below): (a) customer gift card programs; (b) returns, exchanges, and refunds; (c) promotional programs; (d) warranty-related programs related to the Debtors' products; (e) merchant credit card agreements; and (f) all such other similar policies, programs, and practices of the Debtor (collectively, the "Customer Programs").

3

7.      In order to effectuate a smooth transition into and out of chapter 11, the Debtors must maintain customer loyalty and goodwill by maintaining and honoring the Customer Programs.  The Debtors compete in the highly competitive discount shoe industry, where the Debtors must regularly run promotions and discounts to gain new customers and keep existing ones.  Indeed, the Debtors implemented the Customer Programs in the ordinary course of business prior to the Petition Date as a means by which to maintain positive, productive, and profitable relationships with their customers, encourage new purchases, enhance customer satisfaction, and ensure that the Debtors remain competitive in their industry.  Each of the Customer Programs is designed and implemented to encourage the Debtors' customers to increase their purchasing frequency and volume, resulting in larger net revenues for the Debtors and, in return, greater satisfaction for the customers.

8.      Accordingly, the Debtors' ability to honor the Customer Programs in the ordinary course of business is necessary to retain their customer base and reputation within their industry. On account of the Customer Programs, the Debtors may owe certain obligations to their customers as well as other third parties (collectively, the "Customer Obligations"), arising both before and after the Petition Date.

9.      The success and viability of the Debtors' business, and ultimately the Debtors' ability to maximize the value of their estates, are dependent upon the patronage and loyalty of their customers.  In this regard, the Customer Programs are critical, and any delay in honoring Customer Obligations will severely and irreparably impair customer relations and drive away valuable customers, thereby harming the Debtors' efforts to maximize value for all interested parties.

4

10.     Accordingly, the Debtors seek authority to continue, in their discretion, to honor the Customer Programs, including, in their discretion, Customer Obligations arising therefrom, at each of the Debtors' retail locations, including any stores that may be undergoing store liquidations sales.

## I.     Customer Gift Card Programs

11.     Among the Debtors' Customer Programs is a customer gift card program (the "Gift Card Program").[5]  Under the Gift Card Program, gift cards may be purchased at the Debtors' retail stores, online on the Debtors' website, or from various other resellers that are authorized to issue gift cards.[6]  Once purchased, a gift card may be used like cash for purchases at the Debtors' retail stores and online on the Debtors' website, but may not be redeemed for cash or monetary credit except under limited circumstances as required by law.  Customers are typically not permitted to purchase (a) more than five gift cards at one time or (b) gift cards that carry a balance of more than $1,000.   All outstanding gift cards with balances remain redeemable.

12.     As of the Petition Date, approximately $30.6 million of total prepaid liabilities remained outstanding on account of the Gift Card Program.  The Debtors seek authority to continue to administer the Gift Card Program in the ordinary course of business and to pay prepetition obligations related thereto.

## II.     Returns, Exchanges, and Refunds

13.     Certain customers hold contingent claims against the Debtors for refunds, returns, exchanges, substitutions, issuance of store credit, price adjustments (including sales price

---

[5]     Although the Debtors previously had a gift certificate program, they have discontinued that program and do not intend to honor any gift certificates.

[6]     In certain instances, customer service will issue ones to customers as a means of compensation and to encourage continue patronage.

adjustments to billing) and other credit balances relating to goods sold to customers in the ordinary course of business prior to the Petition Date. Under the Debtors' guarantee program (the "Payless Happiness Guarantee Program"), subject to certain restrictions and requirements, customers may return goods purchased for a refund of the purchase price or exchange the item for another of equal value, with no questions asked, so long as the customer has a valid receipt. In addition, the Debtors will accept for refund damaged or faulty goods.

14.    The Debtors' ability to continue the Payless Happiness Guarantee Program is vital to the Debtors' ongoing relationship with their customers. The Debtors believe that the increase in customer loyalty generated by the Payless Happiness Guarantee Program far outweighs the costs of the Payless Happiness Guarantee Program. Accordingly, the Debtors seek authorization to continue, in their discretion, issuing refunds and operating the Payless Happiness Guarantee Program in the ordinary course of business, whether related to purchases made before or after the Petition Date.

