UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 17-42267 (659) |
| | CHAPTER 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | |
| | (Joint Administration Requested) |
| Debtors. | Hearing Date: April 5, 2017 |
| | Hearing Time: 1:30 P.M. |
| | Hearing Location: Courtroom 7 North |

**DECLARATION OF ROBERT CAMPAGNA
IN SUPPORT OF DEBTORS' MOTION SEEKING
ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
(I) CRITICAL VENDORS AND (II) CARRIER, WAREHOUSEMEN, AND
SECTION 503(B)(9) CLAIMANTS AND (B) GRANTING RELATED RELIEF**

I, Robert Campagna, declare as follows:

1.   I am a Managing Director and Head of the Eastern Region Restructuring Practice at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm with numerous offices throughout the country and a restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

---

[1] The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc. 3231 SE 6th Avenue Topeka, KS 66607 United States.

2. I received my bachelor of science from Bucknell University, and I am also a Certified Public Accountant, as well as a Certified Insolvency and Restructuring Advisor.

3. I have over twenty years of distressed company advisory experience, and my primary areas of focus include formulating and evaluating strategic business plans, and developing cash and liquidity forecasting and monitoring programs. I have advised clients in numerous major bankruptcy cases, including Alpha Natural Resources, Inc., Cengage Learning, V2V Holding, Orchard Brands Corporation, Cooper-Standard Automotive, and Interstate Bakeries Corporation, among others. I have substantial knowledge and experience advising large companies and assisting financially distressed organizations with stabilizing their financial condition, developing business plans, and assessing restructuring alternatives.

4. The Debtors engaged A&M on December 15, 2016 to provide restructuring advisory and consulting services to the Debtors. I have assisted the Debtors in a variety of tasks, including the assessment of vendors that are critical to the Debtors' reorganization. I provide this declaration (this "Declaration") in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors and (II) Carrier, Warehousemen, and Section 503(b)(9) Claimants and (B) Granting Related Relief* (the "Critical Vendor Motion").

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, including the Company's books and records, or my opinions based upon my experience and knowledge. If called as a

witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

**I.    The Critical Vendor Motion**

6.     The issues raised in the Critical Vendor Motion go to the core of the Debtors' chapter 11 petitions. The Debtors' business is premised on selling large volumes of shoes at affordable prices, which results in a heavy reliance on their long-standing relationships with those Vendors[2] who can supply, transport, and distribute shoes made to their specifications at the right volume, the right price, and at the right time. To meet the required high volumes necessary to support the Debtors' 110 million plus unit sales per year, the Debtors work with a group of approximately 90 foreign vendors that are highly specialized and uniquely capable of procuring raw materials, producing made-to-order shoes, and delivering large quantities of high-quality and low-cost products to the Debtors' distribution centers and ultimately to their approximately 4,000 retail stores with timely regularity.

7.     The Debtors' products are highly customized due to the Debtors' need for specific styles of shoes in large volumes, at low prices, and in time to sell during the appropriate season. The Debtors' products cannot be purchased off a shelf or from a stockpile of pre-manufactured shoes in a warehouse; they are created to detailed specifications provided by the Debtors to their Critical Vendors, so that the Debtors can provide customers with on-trend products at the less than $30 price point. The Critical Vendors are essential because the Debtors' products are made to order, and the Critical Vendors are the only vendors capable of producing the required volume of specific shoes that the Company needs at the price it needs them.

---

[2]    "Vendors" are (a) those vendors that supply products that are vital to the Debtors' operations, and without which the Debtors would not be able to operate their businesses (the "Critical Vendors"), (b) those vendors that transport, deliver, or store products, and (c) those vendors who delivered goods to the Debtors within the 20 days prior to the Petition Date (as defined in the Critical Vendor Motion).

8. Because the Debtors' business depends on producing on-trend, fashion-forward, shoes, the Debtors must be able to get their shoes from the factories to the end-user in time to keep up with rapidly-changing fashion trends. These made-to-order shoes take roughly twelve weeks to manufacture and approximately another eight weeks to ship from the Debtors' Critical Vendors—who are primarily based in China and Vietnam—to the Debtors' distribution centers and eventually to their retail stores in North America.

9. Given these unique relationships and material quantities involved, it would be virtually impossible to find vendors that could replicate the Debtors' current suppliers within the time frame needed to replace inventory. No other vendors can provide shoes meeting these criteria within the short- or medium-term, so the Debtors depend heavily on regularly receiving product from their existing Vendors.

