## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

-------------------------------------------------------x

In re

PAYLESS HOLDINGS, LLC, *et al.*,[1]

Debtors.

-------------------------------------------------------x

Case No. 17-42267-659

Chapter 11

Jointly Administered

Hearing Date: May 31, 2017
Hearing Time: 10:00 a.m.

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT, (II) FIXING DATES AND DEADLINES RELATED TO CONFIRMATION OF THE PLAN, (III) APPROVING CERTAIN PROCEDURES FOR SOLICITING AND TABULATING THE VOTES ON, AND FOR OBJECTING TO, THE PLAN, (IV) APPROVING THE RIGHTS OFFERING PROCEDURES, SUBSCRIPTION FORM AND AUTHORIZING THE RETENTION OF FINANCIAL BALLOTING GROUP LLC IN CONNECTION THEREWITH, AND (V) APPROVING THE MANNER AND FORM OF THE <u>NOTICES AND OTHER DOCUMENTS RELATED THERETO</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource, Inc., 3231 SE 6th Avenue, Topeka, KS 66607, United States.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT..................................................................................1

II.     STATEMENT OF FACTS .....................................................................................4

      A.   Background ...............................................................................................4

      B.   Potential Claims Arising From the 2012 LBO, 2013 Dividend Recap
          and 2014 Dividend Recap .........................................................................5

      C.   The Proposed Plan and Disclosure Statement.........................................8

III.    OBJECTION .......................................................................................................11

      A.   Approval of the Disclosure Statement Must Be Denied ...........................11

      B.   The Disclosure Statement Should Not Be Approved Because it Does
          Not Contain Adequate Information as Required by Section 1125 of the
          Bankruptcy Code .......................................................................................12

         1.   The Disclosure Statement Contains No Valuation Analysis.....................14

         2.   The Disclosure Statement Contains No Financial Projections.................15

         3.   The Disclosure Statement Contains No Liquidation Analysis .................16

         4.   The Disclosure Statement Contains No Information Regarding Estate
            Claims, Including Those Arising From the 2012 LBO and Dividend
            Recaps, Which the Debtors Propose to Release Under The Plan............17

         5.   The Disclosure Statement Contains Insufficient Information
            Regarding Classification and Treatment of Claims and Impacts on
            Creditor Recoveries .................................................................................19

         6.   The Disclosure Statement Contains No Disclosure Regarding the
            Terms of the Management Equity Incentive Plan, the Cash Incentive
            Plan, Or Their Proposed Recipients..........................................................20

      C.   The Plan As Filed is Defective and Incapable of Being Confirmed..........21

      D.   Certain Solicitation and Tabulation Procedures Improperly
          Disenfranchise Creditors...........................................................................24

IV.     RESERVATIONS OF RIGHTS .............................................................................26

V.      CONCLUSION ....................................................................................................26

The Official Committee of Unsecured Creditors (the "Committee") of Payless Holdings, LLC ("Payless Holdings"), *et al.* (the "Debtors") hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Fixing Dates and Deadlines Related to Confirmation of the Plan, (III) Approving Certain Procedures for Soliciting and Tabulating the Votes On, and for Objecting to, the Plan, (IV) Approving the Rights Offering Procedures, Subscription Form and Authorizing the Retention of Financial Balloting Group LLC in Connection Therewith, and (V) Approving the Manner and Form of the Notices and Other Documents Related Thereto* [Docket No. 377] (the "DS Motion") and the *Disclosure Statement for the Joint Plan of Reorganization of Payless Holdings LLC and Subsidiary Debtors* [Docket No. 416] (the "Disclosure Statement").[2]  In support of its Objection, the Committee respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT

1.     The Disclosure Statement is, by the Debtor's own admission, merely a placeholder filed to meet the fast-track milestones contained in the prepetition Restructuring Support Agreement (the "RSA") between the Debtors and certain consenting holders of prepetition secured debt.  The Disclosure Statement, and the Plan that it purports to describe, are lacking even the most basic information necessary for creditors to determine whether to accept or reject the Plan.  The Debtors' statement that the Disclosure Statement will contain adequate information "***by the time of the hearing on the Disclosure Statement***" is offensive to any notion

---

[2] Original versions of the Plan and Disclosure Statement were filed on April 25, 2017.  At the direction of the Court, corrected versions of the Plan and Disclosure Statement were filed on April 27, 2017 (at Docket Nos. 415 and 416) to include signatures for the Debtors' CFO, Michael Schwindle.  Certain typographical errors were also corrected with those filings.

of due process or fair compliance with federal and local bankruptcy rules. Such blatant disregard of the procedural requirements of this Court should not be condoned.

2.    There is more meaningful information missing from the Disclosure Statement than is included:

- The Disclosure Statement contains a chart entitled "Summary of Claims and Interests and Estimated Recoveries" <u>that is completely blank for both the estimated allowed amount of claims and estimated recovery</u> with respect to each and every class of claims and interests.

- The <u>proposed distributions to unsecured creditors</u>, which are improperly balkanized into four separate classes without any explanation whatsoever, <u>are also blank</u>.

- <u>All key exhibits are missing.</u>

- No valuation analysis (Exhibit A).

- No projections (Exhibit B).

- No liquidation analysis (Exhibit C).