**III.    Promotional Programs**

15.    In the ordinary course of their business, the Debtors have established certain promotional programs designed to generate revenues across the Payless enterprise (collectively, the "Promotional Programs"). The Promotional Programs are typical in the retail industry, including the issuance of coupons which can be presented by customers at the time of purchase of goods at the Debtors' retail stores or online on the Debtors' website. These coupons are not redeemable for cash. The coupons may be distributed through e-mail and text messaging to those customers that have opted in, and through several third-party outlets, including AAA and Entertainment booklets, and "buy one, get one" programs.

16.    One Promotional Program is a loyalty program called the "Payless Rewards" program ("Payless Rewards"). As of the Petition Date, there were approximately 35 million

6

customers enrolled as Payless Rewards members in North America.  The Payless Rewards Program is not a points-based program whereby customers accumulate rewards based on their purchases; rather, members of Payless Rewards receive discount coupons to incentivize continued and frequent purchasing.  Total coupon redemption under the promotional programs, including Payless Rewards, was approximately 9% of total revenue from North American operations in 2016.

17.     The Promotional Programs are an important part of the marketing strategy of the Debtors' business, as they engender goodwill and generate revenue by encouraging sales at the Debtors' store locations and targeting captive customers or customers who would otherwise be unlikely to spend from their own wallets.  The Debtors seek authority to continue these profitable Promotional Programs and honor associated coupons and discounts in the ordinary course of business, whether issued prepetition or postpetition, consistent with past practices.

**IV.     Warranty Programs**

18.     Consistent with industry practices, the Debtors issue product warranties covering certain defects in materials and workmanship related to purchases of SafeTStep shoes (collectively, the "SafeTStep Warranties").  SafeTStep shoes are men's and women's footwear that are slip-resistant and worn by individuals who work in the foodservice industry.  SafeTStep Warranties provide reimbursement for any medical expense paid by a participating company that is directly attributable to injuries sustained by an employee of the participating company resulting from a slip-and-fall accident while wearing SafeTStep shoes, subject to certain terms and conditions.  As a general matter, the SafeTStep Warranties also cover defects that are not attributable to external factors such as natural disasters or physical damage caused by the user. As of the Petition Date, the Debtors have no outstanding obligations under the SafeTStep Warranties.  Nevertheless, out of an abundance of caution, by this Motion, the Debtors request

7

authorization to continue the SafeTStep Warranties on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

## V.    Credit Card Agreements

19.    Many of the Debtors' sales are paid with credit or debit cards.  To facilitate such transactions, the Debtors entered into certain agreements with credit card companies and processors (collectively, the "Credit Card Agreements"), including agreements with (a) American Express ("AmEx"), (b) Discover Card ("Discover"), and (c) Bank of America (together with AmEx and Discover, the "Credit Card Companies").[7]  The Credit Card Agreements enable the Debtors to accept credit and debit card purchases, subject to customer refunds, returns, exchanges, substitutions, price adjustments, and other credit balances.  Under the terms of the Credit Card Agreements, the Debtors are required to pay the Credit Card Companies certain fees associated with each purchase (collectively, the "Credit Card Fees"). The Credit Card Fees vary, but are in the range of $250,000 to $300,000.  Although certain credit card fees are incurred at the time the transaction is made, the fees do not become due until two to four days later.  Therefore, the Debtors believe that there are approximately $260,000 in accrued and unpaid Credit Card Fees as of the Petition Date.

20.    When customers return merchandise to the Debtors following a purchase made using a credit card, or when customers dispute certain charges with their credit card issuer related to a purchase from the Debtors, the Debtors may be obligated to issue a refund to such credit card issuer the purchase price of the returned or disputed merchandise, subject to certain adjustments (collectively, "Chargebacks").  Generally, Chargebacks are satisfied by netting the

---

[7]    In the weeks immediately prior to these chapter 11 cases, certain of the Credit Card Companies implemented reserves to cover any unbilled processing costs plus estimated exposure anticipated under the agreement. The required reserves have amounted to approximately $800,000.

KE 46235479

amount charged against pending payments (the "Credit Card Processor Payments") owed by a Credit Card Company to the Debtors under the Credit Card Agreements.