## II. The Critical Vendors

### A. Process for Determining Payments to Critical Vendors

10. With the assistance of their advisors, the Debtors have spent considerable time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to understand the Company's critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses by, *inter alia*, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' ability to reorganize to the detriment of the Debtors, their stakeholders, and all of the Debtors' vendors. I have been directly involved in that effort. In this process, the Debtors and their advisors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

4

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- the location and nationality of the vendor;

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

- whether there was sufficient time to transition to a new vendor given the design and production timeline.

11. The Debtors and their advisors have used this set of criteria to identify the amount needed to pay the Critical Vendors that supply products vital to the Debtors' operations and without which the Debtors would not be able to operate their businesses.

**B.    The Debtors Will Not Have the Necessary Shoes (or Volume of Shoes) to Sell Unless They Pay Their Critical Vendors**

12. Because the Debtors have, for numerous years, ordered a substantial volume of product from a relatively-small number of Critical Vendors, many of these vendors rely on the Debtors for a majority of their business such that they are effectively vertically integrated into

the Debtors' supply chain. Of the Debtors' top 10 merchandise vendors as of the petition date—representing 60% of the Debtors' shoe production—one has the Debtors as its only customer, three depend on the Debtors for 75% or more of their business, and eight of the ten sell the Debtors 50% or more of their total volume.

13.  As a result of this significant interdependence, the near vertical integration between the Debtors and the Critical Vendors, and the working relationships between them forged over decades, when the Debtors have requested extensions of payment terms, the Critical Vendors have, although reluctantly, agreed. Over the past ten years, these payment terms have increased from 7 days to 60 days (on average). The last request for terms extension in December 2015 from 45 to 60 days was particularly difficult for the vendors to bear, but most granted the extension reluctantly.

14.  Then, beginning in November 2016, the Debtors' liquidity position forced them to fall behind on even these already lengthy payment terms with vendors beyond the 60-day average standard terms, effectively paying suppliers an average of 100 days from the date their products are shipped from overseas. I understand that selling shoes on those terms is challenging for the Critical Vendors' businesses, especially given that the vendors need to procure raw materials for the production process approximately four to six weeks in advance of the production start date, which adds an additional 30 – 45 days between their commitment to their suppliers and the date upon which the Debtors make payment. This elongated payment period has resulted in significant outstanding amounts to all the Debtors' vendors, including the Critical Vendors.

15.  Notwithstanding the Debtors' liquidity problems, most of the Critical Vendors continued to manufacture and ship Critical Vendor Products in January and February of this

6

year. But by March 2017, the Critical Vendors had been stretched as far as they could be, and many were no longer willing or able to ship products to the Debtors without being paid. Based on the Debtors' discussions with these Vendors, we understand that because the Debtors are often the largest, and in some cases the only, customer to their Critical Vendors, the Debtors' nonpayment or delayed payment has put the Critical Vendors in strained financial situations such that many of them have hit their own credit limits with their lenders or suppliers, and without payments from the Debtors, they are no longer able to obtain the raw materials necessary to make the Debtors' products. Some of the Critical Vendors are at serious risk of becoming insolvent themselves.

16. Specifically, in connection with normal course conversations and negotiations with the Critical Vendors, certain Critical Vendors indicated that they are no longer able to purchase the raw material necessary to produce the Debtors' products without payment on account of past due amounts. Many vendors have stopped shipping product or ceased accepting new purchase orders, and many more have threatened to stop shipping in the near term. Given the transition lead time, there are no suppliers in the industry capable of replacing the Critical Vendors and providing the Debtors with the volume of made-to-order product they need. As such, if the Critical Vendors will not or cannot manufacture and ship shoes to the Debtors, then the Debtors will not have the right shoes or the right amount of shoes to sell. Furthermore, without the requisite volume of necessary shoes to sell in the right season, the Debtors will struggle, to the detriment of the Debtors' stakeholders and all of their vendors, critical and non-critical alike.

17. This is not a speculative concern. The threat to the Debtors is real, existential, and current, and it was part of the motivation for the Debtors' chapter 11 petitions. Critical

Vendors who have not been paid have been holding the Debtors' products in their warehouses. Since the beginning of January, in aggregate, approximately 4 million pairs of shoes have been held by merchandise vendors, equating to approximately 15% of total expected shipments during the same period. Because the Debtors' shoes are largely seasonal, if these products are not released to the Debtors soon, they will no longer be in demand when they reach stores and will likely have to be sold at a loss.