- The Disclosure Statement has <u>no breakdown of assets and liabilities of the separate Debtors</u> that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

- The Disclosure Statement provides <u>no description of each of the Debtor entities</u>, their purpose, the corporate structure, intercompany claims and how the Debtors propose to transfer funds by and among the entities to fund obligations under the Plan.

- There is <u>no disclosure as to the relationship between the Debtor entities</u> and why there should not be substantive consolidation of certain Debtors for Plan or operating purposes.

- There is <u>no discussion in the Disclosure Statement concerning the potentially valuable unencumbered estate claims that are to be released</u>, the value of those claims and the consideration provided for the releases.

- There is no disclosure that the equity holders who control the Board of Directors withdrew over $350 million of capital in exchange for no

consideration whatsoever.  Specifically, nowhere in the Disclosure Statement is the fact specifically disclosed that the Debtors' equity holders, Golden Gate Capital ("Golden Gate") and Blum Capital ("Blum"), which together hold 98.5% of the Debtors' equity and control the Debtors' board of directors, received over $350 million of dividends in recent years.  These dividends were funded by the same secured debt that drove the Debtors' bankruptcy filing.  Indeed a search of the entire Disclosure Statement uncovers no mention of either Golden Gate or Blum by name.

- The tax analysis fails to state whether -- based on the actual creditors that are converting their debt to equity --  the Debtors believe there will be a limitation on the Debtors' net operating losses or other tax attributes.

- The Motion seeks (in the title of the Motion) approval of procedures related a rights offering but the Motion itself and the Plan do not discuss any rights offering.

3.     The Debtors have repeatedly indicated to the Committee that they would file an amended disclosure statement to provide the critical missing information, but as of the date hereof and with only a week before the scheduled hearing (including an intervening federal holiday), nothing has been provided.  There are thousands of creditors in these cases.  Those creditors, in addition to the Committee and other parties in interest, are entitled to notice and an opportunity to review the actual disclosure statement rather than be the victims of a bait and switch right before the hearing as the Debtors have indicated they plan to attempt.[3]

4.     These "prearranged" or "pre-negotiated" chapter 11 cases were devised by the Debtors and the consenting lenders with no input by general unsecured creditors. They have engineered a process with manufactured deadlines that bind the Debtors to fast-track confirmation proceedings with respect to a plan that hands over the company to the consenting lenders, gives up to 10% of the new equity to un-named insiders, and grants broad releases of valuable estate claims against the Debtors' equity holders and other insiders, while paying almost

nothing to general unsecured creditors left holding over one hundred and fifty million dollars of claims, and who are continuing to provide goods and services to these Debtors.

5.  The first question any holder of a general unsecured claim would be expected to ask before voting on the Plan is "how much are the Debtors proposing to pay on my claim?" Yet, the Disclosure Statement, as filed, fails to provide any estimate of potential financial recoveries to the holders of such claims. Without an answer to that question, and many others, informed voting by holders of general unsecured claims is not possible.

6.  Furthermore, the Plan is defective because, among other things, it is not feasible, fails the "best interests of creditors" test, and unfairly discriminates against certain classes of unsecured creditors.

7.  Based on the foregoing and as set forth more fully below, the Court should deny approval of the Disclosure Statement and direct the Debtors to notice a new disclosure statement hearing only after the actual document that they are seeking to have approved is on file.

## II.

## STATEMENT OF FACTS

### A.   Background

8.  On April 4, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

---

[3] On May 23, 2017, the Debtors filed a notice extending the objection deadline to May 26, 2017 at 4:00 p.m. CT, as a further indication that they plan to file last minute changes to the Disclosure Statement without an adequate

9.     On April 14, 2017, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of: (i) Moda Shoe, Ltd.; (ii) Qingdao Doublestar Mingren Imp. And Exp. Co.; (iii) C and C Accord, Ltd.; (iv) The Asean Corporation, Ltd.; (v) GGP Limited Partnership; (vi) Simon Property Group, Inc.; and (vii) Brixmor Property Group, Inc.

10.     On May 17, 2017, the Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expenses Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 778] (the "Final DIP Order").  The Final DIP Order memorializes the resolution of concerns raised by the Committee.  It provides, among other things, that certain of the estates' causes of action, including those relating to the 2012 LBO and Dividend Recaps (each as defined below) remain unencumbered.

**B.     Potential Claims Arising From the 2012 LBO, 2013 Dividend Recap and 2014 Dividend Recap**

11.     In May 2012, Collective Brands, Inc. split into two groups of companies: (i) Payless Inc. and subsidiaries (*i.e.*, the Debtors); and (ii) a group of subsidiaries that were sold to Wolverine World Wide Inc.  Payless Inc. was acquired by Golden Gate and Blum.   To fund the acquisition, the Debtors incurred $382 million of new debt. In connection with this leveraged buyout (the "2012 LBO"), the Debtors' ownership was rearranged such that Payless Holdings became the ultimate parent of Payless Inc., and Golden Gate and Blum held the membership interests in Payless Holdings.  In addition, the Debtors entered into an advisory agreement with

---

opportunity for the Committee or any creditors to review and respond accordingly prior to the scheduled hearing.

Golden Gate and Blum pursuant to which Golden Gate and Blum have been paid millions of dollars in fees.

12.     On February 27, 2013, Payless Inc. and other Debtors borrowed an additional $225 million, thereby increasing the Debtors' total debt to $595 million.  The $225 million in proceeds was upstreamed from Payless Inc. as borrower to Payless Holdings and ultimately paid as dividends to Golden Gate and Blum (the "2013 Dividend Recap").