21.    It is possible that certain Chargebacks incurred by the Debtors immediately prior to the Petition Date may not have been fully netted out against the Credit Card Processor Payments received by the Debtors prior to the Petition Date.  Moreover, although the Debtors believe that Chargebacks arising after the Petition Date are postpetition obligations of the Debtors, it may be argued that such Chargebacks nevertheless are prepetition obligations where the merchandise returned or disputed was purchased from the Debtors prior to the Petition Date. In such circumstances, to the extent that the netting of the parties' obligations would not constitute recoupment, the Debtors seek the Court's approval to allow the Credit Card Companies to setoff Chargebacks against Credit Card Processor Payments pursuant to section 362(d) of the Bankruptcy Code.

22.    The Debtors' continued acceptance of credit and debit cards is essential to the operation of the Debtors' business because the majority of the Debtors' sales—indeed, the majority of all retail sales—are made using credit and debit cards.  Declining to accept credit and debit cards would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by their estates.  To avoid disrupting these vital payment processing services, the Debtors seek authority to continue paying the Credit Card Fees and the Credit Card Processor Payments in the ordinary course of their business, whether arising prepetition or postpetition, pursuant to the terms of the Credit Card Agreements, and request that the Court authorize the Credit Card Companies to continue to set off the Credit Card Processor Payments against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with past practices.

**Basis for Relief**

I.      **Prepetition Payments**

23.     Section 363(b) of the Bankruptcy Code authorizes the payment of prepetition obligations where a sound business reason exists for doing so. 11 U.S.C. § 363(b).  Indeed, Courts in this district have authorized payment of prepetition obligations and the continuation of customer programs under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (authorizing debtor to honor customer obligations relating to coal delivered prepetition); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) (authorizing debtors to honor prepetition customer obligations); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

24.     Additionally, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, bankruptcy courts may "authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor." *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999).  Specifically, a bankruptcy court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See Ionosphere*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

10

25.    The "doctrine of necessity" or the "necessity of payment" rule has long been recognized by courts in this Circuit and others. *See In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (describing the "doctrine of necessity" as the idea "that payment of [pre-petition] claims was necessary to keep the debtor in business, and that keeping the debtor in business, and its employees at wage-paying jobs, was in the best interest of all concerned"); *Ionosphere*, 98 B.R. at 174-75 at 174-75.   Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor's reorganization case—is "the paramount policy and goal of Chapter 11."  *Id.* at 176; *see also Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *Wehrenberg, Inc.*, 260 B.R. at 469 (authorizing debtor to pay prepetition claims of vendors because the vendors are "critical to the Debtor's reorganization").

26.    This flexible approach is particularly critical where prepetition creditors—here, the Debtors' customers—are vital to the survival of a debtor's business.  *See In re Structurlite Plastics Corporation*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (quoting *In re Chateaugay Corp.*, 80 B.R. 279, 287 (Bankr. S.D.N.Y. 1987)) ("a bankruptcy court may exercise its equity powers under Section 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'").  The Court in *In re Structurlite Plastics Corporation* explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code."  *Id.* at 932.

27.    Authorizing the Debtors to pay prepetition amounts due on account of, and honor prepetition commitments pursuant to, the Customer Programs will allow the Debtors' operations

11

to continue without interruption during the pendency of these chapter 11 cases. While the Debtors' estates and their creditors will not be harmed by the Debtors' ability to pay prepetition amounts and to honor prepetition commitments under the Customer Programs, the Debtors' failure to do so would likely lead to the loss of customer satisfaction, resulting in reduced future sales, deterioration of goodwill, and irreparable harm to the Debtors' businesses and revenues. *See In re Coserv, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing instances where the debtor in possession can only fulfill its fiduciary duty by pre-plan satisfaction of prepetition claims of "customers which, if not honored, could so harm the debtor's good will as to destroy its going concern value"); *see also In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (noting that the continuance of even insignificant customer business transactions can be "critical to the survival of the business," and failure to continue such transactions risks eroding the business' customer base and going concern value).

## II.    Postpetition Payments

28.    In addition, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to sections 1107 and 1108 of the Bankruptcy Code to use property of the estate in the ordinary course of business without notice or a hearing. Consequently, the postpetition continuation, renewal, and replacement of obligations under the Customer Programs in the ordinary course of business is permitted by sections 363(c), 1107(a), and 1108 of the Bankruptcy Code, without further application to the Court. Out of an abundance of caution, however, the Debtors request the relief described herein.