18.   Critical Vendors have also put the Debtors on notice that unless payments are made on their outstanding invoices, they will cease to supply the Debtors with the products necessary for the Debtors to execute on their business plan, and have begun turning away the Debtors' product orders, which will affect the Debtors' ability to capitalize on the back-to-school sales season that runs from mid-July to mid-September. The back-to-school season is one of the most important selling seasons of the year, and it is critical to the Debtors' annual revenues. In 2016, the Debtors captured roughly 17% of their sales revenue during this six to eight-week period. The following chart plots the Debtors' weekly sales for North America in 2016, including the substantial bump that occurs during the back-to-school selling season:



19. To capitalize on the back-to-school season, the shoes the Debtors will sell *must* be made now—every week of delay risks a delivery date that falls after the season ends. In many ways, receiving back-to-school inventory late would be worse than not manufacturing these shoes at all. Like many types of footwear, back-to-school inventory is highly seasonal, and, as with the inventory currently withheld, if the Debtors miss the back-to-school season, their only option will likely be to mark down the back-to-school shoes and sell them at a loss.

20. More fundamentally, because of the 20-week lead time between placing a product order and having the products in stores and ready to sell, each week in which the Debtors' product orders go unfilled represents one-and-a-half to two million pairs of shoes that the Debtors will not be able to sell in the third or fourth quarters of this year. The chart below depicts this lead time:



21. If the Debtors do not start paying their Critical Vendors soon, they will not hit back-to-school season and will not have the inventory to maintain their revenue and EBITDA in the third and fourth quarters of this year, which would significantly harm the Debtors' estates

and impair their restructuring efforts, and would therefore do significant harm to all of the Debtors' vendors and stakeholders. Conversely, if the Debtors are permitted to pay a portion of their prepetition obligations to the Critical Vendors, the Debtors' other creditors, including their non-critical vendors, will be no worse off, and in fact will fare far better, because the Debtors will be empowered to negotiate such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations, thereby maximizing the likelihood of a successful reorganization and maximizing the Debtors' enterprise value along the way.

22. If they do not pay the Critical Vendors, the Debtors also run the risk of irreparably damaging their relationships with the only vendors capable of supplying product in the volume the Debtors require. There have been news stories in Chinese and Taiwanese media warning factories to beware of financial risks when doing business with the Debtors, and local factory and supplier groups in Asia have already attempted to plan a protest at one of the product consolidation and shipping centers used by the Debtors, which caused employees to take off work to avoid a potential confrontation with the protestors.

23. To avoid causing irreparable damage to the Debtors by disrupting their supply chain, which is integral to their business model and ability to function as a going concern, the Critical Vendor Motion must be approved.

### III.  Carriers and Warehousemen

24. The Debtors' ability to deliver their products in a timely manner is also critically important to their financial performance and depends on a seamless interaction with various third-party service providers. The Debtors depend on certain vendors to transport and store products (collectively, the "Carrier and Warehouse Products").

25. After leaving source factories in Asia, the Debtors' products go to the consolidated freight stations in the applicable sourcing country before sailing on freight vessels

to ports on the West Coast of the United States, Panama, Peru or one of the many countries where the Debtors' franchisees are located. From there, they go to local distribution centers (the "Distribution Centers") before being delivered to the Debtors' stores.

26. The Debtors engage certain vendors (the "Carriers") to transport and deliver the Carrier and Warehouse Products from the consolidated freight stations to the Distribution Centers, and then from the Distribution Centers to the Debtors' stores. The Carriers regularly possess products belonging to the Debtors and certain of the Debtors' partners in the course of transporting and delivering and have the ability to hold those products if they are not paid. In any given week, approximately $29 million worth of the Debtors' inventory is being shipped on water and $18 million is being shipped on land.[3]

27. In the ordinary course of business, the Debtors also use a number of warehouses to store various products, such as shoes, athletics, socks, handbags, accessories, and other products at various points during transit from the vendors to the stores (collectively, the "Warehousemen"). The Debtors pay the Warehousemen in arrears; therefore, many Warehousemen are owed certain amounts on account of prepetition storage fees. The average monthly amount paid by the Debtors to the Carriers and Warehousemen on behalf of the Debtors and their partners is approximately $10 million.

28. The refusal of Carriers or Warehousemen to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.

**IV.    Goods Received Within 20 Days Before the Petition Date**

---

[3] These figures reflect an estimate of the Debtors' cost to produce the shipped goods. The retail value of the shipped goods is substantially higher.

29. The Debtors may have received certain goods from various vendors within the twenty (20) days before the Petition Date (such vendors collectively, the "503(b)(9) Claimants"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts, or are governed by a Master Purchase or Master Sourcing Agreement, which does not obligate the 503(b)(9) Claimant to enter into subsequent Purchase Orders. Rather, the Debtors often obtain products on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims. Certain 503(b)(9) Claimants have already demanded payment in cash on delivery, further exacerbating the Debtors' liquidity problems.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, NY, on this day, April 3, 2017.

*/s/ Robert Campagna*
Robert Campagna