13.     In March 2014, the Debtors issued $665 million in new debt.  In connection therewith, $127 million of such proceeds was paid to Golden Gate and Blum as dividends (the "2014 Dividend Recap" and, together with the 2013 Dividend Recap, the "Dividend Recaps").

14.     The Debtors' Board of Directors, which was dominated by Golden Gate and Blum designees, approved the 2013 Dividend Recap and 2014 Dividend Recap.

15.     In January 2017, Charles Cremens was appointed as the Debtors' "independent director."  At his direction, Munger, Tolles & Olson LLP ("MTO") was retained to investigate the Debtors' potential claims against Golden Gate and Blum in connection with the 2012 LBO, the 2013 Dividend Recap and the 2014 Dividend Recap.  MTO was retained as conflicts counsel on a final basis effective as of the Petition Date to represent the Debtors in these cases to continue its investigation regarding the existence of potential estate claims arising from these prepetition transactions between Payless and its shareholders, Golden Gate and Blum. The Debtors have not retained an independent expert to evaluate the key issue of whether the Debtors were solvent at the times of the 2012 LBO and/or the Dividend Recaps.  Nor have the Debtors advised the Committee as to whether the Debtors have reached any conclusions regarding the value of potential claims arising from the 2012 LBO and/or the Dividend Recaps.

16.     On May 9, 2017, the Committee filed its *Application to Employ Back Bay Management Corporation and its Division, the Michel-Shaked Group, as Expert Consultant and Dr. Israel Shaked as Expert Witness* [Docket No. 643], which seeks to retain an expert (the "Committee Expert") effective as of April 27, 2017, to conduct an independent investigation on behalf of the Committee with respect to, among other things, claims arising from the 2012 LBO and Dividend Recaps.  The Committee's investigation with respect to such claims is ongoing.

17.     The Committee's professionals were directed by the Debtors' lead counsel, Kirkland & Ellis, to interface with MTO regarding the investigation it has been conducting since January 2017 because the claims under investigation – whether against the Debtors' equity holders, their past and present officers and directors, lenders, professionals and others – are intended to be released under the Debtors' proposed plan of reorganization without any meaningful consideration.

18.     To date MTO has provided documents and responded to requests for information on an informal basis.  Substantial requests for the production of documents and critical information requests by the Committee remain outstanding as of the date hereof and MTO has not completed its investigation.

19.     While the Committee's professionals, including the Committee Expert, continue to conduct their own independent investigation, it has become apparent that valuable estate claims for, among other things, fraudulent transfer, illegal payment of dividends and breach of fiduciary duty exist.  Such claims are unencumbered under the Final DIP Order and would be available to satisfy unsecured claims absent the Debtors' proposed release of such claims under the Plan.

C.    **The Proposed Plan and Disclosure Statement**

20.    On April 4, 2017, the Debtors entered into the RSA, which has the support of parties who hold or control, in the aggregate, approximately two-thirds in amount of each of the Debtors' first and second lien term loans. The Debtors also secured the DIP Facilities from their Prepetition ABL Facility Lenders and certain of the consenting lenders under the RSA. The intent of the RSA, coupled with the DIP, plainly was to put the Debtors irrevocably on course for confirmation of the Plan.

21.    On April 25, 2017, the Debtors filed with this Court their proposed plan of reorganization [Docket No. 415] (the "Plan") consistent with the RSA filed on the Petition Date, and the accompanying Disclosure Statement. The Debtors have not sought to assume the RSA. The Debtors conclude that they "believe that the terms of the Restructuring Support Agreement, which are built into the Plan, are fair, equitable, and maximize the value of the Debtors' estates, providing the best available recovery for the Debtors [sic] stakeholders." Disclosure Statement at 15.

22.    The Plan is a debt-for-equity plan, which essentially provides the following:

a.    ABL DIP Claims will be paid in full from proceeds of the New ABL Facility.

b.    Holders of the Term DIP Facility Claims will receive, on a dollar-for-dollar-basis, their pro rata share of the New First Lien Term Loan A-1 Tranche.

c.    First Lien Term Lenders' claims are allowed in the amount of $505.7 million and holders thereof will receive their pro rata share of 91% of the new equity of the Reorganized Debtors (the "New Equity"), subject to reduction by the equity recovery to holders of unsecured claims against Payless ShoeSource Worldwide ("Worldwide"), and subject

to dilution from (a) the management equity incentive plan (6-10% of the New Equity on a fully diluted basis) (the "MEIP"), and (b) the exit commitment fee (which is New Equity of a value equal to 2.5% of the amount of the Term DIP Facility as of the Effective Date). Holders of such claims also will receive a pro rata share of the New First Lien Term Loan A-1 Tranche.

d.      Second Lien Term Lenders' claims are allowed in the amount of "$[145 million]" and holders thereof will receive on account of such claims (which include the unsecured deficiency portion of such claims) the remaining pro rata share of 9% of the New Equity (subject to dilution from the MEIP and the exit commitment fee).

e.      The general unsecured claims' treatment was filed as a placeholder with blanks for general unsecured creditor recoveries. The Debtors propose four different classifications and disparate treatment for general unsecured claims, as follows:

(i)      Qualified Unsecured Trade Claims (Class 5) consist of claims held by preferred ongoing trade vendors that offer trade terms and will be given a percentage payment of their claims after taking into account payments made by the Debtors to such holders on account of general unsecured claims or under other plan classes. The percentage amount in the Plan and Disclosure Statement is blank and to be determined.