29.    Courts in this district and courts in other jurisdictions and others have consistently granted similar relief where retaining the loyalty and patronage of customers is critical to a successful reorganization. *See, e.g., In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (authorizing debtor to honor customer obligations relating to coal

12

delivered prepetition); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) (authorizing debtors to honor prepetition customer obligations); *In re Sbarro, LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. Mar. 12, 2014); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 30, 2012); *In re American Apparel*, No. 16-12551 (BLS) (Bankr. D. Del. Nov. 15, 2016).[8]  The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.  The Debtors' ability to successfully reorganize is dependent upon the continued relationship with their Customers.  Hence, the Debtors have sought the relief requested herein to assure their customers, and potential future customers, that the Debtors' reorganization will cause minimal, if any, disruption to the Debtors' operations.

**III.     Gift Card Payments**

30.     Section 507(a)(7) of the Bankruptcy Code establishes a priority for "unsecured claims of individuals, to the extent of $2,775 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental or property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided." 11 U.S.C. § 507(a)(7).  The Debtors submit that the holders of gift cards under the Gift Card Program cards may be entitled to priority claims under section 507(a)(7) of the Bankruptcy Code if this Court does not authorize the Debtors to honor such gift cards pursuant to the Motion.  *See In re WW Warehouse, Inc.*, 313 B.R. 588, 592-94 (Bankr. D. Del. 2004) (finding that gift certificate holders are entitled to priority status under section 507 of the Bankruptcy Code).  As priority claimholders, holders of gift cards issued pursuant to the Gift Card Program would be paid in full before any general unsecured obligations of the Debtors are satisfied.  Accordingly, the relief requested herein may affect only

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the timing of the Debtors' performance of their obligations to honor these Gift Card Program obligations and will not prejudice the rights of general unsecured creditors or other parties-in-interest.  In addition, continuing to honor the Gift Card Program without interruption will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all the Debtors' creditors and benefit the estates.

### Processing of Checks and Electronic Fund Transfers Should be Authorized

31.    The Debtors have sufficient funds to pay any amounts related to the Customer Programs in the ordinary course of business.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Customer Programs, as applicable.  The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Thus, the Debtors request that the Court authorize, but not direct,  all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Customer Programs; *provided that* sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

32.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to satisfy obligations with respect to the Customer Programs and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their

14

KE 46235479

business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

33.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

34.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' or any other party-in-interest's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be—nor should it be construed as—an admission as to the validity of any claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

35.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agent; (d) counsel to certain Prepetition ABL Lenders; (e) counsel to the Prepetition First Lien Term Loan Agent and the DIP Term Loan Agent; (f) counsel to the Prepetition First Lien Term Loan

15

Steering Committee; (g) counsel to the Prepetition Second Lien Term Loan Agent; (h) the DIP ABL Agent; (i) co-counsel to the DIP ABL Agent, Choate, Hall & Stewart (Attn: Kevin J. Simard, Esq. and Douglas R. Gooding, Esq.) and Thompson Coburn LLP (Attn: Mark V. Bossi, Esq.); (j) the Tranche A-1 Agent; (k) counsel to the Tranche A-1 Agent, Schulte, Roth & Zabel, LLP (Attn: Adam C. Harris, Esq.); (l) the United States Attorney's Office for the Eastern District of Missouri; (m) the Internal Revenue Service; (n) the United States Securities and Exchange Commission; (o) the state attorneys general for all states in which the Debtors conduct business; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

36.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

16

KE 46235479

WHEREFORE, the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  April 4, 2017
St. Louis, Missouri

/s/ *Steven N. Cousins*

Steven N. Cousins MO 30788
Erin M. Edelman MO 67374
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  eedelman@armstrongteasdale.com

Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Cristine F. Pirro (*pro hac vice* pending)
Jessica Kuppersmith (*pro hac vice* pending)
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue
New York, NY 10021
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  nicole.greenblatt@kirkland.com
Email:  cristine.pirro@kirkland.com
Email:  jessica.kuppersmith@kirkland.com

James H.M. Sprayregen, P.C.
William A. Guerrieri  (*pro hac vice* pending)
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  will.guerrieri@kirkland.com

*Proposed Counsel for Debtors
and Debtors in Possession*