(ii)      Other General Unsecured Claims (Class 6A) consist of unsecured claims against one or more of the Debtors other than Qualified Unsecured Trade Claims, Worldwide General Unsecured Claims, or Canadian General Unsecured Claims. They will receive a pro rata share of the Other General Unsecured Claims Recovery Pool, which will be funded from the Term DIP Facility. The recoveries are subject to dilution by the unsecured deficiency claims held by the First Lien Term Lenders and Second Lien Term Lenders. The Disclosure Statement

and Plan do not specify the amount of the Other General Unsecured Claims Recovery Pool to be distributed to these creditors, or what their expected percentage recovery is.

(iii)     Worldwide General Unsecured Claims (Class 6B) consist of unsecured claims against Worldwide.  The Plan provides alternative treatment depending on whether the holder of a Worldwide claim has made an election (*i.e.*, the Worldwide GUC Cash-Out Election) to receive cash on account of the holder's claim or a pro rata share of the Worldwide New Equity Recovery.

If the holder does not make the Worldwide GUC Cash-Out Election, the holder will receive its pro rata share of an undetermined percentage of New Equity (subject to dilution from the MEIP and the exit commitment fee).

The value of the New Equity is equal to the pro rata share of unencumbered property at Worldwide to which Worldwide unsecured creditors would otherwise be entitled to receive (net of value used to pay administrative and priority claims and taking into account the First Lien Term Lenders' deficiency claims and the Second Lien Term Lenders' claims).

The Worldwide GUC Cash Out Option Payment is defined as a cash payment no less than the lesser of (a) "[___]% of the value" of the Worldwide New Equity Recovery that such holder would have otherwise been entitled to had it not made the Worldwide GUC Cash Out Election and (b) such holder's pro rata share of "$[___]" (which amount is the total amount of cash that would be paid assuming all holders of the estimated Worldwide General Unsecured Claims, as estimated in the Disclosure Statement, make the Worldwide GUC Cash Out Election).

(iv)     Canadian General Unsecured Claims (Class 6C) are general unsecured claims against Payless ShoeSource Canada, Inc., Payless ShoeSource Canada GP Inc., and Payless ShoeSource Canada, LP and will be reinstated and rendered unimpaired.

f.     Intercompany claims held by a Debtor against another Debtor or affiliate of a Debtor or by an affiliate of a Debtor against a Debtor will be canceled, reinstated or compromised in the Debtors' determination with the consent of the requisite consenting lenders.

g.     The Plan includes broad releases by the Debtors of various parties (the "Released Parties") which include the Debtors, current and former officers and directors, Prepetition First and Second Lien Lenders and Agents, other lenders and agents, Sponsors (as defined in the Prepetition First Lien Credit Agreement), parties to the RSA and all successors, assigns, principals, members, shareholders, etc. of the foregoing entities.

The Plan also provides for Third Party Releases of the Released Parties.  Along with the Debtors, the "Releasing Parties" include the lenders, the Sponsors, holders of claims and interests (a) who vote in favor of the Plan, (b) are deemed unimpaired and presumed to accept the Plan, or (c) do not expressly opt out of the releases.  The Plan provides no consideration for the releases and the Disclosure Statement provides no analysis whatsoever of the nature, extent or value of the claims that are proposed to be released.

## III.

## OBJECTION

### A.     Approval of the Disclosure Statement Must Be Denied

23.     Bankruptcy Rule 2002(b) requires 28 days' notice of the objection to a Disclosure Statement.  The purpose of these rules is to afford creditors and other parties in interest sufficient time to review the proposed disclosure statement, determine whether it meets the standards of section 1125 of the Bankruptcy Code, and present their objections to the Court.

In order to comport with due process requirements, the 28-day period does not begin to run when a placeholder document laden with blanks for substantive information is filed, but only when a complete document providing "adequate information" (or something close to adequate information) is actually filed.  To date, the Debtors have attempted to circumvent this basic due process requirement first by filing a "bare bones" placeholder Disclosure Statement, which is missing the most fundamental, critical and necessary information for holders of general unsecured claims and other classes of claims to render an informed decision on a plan and indicating their intent to fill in the blanks by the time of the hearing.  The Court should not condone this trickery.  Absent a complete document, a party in interest is unable to determine "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

       24.     Although the Debtors may argue that they have *technically* satisfied their 28-day notice requirement by filing a document titled "Disclosure Statement," the document that was filed is not sufficient to satisfy fundamental notice requirements.  The Debtors have repeatedly indicated to the Committee that they would file the real disclosure statement with the actual information, but to date have failed to do so.  Accordingly, the Court should hold the Debtors to the plain language of the Bankruptcy Rules and deny approval of the Disclosure Statement and admonish the Debtors to schedule a hearing on a Disclosure Statement only when the document is complete for creditors and parties in interest to review.

**B.**     **The Disclosure Statement Should Not Be Approved Because it Does
Not Contain Adequate Information as Required by Section 1125 of
the Bankruptcy Code**

       25.     The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code in numerous material respects.  Section 1125(b) of the Bankruptcy Code requires that a proponent of a plan and disclosure statement demonstrate that the disclosure statement includes

"adequate information" for creditors and other parties in interest to make an informed judgment about the plan.  In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."  *In re Applegate Prop., Ltd.,* 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991). Significantly, even if more thorough disclosure would not have affected an objecting creditor's vote, that creditor still has standing to object because inadequate disclosure may have induced other creditors to approve the plan.  *Everett v. Perez (In re Perez),* 30 F.3d 1209, 1217 (9th Cir. 1994). For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan."  *See In re Jeppson,* 66 B.R. 269, 292 (Bankr. D. Utah 1986; *In re Ferretti,* 128 B.R. at 19 (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution.").

26.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote.  *See In re Phoenix Petroleum Co.,* 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (*citing In re Monroe Well Serv., Inc.,* 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); *see also* 11 Collier on Bankruptcy, 1125.03[1] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

27.     Here, the Disclosure Statement is filled with boilerplate language and omits basic information about matters of primary concern to creditors.  How much do unsecured creditors stand to receive under the Plan?  What is the basis for such estimate?  What claims will be pursued?  What is the extent of claims that are being released and what is their value?  Absent such disclosures, creditors have not been provided with "adequate information" to make an informed decision as to whether to accept or reject the Plan.

### 1.     The Disclosure Statement Contains No Valuation Analysis

28.     Although the Committee recognizes that section 1125(b) of the Bankruptcy Code provides that inclusion of a valuation in a disclosure statement is not mandatory *per se*, *see* 11 U.S.C. § 1125(b), a debtor may not omit a valuation where case circumstances manifestly require its inclusion.  *See In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mon. 1987).  Indeed, courts have refused to approve a disclosure statement because a debtor failed to include a valuation of its enterprise.  *See In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (rejecting debtor's amended disclosure statement for lacking information "regarding the . . . . valuation methods used in preparation" of the disclosure statement); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 570 (Bankr. N.D. Ga. 1984) (denying approval of debtor's disclosure statement for failing to provide valuation of machinery and equipment, and observing that "[a]bsent a valuation of the assets . . . the disclosure statement does not provide adequate  information as required by the Bankruptcy Code") (emphasis added); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (rejecting disclosure statement for not including valuation); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) (finding that circumstances of the case "would appear to mandate, at a minimum," the debtor's inclusion of a valuation in the disclosure statement).

29.     Valuation is a key issue in these cases because, although estimated percentage recoveries are now blank and "TBD," the Plan plainly assumes there is minimal value available for unsecured creditors with no disclosure regarding how the Debtors' reached that conclusion. Creditors cannot understand what they are receiving or what they ought to be receiving from the Debtors' unencumbered assets without a detailed valuation, particularly one that includes an appropriate allocation of value among the Debtors and recoveries across different unsecured creditor constituencies given the proposed balkanization of general unsecured claims into four separate classes.  Unsecured creditors also must have the benefit of the Committee's view of value in order to understand what they are entitled to receive under a plan.  Without this information, the unsecured creditors cannot make an informed decision to either accept or reject the Plan.

### 2.    The Disclosure Statement Contains No Financial Projections

30.     The information provided in a Disclosure Statement should include financial projections:

> A plan is necessarily predicated . . . . on factually supported expectations as to future course of the business sufficient to meet the feasibility standard . . . It may thus be necessary to provide estimates or judgments for that purpose.  Yet it remains practicable to describe, in such detail as may be relevant and needed, the basis for the plan and the data on which supporters of the plan rely.

S. Rep. No. 989, 95th Cong. 2d Sess. 121.  56.  Courts have also recognized the need for detailed disclosure in this regard:

> The Debtor should provide the projection of operations subsequent to confirmation so that the Court may determine the feasibility of the plan.  The Debtor is required to make a full, clear, and complete disclosure of all underlying assumptions.  The Debtor must provide sufficient financial information to determine if the projections for operations subsequent to confirmation are feasible. If the plan assumes an increase in income, the basis for this assumption must be set forth.

*In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983); *see also In re Cardinal Congregate I*,
121 B.R. at 767 (a disclosure statement "should clearly identify all assumptions made in
calculating pro forma information and should set forth those facts supporting all estimates,"
especially when plan depends on debtor's ability to improve its financial performance); *In re
Dakota Rail, Inc.*, 104 B.R. 138, 148-149 (Bankr. D. Minn. 1989) ("A disclosure statement is
misleading where it contains glowing opinions or projections, having little or no basis in fact
and/or contradicted by known fact"); *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981)
(mere allegations or opinions unsupported by factual information in the disclosure statement do
not meet the standard of adequate information).

31.     Although the proposed Plan reduces the leverage on the Debtors from
$838 million on the Petition Date to a projected $469 million on the effective date of the Plan,
there are no plan projections on file, however, and no information for creditors to evaluate
whether the Debtors can service this level of debt post-confirmation.  The Debtors' conclusion
regarding the ability of the Reorganized Debtors to sustain the amount of proposed leverage,
unsubstantiated by any factual information, fails to meet the standard of adequate information
necessary to enable creditors to consider the value of these estates, evaluate the feasibility of the
Plan or determine whether they should accept or reject its terms.

### 3.     The Disclosure Statement Contains No Liquidation Analysis

32.     A disclosure statement must contain a detailed liquidation analysis that
explains any assumptions made in the preparation of such analysis so that creditors can make an
informed decision about the alternatives to a debtor's plan.  *See In re Crowthers McCall Pattern,
Inc.*, 120 B.R. 279, 300-301 (Bankr. S.D.N.Y. 1990).

33.     The Disclosure Statement contains no liquidation analysis.  Without any
disclosures regarding unencumbered assets (*e.g.*, the value of estate causes of action, including

claims arising from the 2012 LBO and Dividend Recaps), general unsecured creditors cannot draw a conclusion as to whether the value they will receive under the Plan exceeds the value they would receive in a liquidation. *See* 11 U.S.C. §1129(a)(7)(A)(ii). Accordingly, it is impossible for such creditors to make an informed decision whether to accept or reject the (as yet unspecified) treatment provided to them under this Plan.

> **4.      The Disclosure Statement Contains No Information Regarding Estate Claims, Including Those Arising From the 2012 LBO and Dividend Recaps, Which the Debtors Propose to Release Under The Plan**

34.      The Debtors propose to release current and former directors and officers, lenders, agents and related entities – including Golden Gate and Blum – without any meaningful disclosure of potential claims that may exist against those parties, the value of those claims and any consideration that is being provided for the releases being granted.

35.      As set forth above, certain estate causes of action, including claims relating to the 2012 LBO and Dividend Recaps, remain unencumbered assets that would be available for the benefit of unsecured creditors. The Committee successfully managed to preserve such assets for the benefit of unsecured creditors in connection with the approval of DIP financing in these cases. Now creditors will be robbed of such value if the releases are approved. The claims must be specifically described and the basis for the release of those claims must be set forth with particularity.

36.      *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), the court cited the following five factors to consider with respect to determining the propriety of releases under a plan:

> 1.      There must be an identity of interest between the debtor and the third party such that a suit against the third party is, in essence, a suit against the debtor or will deplete assets of the estate;

2.      The third party must contribute "substantial assets" to the reorganization;

3.      The injunction is essential to reorganization. Without it, there is little likelihood of success;

4.      A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has overwhelmingly voted to accept the proposed plan treatment; and

5.      The plan must provide for payment of all or substantially of the claims of the classes affected the third party release.

None of the *Master Mortgage* requirements are satisfied by the information provided in the Disclosure Statement.

37.      Unless and until information is disclosed (and it may not be available as the Debtors' investigation of potential claims is still in process), no determination can be made as to whether any plan releases are justified and, if so, for what value.  The Disclosure Statement contains only conclusory statements about the propriety of the releases, but no facts substantiating such conclusions.  The sole mention of these potentially valuable claims themselves is buried in a footnote referencing generic estate claims against the equity holders that MTO is investigating.  *See* Disclosure Statement at n. 21. Creditors who will be deprived the potential value arising from these estate claims must be provided with adequate disclosure to enable them to determine whether to accept or reject these terms.

38.      Adding insult to injury, the Plan proposes that all unreleased causes of action (which would include avoidance actions against general unsecured creditors) will be retained by the Reorganized Debtors, such that the proceeds of such claims will inure only to the benefit of existing lenders as the owners of the Reorganized Debtors.  Unsecured creditors could thus end up paying more to the estates than the presumably *de minimis* distribution offered under the Plan.

39.     To make matters more confusing and misleading, the Disclosure Statement indicates in boilerplate fashion that:

> The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Disclosure Statement at 28.  Presumably the Debtors are invoking Bankruptcy Rule 9019 to justify the proposed releases, but there is no description whatsoever of the Causes of Action that are being "settled" as opposed to released, what the consideration is, or any facts to satisfy the typical Bankruptcy Rule 9019 factors.

### 5.     The Disclosure Statement Contains Insufficient Information Regarding Classification and Treatment of Claims and Impacts on Creditor Recoveries

40.     The Plan does not propose to substantively consolidate the Debtors' assets and liabilities.  As set forth above, general unsecured claims are relegated to four separate classes and provided disparate treatment.  Intercompany claims will be canceled or reinstated at the Debtors' discretion, with the Consenting Lenders' consent.  No valuation, projections or liquidation analysis have been filed and the Disclosure Statement otherwise does not contain sufficient information as to the relationship between the Debtor entities, the description of intercompany claims, and why there should not be substantive consolidation of certain Debtors for Plan or operating purposes.   Separate classification and treatment of similarly situated creditors requires basic disclosure of the assets and liabilities, financial information and liquidation and reorganization values of each of the Debtors.  Yet this is not provided.  Absent such information, creditors cannot discern the impact on their recoveries.

6.    **The Disclosure Statement Contains No Disclosure Regarding the Terms of the Management Equity Incentive Plan, the Cash Incentive Plan, Or Their Proposed Recipients.**

41.    The Disclosure Statement provides that the MEIP will be granted to "continuing employees of the Debtors and members of the New Board with pricing, vesting and exercise terms to be determined by the New Board upon consultation with the Chief Executive Officer of Reorganized Holdings."  Equity awards for 6-10% of the New Equity (on a fully diluted basis) will be provided to recipients under the MEIP.  Such recipients will not be disclosed until the New Board members are identified in the Plan Supplement.  In addition, the Debtors will assume the Cash Incentive Program, the terms of which are referenced as Exhibit H to the Disclosure Statement, but which were not filed or provided to the Committee.  Creditors should be provided with adequate disclosure regarding the rich rewards to be handed out post-confirmation to insiders while general unsecured creditors presumably will receive meager recoveries.

42.    In a case such as this, where the Debtors, their insiders, and lenders are aggressively pushing forward on a Plan that gives general unsecured creditors so little, and where unencumbered assets are not being made available for general unsecured creditors, creditors should know exactly the state of affairs as to whether the Debtors' current management team is going to be part of the Reorganized Debtors' management team, and receive valuable stock grants under the MEIP, the terms of which are not disclosed.  There is no meaningful discussion of this topic at all in the Disclosure Statement.  Rather, such information will be provided prior to the confirmation hearing.

43.    It is hard to imagine that the Debtors have nothing more to disclose at this time about the contemplated post-effective date management and their compensation and incentive awards, when they are on a truncated confirmation timeline and accordingly are so

close to a confirmation hearing.  Simply because such disclosures are also disclosures that must

be made pursuant to section 1129(a)(5) in order to confirm any plan does not obviate the need to

make such disclosures in the Disclosure Statement if they are material, as they clearly are in this

case.

**C.**      **The Plan As Filed is Defective and Incapable of Being Confirmed**

44.      While it is impossible to determine exactly what this Plan provides given

the utter lack of any meaningful disclosure as set forth above, the Committee believes that the

following preliminary obstacles to confirmation of the Plan exist.[4]

45.      The Plan is not feasible.  Section 1129(a)(11) of the Bankruptcy Code

requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need

for further financial reorganization, of the debtor or any successor to the debtor under the plan,

unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. §1129(a)(11).

Debtors are required to provide "ample evidence" to demonstrate that the Plan has a reasonable

probability of success.  *See In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  Here, the

Debtors propose to exit with $469 million of secured debt on their balance sheet at emergence,

but provide no evidence (not even plan projections) that the Debtors can service this level of

debt.

46.      The Plan will presumably be rejected by holders of general unsecured

claims, and cannot be confirmed over their objection because it violates the best interest test.

Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests of creditors

test."  Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests,

(A) each holder of a claim or interest in such class (i) has accepted the plan, or (ii) will receive or

---

[4] The Committee reserves its right to object to confirmation of the Plan (or any amended plan) on the grounds set forth herein and any other grounds.

retain under the plan property of a value that is not less than the amount that holder would receive or retain if the debtor liquidated under chapter 7.  11 U.S.C. §1129(a)(7).  The best interests test is based on a hypothetical liquidation.  7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution….").  In order to carry their burden, the Debtors must produce sufficient financial information about themselves, their assets and liabilities and their prospects to permit the bankruptcy court to judge whether the best interest test for confirmation has been satisfied.  *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000).

47.     The Debtors have provided no evidence of going concern or liquidation value in these cases.  There is no disclosure or analysis of potential actions that may be available to creditors, however the Plan proposes to give holders of unsecured claims less than their pro rata share of unencumbered assets, including potentially valuable claims arising from the 2012 LBO and Dividend Recaps, among other claims.   The Debtors cannot show that their plan provides at least as much to creditors as creditors would receive if the Debtors were liquidated.

48.     Moreover, the structure of the Plan indicates that the holders of Worldwide General Unsecured Claims will receive less value than their entitlement under the Bankruptcy Code.  Holders of First Lien Secured Claims in Class 3 will receive 91% of the New Equity of the Reorganized Debtors.  That amount is reduced by the New Equity allotment to holders of Worldwide General Unsecured Claims, the calculation of which takes into account (a) the deficiency claims held by the First Lien Lenders, and (b) the entire Second Lien claims, indicating that the Second Lien claims are fully unsecured.  Thus, the holders of Worldwide General Unsecured Claims should share *pari passu* with the holders of Class 4 Second Lien

claims as to the New Equity not otherwise allocated to holders of First Lien Secured Claims in Class 3.

49.     The Plan cannot be confirmed over the rejection of an impaired class because it discriminates unfairly and is not fair and equitable.  Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an impaired class, also known as a cramdown, only if, among other things, "the plan does not discriminate unfairly and is fair and equitable."  11 U.S.C. § 1129(b)(1).

50.     The "unfair discrimination" standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.  Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes.  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).  This Plan is discriminatory insofar as it provides disparate treatment of creditors who hold unsecured claims.  Here, the Second Lien claims are vastly undersecured.  However, the Second Lien Lenders will receive 9% of the New Equity, which is presumably more than will be offered to holders of general unsecured claims.  The Debtors must demonstrate that the recovery to each of the unsecured creditor classes is justified by the debt structure and asset values of the Debtor entities and that the corporate structure of the Debtors is justified for business purposes and not set up as a mechanism to unfairly treat similarly situated creditors.

51.     The "fair and equitable" standard " has at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 Collier on Bankruptcy ¶1129.03[4][a].  In this case, without being able to test the Debtors' valuation and its

underlying assumptions -- which have not yet been filed --  there is no way to determine whether the allocation of New Equity under the Plan violates the absolute priority rule and is not fair and equitable because it provides the Class 3 Secured Lien Lenders value in excess of the amount of their claims.  For this reason, it is critical that the Committee's professionals conduct an independent valuation and carefully review and scrutinize the Debtors' valuation once it is filed.

52.    The Plan also contains broad, gratuitous and otherwise inappropriate direct and third party releases in favor of all the lenders and Debtors' current and former officers. These releases improperly take away the only rights that unsecured creditors may have to seek as a recovery - their litigation rights - without adequately compensating them for such treatment.

**D.    Certain Solicitation and Tabulation Procedures Improperly Disenfranchise Creditors**

53.    Finally, the Committee objects to certain of the solicitation and ballot tabulation procedures proposed in the Motion.  At the time the Motion was filed, the Debtors had proposed a general claims bar date (the "<u>Bar Date</u>") that would have occurred prior to solicitation.  Since then the Court has entered an order (the "<u>Bar Date Order</u>") establishing June 19, 2017 as the Bar Date.  Although the Debtors agreed that such timing required modifications to the proposed solicitation procedures, they have not yet posted a revised order containing any such modifications.  Accordingly, the Committee respectfully requests that any order contain the modifications set forth below in order to preserve creditors' fundamental right to vote to accept or reject the Plan.  The Committee's objections to the solicitation and tabulation procedures are as follows:

- The Debtors propose that the solicitation deadline be June 7, 2017 "or as soon as reasonably practicable thereafter." Proposed Order at ¶¶ 7.b.; 10. The Debtors should not be permitted to vary from the solicitation deadline because it will result in less time for creditors to submit votes.

- The voting and tabulation procedures should apply only absent a contrary order of this Court in the event unforeseen circumstances arise that require Court intervention. The Committee proposes that the provision "absent a contrary order of the Court" be added at the beginning of paragraphs 16 and 17 of the Proposed Order.

- The proposed procedures enabling creditors to file motions pursuant to Bankruptcy Rule 3018 are flawed. Specifically, the Proposed Order states that such motions must be filed by the "Voting Resolution Deadline" but does not indicate what that date is. *See* Proposed Order at ¶19.b. In addition, the Debtors also are not required to file any responses to such motions, but may present them at the confirmation hearing. The Debtors must provide a reasonable timeline for the filing of motions and objections that affect a creditor's right to vote, and must inform creditors who file such motions of any basis for objecting to them by way of a written response in advance of the confirmation hearing.

- The Proposed Order provides for the possibility that the Debtors could object to a filed proof of claim and thereby affect the amount in which the vote on any such claim is counted, but do not provide a deadline for objecting to claims that will affect the amount of a creditor's vote. *See* Proposed Order at ¶16.c. If the Debtors plan to object to claims prior to the voting deadline, they should be required to do so by a certain deadline that will provide such creditors with adequate time to file a motion pursuant to Bankruptcy Rule 3018.

- The Proposed Order provides that a vote cast by the holder of a claim scheduled as contingent, unliquidated or disputed for which the Bar Date has not passed <u>will be counted</u> in the amount of <u>$1.00</u> solely for purposes of section 1126(c). Proposed Order at ¶16.e. It then provides that a "Disputed Claim Notice" will be sent to entities with claims scheduled or filed as contingent, unliquidated or disputed, or for $0.00 or in an unknown amount. Such notice states, contrary to the foregoing provision, that the holders of such claims are <u>not entitled to vote at all</u>. *See* Proposed Order at Exhibit 4. Such notice should be revised to provide that votes cast by such holders will be counted in

the amount of $1.00 and should explicitly provide notice of the opportunity for such holders to file Bankruptcy Rule 3018 motions and the deadline to do so rather than a generic reference to their right to contest their status "in accordance with the Disclosure Statement Order." *Id.*

- The Bar Date Order provides that counterparties to unexpired leases may submit a cure statement to the Debtors by the Bar Date in lieu of a proof of claim in accordance with the terms of the Bar Date Order. In the event a cure statement is provided prior to the voting deadline, any vote cast by such a counterparty should be counted in the amount set forth in the cure statement as the prepetition amount owed.

54.    In addition, in the event the Disclosure Statement is amended to provide the missing information described herein and the Debtors proceed to solicitation, they should be required to include a letter from the Committee as part of the solicitation package.

# IV.

# RESERVATIONS OF RIGHTS

55.    The Committee reserves its right to supplement this Objection at or prior to the hearing or continued hearing on the Disclosure Statement.

# V.

# CONCLUSION

56.    Based on the foregoing, the Court should deny approval of the Disclosure Statement and direct the Debtors to notice a new disclosure statement hearing only after the actual document that they are seeking to have approved is on file.

Dated: May 24, 2017                    POLSINELLI P.C.

                                       */s/ Matthew S. Layfield*
                                       Matthew S. Layfield, Esq.
                                       100 S. Fourth Street, Suite 1000
                                       St. Louis, MO 63102
                                       Telephone: (314) 889-8000

                                       *Proposed Local Counsel for the Official Committee
                                       of Unsecured Creditors*

                                       PACHULSKI STANG ZIEHL & JONES LLP

                                       Robert J. Feinstein, Esq. (admitted *pro hac vice*)
                                       780 Third Avenue, 34th Floor
                                       New York, NY 10017
                                       Telephone:  (212) 561-7700

                                       Bradford J. Sandler, Esq. (admitted *pro hac vice*)
                                       919 North Market Street, 17th Floor
                                       Wilmington, DE 19801
                                       Telephone:  (302) 652-4100

                                       Jeffrey N. Pomerantz, Esq. (admitted *pro hac vice*)
                                       10100 Santa Monica Boulevard, 13th Floor
                                       Los Angeles, CA 90067-4100
                                       Telephone:  (310) 227-6910

                                       *Proposed Lead Counsel for the Official Committee
                                       of Unsecured Creditors*