# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Case No. 17-42267-659 |
|  | ) CHAPTER 11 |
| PAYLESS HOLDINGS LLC, *et al.*,[1] | ) |
|  | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

---

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED
## JOINT PLAN OF REORGANIZATION OF PAYLESS HOLDINGS LLC AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

---

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Cristine F. Pirro (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
William A. Guerrieri (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:          (312) 862-2000
Facsimile:          (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Steven N. Cousins (MO 30788)
Erin M. Edelman (MO 67374)
John G. Willard (MO 67049)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone:          (314) 621-5070
Facsimile:          (314) 621-2239

---

[1]      The Debtors (as defined herein) in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [5190]; WBG-PSS Holdings LLC [0673]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [2940]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource Inc. 3231 SE 6th Avenue Topeka, KS 66607 United States.

| **IMPORTANT INFORMATION FOR YOU TO READ** |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS JULY 17, 2017, AT 4:00 P.M. CENTRAL TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

This Disclosure Statement provides information regarding the Debtors' Plan,[2] which the Debtors seek to have confirmed in the Bankruptcy Court. A copy of the Plan is attached hereto as <u>Exhibit A</u>. Unless otherwise noted, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article VIII of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to go effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement (including Article VIII hereof entitled "<u>Plan-Related Risk Factors</u>") and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Plan-Related Risk Factors described in Article VIII.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan, attached hereto and/or incorporated by reference herein. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors'

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

The Debtors have prepared this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Bankruptcy Rule 3017 and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained in this Disclosure Statement or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

This Disclosure Statement does not constitute, and should not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, the terms of the Plan and the restructuring transactions contemplated by the Plan will bind the Debtors, any Person acquiring property under the Plan, all Holders of Claims and Interests (including those Holders of Claims and Interests that do not submit Ballots to accept or reject the Plan or that are not entitled to vote on the Plan), and any other Person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan have been filed with the United States Securities And Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Debtors are relying on Section 4(2) of the Securities Act, Section 701 promulgated under the Securities Act,

KE 46447836

and similar provisions of Blue Sky Laws, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Laws.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

| QUESTIONS AND ADDITIONAL INFORMATION |
| --- |

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Prime Clerk LLC by (a) calling the Debtors' restructuring hotline at (844) 648-5574; (b) emailing paylessballots@primeclerk.com; (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/payless; and/or (d) writing to Prime Clerk LLC at Payless Balloting Center c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022.

KE 46447836

## TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

| | | | |
|---|---|---|---|
| **I.** | **EXECUTIVE SUMMARY** | | **1** |
| | A. | Introduction | 1 |
| | B. | Key Constituent Support for the Plan | 2 |
| | C. | Plan Overview | 2 |
| | D. | Treatment of Claims and Interests Under the Plan | 6 |
| | E. | Plan Timeline and Related Contingencies | 7 |
| **II.** | **BACKGROUND TO THESE CHAPTER 11 CASES** | | **10** |
| | A. | Corporate History and Current Structure | 10 |
| | B. | Current Businesses and Operations | 10 |
| | C. | Prepetition Organizational Structure, Capitalization, and Indebtedness | 12 |
| | D. | Events Leading up to the Chapter 11 Filing | 14 |
| **III.** | **CHAPTER 11 CASES** | | **17** |
| | A. | First and Second Day Relief | 17 |
| | B. | Other Material Events in These Chapter 11 Cases | 19 |
| **IV.** | **SUMMARY OF THE PLAN** | | **23** |
| | A. | General Basis for the Plan | 23 |
| | B. | Proposed Treatment of Each Class of Claims and Interests | 23 |
| | C. | Post-Emergence Capital Structure | 29 |
| | D. | Certain Means for Implementation of the Plan | 30 |
| | E. | Plan Supplement | 36 |
| | F. | Treatment of Executory Contracts and Unexpired Leases | 36 |
| | G. | Distributions on Account of Claims | 40 |
| | H. | Resolution of Contingent, Unliquidated, or Disputed Claims | 46 |
| | I. | The Debtor Release, Third-Party Release, Injunction, and Exculpation | 48 |
| | J. | Modification, Revocation, or Withdrawal of the Plan | 51 |
| | K. | Important Securities Law Disclosure | 52 |
| **V.** | **VALUATION AND FINANCIAL PROJECTIONS** | | **54** |
| | A. | Estimation of Payless' Enterprise Value | 54 |
| | B. | Financial Projections | 54 |
| | C. | Liquidation Analysis | 54 |

<div align="center">iv</div>

| VI. | SOLICITATION AND VOTING PROCEDURES | 56 |
|---|---|---|
| VII. | CONFIRMATION AND CONSUMMATION OF THE PLAN | 59 |
| | A. Statutory Requirements for Confirmation of the Plan | 59 |
| | B. Conditions for Consummation of the Plan | 63 |
| | C. Alternatives to Confirmation and Consummation of the Plan | 64 |
| VIII. | PLAN-RELATED RISK FACTORS | 65 |
| | A. Risks Relating to Confirmation of the Plan | 65 |
| | B. Risks Relating to Recoveries Under the Plan | 66 |
| | C. Risks Relating to the Debtors' Businesses | 67 |
| | D. Disclosure Statement Disclaimer | 68 |
| IX. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 71 |
| | A. Brief Overview and Disclosure | 71 |
| | B. Consequences to the Debtors | 72 |
| | C. Consequences to U.S. Holders of Allowed Claims | 74 |
| | D. Consequences to Non-U.S. Holders of Allowed Claims | 77 |
| | E. Withholding and Reporting | 78 |
| X. | RECOMMENDATION | 80 |

## **EXHIBITS**

EXHIBIT A   Plan of Reorganization

EXHIBIT B   Corporate Structure Chart

EXHIBIT C   Disclosure Statement Order

EXHIBIT D   Financial Projections

EXHIBIT E   Liquidation Analysis

EXHIBIT F   Estimation of Payless' Enterprise Value

EXHIBIT G   Restructuring Support Agreement (together with the Restructuring Term Sheet)

EXHIBIT H   Cash Incentive Plan Term Sheet

EXHIBIT I   New First Lien Term Loan Facility Term Sheet

| |
|---|
| THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. |

KE 46447836

# I.
# EXECUTIVE SUMMARY

## A.    INTRODUCTION

Payless ShoeSource Inc., a Missouri corporation, together with its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri on April 4, 2017 (the "Petition Date").  The Debtors' Chapter 11 Cases are jointly administered under lead case name Payless Holdings LLC and lead case number 17-42267-659.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *First Amended Joint Plan of Reorganization of Payless Holdings LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 977], dated June 5, 2017, as amended, supplemented, or modified from time to time in accordance with its terms.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

On [__], 2017, the Bankruptcy Court entered an order [Docket No. [__]] (the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures, and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan, and (d) scheduling the Confirmation Hearing.  The Disclosure Statement Order is attached hereto as **Exhibit C**.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable Kathy A. Surratt-States at [10]:00 a.m. prevailing Central Time on July 24, 2017 at the Bankruptcy Court, Thomas F. Eagleton U.S. Courthouse, 111 S. 10th Street, 4th Floor, Courtroom 7 North, St. Louis, MO 63102. Additional information with respect to Confirmation is provided in Article VII of this Disclosure Statement.

This Disclosure Statement includes information about, without limitation, (i) the Debtors' business, prepetition operations, financial history, and events leading up to these Chapter 11 Cases, (ii) the significant events that occurred thus far in these Chapter 11 Cases, (iii) the anticipated recoveries of Creditors under the Plan, (iv) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (v) the Plan Confirmation process, (vi) certain risk factors to be considered before voting on the Plan, and (vi) discussions relating to certain securities registration and tax consequences of the Plan.  The descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors relate to the Plan filed with the Bankruptcy Court on June 5, 2017.  The Plan remains subject to ongoing negotiations between the Debtors and their stakeholders and may be modified.

*This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  The Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan and the Plan Supplement.  The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement, the Plan, and the Plan Supplement.*

1

**B.      KEY CONSTITUENT SUPPORT FOR THE PLAN**

Prior to the Petition Date, the Debtors engaged in extensive, good-faith negotiations with a steering committee of their secured term loan lenders to develop a comprehensive financing, restructuring, and recapitalization plan to be implemented through these Chapter 11 Cases. That agreement was memorialized in the Restructuring Support Agreement attached hereto as **Exhibit G**, executed by parties that collectively hold or control at least 85% and 75% of the Debtors' first and second lien term loans, respectively.

The Plan reflects the agreement reached among the Debtors and their prepetition secured lenders to reorganize the Debtors as a going-concern business and outlines a consensual deleveraging transaction that will leave the Debtors appropriately capitalized and with access to financing to support their emergence and go-forward business needs. The Debtors and plan support parties believe that the compromises and transactions reflected in the Plan and DIP Documents will provide the Debtors with liquidity to achieve the financial restructuring contemplated by the Plan, implement the Debtors' long-term business plan, and positively signal the market about the Debtors' post-emergence prospects.

The Debtors and the parties supporting the Plan have also agreed that a prolonged chapter 11 case would drain estate assets and is not in the best interest of creditors. Accordingly, the Restructuring Support Agreement and DIP Documents provide for certain milestones designed to ensure the Debtors move expeditiously towards confirmation of the Plan in the current distressed retail environment, as well as certain conditions and covenants requiring the Debtors to meet operational objectives associated with rent concessions, EBITDA targets, inventory receipts, and a renegotiation of existing joint venture agreements.

Consummation of the Plan and the financial restructurings contemplated thereby will both significantly de-lever the Debtors' capital structure and provide the Debtors with access to new money necessary for ongoing operations. With a sustainable capital structure aligned with the Debtors' revised business plan and adequate operating liquidity, the Reorganized Debtors will be positioned to compete more effectively in the evolving retail industry.

> **THE DEBTORS AND THE PREPETITION SECURED LENDERS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**C.      PLAN OVERVIEW**

**1.      Purpose and Effect of the Plan**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Equity Interests. Under the Plan, Claims and Equity Interests are divided into Classes according to their relative priority and other criteria.

KE 46447836

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases.  Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business.  The Reorganized Debtors' financial projections are set forth on **Exhibit D**.[3]  Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty.  Actual results may differ from the projections, and the differences may be material.

2.      **Financial Restructurings Under the Plan**

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $847 million, consisting primarily of approximately (a) $187 million outstanding under their ABL Credit Facility (inclusive of Letters of Credit of approximately $30.5 million); (b) $506 million outstanding under their First Lien Term Loan; and (c) $145 million outstanding under their Second Lien Term Loan.[4]  Additionally, based on invoices in their accounts payable systems and estimated accruals, the Debtors estimate that an aggregate of approximately $240 million was owing and outstanding to the Debtors' trade creditors, including vendors, suppliers, service providers, and contract counterparties, as of the Petition Date.

If the Plan is confirmed, Payless (as defined herein) will emerge from these Chapter 11 Cases with approximately 50% less funded debt.  Payless' pro forma exit capital structure will consist of a New ABL Facility, a New First Lien Term Loan Facility, and New Equity in Reorganized Holdings, as set forth below (in millions):[5]

---

[3]      The Debtors' business plan and projections also incorporate forecasts of operating performance for the foreign franchise and joint venture businesses that relate to entities that are not Debtors in these Chapter 11 Cases.

[4]      In addition, Payless had $8.9 million of obligations outstanding under capital leases and similar payables that Payless has treated as debt for accounting and financial projection purposes.

[5]      The Debtors will also assume existing capital leases and similar obligations.

3



Specifically, the Plan contemplates the following restructuring transactions:

- The Debtors' Prepetition ABL Facility has been rolled up into the ABL DIP Facility, a $305 million asset-based lending facility consisting of an up to $245 million Tranche A Credit Facility and an up to $60 million Tranche A-1 Credit Facility. The Plan provides that the ABL DIP Facility will be indefeasibly paid in full, in Cash.[6]

- Certain of the Debtors' Prepetition First Lien Lenders have provided the Debtors with a Term DIP Facility of up to $80 million to finance these Chapter 11 Cases and the Debtors' emergence. The Term DIP Facility will roll into the New First Lien Term Loan A-1 Tranche under the New First Lien Term Loan Facility, which New First Lien Term Loan A-1 Tranche will be in an amount equal to the outstanding balance of the Term DIP Facility on the Effective Date (each Holder of a Term DIP Facility Claim shall convert its Term DIP Facility Claim into a claim under the New First Lien Term Loan A-1 Tranche, on a dollar-for-dollar basis).

- The Prepetition First Lien Lenders (on account of their Prepetition First Lien Credit Agreement Claims, including the Prepetition First Lien Credit Agreement Claims that are Secured and their Prepetition First Lien Credit Agreement Claims) will receive their Pro Rata share of (a) 91.0% of the common equity of Reorganized Holdings (less the common equity distributed as part of the Worldwide GUC Equity Recovery (which, depending on the extent of participation in the Worldwide GUC Cash-Out Election, could be up to 2.9% of the common equity), and subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee) and (b) the New First Lien Term Loan A-2 Tranche under the New First Lien Term Loan Facility in the amount of $280 million less the amount of the New First Lien Term Loan A-1 Tranche.

- The Debtors' obligations under the Prepetition Second Lien Credit Agreement will be discharged, and in exchange each Holder of a Claim under the Prepetition Second Lien Credit Agreement will receive their Pro Rata share of 9.0% of the common equity of Reorganized Holdings (subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee).

---

[6]    The Debtors are in the process of soliciting, and expect to secure, a replacement revolving exit financing facility, which together with cash on hand, will finance repayment of the ABL DIP Facility.

KE 46447836

- Holders of General Unsecured Claims against Debtor Payless ShoeSource Worldwide, Inc. will receive their Pro Rata share of 2.9% of the common equity of Reorganized Holdings (subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee); *provided* that if such Holder has made the Worldwide GUC Cash-Out Election on its Ballot, such Holder will receive the Worldwide GUC Cash-Out Option Payment, which is a cash payment equal to no less than the lesser of (a) 50% of the value of the common equity such Holders would otherwise been entitled to receive or (b) such Holder's Pro Rata share of $3.66 million (the Worldwide GUC Cash-Out Cap).

- Other General Unsecured Claims will receive their Pro Rata share of (a) in the event that Class 5A votes to accept the Plan, $1,000,000 in Cash, or (b) in the event that Class 5A votes to reject the Plan, $250,000 in Cash.

- Canadian General Unsecured Claims against the Canadian Debtors shall be Reinstated.

- All Equity Interests in Payless Holdings LLC will be extinguished.

As a result of the restructuring transactions contemplated by the Plan, the New Equity in Reorganized Holdings will be allocated among (i) the Prepetition First Lien Lenders, (ii) the Prepetition Second Lien Lenders, and (iii) such Holders of Worldwide General Unsecured Claims who do not elect to receive the Worldwide GUC Cash-Out Option Payment, in each case based on each such parties' relative rights and priorities, and in each instance, subject to dilution by equity issued under the Management Equity Incentive Plan or to satisfy the Exit Commitment Fee as set forth in the Plan.

### 3.    Recovery Analysis

The Plan, which provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.  In developing the Plan, the Debtors gave due consideration to various alternatives and engaged in significant discussions with representatives and/or professionals of the senior secured lenders under their prepetition first lien and second lien term loans, whom the Debtors believe will be the primary economic stakeholders in the Reorganized Debtors.  With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, prospects as an ongoing business, financial projections, and the go-forward business plan developed by management.  Based on this analysis and a review of estimated recoveries in a liquidation scenario, the Debtors concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern.  Indeed, the Debtors believe that their business and assets have significant value that would <u>not</u> be realized in a liquidation scenario.

Substantially all of the Debtors' assets are subject to valid and perfected liens held by the DIP Lenders and the Prepetition Lenders, which obligations require payment in full prior to distributions to Holders of unsecured claims against the Debtors.[7]  The Debtors do, however, have certain assets that were unencumbered as of the Petition Date, the primary value of which relates to minority interests in certain first-tier foreign subsidiaries.  Specifically, certain of the Debtors' direct and indirect subsidiaries are subject to only 65% equity interest pledges for the benefit of the Prepetition Lenders.[8]  The value of the 35% of the equity interests in these direct and indirect subsidiaries that is not pledged for the benefit of the Prepetition Lenders was unencumbered as of the Petition Date and flows only to the benefit of Holders of Claims at Payless ShoeSource, Worldwide, Inc., which includes only the Worldwide General Unsecured Claims and the deficiency claims of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders.  These subsidiaries include entities that operate the Debtors' business in Latin America, Puerto Rico, Saipan, and Mexico.

---

[7]    Prepetition First Lien Credit Agreement Claims and Prepetition Second Lien Credit Agreement Claims are secured by valid, perfected liens on, among other things, all of the Debtors' Cash, accounts receivable, intellectual property, contract rights, general intangibles, equipment and fixtures, and proceeds of collateral.

[8]    For tax purposes, the Debtors pledged only 65% of the equity interests of certain of their foreign subsidiaries to secure obligations under the Prepetition Credit Agreements.

5

Prior to commencing these Chapter 11 Cases, the Debtors and a steering committee of the Debtors' Prepetition First Lien Lenders recognized the critical need for the Debtors to consummate the Plan in an efficient manner to avoid significant harm to the Debtors' businesses and operations. The parties also recognized the real risk that the complexities surrounding the unencumbered value, if litigated, could result in a value-destructive liquidation. Absent a global deal among stakeholders, the Debtors believe the cost and delay of litigating (i) the value of unencumbered assets and (ii) the amount of such value that would be available for distribution to unsecured creditors after taking into account (a) the costs of these Chapter 11 Cases; (b) the significant deficiency claims of the Prepetition Secured Lenders; and (c) any potential adequate protection claims of the Prepetition First Lien Lenders would exceed the recovery proposed to be paid to unsecured creditors under the Plan. Moreover, such distractions would divert the Debtors from their operational restructuring initiatives—a key component of the success of these Chapter 11 Cases for the Reorganized Debtors.

In an effort to minimize potential litigation during the Chapter 11 Cases, the steering committee of Prepetition First Lien Lenders and certain Prepetition Second Lien Lenders engaged in substantial, good-faith negotiations regarding recoveries to Holders of Prepetition Second Lien Credit Agreement Claims. The Debtors believe that the negotiated treatment of such Claims provides at least as much value to such Holders as such Holders may realize were the issues surrounding unencumbered value litigated to a decision.

Likewise, and as described herein, the Plan contemplates significant recoveries to Holders of General Unsecured Claims, each of whom stand to greatly benefit from the Debtors' ability to consummate the Plan and continue as a going concern. Specifically, the Plan contemplates a significant amount of value distribution to Holders of Worldwide General Unsecured Claims (in the form of either New Equity or Cash, at each such Holder's election) that reflects the Holders of Worldwide General Unsecured Claims' Pro Rata share of distributable unencumbered value on terms consistent with the settlement reached among the steering committee and the Prepetition Second Lien Lenders with respect to their entitlement to receive a distribution of unencumbered value based on their deficiency claims. Furthermore, the Plan also provides for a Cash recovery to holders of Other General Unsecured Claims and other legal entities, who otherwise have no claim to any material unencumbered property of the Debtors and thus would be entitled to no recovery. **Accordingly, the Debtors believe, as supported by the analysis underlying Guggenheim Securities' estimate of Payless enterprise value set forth in Exhibit F, that the Plan provides all Holders of General Unsecured Claims with a greater recovery over what such Holders otherwise would receive under a priority waterfall recovery analysis and is therefore in the best interest of all creditors.**

The Debtors also believe that any alternative to Confirmation of the Plan, such as an attempt by another party to file a competing plan, would result in significant delays, litigation, and additional costs, could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, and could potentially lead to a liquidation by the Debtors, in which case substantially all Holders of Claims would do substantially worse or receive no recovery at all.

> **ACCORDINGLY, FOR ALL OF THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE YOU TO TIMELY RETURN YOUR BALLOT ACCEPTING THE PLAN.**

## D.    TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The table below summarizes the classification and treatment of Claims and Interests under the Plan. These summaries are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see Section IV.B hereof.

The table below also sets forth the estimated percentage recovery for Holders of Claims and Interests in each Class and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors (as modified by the Bankruptcy Court through certain hearings), and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.

Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

KE 46447836

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE
BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Claim/Equity Interest | Status | Estimated Amount of Allowed Claims[9] | Estimated Percent Recovery Under the Plan[10] |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0.9 | 100% |
| 2 | Other Secured Claims | Unimpaired | $0.0 | 100% |
| 3 | Prepetition First Lien Credit Agreement Claims | Impaired | $506.3 | 83.5% |
| 4 | Prepetition Second Lien Credit Agreement Claims | Impaired | $145.0 | 15.7% |
| 5A | Other General Unsecured Claims | Impaired | $121.8 | 0.8% |
| 5B | Worldwide General Unsecured Claims | Impaired | $46.6 | 15.7% |
| 5C | Canadian General Unsecured Claims | Unimpaired | $1.6 | 100% |
| 6 | Intercompany Claims | Unimpaired / Impaired | $104.9 | 100% / 0% |
| 7 | Existing Equity Interests[11] | Impaired | n/a | 0% |
| 8 | Intercompany Interests | Unimpaired | n/a | 100% |
| 9 | Section 510(b) Claims | Impaired | n/a | 0% |

**E.     PLAN TIMELINE AND RELATED CONTINGENCIES**

Although, the Debtors believe that the restructuring proposed in the Plan is the best alternative for maximizing stakeholder recoveries, the Plan is subject to a number of conditions and there are certain material risks to the Debtors' ability to implement the Plan and consummate near-term creditor distributions.  The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with Article VIII.B of the Plan, including:

- The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

---

[9]     All dollar amounts in millions.

[10]     Recoveries are based on the estimated midpoint enterprise value and do not take into account dilution caused by the Management Equity Incentive Plan and the Exit Commitment Fee.  In addition, recoveries assume that all Worldwide General Unsecured Claims receive New Equity and do not make the Worldwide GUC Cash-Out Election.  Analysis also assumes $1 million of cash paid to Other General Unsecured Claims and $80 million drawn under the Term DIP Facility.

[11]     Following the Petition Date, the Debtors received a letter from certain Holders of Existing Equity Interests in Payless Holdings LLC asserting entitlement to certain assets of Payless Holdings LLC with an approximate value of $5 million.  These Holders have requested that such value be preserved for distributions to Holders of Existing Equity Interests.  The Debtors are evaluating the assets and liabilities at each Debtor and reserve all rights related thereto, including the right to modify the proposed treatment of Claims in Class 7 under the Plan, as a result of such evaluation.

KE 46447836

- The Definitive Documents shall satisfy the Definitive Document Restructuring Support Agreement Requirements;

- The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtors and the Requisite Consenting Lenders.

- The Confirmation Order shall have been entered and become a Final Order. The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing, and consummating the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with or described in the Plan.

- All documents and agreements necessary to implement the Plan, including, without limitation, the New Credit Facilities Documents, shall have (a) been tendered for delivery and (b) been effected or executed. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, and the commitment fees described in Article IV.H of the Plan shall have been paid.

- All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

- The Professional Fee Escrow Account shall have been established and funded.

In addition, the Plan is subject to certain contingencies and risk factors, which are set forth in Article VIII hereof, and include, among others:

- **Case Milestones**. The Debtors' Restructuring Support Agreement and the DIP Documents set forth a series of case milestones (the "Milestones") that the Debtors must meet. Pursuant to the Milestones, the Debtors must, among other Milestones, (a) obtain Bankruptcy Court approval of the Disclosure Statement by June 15, 2017; (b) renegotiate the terms of agreements related to their Latin American joint venture with their joint venture partners by July 13, 2017; (c) obtain entry of the Confirmation Order by July 27, 2017; and (d) reach the Effective Date by August 10, 2017.

   The importance of meeting these Milestones cannot be overstated. If the Debtors fail to satisfy the Milestones set out in the Restructuring Support Agreement or the DIP Documents, or otherwise fail to obtain waivers in accordance with the terms of such documents, the Debtors may lose support from their current stakeholders for the Plan and may lose access to the DIP Facilities. Fundamentally, this means that the DIP Lenders may declare a default under the DIP Facilities and exercise remedies to foreclose on their collateral, or that counterparties to the Restructuring Support Agreement may declare a default thereunder and terminate the Restructuring Support Agreement. Moreover, the Debtors have milestones that require them to commence going out of business sales on a timeline that will result in the liquidation of their inventory in their stores prior to the expiration of the 210-day statutory deadline for the Debtors to make decisions whether to assume or reject their thousands of store leases. In either case, the likely outcome for the Debtors of missing these milestones is a liquidation of their Estates. As set forth in the Liquidation Analysis, recoveries to creditors in a liquidation scenario are vastly inferior to the recoveries contemplated by the Plan. Accordingly, the Debtors believe that failure to meet the case Milestones may jeopardize the Plan recoveries for all creditors.

- **Lease Renegotiation Efforts**. The Plan contemplates a substantial reduction of annual expenditures on account of agreements with existing landlords to modify the terms of existing leases. Further, the Restructuring Support Agreement contemplates that the Debtors will realize 85% of their projected rent savings from landlord concessions. If such reductions cannot be realized, the Debtors may not be able to implement the Plan.

8

- **Latin America Joint Venture Renegotiation**.  The Debtors' Latin America operations are run through a non-Debtor affiliate that is party to certain joint venture arrangements with local partners, but heavily dependent upon management services, sourcing services, and intellectual property licensing from the Debtors.  The Debtors and certain stakeholders believe that the payment terms for such services and licensing arrangements are on below market terms.  Accordingly, the Restructuring Support Agreement requires that the Debtors renegotiate these agreements related to the joint venture during the Chapter 11 Cases in order to obtain agreements on current market terms.  If the Debtors cannot reach renegotiated agreements on current market terms with their joint venture partners, they will be in default of their obligations under the Restructuring Support Agreement and there is a substantial risk that the Debtors will be forced to liquidate.  If the Debtors fail to secure the necessary consents for a renegotiation of these agreements from the joint venture partner and the Debtors elect to reject any of these agreements, the counterparty to the applicable agreements will be entitled to assert a rejection damages claims against the applicable Debtor.

- **Exit ABL Financing**.  Because the Plan contemplates that the ABL DIP Claims will be paid in full, in Cash, the Debtors must procure a New ABL Facility to ensure they have sufficient liquidity to pay the ABL DIP Claims and to maintain their business operations after the Effective Date.  The Debtors have begun to solicit a New ABL Facility, including by engaging the ABL DIP Lenders regarding rolling the ABL DIP Facility into a New ABL Facility as part of their pursuit of a New ABL Facility.  If the Debtors cannot procure a New ABL Facility on market terms, they will not be able to consummate the Plan.[12]

---

[12]   The Debtors do not currently have a commitment for the New ABL Facility, but the terms of such commitment (either from the ABL DIP Lenders or a third party) will be included in the Plan Supplement.  The New ABL Facility is expected to include guarantees from the Canadian Debtors.

KE 46447836

## II.
## BACKGROUND TO THESE CHAPTER 11 CASES

### A.   CORPORATE HISTORY AND CURRENT STRUCTURE

Founded in 1956, Payless Holdings LLC is the parent company for each of the Debtors in these Chapter 11 Cases and certain direct and indirect Affiliates which are not debtors in these Chapter 11 Cases (collectively, the "Company" or "Payless"). Headquartered in Topeka, Kansas, Payless is an iconic American footwear retailer selling quality shoes at affordable prices in a self-select environment. With nearly 4,300 stores[13] in more than 30 countries across the world and nearly 22,000 employees as of the Petition Date, a brand that is globally recognized and a business that generates significant unlevered free cash flow, Payless is the largest specialty footwear retailer in the Western hemisphere. In fiscal year 2016, Payless generated approximately $2.3 billion of sales and $95 million of EBITDA.

Payless was founded as an everyday footwear retailer with a strategy of selling low-cost, high-quality, fashion-forward family footwear. Today, Payless is the second largest footwear retailer by unit sales in the United States, with North American sales of approximately $1.9 billion in 2016 and $2.0 billion in 2015. Payless operates in more than 30 countries through its three business segments (North America, Latin America, and franchised stores), sourcing approximately 110 million pairs of shoes per year across the world. Worldwide, Payless had approximately $2.3 billion in net sales in 2016.

Payless is able to offer its budget-conscious customers outstanding value on basics, on-trend and special occasion footwear through a national assisted-service store footprint, localized assortment, and a low-cost integrated-sourcing business model, including a growing online presence. Through this unique product development strategy, which ensures popular, quality, and on-trend merchandise in stores for the right price, Payless retains its customers' loyalty. This business model depends upon (a) identifying and developing on-trend merchandise, (b) developing strong relationships with branding partners, and (c) maintaining an overseas sourcing network that can develop and produce products at a scale and cost necessary to serve Payless' customers.

Payless has a strong seasonal cadence, as evidenced by its four key selling seasons: Easter, sandals, back-to-school, and boots. Because these periods fall relatively evenly throughout the course of the year, Payless' selling periods create a broad, even flow of business throughout the year, even though the composition of the business varies widely depending on the time of the year. This has served over many years to create a largely continuous overall flow of product from overseas suppliers through Payless' supply chain to customers in North America and abroad. These peak seasons are very important to the Debtors' business, bringing in approximately 47% of total revenue on an annual basis.

### B.   CURRENT BUSINESSES AND OPERATIONS

The Debtors are headquartered in Topeka, Kansas, but their operations are extensive and span across Asia, Africa, the Middle East, Latin America, Europe, and the United States.

#### 1.   North America

Payless' North American business represents a majority of the Debtors' store base, with more than 3,500 wholly-owned stores in the United States, Puerto Rico, and Canada. In the United States, 76% of household disposable income and 3 out of 4 children under age 10 live within five miles of a Payless store.[14]

Despite the industry-wide shift away from brick-and-mortar stores, North American wholly-owned stores generated nearly $1.9 billion in sales in fiscal year 2016 and nearly $2 billion in fiscal year 2015, representing approximately 63% and 56% of Payless' overall EBITDA, respectively. Payless North America provides an

---

[13]   Data as of February 2017.

[14]   Data as of February 2017.

10

KE 46447836

extensive range of operational and corporate services to the Latin American and franchised segments, including product development and sourcing, retail operations, marketing, IT, finance, tax, and legal assistance.

### 2.    Latin America

Seventeen years after opening its first store in Latin America, Payless has become the largest specialty footwear retailer in the region.  Payless Latin America has provided stable growth since its inception, opening 15 to 35 new stores per year and averaging 8% annual revenue growth since 2013.  It is also highly profitable, generating approximately 39% of Payless' overall EBITDA despite accounting for less than 10% of Payless' store footprint. Payless Latin America is expected to continue to grow through new stores and increased e-commerce.  Payless currently operates nearly 400 stores across 22 countries in Latin America and enjoys leadership positions in the relevant markets.

Many of Payless' Latin American operations are governed by joint venture agreements and related ancillary agreements, pursuant to which Payless receives certain sourcing and other corporate fees, as well as dividends, on a periodic basis, in exchange for use of Payless' intellectual property, sourcing, operational management, and information technology.  In exchange, the joint venture agreements have allowed Payless to utilize their partners' significant local market knowledge to buy, plan, and distribute their products

### 3.    Franchised Store Segment

Finally, Payless' franchised segment consists of stores operated by franchisees in several countries in Africa, Asia, and the Middle East.  Since opening their first franchised stores in 2009, the Debtors' franchise business has grown to nearly 400 stores across 17 countries. The franchised stores are held to the same high standards as the Debtors' wholly-owned and joint venture stores and provide a similar customer experience.  The Debtors receive favorable royalty fees, which typically range from 6 to 8 percent of the franchisee's net revenue, pursuant to the franchise agreements.  The Debtors' franchise business requires minimal upfront risk, capital requirements, and overhead expenses, as they successfully leverage their existing North American operations and sourcing capabilities to support the business segment.  Looking forward, Payless intends to further develop new markets through its franchised segment in the next three years.

### 4.    Merchandising strategy

Core to the Debtors' business model is the customer loyalty generated by their core demographic.  Payless is particularly popular in the women's and children's shoes market, serving as the second largest retailer of women's and children's shoes in the under $30 footwear category.  Payless' women's and children's segments account for 50% and 25% of sales, respectively.  45% of women in the United States shop at Payless annually, driven in part by the fact that Payless is able to sell its goods at approximately 50% of the industry average price.  To maintain their loyal consumer base, Payless' merchandising strategy necessitates having a wide selection of core products alongside the latest fashion styles at prices significantly below that of most competitors.  This is particularly important to Payless' customers, who typically have less than $75,000 of household income.

Payless' business model is highly dependent on identifying on-trend merchandise through its branding and merchandising partners.  Payless is able to keep its products on-trend by utilizing a design team, agent partners, and third-party consultants—each of whom monitor marketplace trends and provide input on each style of shoe.  The Debtors also maintain a number of branding relationships to assist them in bringing to market popular brands and designs to follow the trends of their core customer groups.

The Debtors are parties to certain license agreements that grant them rights to use a number of popular, broadly-recognized brands, including Champion, Christian Siriano, Disney, DreamWorks, Star Wars, and Marvel, each of which helps the Debtors maintain their strength in various niche target markets.  The Debtors also utilize design partnerships, through which popular labels provide the Debtors with existing product designs in exchange for a fee.  These partnerships allow the Debtors to offer their partners' designs under the Payless name at much cheaper prices for the consumer.  Finally, the Debtors market certain high-volume proprietary brands, such as American Eagle and Brash, which they own outright.  These brands make up over 40 percent of the Debtors' sales.

11

5.      **Procurement and Global Supply Chain**

Also key to serving the Debtors' customer base is the Debtors' well-established and seamless global supply chain. Payless focuses on developing core products internally, rather than retailing shoes developed by third parties, which dramatically reduces product costs and allows Payless to sell products at value-positioned price points. Direct sourcing, as a percentage of Payless' product lines, has increased from 59% in 2011 to 70% in 2016. Payless has unique relationships with its vendors, primarily based out of China and Vietnam.

Because the Debtors' business model depends heavily on their supply chain, the Debtors have developed long-standing relationships (in some cases extending over 15 years) and highly streamlined processes with key supplier factories. These factories provide shoes made to the Debtors' specification at the right volume and at the right price. Given the significant volume of made-to-order shoes, the Debtors cannot replace the volume provided by their key critical vendors, so they depend heavily on regularly receiving product from their existing vendors. The Debtors' ability to deliver their products in a timely manner is also critically important to their financial performance and depends on a seamless interaction with various third-party service providers who ship and store the Debtors' products. The coordination across factories, distributors, shippers, carriers, warehousemen, and customer-facing stores is vital to ensuring Payless' shoes reach customers in the right season and at the right price.

C.      **PREPETITION ORGANIZATIONAL STRUCTURE, CAPITALIZATION, AND INDEBTEDNESS**

Payless was first traded publicly in 1962, and was taken private in May 2012. As set forth in the structure chart attached hereto as **Exhibit B**, Payless Holdings LLC currently owns, directly or indirectly, each of Payless' Debtor subsidiaries. Of the wholly-owned entities, 20 entities are obligors on all of the Debtors' approximately $847 million of prepetition funded debt.

1.      **Prepetition Capital Structure and Indebtedness**

Payless' prepetition capital structure includes approximately $847 million in outstanding debt as of the Petition Date, consisting of: (a) approximately $187 million in secured debt under their asset-backed revolving credit facility (the "ABL Credit Facility"); (b) approximately $506 million in secured debt under their first lien credit facility (the "First Lien Term Loan"); and (c) approximately $145 million in secured debt outstanding under their second lien credit facility (the "Second Lien Term Loan").[15]

The chart below summarizes Payless' prepetition funded indebtedness, including approximate outstanding amounts, as of the Petition Date.

| Debt Obligation | Debt Facility Size | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Collateral |
|---|---|---|---|---|
| ABL Credit Facility | $300 million | $187 million | March 14, 2019 | Substantially all tangible and intangible assets; first priority over ABL Priority Collateral |
| First Lien Term Loan | $520 million | $506 million | March 11, 2021 | Substantially all tangible and intangible assets; first priority over Term Priority Collateral |

---

[15]     In addition, the Debtors had $8.9 million of obligations outstanding under capital leases and similar payables that the Debtors have treated as debt for accounting and financial projections purposes.

KE 46447836

| Debt Obligation | Debt Facility Size | Approximate Amount Outstanding as of the Petition Date | Maturity Date | Collateral |
|---|---|---|---|---|
| Second Lien Term Loan | $145 million | $145 million | March 11, 2022 | Substantially all tangible and intangible assets; second priority over Term Priority Collateral |
| Trade Claims | N/A | Approximately $240 million | Past Due | N/A (not including potential liens held by carriers, shippers, or warehouse vendors) |

      (a)       The ABL Credit Facility

Payless, Inc., as the lead borrower, the other Debtors party thereto as borrowers and guarantors, and Wells Fargo Bank, National Association ("Wells Fargo"), as administrative agent, entered into a revolving credit facility documented by the Credit Agreement dated as of October 9, 2012. Under the ABL Credit Facility, which has two tranches bearing interest at different rates, the Debtors may draw up to $300 million for general corporate purposes. The ABL Credit Facility is secured by a first-priority lien over substantially all tangible and intangible assets of the Debtors including, among other things, accounts, cash, inventory, and real property (such collateral package, the "ABL Priority Collateral"). The ABL Credit Facility is also secured by a third-priority lien on the remaining assets of the Debtors including, among other things and subject to certain limitations, thresholds, and exclusions, equipment, intellectual property, and stock pledges (such collateral package, the "Term Loan Priority Collateral"). An aggregate amount of approximately $187 million was outstanding as of the Petition Date under the ABL Credit Facility.[16]

Due to the Debtors' diminishing liquidity and decreasing borrowing base, and in an effort to prepare for these Chapter 11 Cases, the Debtors agreed to enter into "cash dominion" with Wells Fargo, pursuant to which the Debtors agreed to cause all funds in certain of their deposit accounts, subject to any nominal minimum balances required, to be swept daily into an account owned by Wells Fargo (the "Concentration Account"), and cause the proceeds of all collections and balances of all other deposit accounts, subject to any nominal minimum balances required, to also be swept daily into the Concentration Account.

      (b)       The First Lien Term Loan

Payless, Inc., Payless Finance, Inc., Payless ShoeSource, Inc., and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Morgan Stanley Senior Funding, Inc.,[17] as administrative and collateral agent, and the lenders party thereto are parties to that certain First Lien Term Loan and Guarantee Agreement, dated as of March 11, 2014[18] (as amended, restated, modified, and/or supplemented and in effect immediately prior to the Petition Date, the "First Lien Term Loan Agreement"). The First Lien Term Loan Agreement, which matures on March 11, 2021, provides a $520 million first lien term loan secured by a first priority lien in the Term Loan Priority Collateral and a second priority lien in the ABL Priority Collateral (in each case,

---

[16]    Pursuant to the Final DIP Order, all prepetition amounts under the ABL Credit Facility were rolled up into and converted into DIP ABL Obligations. *See* Final DIP Order at ¶ J.vii. Accordingly, ABL Credit Facility is no longer outstanding.

[17]    Cortland Products Corporation has since replaced Morgan Stanley Senior Funding, Inc. as the administrative and security agent for the First Lien Term Loan.

[18]    The First Lien Term Loan was originally dated October 9, 2012, but was refinanced in March 2014.

KE 46447836

subject to certain limitations, thresholds, and exclusions).  An aggregate amount of approximately $506 million was outstanding as of the Petition Date under the First Lien Term Loan.

(c)  The Second Lien Term Loan

Payless, Inc., Payless Finance, Inc., Payless ShoeSource, Inc., and Payless ShoeSource Distribution, Inc., as borrowers, the other Debtors party thereto as guarantors, Morgan Stanley Senior Funding, Inc.,[19] as administrative and collateral agent, and the lenders party thereto are parties to that certain Second Lien Term Loan and Guarantee Agreement, dated as of March 11, 2014[20] (as amended, restated, modified, and/or supplemented and in effect immediately prior to the Petition Date, the "Second Lien Term Loan Agreement" and together with the First Lien Term Loan Agreement, the "Term Loan Agreements").  The Second Lien Term Loan Agreement, which matures on March 11, 2022, provides a $145 million second lien term loan secured by a second priority lien in the Term Loan Priority Collateral and a third priority lien in the ABL Priority Collateral  (in each case, subject to certain limitations, thresholds, and exclusions).  An aggregate amount of $145 million was outstanding as of the Petition Date under the Second Lien Term Loan.

(d)  Swap Transactions

Pursuant to the Term Loan Agreements, Payless is permitted to enter into interest rate swap transactions to mitigate certain risks, including in connection with hedging the variable interest rates contemplated thereunder. Presently, Payless is party to three such transactions (the "Swap Transactions"), one with respect to the First Lien Term Loan Agreement and two with respect to the Second Lien Term Loan Agreement, each with Morgan Stanley Capital Services LLC as counterparty.  The Swap Transactions are governed by an ISDA 2002 Master Agreement dated as of October 2, 2013.

(e)  Intercreditor Agreements

The Debtors' prepetition indebtedness is also subject to two different intercreditor agreements, generally referred to as the ABL/Term Loan Intercreditor Agreement[21] and the Term Loan Intercreditor Agreement.[22]  The ABL/Term Loan Intercreditor Agreement governs the relative contractual rights of lenders under the ABL Credit Facility, the First Lien Term Loan, and the Second Lien Term Loan.  The Term Loan Intercreditor Agreement, in turn, governs the relative contractual rights of lenders under the First Lien Term Loan, on the one hand, and the lenders under the Second Lien Term Loan, on the other hand.

**D.  EVENTS LEADING UP TO THE CHAPTER 11 FILING**

1.  **Difficult Market Conditions and Adverse Non-Recurring Events**

Since early 2015, the Debtors have experienced a top-line sales decline driven primarily by (a) a set of significant and detrimental non-recurring events, (b) foreign exchange rate volatility, and (c) challenging retail market conditions.  These pressures led to the Debtors' inability to both service their prepetition secured indebtedness and remain current with their trade obligations.

---

[19]  Wilmington Savings Fund Society, FSB  has since replaced Morgan Stanley Senior Funding, Inc. as the administrative and security agent for the Second Lien Term Loan

[20]  The Second Lien Term Loan was originally dated October 9, 2012, but was refinanced in March 2014.

[21]  The "ABL/Term Loan Intercreditor Agreement" means that certain Intercreditor Agreement dated as of March 11, 2014 (as amended, restated, modified, and/or supplemented from time to time) by and among Wells Fargo Bank, National Association, as administrative agent for the lenders under the ABL Credit Agreement, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent, and acknowledged by the Debtors.

[22]  The "Term Loan Intercreditor Agreement" means that certain Intercreditor Agreement dated as of March 11, 2014 (as amended, restated, modified, and/or supplemented from time to time) between the Prepetition First Lien Agent and the Prepetition Second Lien Agent, and acknowledged by the Debtors.

KE 46447836

Specifically, a confluence of events in 2015 lowered Payless' EBITDA by 34 percent—a level from which it has not fully recovered. In early 2015, the Debtors meaningfully over purchased inventory due to antiquated systems and processes (that have since undergone significant enhancement). Then, in February 2015, West Coast port strikes delayed the arrival of the Debtors' products by several months, causing a major inventory flow disruption just before the important Easter selling period, leading to diminished sales. When delayed inventory arrived after that important selling period, the Debtors were saddled with a significant oversupply of spring seasonal inventory after the relevant seasonal peak, and were forced to sell merchandise at steep markdowns, which depressed margins and drained liquidity. Customers filled their closets with these deeply discounted products, which served to reduce demand; the reset of customer price expectations away from unsustainably high markdowns further depressed traffic in late 2015 and 2016. In total, millions of pairs of shoes were sold below cost in order to realign inventory and product mix.

Industry-wide declines in sales and traffic during 2015 and 2016 compounded the aforementioned challenges, as did sharp and unexpected declines in foreign exchange rates in 2015, primarily in Canada, Colombia, and Australia. Although Payless implemented many measures to improve liquidity as well as decrease operating expenses, the port strike and the inventory management issues meaningfully reduced profitability and liquidity.

This weaker-than-anticipated financial performance forced management to curtail capital and marketing investments required to combat the broader challenges facing the retail industry. For example, liquidity constraints prevented the Debtors from purchasing normal television advertising throughout the second half of 2016, which further compounded traffic declines. Reduced capital availability also delayed Payless' plans for omni-channel development and implementation, *i.e.*, the integration of physical store presence with online digital presence to offer a unified customer experience. Payless' ability to invest in omni-channel development is essential if Payless is to maintain relevancy with its customer base as the retail industry transitions away from a focus on brick-and-mortar stores.

Notwithstanding these pressures, the Debtors' core business remains strong and operates in an underserved market. In the Debtors' strongest customer segment, domestic women's footwear, they maintain strong brand awareness and high customer penetration and market share relative to the Debtors' competitive set. The Debtors' international expansion has also proven successful with continued growth in its higher margin, lower risk franchise business and through its Latin American joint ventures, as further discussed above.

## 2.    Prepetition Restructuring Efforts

To address their financial difficulties, the Debtors took significant steps to evaluate and implement cost reduction initiatives in the months leading up to the Petition Date. These initiatives have included (a) closing 128 brick-and-mortar stores, which closures are expected to result in an additional $9 million in annual cost savings, (b) terminating approximately 145 employees from their corporate offices and support organization, which is expected to generate $15 million in annual cost savings, and (c) pursuing rent concessions across remaining stores.

At the same time, the Debtors managed liquidity constraints by stretching payments to the merchandise vendors and suppliers that are essential to the Debtors' operations. Given the significant product volume concentrated among Payless' small group of merchandise vendors abroad, the suppliers withstood delayed payments for up to 100 days, and some of them continued to ship products to the Debtors in January and February 2017. But, the suppliers were stretched to the brink of their own survival and required immediate liquidity to procure the raw materials necessary to meet the Debtors' product needs for the important back-to-school selling season. Accordingly, to maintain stability during the opening days of these chapter 11 cases and to avoid jeopardizing the Debtors' ability to service their customers and reorganize their business, the Debtors sought and obtained interim and final authority to pay certain prepetition obligations owed to critical vendors.[23]

Beginning in February 2017, the Debtors commenced discussions with a steering committee of their senior term loan lenders regarding a potential transaction structure that would enable the Debtors to obtain capital, manage

---

[23]    *See Interim Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors and (II) Carrier, Warehousemen, and Section 503(b)(9) Claimants and (B) Granting Related Relief* [Docket No. 94] and *Final Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors and (II) Carrier, Warehousemen, and Section 503(b)(9) Claimants and (B) Granting Related Relief* [Docket No. 642].

their vendor issues, right size their balance sheet, and invest in their omni-channel presence and relevance.  As these discussions progressed, and given the Debtors' objectives, it became apparent that an in-court reorganization was the best path to reorganizing the Debtors' business and improving their overall financial condition.

For several months before the Petition Date, the Debtors worked closely with the term lender steering committee and their existing ABL lenders to develop a comprehensive financing and recapitalization plan, and commenced these Chapter 11 Cases to access that financing and the tools necessary to effectuate their business objectives.  Through these Chapter 11 Cases, the Debtors continued to prioritize the vendors they need to meet their consumer demands and obtained the liquidity to pay their key vendors while rejecting contracts with non-critical prepetition creditors.  The Debtors also used these cases to consummate a comprehensive evaluation of their North American store footprint.  Through the bankruptcy process, the Debtors intend to close some stores (797 of which have already been identified for immediate closure) and negotiate significant rent concessions with the landlords of others.  Finally, the Debtors will be able to increase marketing spend in the North American business segment (including significant omni-channel expansion) and further expansion in North America and Asia through an agreement with their lenders to significantly reduce their outstanding debt.

3.    **Restructuring Support Agreement**

On April 4, 2017, the Debtors entered into the Restructuring Support Agreement attached hereto (as amended or modified) as **Exhibit G**.  The Restructuring Support Agreement has the support of parties who hold or control, in the aggregate, more than 85% and 75% of the Debtors' first and second lien term loans, respectively.  The Debtors have also secured the DIP Facilities from their Prepetition ABL Facility Lenders and certain of the consenting lenders under the Restructuring Support Agreement.  Collectively, the Restructuring Support Agreement and DIP Facilities enable the Debtors to (a) obtain immediate and long-term financial support to address a distressed supply chain and otherwise execute on their strategic plan, (b) right-size their balance sheet by significantly reducing annual debt service and total outstanding debt from $847 million to approximately $397 million (inclusive of assumed revolving loans), and (c) rationalize their store fleet to eliminate unprofitable locations and renegotiate above-market leases.

Importantly, the Restructuring Support Agreement provides for certain Milestones designed to ensure the Debtors move expeditiously towards confirmation of the Plan in the current distressed retail environment. Specifically, the Milestones contemplate emergence from the Chapter 11 Cases within 128 days of the Petition Date.

The Debtors believe that the terms of the Restructuring Support Agreement, which are built into the Plan, are fair, equitable, and maximize the value of the Debtors' estates, providing the best available recovery for the Debtors stakeholders.

16

<div align="center">

**III.**
**CHAPTER 11 CASES**

</div>

**A.**      **FIRST AND SECOND DAY RELIEF**

On or around the Petition Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "First Day Motions") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital, and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. At the first day hearing conducted on April 5, 2017 and in the days that followed, the Bankruptcy Court entered several orders approving the First Day Motions.  Additional hearings were held on May 9, 2017 and May 15, 2017 at which the Bankruptcy Court considered the approval of the First Day Motions on a final basis and certain additional relief requested by the Debtors.

**1.**      **Procedural Motions**

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases, (b) scheduled an expedited first day hearing; (c) granted leave to exceed the page limitation in the Debtors' First Day Motions; (d) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors; (e) approved an extension of time to file their Schedules; (f) approved certain procedures for the rejection and assumption of contracts and leases; and (g) established procedures for interim compensation and reimbursement of expenses of retained professionals.

**2.**      **Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor obligations arising under or relating to those customer programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses, and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- continue and renew their surety bond program;

- establish procedures for certain transfers and declarations of worthlessness with respect to common stock;

- begin the orderly liquidation of approximately 400 stores and set forth procedures for ongoing liquidation efforts;

- maintain their existing cash management systems; and

- remit and pay certain taxes and fees.

<div align="center">

17

</div>

KE 46447836

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay up to approximately $113 million of prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business. Importantly, the Debtors were able to condition payments of these prepetition claims on the vendors' agreement to provide, among other things, favorable trade terms for the postpetition procurement of goods from the vendors. These agreements also resulted in vendors waiving over approximately $44 million of unsecured claims that would have otherwise received distributions under the Plan, thereby substantially increasing the recoveries of the remaining unsecured creditors. The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

### 3.    Postpetition Financing and Use of Cash Collateral

Following the First Day Hearing, the Court authorized the Debtors pursuant to the Interim DIP Order to (a) enter into the ABL DIP Facility comprised of a revolving loan facility in an aggregate principal amount not to exceed $305 million, (b) enter into the Term DIP Credit Facility comprised of a term loan facility in an aggregate amount not to exceed $80 million, and (c) use Cash Collateral on the terms set forth in the Interim DIP Order [Docket No. 69]. On May 17, 2017, the Court entered the Final DIP Order authorizing the Debtors to, among other things, access the full amount of the ABL DIP Facility and use Cash Collateral on a final basis pursuant to the terms of the Final DIP Order [Docket No. 778].

The ABL DIP Facility is an up to $305 million (aggregate amount) asset-based lending facility consisting of an up to $245 million Tranche A Credit Facility and an up to $60 million Tranche A-1 Credit Facility, which facility rolled up all amounts outstanding under the tranche A prepetition asset-based lending facility in full pursuant to the Final DIP Order.

The Term DIP Facility is a term loan facility in an aggregate amount not to exceed $80 million of principal loaned (subject to original issue discount) consisting of (a) a $30 million initial draw that was authorized pursuant to the Final DIP Order and (b) up to an aggregate of $50 million in additional draws that would be available to be drawn following entry of an order by the Bankruptcy Court approving the Disclosure Statement through the Effective Date (subject to the consent of the Required Lenders), including a final draw of remaining availability, if any, under the Term DIP Facility.

The proceeds of the DIP Facilities, access to letters of credit, and the use of Cash Collateral, have allowed the Debtors to, among other things, continue their businesses in an orderly manner; maintain valuable relationships with vendors, suppliers, customers, and employees; pay certain interest, fees, and expenses owing under the DIP Credit Facilities; satisfy their adequate protection obligations; and support working capital, general corporate, and overall operational needs—all of which were necessary to preserve and maintain the going-concern value of the Debtors' business and, ultimately, help ensure a successful reorganization.

### 4.    Employment and Compensation of Professionals

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases: (a) Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as restructuring counsel; (b) Armstrong Teasdale LLP, as local counsel; (c) Guggenheim Securities, LLC ("Guggenheim Securities"), as investment banker; (d) Alvarez & Marsal North America, LLC ("A&M"), as restructuring advisor, which provided the Debtors with a Chief Restructuring Officer (Robert Campagna of A&M) and certain additional personnel; (e) RCS Real Estate Advisors ("RCS"), as real estate advisor; (f) Keen-Summit Capital Partners LLC ("Keen"), as real estate advisor; and (g) Munger, Tolles & Olson LLP ("MTO"), as conflicts counsel.[24]

The Debtors also filed applications seeking to retain Ernst & Young LLP as tax services provider [Docket No. 931] and PricewaterhouseCoopers LLP as independent auditors and tax consultants [Docket No. 936].

---

[24]    In January 2017, Charles Cremens was appointed to serve as an independent director of the Board of Directors of Payless Holdings LLC, to, among other things, assist the Debtors' restructuring efforts. In that capacity, Mr. Cremens had Payless retain MTO to advise and assist Mr. Cremens with respect to conflicts matters, including with respect to the independent investigation described below in section III.B.7.

The Debtors also sought and received approval of Prime Clerk LLC as the Noticing and Claims Agent [Docket No. 237] and filed an application to retain Prime Clerk LLC as Solicitation and Administrative Agent [Docket No. 652].

**B.      OTHER MATERIAL EVENTS IN THESE CHAPTER 11 CASES**

**1.      Claims Bar Date and the Debtors' Schedules**

On April 18, 2017, the Debtors filed the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 287], (the "Bar Date Motion") seeking to establish June 19, 2017, as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Petition Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, against the Debtors in these Chapter 11 Cases (the "Claims Bar Date"). Additionally, the Debtors' requested that the Court establish October 2, 2017, as the deadline by which all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "Government Bar Date"). The Bankruptcy Court granted the bar date Motion on May 16, 2017 [Docket No. 767].

The Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on May 10, 2017 [Docket Nos. 655 - 683].

**2.      Executory Contracts and Unexpired Leases**

As set forth in the *Debtors' Motion For Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 280] (the "Lease Rejection Extension Motion"), the Debtors are party to approximately 3,500 unexpired non-residential real property leases in North America alone. Further, the Debtors are party to a substantial number of executory contracts. In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their global operations, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases and supply chain. The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors are conducting a comprehensive analysis of their executory contracts and unexpired leases and have, and intend to continue to, engage in extensive discussions with contract and lease counterparties regarding the contributions such parties are making to the restructuring process and can make to the post-emergence businesses. While the Debtors intend to efficiently work through these leases, given the number of leases and contracts, they will likely need more than the 120 days afforded by section 365(d)(4) of the Bankruptcy Code. To that end, the Debtors filed the Lease Rejection Extension Motion on April 18, 2017, seeking an extension of the applicable deadline for an additional 90 days until October 31, 2017. The Bankruptcy Court issued an order approving the motion on May 4, 2017 [Docket No. 551].

**3.      Lease Renegotiation and Store Closing Process**

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 15] (the "Store Closing Motion") seeking to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores. The Bankruptcy Court approved the Store Closing Motion on an interim basis on April 7, 2017 [Docket No. 129] and on a final basis on May 17, 2017 [Docket No. 786], pursuant to which the Debtors began the liquidation of 389 underperforming stores. These efforts, which are ongoing, are part of the Debtors' attempt to rationalize their store fleet. On May 24, 2017, the Debtors filed a second motion seeking approval to close an additional 408 stores [Docket No. 883] (the "Second Store Closing Motion"). The hearing to consider the Second Store Closing Motion is scheduled for June 8, 2017.

As set forth above, the Debtors continue to evaluate approximately 3,000 additional leases to determine whether or not to reject or assume such unexpired leases.  Further, based on this analysis, the Debtors are in the middle of negotiations with their landlords regarding the terms of the Debtors' unexpired leases in an effort to procure more favorable lease terms such that these stores can continue to operate.  These negotiations have generally been successful and the Debtors' have reached agreements to consensually modify hundreds of the Debtors' leases resulting in substantial cost savings (over $20 million in annual occupancy costs have already been saved), which savings will accrue to the benefit of the Debtors' estates and improve the profitability of the Debtors as a going-concern.  Negotiations with the Debtors other landlords are ongoing and significant amounts of additional savings are expected to be achieved in an amount consistent with the Debtors' Financial Projections.

If the Debtors' efforts to renegotiate these other leases are unsuccessful, they are prepared to seek authority to expand their liquidation efforts and close additional stores in a manner consistent with the process set forth in the Store Closing Motion.

Any savings projected by the Debtors on account of the lease renegotiation process are merely projections, and the actual realized savings may be greater than or less than such projections.

4.      **Canadian Recognition Proceeding**

On April 7, 2017, the Debtors sought and were granted a Recognition Order by R.S.J. Morawetz of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to which the Chapter 11 Cases were recognized in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings").  On April 12, 2017, R.S.J. Morawetz granted the Debtors a Supplemental Order.  Among other things, the Recognition Order and the Supplemental Order: (i) recognized the Chapter 11 Cases as a foreign main proceeding; (ii) recognized Payless Holdings LLC as the Foreign Representative of the Debtors in Canada; (iii) recognized certain first-day orders granted by the Bankruptcy Court; (iv) granted a stay of proceedings in Canada in respect of the Debtors, their property and business, and their directors and officers; (v) prohibited the commencement of any proceedings against the Debtors in Canada absent further order of the Canadian Court; and (iv) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings.

As of the date hereof, the DIP Order has not yet been recognized by the Canadian Court.  The Debtors originally intended to include the Canadian Debtors as guarantors on the ABL DIP Facility.  The Debtors no longer believe there would be necessary but do expect the reorganized Canadian Debtors to guarantee any exit ABL financing.

5.      **Appointment of the Creditors' Committee and Retention of Professionals**

On April 14, 2017, the United States Trustee appointed the Official Unsecured Creditors Committee (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 241].  As of the date hereof, the Creditors' Committee consists of (a) Moda Shoe, Ltd.; (b) GGP Limited Partnership; (c) Qingdao Doublestar Mingren Imp. & Exp. Co.; (d) C and C Accord, LTD.; (e) Simon Property Group, Inc.; (f) The Asean Corporation, Ltd.; and (g) Brixmore Property Group, Inc.

With authorization from the Bankruptcy Court, the Creditors' Committee retained the following professional advisors to assist the Creditors' Committee in carrying out its duties and to represent their interests in the Chapter 11 Cases:  (a) Pachulski Stang Ziehl & Jones LLP ("Pachulski"), as lead counsel; (b) Polsinelli P.C. ("Polsinelli") as local counsel; and (c) Province, Inc. ("Province"), as financial advisor.  In addition, the Creditors' Committee has sought to retain Back Bay Management Corporation and its division, The Michel-Shaked Group, as expert consultant and Dr. Israel Shaked as expert witness ("Back Bay Management Corporation and the Michel-Shaked Group").  The hearing on the application to retain Back Bay Management Corporation and the Michel-Shaked Group is scheduled for June 14, 2017.

6.      **Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on May 15, 2017.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors

20

KE 46447836

appear at such meeting of creditors for the purpose of being examined by the United States Trustee and other attending parties in interest), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the United States Trustee and other parties in interest present at the meeting.  The United States Trustee continued the meeting of creditors to June 14, 2017, to give parties additional time to review the Debtors' Schedules.

### 7.    Independent Director Investigation

The Debtors' independent director, Mr. Charles Cremens, was appointed to Payless Holdings LLC's Board of Directors in January 2017.  Mr. Cremens has extensive business and restructuring experience, as well as a strong background as an independent director.  He has more than thirty years of experience restructuring public and private companies and has served as the President and/or Chief Executive Officer of several large and complex companies during their restructurings, including Spirit Finance Corporation, Conseco Finance Corporation, and WMF Group, Ltd.  Prior to those assignments, Mr. Cremens served as the Chief Investment Officer of Beacon Properties Corp., President of Real Estate Investments at Aetna Inc., and held various executive management positions at the Bank of Boston.  Mr. Cremens has served as an independent or disinterested director for various companies in financial distress and restructurings.  His present director engagements include Bluestem Brands (f/k/a Capmark Financial Group), U.S. Steel Canada, iHeartMedia Inc., Payless Holdings LLC, and Energy Future Intermediate Holding Company LLC.

Since his appointment, Mr. Cremens has actively participated as a member of the board with management and the advisors on the restructuring of Payless.  This includes approval of the commencement of these cases and entry into the Restructuring Support Agreement.  In addition to participating as a member of the Board in decisions regarding the restructuring, Mr. Cremens also has been conducting an investigation into any estate claims and estate causes of action the Debtors may have with respect to transactions between the Debtors and the equity holders of Payless Holdings LLC (the "Sponsors").  In particular, MTO, at the direction of Mr. Cremens and with the assistance of the existing financial professionals of the Debtors, has been investigating dividends paid by certain of the Debtors on February 28, 2013 and March 10, 2014 ("Dividends"), the 2012 acquisition of Payless by the Sponsors, and management and transaction fees paid to the Sponsors under that certain Advisory Agreement dated as of October 9, 2012 among certain of the Debtors, GGC Administration, LLC, and Blum Capital Partners (collectively with the Dividends, the "Transactions").

The investigation has included a legal analysis and factual investigation of the Transactions to determine whether they give rise to potential claims against the Sponsors ("Potential Claims").  The efforts by MTO and the Debtors existing financial advisors to date have included, among other activities, the review and evaluation of hundreds of documents pertinent to the Transactions, including transaction documents, related Board minutes and presentations, lender and rating agency and other presentations and related materials, financial projections, and publicly-available materials.  In addition, the investigation has included an evaluation of the work of Duff & Phelps, who was engaged to opine on the solvency of the pertinent Debtor entities at the time, and as a result of, the 2012 acquisition and each Dividend.  For each of the three dates, Duff & Phelps issued an opinion that the pertinent Debtor entities were solvent, which was provided to the Debtors Boards of Directors, with accompanying presentations by Duff & Phelps.

MTO has also interviewed twelve potential witnesses from the Debtors, the Sponsors, and Duff & Phelps and engaged in several calls with Debtors management involving follow-up questions or additional background.  MTO also has had, and continues to have, discussions with the Debtors' existing financial advisors regarding the Debtors' business and history, the Transactions, and considerations relating to Potential Claims.  MTO and the financial advisors are also analyzing various external factors that potentially bear on the reasonableness of the prior solvency determinations by Duff & Phelps and the Board.

Throughout the course of the investigation, MTO has taken direction from Mr. Cremens, the privilege over the investigation is controlled by Mr. Cremens, and MTO has regularly consulted with and reported to Mr. Cremens on the status of the investigation and the facts surrounding the Potential Claims.  MTO, at the direction of Mr. Cremens, has also sought to engage cooperatively with the Committee and other creditor groups regarding the Potential Claims.  In that regard, shortly after the appointment of the Committee and its engagement of counsel, on April 24, 2017, MTO spoke with Committee counsel regarding the investigation and subsequently met with Committee counsel in person on May 2, 2017 to review the work done on behalf of Mr. Cremens.  MTO

KE 46447836

subsequently produced documents it had reviewed and worked with the Committee on an informal, cooperative basis to gather and produce additional documents requested as part of its investigation and diligence of the Transactions.  These efforts have included responding to more than 20 document requests made by the Committee on May 5, 2017, which were directed at the Debtors, the Sponsors, and Duff & Phelps, gathering and producing several hundred documents during May, responding to several additional information requests by the Committee, and having status calls with the Committee on May 15 and May 19, 2017.

The investigation has not been concluded at this time.  It has been and remains the intent of Mr. Cremens to continue working with the Debtors retained financial advisors and MTO to complete the investigation and to solicit the view and input and analyses of the Committee and other creditor groups before reaching a final decision and recommendation regarding the Potential Claims.

The release of the Potential Claims is subject to the conclusion of the investigation by Mr. Cremens.  The Debtors may modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.  For purposes of voting on the Plan, all Holders should vote as if the Debtor Release is being granted without modification or amendment.

KE 46447836

# IV.
## SUMMARY OF THE PLAN

THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD **NOT** BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.   THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS) THE LATTER SHALL GOVERN.

## A.     GENERAL BASIS FOR THE PLAN

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article IV of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor.

The terms of the Debtors' Plans are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of business.  Under the Plan, Claims against and Interests in the Debtors are divided into separate Classes according to their relative seniority, legal nature and other criteria, and the Plan proposes recoveries for Holders of Claims against and Interests in the Debtors in such Classes, if any.  The Debtors believe that the Plan maximizes value for all stakeholders.

## B.     PROPOSED TREATMENT OF EACH CLASS OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 1.     Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, ABL DIP Claims, Term DIP Facility Claims, Priority Tax Claims, or Professional Fee Claims and, thus, Article III of the Plan does not include such Claims in the Classes of Claims set forth therein.  Instead, Article II of the Plan provides for the satisfaction of these unclassified Claims.  The treatment and the projected recoveries under the Plan of these unclassified Claims, which are not entitled to vote on the Plan, are described in summary form below for illustrative purposes only.

KE 46447836

| Unclassified Claim | Plan Treatment | Estimated Percent Recovery Under the Plan |
|---|---|---|
| Administrative Claims | Unimpaired | 100% |
| ABL DIP Claims | Unimpaired | 100% |
| Term DIP Facility Claims | Unimpaired | 100% |
| Priority Tax Claims | Unimpaired | 100% |
| Professional Fee Claims[25] | Unimpaired | 100% |

      (a)      <u>Administrative Claims</u>

Except with respect to Administrative Claims that are Professional Fee Claims and ABL DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.  Notwithstanding any provision of the Plan to the contrary, no Governmental Unit shall be required to file a request for the payment of an expense described in 11 U.S.C. § 503(b)(1)(B) or (C) as a condition of it being allowed as an administrative expense.

      (b)      <u>Administrative Claims Bar Date</u>

All requests for payment of an Administrative Claim (other than Prepetition Credit Agreement Claims or Professional Fee Claims) that accrued on or before the Effective Date that were not accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

---

[25]      The Professional Fee Claims set forth herein and in the Plan constitute the estimated unpaid Professional Fee Claims as of a hypothetical Effective Date of August 10, 2017, and this estimate is nonbinding and is subject to material revision.

KE 46447836

(c)     Professional Compensation

(i)     *Final Fee Applications*

All final requests for Professional Fee Claims shall be filed no later than 30 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(ii)    *Professional Fee Escrow Account*

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(iii)   *Professional Fee Reserve Amount*

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(iv)    *Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor and Reorganized Debtor (as applicable) shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Debtors and Reorganized Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable). If the Debtors or Reorganized Debtors (as applicable), dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein. Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(v)     *Substantial Contribution Compensation and Expenses*

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or

25

Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

(d)    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

(e)    ABL DIP Claims

On the Effective Date, except to the extent that a Holder of an Allowed ABL DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed ABL DIP Claim, each Holder of an Allowed ABL DIP Claim shall indefeasibly receive payment in full, in Cash.

(f)    Term DIP Facility Claims

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Term DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Term DIP Facility Claim, each such Holder of an Allowed Term DIP Facility Claim shall receive, on a dollar-for-dollar-basis, its Pro Rata share of the New First Lien Term Loan A-1 Tranche.

(g)    United States Trustee Statutory Fees

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order, dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

**2.    Classified Claims and Interests**

(a)    Proposed Distributions to Holders of Allowed Claims and Interests

The Plan contemplates the following distributions to Holders of Allowed Claims and Interests, among other recoveries:

| Class 1 – Other Priority Claims | **Treatment**.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Other Priority Claim has already been paid during the Chapter 11 Cases or such Holder of an Allowed Other Priority Claim, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim.<br><br>**Voting**.  Unimpaired.  Each Holder of an Allowed Other Priority Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
|---|---|
| Class 2 – Other Secured | **Treatment**.  On the Effective Date or as soon as reasonably practicable |

26

| | |
|---|---|
| **Claims** | thereafter, except to the extent that a Holder of an Allowed Other Secured Claim has already been paid during the Chapter 11 Cases or such Holder, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive: (i) payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) other treatment, as decided by the Debtors and the Requisite Consenting Lenders to their mutual satisfaction, such that the Other Secured Claim shall be rendered unimpaired.<br><br>**Voting**.  Unimpaired.  Each Holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan. |
| **Class 3 – Prepetition First Lien Credit Agreement Claims** | **Allowance**.  The Prepetition First Lien Credit Agreement Claims shall be allowed in the aggregate amount of $506.3 million (including $633,433.66 (plus accrued and unpaid interest and any reasonable, actual, and documented fees) on account of the Allowed MSCS Swap Claim).<br><br>**Treatment**.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Prepetition First Lien Credit Agreement Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Prepetition First Lien Credit Agreement Claim, each Holder of an Allowed Prepetition First Lien Credit Agreement Claim shall receive its Pro Rata share of: (i) the New First Lien Term Loan A-2 Tranche; and (ii) 91.0% of the New Equity subject to reduction on account of the Worldwide GUC Equity Recovery, and subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee.<br><br>**Voting**.  Impaired.  Each Holder of an Allowed Prepetition First Lien Credit Agreement Claim will be entitled to vote to accept or reject the Plan. |
| **Class 4 – Prepetition Second Lien Credit Agreement Claims** | **Allowance**.  The Prepetition Second Lien Credit Agreement Claims shall be allowed in the aggregate amount of $145 million.<br><br>**Treatment**.  Except to the extent that a Holder of an Allowed Prepetition Second Lien Credit Agreement Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Prepetition Second Lien Credit Agreement Claim (including the unsecured deficiency claim of its Prepetition Second Lien Credit Agreement Claim), each Holder of an Allowed Prepetition Second Lien Credit Agreement shall receive its Pro Rata share of 9.0% of the New Equity, subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee.<br><br>**Voting**.  Impaired.  Each Holder of an Allowed Prepetition Second Lien Credit Agreement Claim will be entitled to vote to accept or reject the Plan. |
| **Class 5A – Other General Unsecured Claims** | **Treatment**.  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of an in exchange for its Allowed Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the Other General Unsecured Claims Recovery Pool, which is (i) $1,000,000 in Cash in the event that Class 5A votes |

<table>
<tr><td></td><td>to accept the Plan or (ii) $250,000 in Cash in the event that Class 5A votes to reject the Plan.

**Voting**.  Impaired.  Each Holder of an Allowed Other General Unsecured Claim will be entitled to vote to accept or reject the Plan.</td></tr>
<tr><td>**Class 5B – Worldwide General Unsecured Claims**</td><td>**Treatment**.  Except to the extent that a Holder of an Allowed Worldwide General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Worldwide General Unsecured Claim, each Holder of an Allowed Worldwide General Unsecured Claim shall receive:

- if such Holder has not made the Worldwide GUC Cash-Out Election, such Holder's Pro Rata share of the Worldwide New Equity Recovery, which is 2.9% of the New Equity (subject to dilution from the Management Equity Incentive Plan and the Exit Commitment Fee); or

- if such Holder has made the Worldwide GUC Cash-Out Election, such Holder's Worldwide GUC Cash-Out Option Payment, which is a Cash payment no less than the lesser of (a) 50% of the value of the Worldwide New Equity Recovery such Holder would otherwise have been entitled to receive had it not made such Worldwide GUC Cash-Out Election and (b) such Holder's Pro Rata share of the Worldwide GUC Cash-Out Cap; (if the Holder makes the Worldwide GUC Cash-Out Election the Holder's Pro Rata share of the Worldwide New Equity Recovery to which it would have been entitled shall be removed from the Worldwide New Equity Recovery and not issued).

**Voting**.  Impaired.  Each Holder of an Allowed Worldwide General Unsecured Claim will be entitled to vote to accept or reject the Plan.</td></tr>
<tr><td>**Class 5C – Canadian General Unsecured Claims**</td><td>**Treatment**.  On the Effective Date or as soon as reasonably practicable thereafter, except to the extent a Holder of a Canadian General Unsecured Claim has already been paid during the Chapter 11 Cases or a Holder of a Canadian General Unsecured Claim, together with the Debtors and the Requisite Consenting Lenders, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Canadian General Unsecured Claim, each Holder of a Canadian General Unsecured Claim shall have its Claim Reinstated provided, however, that nothing in this Plan shall affect any of the Debtors' rights and defenses, whether legal, equitable, or otherwise, in respect of such claims and all such rights and defenses of all Debtors (including any right of counterclaims or right of set off) shall continue following the Effective Date.

The Debtors intend to seek recognition with the Canadian Court in the pending CCAA Recognition Proceedings of the confirmation order authorizing the treatment set forth in the Plan.  The Debtors also expect that the reorganized Canadian Debtors will be guarantors on the exit ABL facility.

**Voting**. Unimpaired. Each Holder of a Canadian General Unsecured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Canadian General Unsecured Claim will not be entitled to vote to accept or reject the Plan.</td></tr>
</table>

KE 46447836

| Class 6 – Intercompany Claims | **Treatment**.  To preserve the Debtors' corporate structure, as of the Effective Date, Intercompany Claims shall be reinstated, cancelled, or compromised as determined by the Debtors, with the consent of the Requisite Consenting Lenders. |
| | **Voting**.  Impaired or Unimpaired.  Each Holder of an Intercompany Claim will be conclusively deemed to have (a) rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan or (b) accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan. |
| **Class 7 – Existing Equity Interests** | **Treatment**.   On the Effective Date, all Existing Equity Interests shall be discharged, cancelled, released, and extinguished.[26] |
| | **Voting**.   Impaired.   Each Holder of an Existing Equity Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Existing Equity Interest will not be entitled to vote to accept or reject the Plan. |
| **Class 8 –Intercompany Interests** | **Treatment**.  To preserve the Debtors' corporate structure, on the Effective Date, all Intercompany Interests shall be cancelled or Reinstated, as determined by the Debtors, with the consent of the Requisite Consenting Lenders, which consent shall not be unreasonably withheld. |
| | **Voting**.   Unimpaired.   Each Holder of an Intercompany Interest will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan. |
| **Class 9 – Section 510(b) Claims** | **Treatment**.  On the Effective Date, all Section 510(b) Claims shall be cancelled without any distribution. |
| | **Voting**.  Impaired.  Each Holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan of Reorganization pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan. |

C.      **POST-EMERGENCE CAPITAL STRUCTURE**

The Debtors capital structure at emergence will consist of:

- **New ABL Facility**.  An up to $305 million senior secured asset-based revolving credit facility, on terms at least as favorable to the Debtors and the lenders under the New First Lien Term Loan Facility as the Prepetition ABL Facility, as determined by the Requisite Consenting Lenders (as defined herein) in their reasonable discretion.  The New ABL Facility is expected to include guarantees from the Canadian Debtors.

- **New First Lien Term Loan Facility**.  A $280 million first lien senior secured term loan (the "New First Lien Term Loan Facility") consisting of (i) the New First Lien Term Loan A-1 Tranche, a first-out amortizing term loan which shall be in an amount equal to the outstanding balance of the

---

[26]     Following the Petition Date, the Debtors received a letter from certain Holders of Existing Equity Interests in Payless Holdings LLC asserting entitlement to certain assets of Payless Holdings LLC with an approximate value of $5 million.  These Holders have requested that such value be preserved for distributions to Holders of Existing Equity Interests.  The Debtors are evaluating the assets and liabilities at each Debtor and reserve all rights related thereto, including the right to modify the proposed treatment of Claims in Class 8 under the Plan as a result of such evaluation.

KE 46447836

Term DIP Facility on the Effective Date and (ii) the New First Lien Term Loan A-2 Tranche, a last-out amortizing term loan, which shall be in an amount of $280 million less the amount of the outstanding balance of the Term DIP Facility on the Effective Date.

- **New Equity.**  Payless Holdings LLC, as reorganized pursuant to and under the Plan, or a new corporation or limited liability company that may be formed to directly or indirectly acquire all of the assets and/or stock of the Debtors shall issue equity (the "<u>New Equity</u>") on the Effective Date on the terms set forth in the Plan.

## D.    CERTAIN MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

### 2.    Restructuring Transactions

The Plan provides that, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate; *provided*, *however*, that no such restructuring transactions may violate the terms of any Unexpired Lease assumed by the Debtors.

### 3.    The New Credit Facilities and Approval of the New Credit Facilities

Confirmation of the Plan shall be deemed to constitute approval of the New Credit Facilities and the New Credit Facilities Documents (including all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New Credit Facilities Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the New Credit Facilities Documents.

On the Effective Date, the New Credit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Credit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the liens and security interests to be granted in accordance with the New Credit Facilities Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Credit Facilities Documents, (b) shall be deemed automatically attached and perfected on the Effective Date,

KE 46447836

subject only to such liens and security interests as may be permitted under the New Credit Facilities Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non bankruptcy law. The Reorganized Debtors and the Entities granted such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent such Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the New Credit Facilities Documents that are necessary to cancel and/or extinguish such liens and/or security interests.

4.      **Corporate Existence**

Subject to any restructuring transactions as permitted under Article IV.B, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other similar formation and governance documents) are amended by or in connection with the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

5.      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.      **Cancellation of Prepetition Credit Agreements and Equity Interests**

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreements and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease that (i) has been, or will be, assumed

31

pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, except that:

- the Prepetition Credit Agreements shall continue in effect solely for the purpose of: (i) allowing Holders of the ABL DIP Claims, Prepetition First Lien Credit Agreement Claims, and Prepetition Second Lien Credit Agreement Claims, as applicable, to receive the distributions provided for under the Plan; (ii) allowing the Prepetition Agents to receive distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the Prepetition Agents' right to indemnification pursuant and subject to the terms of the Prepetition Credit Agreements in respect of any Claim or Cause of Action asserted against the Prepetition Agents; *provided* that any Claim or right to payment on account of such indemnification by the Debtors shall be an unsecured Claim and shall not be secured in any of the assets of the Debtors, Reorganized Debtors, or their Affiliates; and

- the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor.

### 7.     Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with proceeds from the New ABL Facility and Cash on hand as of the Effective Date.  Specifically, the Debtors expect that the New ABL Facility will provide sufficient Cash to satisfy all of the DIP ABL Claims.[27] Additionally, prior to the Effective Date, the Debtors may draw under the Term DIP Facility (subject to and in accordance with the Final DIP Order) to provide the Debtors with additional liquidity.  The Debtors will rely on this draw under the Term DIP Facility and Cash on hand to fund other payments required in connection with emergence.

In making such Cash payments, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### 8.     Payment of Commitment Fees

On the Effective Date, to the extent any portion of the commitments under the Term DIP Facility are not borrowed, the Reorganized Debtors shall pay a Cash fee equal to 3% of the commitments under the Term DIP Facility that are not borrowed to each Backstop Lender in accordance with the DIP Documents.

On the Effective Date, to the extent any portion of the commitments under the Term DIP Facility are not borrowed, the Reorganized Debtors shall pay a Cash fee equal to 2% of the commitments under the Term DIP Facility that are not borrowed to each lender under the Term DIP Facility in accordance with the DIP Documents.

On the Effective Date, the Reorganized Debtors shall pay the Exit Commitment Fee to lenders under the Term DIP Facility in accordance with the DIP Documents.

### 9.     Worldwide GUC Cash-Out Option

Each Holder of a Class 5B Worldwide General Unsecured Claim shall have the option to elect on its Ballot to receive a Worldwide GUC Cash-Out Option Payment instead of its Pro Rata share of Worldwide New Equity

---

[27]     The New ABL Facility is expected to include guarantees from the Canadian Debtors.

KE 46447836

Recovery.  The GUC Cash-Out Option will be funded by Cash on the Debtors' balance sheet or proceeds of the Term DIP Facility.

**10.     Effectuating Documents and Further Transactions**

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.  Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

**11.     Issuance of New Equity**

1.     New Equity

On the Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.  The issuance of such documents is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. Distributions of New Equity will only be made through broker accounts via electronic issuance and Reorganized Holdings will not issue separate stock certificates.

2.     Shareholders Agreements

On the Effective Date, Holders of New Equity shall be parties to a Shareholders Agreement, in substantially the form included in the Plan Supplement, and which shall otherwise be satisfactory to the Requisite Consenting Lenders.  On the Effective Date, Reorganized Holdings and the Requisite Consenting Lenders shall enter into and deliver the Shareholders Agreement to each Entity that is intended to be a party thereto and such Shareholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

3.     Private Companies

On the Effective Date, the Reorganized Debtors shall be private, non-SEC reporting companies.

**12.     Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities.  In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Equity contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

33

### 13.      New Organizational Documents

On or immediately prior to the Effective Date, the organizational documents of each of the Debtors shall be amended and restated, as may be necessary to effectuate the transactions contemplated by the Plan, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be satisfactory to the Requisite Consenting Lenders. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

### 14.      Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 15.      Directors and Officers of Reorganized Holdings and Other Reorganized Debtors

The initial directors and officers of the Reorganized Holdings shall be selected by the Requisite Consenting Lenders.  Unless otherwise set forth in the Plan Supplement, the existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.  The identity of each of the members of the New Board will be disclosed prior to the Confirmation Hearing and any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to and to the extent necessary to satisfy section 1129(a)(5) of the Bankruptcy Code.

### 16.      Avoidance Actions

The Reorganized Debtors will retain all rights to commence and pursue any and all Avoidance Actions.

### 17.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including Article IX.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any**

and all available Causes of Action against it. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

18.     **Directors and Officers Insurance Policies and Agreements**

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

19.     **Compensation and Benefits Programs**

Unless otherwise provided herein or in the Plan Supplement, the Confirmation Order, or any applicable agreements binding on the Debtors, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(a)     Management Equity Incentive Plan

Promptly on or as soon as practicable after the Effective Date, the New Board will adopt and implement the Management Equity Incentive Plan whereby equity awards for 6–10% of the New Equity (on a fully diluted basis) of Reorganized Holdings will be granted to continuing employees of the Debtors and members of the New Board with pricing, vesting and exercise terms to be determined by the New Board upon consultation with the Chief Executive Officer of Reorganized Holdings.

35

(b)    <u>Cash Incentive Program</u>

Promptly on or as soon as practicable after the Effective Date, the Reorganized Debtors will assume the Cash Incentive Program.

(c)    <u>Continuation of Retiree Benefits</u>

The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.

(d)    <u>Workers' Compensation Programs</u>

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance, including without limitation, any Insurance Policies providing workers' compensation insurance coverage to the Debtors.

All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

## E.    PLAN SUPPLEMENT

The Debtors will file the Plan Supplement with the Bankruptcy Court on or before the date that is seven (7) calendar days prior to the Voting Deadline. The Noticing and Claims Agent will serve the 2002 List and Master List with a courtesy notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained. The Plan Supplement will include, without limitation, the forms of:

- the Shareholders Agreement;

- the New First Lien Credit Agreement;

- the New ABL Credit Agreement;

- the Schedule of Assumed Executory Contracts and Unexpired Leases;

- the Schedule of Rejected Executory Contracts and Unexpired Leases;

- a list of retained Causes of Action;

- the New Organizational Documents; and

- the documents and agreements necessary to implement the Cash Incentive Program.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases, Generally

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract or Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant

KE 46447836

to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) is the subject of a motion to assume such Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (3) is a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, unless otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease, and except as such terms are modified any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right (subject to the consent of the Requisite Consenting Lenders) to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases (i) to add or remove any Executory Contract or Unexpired Lease to the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Confirmation Date, and (ii) to remove any Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time through and including the Confirmation Date.  The Debtors or the Reorganized Debtors shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby.  In any case, if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases in which case such Executory Contract or Unexpired Lease will be deemed to have been rejected as of the Effective Date.

### 2.    Indemnification Provisions

On the Effective Date, except as otherwise provided by the Plan, all indemnification provisions, consistent with applicable law, in place as of the date of the Restructuring Support Agreement (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed, which assumption shall be irrevocable, and shall survive the Effective Date.

### 3.    Directors and Officers Insurance Policies and Agreements

Pursuant to Article IV.R of the Plan, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

### 4.    Insurance Policies

Notwithstanding anything to the contrary herein, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Insurance Policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.C of the Plan) and any agreements, documents, and instruments relating to coverage of all insured Claims.  Except as set forth in Article V.C of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a Cure objection or a request, application,

KE 46447836

claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing cure amounts or Claims.

### 5.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date.

The Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases (including the proposed Cure Claim amounts) with the Plan Supplement.  The Debtors will cause such notices of proposed assumption and proposed Cure amounts to be served by overnight delivery service upon the applicable contract counterparty affected by such notices and by email upon counsel of record for the applicable contract counterparty, if any.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be filed, served, and actually received by the Debtors no later than fourteen (14) days after the Plan Supplement Filing Date.  Any such objections will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount. Notwithstanding the foregoing, all landlords' rights to recover amounts which have accrued or come due between the Cure objection deadline and the effective date of assumption are reserved.

To the extent that the Debtors amend the Schedule of Assumed Executory Contracts and Unexpired Leases after the objection deadline set forth in this section but prior to the Effective Date, any party to an Executory Contract or Unexpired Lease directly impacted by such amendment may object to the amended proposed Cure amount within 14 days of any such amendment.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing after which such objection is timely filed.  To the extent any such dispute regarding the assumption of an Executory Contract or Unexpired Lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the Effective Date if approved by the Bankruptcy Court.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of any one of the following: (1) amounts listed on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases, (2) amounts agreed to by the Debtors and the applicable counterparty, or (3) amounts as ordered by the Court; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**Any Proofs of Claim filed with respect to an Executory Contract, Unexpired Lease, or Insurance Policy that has been assumed pursuant to the provisions of the Plan shall be deemed satisfied upon the Debtors' curing of any and all defaults related thereto, without further notice to or action, order, or approval of the Bankruptcy Court.**

6.  **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 14 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

7.  **Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

8.  **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.  **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

10.  **Reservation of Rights**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

39

11.     **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.     **DISTRIBUTIONS ON ACCOUNT OF CLAIMS**

1.     **Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided, however*, that payments on account of Other General Unsecured Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date.

2.     **Disputed Unsecured Claims Reserves**

(a)     <u>Other General Unsecured Claims Reserve</u>

From and after the Effective Date, and until such time as all Disputed Other General Unsecured Claims have been compromised and settled or determined by order of the Bankruptcy Court, for the benefit of each Holder of such claims, an amount of the Other General Unsecured Claims Recovery Pool shall be reserved in Cash, in an amount equal to lesser of (a) the amount of the  Disputed Other General Unsecured Claims; (b) the amount in which the Other General Unsecured Claims shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim; and (c) such other amount as may be agreed upon by the Holder of such Other General Unsecured Claims and the Reorganized Debtors.  Any amount of the Other General Unsecured Claims Recovery Pool reserved and held for the benefit of a Holder of a Disputed Other General Unsecured Claim shall be treated as a payment and reduction on account of such Other General Unsecured Claim for purposes of computing any additional amounts to be paid to such Holder if the Other General Unsecured Claim ultimately becomes an Allowed Claim.  Such amount of the Other General Unsecured Claims Recovery Pool shall be reserved for the benefit of Holders pending determination of their entitlement thereto under the terms of the Plan.  No payments or distributions shall be made with respect to all or any portion of any Disputed Other General Unsecured Claim pending the entire resolution thereof by Final Order.

Any amount remaining in the reserve being held for the benefit of Disputed Other General Unsecured Claims after reconciliation of all Other General Unsecured Claims asserted against the Debtors shall be distributed to Holders of Allowed Other General Unsecured Claims in accordance with the provisions of the Plan.

(b)     <u>Worldwide General Unsecured Claims Reserve</u>

From and after the Effective Date, and until such time as all Disputed Worldwide General Unsecured Claims have been compromised and settled or determined by order of the Bankruptcy Court, for the benefit of each Holder of such claims, the Debtors and Reorganized Debtors shall maintain a reserve consisting of:

(i)     Worldwide New Equity Recovery of a value equal to the distributions of New Equity (after taking into account dilution from the Management Equity Incentive Plan and the Exit Commitment Fee), which would be made to the Holders of any Disputed Worldwide General Unsecured Claims who did not make the Worldwide GUC Cash-Out Election if such Claims were Allowed Claims, in an amount for each Disputed Worldwide General Unsecured Claim equal to the lesser of:  (i) the amount of such Disputed Worldwide General Unsecured Claim; (ii) the amount of such Disputed Worldwide General Unsecured Claim as estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the

KE 46447836

Bankruptcy Court, shall constitute and represent the maximum amount of such Claim that may ultimately become an Allowed Claim; and (iii) such other amount as may be agreed upon by the Holder of such Worldwide General Unsecured Claim and the Reorganized Debtors.  Any amount of the Worldwide New Equity Recovery reserved and held for the benefit of a Holder of a Disputed Worldwide General Unsecured Claim shall be treated as a payment and reduction on account of such Worldwide General Unsecured Claim for purposes of computing any additional amounts to be paid to such Holder if such Worldwide General Unsecured Claim ultimately becomes an Allowed Claim. Such amount of the Worldwide New Equity Recovery shall be reserved for the benefit of Holders pending determination of their entitlement thereto under the terms of the Plan; and

(ii)     an amount of Cash equal to the distributions of Cash that would be made to the Holders of Disputed Worldwide General Unsecured Claims for which such Holders made the Worldwide GUC Cash-Out Election if such Claim were an Allowed Claim in an amount equal to the lesser of G(2)(b)(i)–(iii) above.  Any amount of Cash reserved and held for the benefit of a Holder of a Disputed Worldwide General Unsecured Claim shall be treated as a payment and reduction on account of such Worldwide General Unsecured Claim for purposes of computing any additional amounts to be paid to such Holder if such Worldwide General Unsecured Claim ultimately becomes an Allowed Claim.

For the avoidance of doubt, distributions from the reserve to Holders of Disputed Worldwide General Unsecured Claims whose Claims become Allowed and who made the Worldwide GUC Cash-Out Election shall be made in Cash in accordance with the Plan and the amount of New Equity that would have been received by such Holder shall be removed from the reserve and instead be subsequently distributed on a Pro Rata basis to Holders of Prepetition First Lien Credit Agreement Claims in accordance with the Plan.

After each Periodic Distribution Date, the Reorganized Debtors may reduce the applicable reserve established pursuant to this Section VI.B.2 by any amount distributed from such reserve on such Periodic Distribution Date.

Any amount remaining in the reserve being held for the benefit of Disputed Worldwide General Unsecured Claims after reconciliation of all asserted Worldwide General Unsecured Claims shall be distributed to Holders of Allowed Worldwide General Unsecured Claims in accordance with the provisions of the Plan.

### 3.     Distributions on Account of Claims Allowed After the Effective Date

(a)     Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim from the applicable reserve.  If a Holder made the Worldwide GUC Cash-Out Election on a timely cast and valid Ballot, such Holder will receive its Pro Rata share of Cash from the Worldwide General Unsecured Claims Reserve.  If a Holder did not make the Worldwide GUC Cash-Out Election on a timely cast and valid Ballot or did not submit a Ballot, such Holder will receive its Pro Rata share of the Worldwide New Equity Recovery.

Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

KE 46447836

(b)        Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

**4.        Timing and Calculation of Amounts to Be Distributed**

Except as otherwise herein, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VI of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**5.        Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)        Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly-traded security is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)        Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be the address set forth in any Proof of Claim filed by that Holder.

(c)        Delivery of Distributions to Prepetition First Lien Credit Agreement Claims

The Prepetition First Lien Agent shall be deemed to be the Holder of all Prepetition First Lien Credit Agreement Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition First Lien Credit Agreement Claims shall be made to or on behalf of the Prepetition First Lien Agent.  The Prepetition First Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Prepetition First Lien Credit Agreement Claims, as applicable.  As soon as practicable following compliance with the requirements set forth in this Article VI of the Plan, the Prepetition First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of such Holders of Allowed Prepetition First Lien Credit Agreement Claims.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition First Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition First Lien Agent.

KE 46447836

(d)     Delivery of Distributions to Prepetition Second Lien Credit Agreement Claims

The Prepetition Second Lien Agent shall be deemed to be the Holder of all Prepetition Second Lien Credit Agreement Claims, as applicable, for purposes of distributions to be made hereunder, and all distributions on account of such Prepetition Second Lien Credit Agreement Claims shall be made to or on behalf of the Prepetition Second Lien Agent. The Prepetition Second Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Prepetition Second Lien Credit Agreement Claims, as applicable. As soon as practicable following compliance with the requirements set forth in this Article VI of the Plan, the Prepetition Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of such Holders of Allowed Prepetition Second Lien Credit Agreement Claims. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Prepetition Second Lien Agent shall not have any liability to any person with respect to distributions made or directed to be made by the Prepetition Second Lien Agent. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented (in summary form) fees, costs, and expenses incurred by the Prepetition Second Lien Agent prior to the Effective Date, which shall include the reasonable and documented fees and expenses of Pryor Cashman LLP (including for services, if any, provided prior to the Petition Date), without the need for the Prepetition Second Lien Agent to file a fee application with the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented fees, costs, and expenses incurred by the Prepetition Second Lien Agent (including the reasonable and documented fees and expenses of Pryor Cashman LLP for services rendered on or after the Effective Date) in connection with distributions to Holders of Allowed Prepetition Second Lien Credit Agreement Claims in accordance with the Plan.

(e)     Distributions by Distribution Agents (if any)

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(f)     Minimum Distributions

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Equity under the Plan would otherwise be called for, the actual payment or distribution will

43

reflect a rounding of such fraction to the nearest whole dollar or share of New Equity (up or down), with half dollars and half shares of New Equity or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made from on the Periodic Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VI.E.7 of the Plan.

(g)     Undeliverable Distributions

(i)     Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or their Distribution Agent) are notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VI.E.7(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(ii)     Failure to Claim Undeliverable Distributions

No later than 120 days after the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within 180 days of the Effective Date, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.

In such cases, (i) any Cash or New Equity held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(iii)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.  In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, the Reorganized Debtors shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks no later than 160 days after the issuance of such checks.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 120 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with

44

respect thereto.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### 6.        Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

### 7.        Setoffs

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved Claims, Equity Interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, Equity Interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

### 8.        Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

### 9.        Claims Paid or Payable by Third Parties.

(a)        Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.

45

If the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including any insurer(s) under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the Insurance Policies.

## H.      RESOLUTION OF CONTINGENT, UNLIQUIDATED, OR DISPUTED CLAIMS

### 1.      Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

### 2.      Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 3.      Estimation of Claims

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

46

4.      **Adjustment to Claims Without Objection**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court

5.      **Time to File Objections to Claims**

Any objections to Claims shall be filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

6.      **Disallowance of Claims**

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

7.      **Amendments to Claims**

On or after the applicable bar date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

8.      **No Distribution Pending Allowance**

If an objection to a Claim or portion thereof is filed as set forth in Article VIII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

9.      **Distribution After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

47

I.      **THE DEBTOR RELEASE, THIRD-PARTY RELEASE, INJUNCTION, AND EXCULPATION**

    1.      **Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

    2.      **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

    3.      **Discharge of Claims and Termination of Equity Interests**

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by current of former employees of the Debtors prior to the Effective Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

    4.      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in accordance with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens,

<div align="center">48</div>

pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

5.      **Debtor Release**

**Notwithstanding anything to the contrary herein, the "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor that the Boards of Directors of the Debtors determines, after investigation, should be excluded from this "Debtor Release." All rights of the Debtors and the Board of Directors to make changes to the terms of the Debtor Release solely based on the outcome of such investigation are reserved as of the date of the filing of this Plan.[28]**

> **For purposes of voting on the Plan or considering whether to object to the Plan, all Holders of Claims and Interests should assume the following Debtor Release will not be changed.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct, or gross negligence.**

**Notwithstanding anything to the contrary herein, the "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release, or document delivered pursuant to the Plan, including, without limitation, the New ABL Facility Documents, the New First Lien Term Loan Facility Documents, or the Shareholders Agreement or documents, agreements, or instruments executed in connection therewith, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a**

---

[28]      See section III.B.7 for further information on the investigation.

KE 46447836

bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

6.      **Third-Party Release**

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct, or gross negligence.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Third-Party Release against any of the Released Parties.

7.      **Exculpation**

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement, or related documents, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing, and/or effecting the Restructuring Support Agreement, the DIP Documents, the Disclosure Statement, and the Plan (including the Plan Supplement and any related contract, instrument, release, or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the

50

Plan; and/or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order.

8.      Injunction

The satisfaction, release, and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

9.      No Release of Any Claims Held by the United States

Nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

J.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

1.      Modification of Plan

Subject to the limitations contained in the Plan, the Restructuring Support Agreement, the ABL DIP Facility, and the Term DIP Facility, and in accordance with the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

2.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      Revocation of Plan

Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective

Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## K.      IMPORTANT SECURITIES LAW DISCLOSURE

### 1.      General Disclosure

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan of the New Equity will be exempt from registration under the Securities Act and Blue Sky Laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.  Accordingly, such New Equity may be resold without registration under the Securities Act, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code.  In addition, such New Equity governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective securities laws of those states; however, the availability of such exemptions cannot be known unless individual Blue Sky Laws are examined.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the Holders of those securities;

- offers to buy those securities from the Holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.  You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or

52

successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity issued to holders deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Equity who are deemed to be "underwriters" may be entitled to resell their New Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to such New Equity would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Equity issued to holders and, in turn, whether any Person may freely resell such New Equity.

**2.        Management Equity Incentive Plan**

The Plan contemplates the implementation of the Management Equity Incentive Plan, which will reserve up to 6–10% of the New Equity (on a fully diluted basis) for issuance. The Management Equity Incentive Plan will be established and implemented by the New Board as soon as reasonably practicable following the Effective Date. Such New Equity will be exempt from registration under the Securities Act by virtue of Rule 701 promulgated under the Securities Act, Section 4(a)(2) of the Securities Act, or a "no sale" under the Securities Act.

PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

KE 46447836

<div align="center">

**V.**
**VALUATION AND FINANCIAL PROJECTIONS**

</div>

> THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE OF THE NEW EQUITY DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

**A.      ESTIMATION OF PAYLESS' ENTERPRISE VALUE**

In connection with developing the Plan, the Debtors directed Guggenheim Securities to perform various indicative financial analyses to assess the estimated enterprise value of Payless on a going-concern basis upon emergence from chapter 11 pursuant to the Plan.  A summary of Guggenheim Securities' estimation of Payless' enterprise value is attached hereto as **Exhibit F** (the "Estimation of Payless' Enterprise Value").

The Estimation of Payless' Enterprise Value is subject to various important qualifiers and assumptions that are set forth in **Exhibit F**.

**B.      FINANCIAL PROJECTIONS**

As discussed more fully in Article VI.A herein, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "feasibility" standard, the Debtors, with the assistance of A&M, prepared the financial projections for the fiscal years of 2017 through 2021 set forth on **Exhibit D** (the "Financial Projections").  In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will operate a successful business with sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are subject to various important qualifiers and assumptions that are set forth in the Financial Projections.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.**

**The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.**

**C.      LIQUIDATION ANALYSIS**

As discussed more fully in Article VII.A.4, hereof, the Debtors believe that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "best interest" test, the Debtors, with the assistance of A&M, prepared the Liquidation Analysis attached here to as **Exhibit E** (the "Liquidation Analysis").  In general, as illustrated by the Liquidation Analysis, the Debtors believe that the Plan provides all Holders of a claim or interest property of a value that is equal to or greater than such Holder would receive in a liquidation.

<div align="center">54</div>

The Liquidation Analysis is subject to various important qualifiers and assumptions that are set forth in the Liquidation Analysis.

# VI.
## SOLICITATION AND VOTING PROCEDURES

On [__], 2017, the Bankruptcy Court entered the Disclosure Statement Order by which the Bankruptcy Court approved, among other things, procedures and documents for the solicitation of acceptances on the Plan, certain key dates and deadlines relating to the voting and Confirmation and procedures for tabulating votes. For purposes of this Article VI, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. The procedures and instructions for voting on the Plan are set forth in the exhibits annexed to the Disclosure Statement Order. The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

<div style="border:1px solid black; text-align:center;">

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED AS **EXHIBIT C**
FOR A MORE COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### 1.    Solicitation Packages

Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (the "General Solicitation Package"), including:

- a copy of the Solicitation Procedures;

- the Confirmation Hearing Notice;

- a cover letter, describing the contents of the General Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- an appropriate form of Ballot for Holders of Claims; and

- the approved Disclosure Statement (with all exhibits attached thereto, including the Plan and the exhibits attached thereto).

The Solicitation Packages will provide the Disclosure Statement and Plan in electronic format (i.e., CD ROM or flash drive) and all other contents of the Solicitation Packages, including Ballots, in paper format. Any Holder of a Claim or Interest may obtain, at no charge, a paper copy of the documents otherwise provided by (a) accessing Prime Clerk's website at https://cases.primeclerk.com/payless.

### 2.    Voting Rights

**Classes Entitled to Vote**. Under the provisions of the Bankruptcy Code, not all Holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3, 4, 5A, and 5B (the "Voting Classes") because Holders of Claims in the Voting Classes are Impaired under the Plan and, may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan. If your Claim or Interest is not included in one of these Classes, you are not entitled to vote and you will not receive a Solicitation Package.

Each of the Voting Classes will have accepted the Plan if: (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan; and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan. Additionally, if Prime Clerk receives no votes to accept or reject the Plan with respect to any particular Class of Claims, the Debtors may seek to deem such class as having accepted the Plan.

56

The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 3 | Prepetition First Lien Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Second Lien Credit Agreement Claims | Impaired | Entitled to Vote |
| 5A | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 5B | Worldwide General Unsecured Claims | Impaired | Entitled to Vote |

**Classes not Entitled to Vote.**  Under the Bankruptcy Code, Holders of Claims or Interests are not entitled to vote if such Claims or Interests are Unimpaired under the Plan or if they will receive no distribution of property under the Plan.  Based on this standard, the following Classes of Claims and Interest for each Debtor, as applicable, will not be entitled to vote on the Plan and the Holders of such Claims will not be solicited to vote on the Plan.

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5C | Canadian General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Deemed to Reject |
| 9 | Section 510(b) Claims | Impaired | Deemed to Reject |

3.      **Record Date**

**The Record Date June 14, 2017**.  This means that it will be determined (a) which Holders of Claims in Classes 3, 4, 5A, and 5B are entitled to vote to accept or reject the Plan and (b) whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim by the Record Date.

4.      **Voting Deadline**

**The Voting Deadline is 4:00 p.m. prevailing Central Time on July 17, 2017**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that each Ballot is *actually received* on or before the Voting Deadline by either the Noticing and Claims Agent or the Solicitation and Subscription Agent at the applicable address:

**Payless Balloting Center
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, New York, 10022**

5.      **Ballots Not Counted**

**The following Ballots will not be counted toward Confirmation of the Plan:**  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or transmitted by facsimile or other electronic means; (b) any Ballot cast by an entity that is not entitled to vote on the Plan; (c) any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (d) any Ballot cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (e) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Noticing and Claims Agent),

the Indenture Trustee or the Debtors' financial or legal advisors; (e) any unsigned Ballot; or (f) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICING AND CLAIMS AGENT OR THE SOLICITATION AND SUBSCRIPTION AGENT, AS APPLICABLE.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

---

KE 46447836

**VII.**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

**1.      Confirmation Hearing**

**The Confirmation Hearing is scheduled to commence on July 24, 2017, at 10:00 a.m. prevailing Central Time.**  The Confirmation Hearing will be held before the Honorable Kathy A. Surratt-States, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Missouri, Thomas F. Eagleton U.S. Courthouse, 111 S. 10th Street, 4th Floor, Courtroom 7 North, St. Louis, MO 63102).  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice.  Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than July 17, 2017, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing, attached to the Disclosure Statement Order as Exhibit 2 and incorporated herein by reference.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

**The "Plan Objection Deadline" is 4:00 p.m. prevailing Central Time on July 17, 2017**.  This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served on all parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002, so as to be *actually received* on or before the Plan Objection Deadline by such parties.

**2.      Effect of Confirmation**

Following Confirmation, subject to Article IX of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective.  As such, it is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.  **Additionally, for a more detailed description of the provisions set forth in Article X of the Plan, please refer to Section IV.I herein**

**PLEASE TAKE NOTICE that, the "Third-Party Release" set forth in Article X.F of the Plan is a consensual release which provides that only Holders of Claims in Classes 3, 4, 5A, or 5B who affirmatively vote to _accept_ the Plan _are_ bound by the "Third-Party Release" pursuant to Article X.F of the Plan.  Holders of Claims who vote to _reject_ the Plan are _not_ bound by the Third-Party Release if they elect on their ballot to opt-out of the release.**

---

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

---

KE 46447836

### 3.        Confirmation Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than 30 days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- With respect to each class, each Holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the Holder would receive or retain if the debtors liquidated under chapter 7.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### 4.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each Holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the Holder would receive or retain if the debtors liquidated under chapter 7.

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit E**.

Thus, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

### 5.    Feasibility Requirements

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared certain Financial Projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit D**. These Financial Projections relate to the expected performance of the Reorganized Debtors under the Plan.  Based on these Financial Projections and the fact that the Debtors will have sufficient funds upon Confirmation to make all payments required under the Plan, the Debtors believe that the deleveraging contemplated by the Plan meets the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 6.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the Holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the Holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the Holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

KE 46447836

Claims in Classes 1, 2, 5C, and 8, and certain Claims in Class 6 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims and Interests in Classes 7 and 9 will receive no distribution under the Plan and are, therefore, presumed deemed to have rejected the Plan.

Claims in Classes 3, 4, 5A, and 5B are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

**7.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

(a)      <u>No Unfair Discrimination</u>

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)      <u>Fair and Equitable</u>

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan:

- <u>Secured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the Holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each Holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at

least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each Holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the Holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

- <u>Equity Interests</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each Holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the Holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property:

## B.    CONDITIONS FOR CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with the Article IX.B of the Plan, including:

- The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

- The Definitive Documents shall satisfy the Definitive Document Restructuring Support Agreement Requirements;

- The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtors, the Requisite Consenting Lenders, and the ABL DIP Lenders.

- The Confirmation Order shall have been entered and become a Final Order in form and in substance reasonably satisfactory to the Debtors and the Requisite Consenting Lenders.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

- All documents and agreements necessary to implement the Plan, including, without limitation, the New Credit Facilities Documents, shall have (a) been tendered for delivery and (b) been effected or executed.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, and the commitment fees described in Article IV.H of the Plan shall have been paid.

- All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

- The Professional Fee Escrow Account shall have been established and funded.

## C.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.      Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section VI.A herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### 2.      Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors. In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in New Equity (if issued).

# VIII.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  WHILE NUMEROUS, THESE RISK FACTORS SHOULD <u>NOT</u> BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN.

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

A. **RISKS RELATING TO CONFIRMATION OF THE PLAN**

1. **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2. **Failure to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3. **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable

KE 46447836

treatment of any Class than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### 4. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 6. Failure to Obtain Exit ABL Financing

The Debtors will not be able to operate or pay the ABL DIP Claims as contemplated under the Plan without a New ABL Facility. If the Debtors cannot procure a New ABL Facility on market terms prior to the Confirmation Hearing, they will likely be unable to meet the feasibility requirement for confirmation of the Plan.

### 7. Failure to Obtain Recognition of the Interim DIP Order in the Canadian Proceedings

The Debtors' access to the full amount of the borrowing base contemplated by the ABL DIP Facility requires that the Canadian Court recognize the Bankruptcy Court's orders regarding the DIP Facilities. As of the date hereof, the Canadian Court has not granted such recognition. If the Debtors do not obtain recognition of such orders in the Canadian Court, or otherwise negotiate an alternative solution to obtain access to the necessary liquidity, the Debtors may be unable to sufficiently finance operations to reach the Confirmation Hearing.

### 8. The Restructuring Support Agreement May Terminate

The parties to the Restructuring Support Agreement have agreed to support the Plan provided certain conditions are met. To the extent that the terms or conditions of the Restructuring Support Agreement are not satisfied, or to the extent events of termination arise under the Restructuring Support Agreement, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to Confirm and Consummate the Plan.

### 9. Release, Injunction, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations. All of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If they are not approved, the Plan likely cannot be confirmed and likely cannot go effective.

## B.    RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1. The Recovery to Holders of Allowed Claims Can Not be Stated With Absolute Certainty.

This Disclosure Statement contains various projections concerning the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized

KE 46447836

Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections. Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

Further, the Claims estimates set forth herein are based on various assumptions and are estimates. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

### 2.    The Value of New Equity Can Not Be Stated With Absolute Certainty.

On the Effective Date, 100% of the New Equity will be issued to various creditors on account of their Claims, but will be subject to dilution by (a) 6–10% of the New Equity (on a fully-diluted basis) that will be reserved for issuance in connection with the Management Equity Incentive Plan to be granted at the discretion of the New Board and (b) the New Equity that will be used to pay the Exit Commitment Fee. Despite the Debtors' best efforts to value the New Equity, various uncertainties, including market conditions, the Debtors' inability to implement their business plan, and lack of a market for the New Equity may cause fluctuations or variations in value of the New Equity not fully accounted for herein.

In addition, the value of the New Equity may be impacted by changes to the Reorganized Debtors' post-emergence capital structure.

### 3.    Risk of Non-Occurrence of the Effective Date

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The occurrence of the Effective Date is subject to certain conditions precedent as described in Article IX.B of the Plan, including, among others, those relating to consummation of the Plan, as well as the receipt of certain regulatory approvals. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

## C.    RISKS RELATING TO THE DEBTORS' BUSINESSES

### 1.    Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facilities or

otherwise, in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

**2.      The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations.**

The DIP Facilities and Restructuring Support Agreement include financial covenants that, among other things, require the Debtors to perform within a budget and meet certain milestones.  If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants.  Furthermore, the DIP Facilities and Restructuring Support Agreement contain limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets.  If the Debtors fail to comply with the covenants in the DIP Facilities and Restructuring Support Agreement and are unable to obtain a waiver or amendment of such covenants, an event of default will occur thereunder.  The DIP Facilities and Restructuring Support Agreement contain other events of defaults customary for debtor-in-possession financings.

**3.      The Debtors May Fail in Their Lease Rationalization Efforts**

The Debtors' efforts to renegotiate leases and close stores depends during the Chapter 11 Cases is an effort to cut costs and maintain profitability.  The Debtors' forward-looking financial projections are based on a certain amount of savings and number of operating stores, which amounts anticipates substantial concessions from various landlords.  If the Debtors are unable to reach satisfactory terms with the quantity of landlords they anticipate, the Debtors may be forced to close additional stores, decreasing revenue.  Further, the actual savings may be substantially greater than or less than the projected savings ranges.

**4.      The Debtors May Fail to Negotiate Qualified Trade Agreements with Core Vendors**

The Debtors' efforts to negotiate Qualified Trade Agreements may fall short of the Debtors stated needs, potentially damaging the Debtors' supply chain and limiting access to products or prices that allow the Debtors to operate their businesses in a cost-effective manner.

**5.      The Debtors May Fail in Their Latin America Joint Venture Renegotiation Efforts**

The Debtors' efforts to renegotiate their joint venture partnership agreements with their Latin American partners may not yield the market terms contemplated by the Debtors and the Restructuring Support Agreement counterparties.  Failure to achieve the goals set in the Restructuring Support Agreement could result in termination of the Restructuring Support Agreement.  If this covenant is waived, failure to modify terms will likely negatively effect the Debtors actual performance as compared to current projections, negatively impacting business performance.

**6.      The Chapter 11 Cases May Affect the Tax Liability of Reorganized Debtors.**

In connection with the Debtors' emergence from these Chapter 11 Cases, it is likely that the Debtors' tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to limitation under Sections 382 and 383 of the IRC.

**Holders of Claims should carefully review Article IX hereof, to determine how the tax implications of the Chapter 11 Cases and treatment of Allowed Claims under the Plan could adversely affect the Reorganized Debtors and such Holders.**

**D.      DISCLOSURE STATEMENT DISCLAIMER**

**1.      No Representations Made Outside this Disclosure Statement Are Authorized.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.  Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or

the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the United States Trustee.

**2.      The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Equity under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Equity or any shares reserved for issuance under the Management Equity Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 701 promulgated under the Securities Act, or a "no sale" under the Securities Act as described herein.

**3.      The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.**

The Debtors have used their reasonable business judgment to ensure the accuracy of the information, including financial information, provided in this Disclosure Statement, the Plan and related documents. Nonetheless, the Debtors cannot, and do not, confirm the current accuracy of every statement appearing in this Disclosure Statement.

Statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. **Although the Debtors may subsequently** **update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless** **ordered to do so by the Bankruptcy Court.**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.      No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity

KE 46447836

Interest or any other parties in interest.  The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

KE 46447836

## IX.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**A.    BRIEF OVERVIEW AND DISCLOSURE**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim, the New Equity, or the New First Lien Term Loan Facility,  that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a Holder of a Claim, the New Equity, or the New First Lien Term Loan Facility  that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations.   Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax.   Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.  If you are a partner of a partnership that is, or will be, a Holder of a Claim, the New Equity, or the New First Lien Term Loan Facility, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, a Claim, the New Equity, or the New First Lien Term Loan Facility, as part of a hedge, straddle, conversion, or constructive sale transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

The following discussion assumes that each Holder of a Claim holds its New Equity or New First Lien Term Loan Facility, as applicable, as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**B.     CONSEQUENCES TO THE DEBTORS**

**1.     Cancellation of Indebtedness and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC**,** though it has not been determined whether the Debtors would make this election.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that Holders of certain Claims will receive shares of the New Equity, the New First Lien Term Loan Facility, and/or the New ABL Facility, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Equity, and the issue price of the New First Lien Term Loan Facility, and the New ABL Facility.  This value cannot be known with certainty until after the Effective Date.  Following this reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, they may not have NOL carryforwards remaining after emergence from chapter 11, but will have other significant tax attributes remaining.

**2.     Limitation of NOL Carryforwards and Other Tax Attributes**

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a)     General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 2.09% for the month of May 2017).  If the Debtors are in a net unrealized built in gain position, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in

KE 46447836

IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Equity, along with the cancellation of Existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b)        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of a reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because a debtor does not qualify for it or a debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of any Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

3.        **Alternative Minimum Tax**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, generally, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.

Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

KE 46447836

C.        **CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS**

1.        **Holders of Allowed Prepetition First Lien Credit Agreement Claims**

The following discussion assumes that each U.S. Holder of an Allowed Prepetition First Lien Credit Agreement Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each U.S. Holder of such Allowed Prepetition First Lien Credit Agreement Claim shall receive its Pro Rata share of the New First Lien Term Loan A-2 Tranche and the New Equity, as further described above.

(a)        Exchange of an Allowed Prepetition First Lien Credit Agreement Claim for New Equity and New First Lien Term A-2 Tranche

Whether a U.S. Holder of an Allowed Prepetition First Lien Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for New Equity and its Pro Rata share of the New First Lien Term Loan A-2 Tranche depends on whether (i) both the Allowed Prepetition First Lien Credit Agreement Claim and the New First Lien Term Loan A-2 Tranche qualify as securities for U.S. federal income tax purposes, (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition First Lien Credit Agreement  Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition First Lien Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(i)        *Treatment of a Debt Instrument as a "Security"*

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U. S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  Each U.S. Holder of an Allowed Prepetition First Lien Credit Agreement Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed Prepetition First Lien Credit Agreement Claim is a "security" for U.S. federal income tax purposes.

(ii)        *Treatment of a U.S. Holder of an Allowed Prepetition First Lien Credit Agreement Claim if such U.S. Holder receives New Equity and New First Lien Term Loan A-2 Tranche, and the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim and the New First Lien Term Loan A-2 Tranche are Both Treated as "Securities" for U.S. Federal Income Tax Purposes*

If the debt underlying both the Allowed Prepetition First Lien Credit Agreement Claim and the New First Lien Term Loan A-2 Tranche are treated as "securities" for U.S. federal income tax purposes, the exchange of the Allowed Prepetition First Lien Credit Agreement Claim for the New First Lien Term Loan A-2 Tranche and New Equity should constitute a "recapitalization" for U.S. federal income tax purposes.

If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder exchanging an Allowed Prepetition First Lien Credit Agreement Claim would not recognize loss on the exchange and would generally recognize gain equal to the lesser of:

a.        the fair market value of the New Equity received, (other than to the extent attributable to accrued but untaxed interest on the Allowed Prepetition First Lien Credit Agreement Claim that will be treated as discussed below under "—Accrued Interest"); and

b.  the gain realized by the U.S. Holder (i.e., the excess of the "issue price" (as described below) of the New First Lien Term Loan A-2 Tranche received plus the fair market value of the New Equity received, (in each case, other than to the extent attributable to accrued but untaxed interest on the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim that will be treated as discussed below under "—Accrued Interest") over the U.S. Holder's adjusted tax basis in the debt underlying the Claim surrendered in the exchange).

The adjusted tax basis of the Allowed Prepetition First Lien Credit Agreement Claim generally will equal a U.S. Holder's purchase price for the debt as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect thereto, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Except as provided below under "—Market Discount" with respect to accrued market discount, any such gain generally will be long-term capital gain if the U.S. Holder held the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim for more than one year at the time of the exchange. Long-term capital gains of a non-corporate taxpayer may be taxed at a preferential rate. The deductibility of capital losses is subject to limitations as described in more detail below under "—Limitations on Use of Capital Losses."

Except to the extent the New First Lien Term Loan A-2 Tranche received is attributable to accrued interest on the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim, a U.S. Holder's holding period for the New First Lien Term Loan A-2 Tranche received will include the period of time during which the U.S. Holder held the corresponding debt underlying such Claim, and a U.S. Holder's initial tax basis in the New First Lien Term Loan A-2 Tranche will equal the adjusted tax basis in the debt underlying the Claim immediately prior to the exchange, decreased by the fair market value of New Equity received and increased by the amount of gain, if any, recognized by the U.S. Holder in respect of the exchange. Any portion of the New First Lien Term Loan A-2 Tranche received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date. A U.S. Holder's initial basis in the New Equity will be equal to fair market value and its holding period for the New Equity will generally begin the day following the Effective Date.

(iii)    *Treatment of a U.S. Holder of an Allowed Prepetition First Lien Credit Agreement Claim if such U.S. Holder receives New Equity and New First Lien Term Loan A-2 Tranche, and the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim and the New First Lien Term Loan A-2 Tranche are not Both Treated as "Securities" for U.S. Federal Income Tax Purposes*

If either the debt underlying the Allowed Prepetition First Lien Credit Agreement Claim or the New First Lien Term Loan A-2 Tranche is not treated as a "security" for U.S. federal income tax purposes, the exchange of the Allowed Prepetition First Lien Credit Agreement Claim for a Pro Rata Share of New Equity, a New First Lien Term Loan A-2 Tranche, and Cash (if any) will, in each case, constitute a fully taxable exchange under Section 1001 of the IRC. Accordingly, each U.S. Holder generally should recognize gain or loss in the exchange equal to the difference between (1) the sum of the fair market value of the New Equity received, plus the "issue price" (as discussed below) of the New First Lien Term Loan A-2 Tranche received, (in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the debt underlying the Claim, as discussed below under "—Accrued Interest") and (2) such U.S. Holder's adjusted tax basis, if any, in the debt underlying the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the debt underlying the Claim in such U.S. Holder's hands, whether that debt constitutes a capital asset in the hands of the U.S. Holder, whether the debt underlying the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect thereto. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held the debt underlying the Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any New Equity received should equal the fair market value of such New Equity as of the date such New Equity is distributed to the U.S. Holder and a U.S. Holder's tax basis in the New First Lien Term Loan A-2 Tranche received should equal its "issue

75

price" (as discussed below). A U.S. Holder's holding period for the New Equity received and the New First Lien Term Loan A-2 Tranche should each begin on the day following the Effective Date.

**2.      Exchange of an Allowed Prepetition Second Lien Credit Agreement Claim or Worldwide General Unsecured Claim for New Equity**

An exchange of an Allowed Prepetition Second Lien Credit Agreement Claim or Worldwide General Unsecured Claim for New Equity should constitute a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should generally recognize gain or loss equal to the difference between (i) the fair market value of the New Equity to the extent such consideration is not allocable to accrued but untaxed interest (which will be treated as discussed below under —Accrued Interest) that is received in exchange for the Claim; and (ii) such U.S. Holder's adjusted tax basis, if any, in the debt underlying such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed above. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any New Equity received should equal the fair market value of such New Equity. A U.S. Holder's holding period for the New Equity should begin on the day following the Effective Date.

**3.      Holders of Allowed Allowed Other General Unsecured Claims**

Pursuant to the Plan, each U.S. Holder of an Allowed Other General Unsecured Claim shall receive Cash, as further described above. Such exchange should be treated as a taxable exchange under Section 1001 of the IRC. The U.S. Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the U.S. Holder's adjusted tax basis in its claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Other General Unsecured Claim were held for more than one year. To the extent that a portion of the Allowed Other General Unsecured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" below.

**4.      Issue Price**

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

**5.      Accrued Interest**

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

6.    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

7.    Limitations on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders generally may only carry over unused capital losses for the five years following the capital loss year, but are generally allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.    CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of Payless Holding LLC, is not a controlled foreign corporation related, directly or indirectly, to Payless Holding LLC through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

KE 46447836

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or Cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address. The Non-U.S. Holder must provide the form to the Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; *provided*, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

E.    **WITHHOLDING AND REPORTING**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,**

**INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

KE 46447836

# X.
# RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ *Michael Schwindle*

Payless Holdings LLC
(for itself and on behalf of each of the Debtors)

By:      Michael Schwindle

Title:    Chief Financial Officer, Payless ShoeSource, Inc.

Dated:   June 5, 2017

KE 46447836

**Exhibit A**

Plan of Reorganization

[Filed at Docket No. 977]

**<u>Exhibit B</u>**

Corporate Structure Chart

[No changes from version filed at Docket No. 376]

## **Exhibit C**

Disclosure Statement Order

[To Come]

**<u>Exhibit D</u>**

Financial Projections

**EXHIBIT D**

**REORGANIZED PAYLESS' FINANCIAL PROJECTIONS[1]**

**Introduction to Financial Projections**

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors (and together with their non-Debtor affiliates, the "Company"). In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Plan, the Company's management team ("Management"), with the assistance of their advisors, developed financial projections (the "Financial Projections") to support the feasibility of the Plan.

The Financial Projections were prepared by Management and are based on a number of assumptions made by Management, within the bounds of their knowledge of their business and operations, with respect to the future performance of the Company's operations. In addition, the Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. Forward-looking statements in these projections include the intent, belief, or current expectations of the Company and members of its Management team with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Company's strategic business plan, bank financing, debt and equity market conditions, and the Company's future liquidity, as well as the assumptions upon which such statements are based. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Company can provide no assurance that such assumptions will be realized. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Company expects that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections and from those contemplated by such forward-looking statements. No representations can be made as to the accuracy of the Financial Projections or the Company's ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Company considered or consider the Financial Projections to reliably predict future performance. Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

The Company's board of directors was not asked to and did not approve the Financial Projections or evaluate or endorse the projections or the assumptions underlying the Financial Projections. Moreover, the following Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Company's independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Company's independent auditor assumes no responsibility for, and denies any association with the prospective financial information.

The Company does not intend to and disclaims any obligation to: (1) furnish updated Financial Projections to holders of Claims or Equity Interests prior to the Effective Date or to any other party after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*.

**Select Assumptions of the Financial Projections**

The Financial Projections are based on, but not limited to factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Company and do not take into account the uncertainty and disruption of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors described below under "*Select Risk Factors Related to the Financial Projections*".

- **Methodology:** The Financial Projections were developed on an operational rather than legal entity basis.

- **Plan and Effective Date**: The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by August 26, 2017 (the "Assumed Effective Date"). This is done as a matter of convenience as August 26, 2017 represents the final day of August within the Company's 2017 fiscal retail calendar.

- **Projection Period:** The Financial Projections contained herein commence after the Assumed Effective Date, and cover the period beginning August 27, 2017 through January 29, 2022. This period represents September 2017 through January 2022 within the Company's fiscal retail calendar.

- **Fresh Start Accounting:** The Financial Projections reflect an anticipated emergence from chapter 11 on or before August 26, 2017. The Financial Projections do not, however, consider the potential impact of the application of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" ("ASC 852") that may apply upon the Effective Date. If the Debtors do fully implement fresh start accounting, differences from the depiction presented are anticipated and those differences may be material.

- **Macroeconomic & Industry Environment:** The Financial Projections take into account the current difficult retail and competitive environment. These projections also assume constant foreign currency exchange rates and stable commodity pricing environments.

- **Operations:** The Financial Projections incorporate the Company's planned sales and cost initiatives, as well as operational restructuring activities. The Financial Projections reflect two main operational restructuring activities:

  1. Store Closings: Recognizing the need to rationalize its brick-and-mortar footprint to align with current retail-industry conditions, the Debtors' Management and advisors undertook an extensive analysis of the Debtors' existing store footprint to determine whether the Debtors should close any stores in connection with their broader financial and operational restructuring initiatives. In formulating the list of stores, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance. The projections herein reflect approximately 800 store closures, but the actual total amount of store closures will be based upon, among other factors, ongoing renegotiating of leases for the Debtors' lower-profitability stores.

  2. Lease Renegotiations: Given the current real estate environment and in order to reduce operating costs, the Debtors' Management and advisors are currently renegotiating above-market and unfavorable leases. The Financial Projections reflect a material amount of lease and occupancy savings, with total lease and occupancy costs being more aligned with current market rates. The results of the lease renegotiation process will have a significant impact on the total amount of store closures.

- ▪ **Other Assumptions:** The Financial Projections also assume that: (1) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Company; (2) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Company; (3) the potential application of fresh start accounting will not materially change the Debtors' accounting procedures; and (4) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Debtors.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections herein are inherently subject to risks and uncertainties. Such risk factors, many of which are beyond the control of the Company, could cause actual results to differ materially from the Financial Projections. Although the Financial Projections take into account the current difficult retail and competitive environment, no other specific risks (including the below listed risks) are reflected within the Financial Projections. Select industry and Company-specific risks include, but are not limited to, the following:

- ▪ The Company operates in a highly competitive market, with significant established competitors, and competition may reduce overall market share, sales and profitability. Additionally, the Company operates in a cyclical industry that is heavily dependent upon the overall level of consumer spending and disposable income of their core customer base. Any substantial deterioration in general economic conditions could adversely impact sales and profitability.

- ▪ The industry in which the Company operates fluctuates according to changing fashion tastes and seasons, and merchandise usually must be ordered well in advance of the season, frequently before consumer fashion tastes are evidenced by consumer purchases. If the Company fails to properly gauge the fashion tastes of consumers or to respond in a timely manner, this failure could adversely affect consumer acceptance of the Company's merchandise and leave the Company with substantial unsold inventory.

- ▪ The Company depends on third-party manufacturers to manufacture the merchandise that the Company sells. If these manufacturers are unable to secure sufficient supplies of raw materials, produce products that meet quality standards, or maintain adequate manufacturing and shipping capacity, they may be unable to provide the Company with timely delivery of products. Additionally, manufacturers in China are the Company's major suppliers. Any deterioration in the trade relationship between the United States and China or any other disruption in the Company's ability to import footwear, accessories, or other products from China or any other country where the Company operates could have a material adverse effect on financial results.

- ▪ The Company licenses trademarks and brands through various agreements with third parties. The inability to renew or replace any trademark, brand, or character mark could have a significant impact on sales.

- ▪ The Company currently uses distribution centers which serve as the source of replenishment of inventory for stores and serve wholesale operations. If complications arise with any of the operating distribution centers or distribution centers are severely damaged or destroyed, other distribution centers may not be able to support the resulting additional distribution demands and the Company may be unable to locate alternative persons or entities capable of doing so. This may adversely impact the Company's ability to deliver inventory on a timely basis.

- ▪ The Company's profitability is dependent on, among other things, the prices of commodities used to make and transport their products, as well as labor prices. Any meaningful fluctuation in any of these items may have a material impact on the financial results.

- A majority of the Company's operating expenses are fixed costs that are not directly dependent on sales performance. If sales decline, the Company may be unable to reduce or offset these fixed operating expenses in the short term.

- Any significant delay in the Assumed Effective Date may have significant adverse impacts on the Company's operations and financial performance including, but not limited to, an increased risk or inability to meet sales forecasts and the incurrence of greater reorganization expenses.

- The Company may be subjected to continued risks associated with a decline in sales associated with the stigma of having filed for reorganization under chapter 11 of the Bankruptcy Code, which is not incorporated within the Financial Projections. Additionally, the Company may be subjected to employee turnover at the Management, product development, and sales force levels due to having filed for reorganization under chapter 11 of the Bankruptcy Code. Loss of employees from these and other parts of the Company's organization could have an adverse impact on the Company's financial performance.

- The Financial Projections incorporate the Company's planned sales and cost initiatives, as well as operational restructuring activities including store closures and lease renegotiations. The Company may be unable to execute or may only partially realize certain or all of these initiatives and activities due to factors that may be beyond the control of the Company. Not realizing such initiatives or activities may have a material impact on the financial results.

- Upon emergence, the Debtors will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date. Such determination will be based upon the fair value at that time, which may be based on, among other things, a different methodology than what is reflected within the Financial Projections. In any event, such valuation, as well as the determination of the fair value of the Debtors' assets and liabilities, will be made as of the Effective Date. The differences between the amounts of any or all of the foregoing items as assumed in the Financial Projections and the actual amounts thereof as of the Effective Date may be material.

THE INDEPENDENT AUDITOR FOR THE COMPANY HAS NOT EXAMINED, COMPILED, OR OTHERWISE PERFORMED ANY PROCEDURES ON THE FOLLOWING PROSPECTIVE FINANCIAL INFORMATION AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.

## UNAUDITED PROJECTED INCOME STATEMENT

| ($ in millions) | FY2017 (Sept. - Jan.) | FY2018 | FY2019 | FY2020 | FY2021 | Notes |
|---|---|---|---|---|---|---|
| **FISCAL YEAR TOTALS** | | | | | | |
| Ending Store Count | 3,201 | 3,220 | 3,212 | 3,207 | 3,201 | |
| Sales | $814.1 | $1,965.0 | $2,045.5 | $2,123.2 | $2,202.5 | [1] |
| Cost of Sales | (357.7) | (865.9) | (902.3) | (935.4) | (968.6) | [2] |
| **Merchandise Margin** | **$456.3** | **$1,099.1** | **$1,143.2** | **$1,187.8** | **$1,233.9** | |
| Store Expenses | ($302.0) | ($732.5) | ($751.9) | ($769.3) | ($786.2) | [3] |
| Advertising | (23.9) | (100.5) | (105.0) | (109.1) | (112.9) | [4] |
| Operating Expenses | (54.1) | (146.9) | (147.8) | (151.1) | (153.3) | [5] |
| **EBITDA** | **$76.3** | **$119.1** | **$138.4** | **$158.3** | **$181.5** | |
| Depreciation and Amortization | ($29.5) | ($69.1) | ($69.1) | ($69.1) | ($69.1) | [6] |
| **EBIT** | **$46.9** | **$50.0** | **$69.3** | **$89.2** | **$112.4** | |
| Interest Expense | ($14.8) | ($34.5) | ($35.2) | ($34.9) | ($32.8) | [7] |
| Income Taxes | (8.3) | (26.0) | (30.2) | (34.6) | (39.5) | [8] |
| Restructuring Related Items | (8.5) | - - | - - | - - | - - | [9] |
| Other, Net | (1.9) | (3.6) | (3.6) | (3.6) | (3.6) | [10] |
| **Net Income / (Loss)** | **$13.4** | **($14.0)** | **$0.4** | **$16.2** | **$36.5** | |

*Note: The above FY2017 data represents the post-emergence period from August 27, 2017 - February 3, 2018.*

### UNAUDITED PROJECTED BALANCE SHEET

| ($ in millions) | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | Notes |
|---|---|---|---|---|---|---|
| **FISCAL YEAR END TOTALS** | | | | | | |
| **ASSETS** | | | | | | |
| Cash and Cash Equivalents | $44.5 | $43.1 | $43.6 | $44.1 | $48.6 | [11] |
| Accounts Receivable, Net | 17.1 | 17.9 | 18.8 | 19.8 | 20.9 | [12] |
| Inventory | 320.7 | 340.9 | 353.9 | 367.1 | 381.3 | [12] |
| Current Deferred Income Tax Asset | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | |
| Prepaid Expenses | 21.6 | 21.6 | 21.6 | 21.6 | 21.6 | [12] |
| Other Current Assets | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | |
| Total Current Assets | $417.0 | $436.7 | $451.1 | $465.8 | $485.6 | |
| | | | | | | |
| PP&E, Net | $187.3 | $170.3 | $161.0 | $159.1 | $157.2 | [13] |
| Goodwill and Intangible Assets | 228.3 | 222.1 | 215.9 | 209.8 | 203.6 | [14] |
| Long Term Deferred Inc. Tax Asset | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | |
| Other Long Term Assets | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | |
| Total Long Term Assets | $444.6 | $421.4 | $406.0 | $397.9 | $389.8 | |
| **Total Assets** | **$861.6** | **$858.1** | **$857.1** | **$863.7** | **$875.4** | |
| | | | | | | |
| **LIABILITIES & SHAREHOLDERS' EQUITY** | | | | | | |
| Accounts Payable | $119.7 | $153.4 | $159.2 | $165.2 | $171.6 | [12] |
| Accrued Exp. and Other Liabilities | 110.4 | 117.9 | 118.3 | 118.7 | 119.0 | [12] |
| Total Current Liabilities | $230.1 | $271.4 | $277.6 | $283.9 | $290.6 | |
| | | | | | | |
| Long Term Debt | $353.3 | $322.5 | $314.9 | $299.0 | $267.4 | [15] |
| Long Term Deferred Inc. Tax Liab. | 18.6 | 18.6 | 18.6 | 18.6 | 18.6 | |
| Other Long Term Liabilities | 108.3 | 108.3 | 108.3 | 108.3 | 108.3 | |
| Total Long Term Liabilities | $480.1 | $449.4 | $441.7 | $425.9 | $394.3 | |
| | | | | | | |
| Restructuring Related Liabilities | $687.3 | $687.3 | $687.3 | $687.3 | $687.3 | [16] |
| **Total Liabilities** | **$1,397.6** | **$1,408.1** | **$1,406.6** | **$1,397.1** | **$1,372.2** | |
| **Total Shareholders' Equity** | **($535.9)** | **($549.9)** | **($549.6)** | **($533.3)** | **($496.9)** | |
| **Liabilities & Shareholders' Equity** | **$861.6** | **$858.1** | **$857.1** | **$863.7** | **$875.4** | |

## UNAUDITED PROJECTED STATEMENT OF CASH FLOWS

| | FISCAL YEAR TOTALS | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | FY2017 (Sept. - Jan.) | FY2018 | FY2019 | FY2020 | FY2021 | Notes |
| **OPERATING ACTIVITIES** | | | | | | |
| Net Income / (Loss) | $13.4 | ($14.0) | $0.4 | $16.2 | $36.5 | |
| Depreciation and Amortization | $29.5 | $69.1 | $69.1 | $69.1 | $69.1 | |
| Net Changes in Working Capital | 48.2 | 20.2 | (7.7) | (7.9) | (8.5) | [17] |
| Changes in Other Assets and Liab. | - - | - - | - - | - - | - - | |
| **Cash Flow from Operating Activities** | **$91.1** | **$75.3** | **$61.8** | **$77.4** | **$97.0** | |
| **INVESTING ACTIVITIES** | | | | | | |
| Capital Expenditures | ($12.4) | ($45.9) | ($53.7) | ($61.0) | ($61.0) | [18] |
| **Cash Flow from Investing Activities** | **($12.4)** | **($45.9)** | **($53.7)** | **($61.0)** | **($61.0)** | |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayments of Long Term Debt | ($3.4) | ($5.4) | ($4.4) | ($4.4) | ($3.3) | [19] |
| ABL Proceeds / (Repayments) | (40.6) | (25.3) | (3.2) | (11.5) | (28.3) | [20] |
| **Cash Flow from Financing Activities** | **($44.0)** | **($30.7)** | **($7.6)** | **($15.9)** | **($31.6)** | |
| **RESTRUCTURING ACTIVITIES** | | | | | | |
| Total Restructuring Related Items | ($32.0) | - - | - - | - - | - - | [21] |
| **Cash Flow from Restruct. Activities** | **($32.0)** | **- -** | **- -** | **- -** | **- -** | |
| **Total Cash Flow** | **$2.8** | **($1.4)** | **$0.5** | **$0.5** | **$4.5** | |
| **CASH ROLLFORWARD** | | | | | | |
| Beginning Cash | $41.7 | $44.5 | $43.1 | $43.6 | $44.1 | |
| Total Cash Flow | 2.8 | (1.4) | 0.5 | 0.5 | 4.5 | |
| Ending Cash | $44.5 | $43.1 | $43.6 | $44.1 | $48.6 | |

*Note: The above FY2017 data represents the post-emergence period from August 27, 2017 - February 3, 2018.*

## NOTES TO FINANCIAL PROJECTIONS

*Note 1 – Sales*

The Financial Projections are based on Management's view of the Company's market position and overall economic outlook.  Sales consist of retail, e-commerce, wholesale, and franchising sales.  Transactions at the Company's retail stores are recognized at the time the sale is made to the customer.  Sales for wholesale and e-commerce transactions are recognized when title passes and the risks or rewards of ownership have transferred to the customer based on the shipping terms, the price is fixed and determinable, and collectability is reasonably assured.  Products are sold free on board shipping point for wholesale customers.  Any shipping charges that the Company pays are recorded as cost of sales and any reimbursement is recorded as sales.

With respect to Latin American joint venture sales, 100% of sales are reflected within the Financial Projections.  The Company's joint venture partners' share of sales, net of costs, is eliminated within the store expenses line item.

*Note 2 – Cost of Sales*

Cost of sales includes the cost of merchandise sold and the Company's buying, occupancy, warehousing, product development, and product movement costs.

*Note 3 – Store Expenses*

Store expenses include store payroll/benefits/incentive compensation, rent and other occupancy expense, treasury expense, general and property insurance, supplies, and other store expenses.  As noted above, the Company's joint venture partners' share of sales, net of costs, is eliminated within the store expenses line item.

*Note 4 – Advertising*

Advertising costs and sales promotion costs are expensed at the time the advertising takes place.  The Company engages in co-op advertising programs with certain wholesale customers.  Co-op advertising funds are available to all wholesale customers in good standing.  Wholesale customers receive reimbursement under this program if they meet established advertising guidelines and trademark requirements.  Advertising costs are net of the Company's joint venture partners' share of expenses.

*Note 5 – Operating Expenses*

Operating expenses consist of information technology, field, finance, human resources, store development, legal, merchandise/supply chain, customer support, administrative, and incentive compensation costs.  Operating expenses are net of the Company's joint venture partners' share of expenses.

*Note 6 – Depreciation and Amortization*

Depreciation is associated with buildings, leasehold improvements, furniture, fixtures and equipment, and property under capital leases and is determined on a straight-line basis over the estimated useful life of the assets.  Amortization is associated with intangible assets.  The Debtors' depreciation and amortization are subject to material change based on accounting treatment of the Debtors' financials upon emergence.

*Note 7 – Interest Expense*

Interest expense is primarily based upon interest associated with the New ABL Facility (tranche A and tranche A-1), the New First Lien Term Loan A-1 Tranche, and the New First Lien Term Loan A-2 Tranche.  Interest rates for the tranche A and tranche A-1 portions of the New ABL Facility are assumed to be LIBOR plus 200 bps and LIBOR plus 700 bps, respectively, and interest accrues and is paid monthly.  Interest rates for the New First Lien Term Loan A-1 Tranche and the New First Lien Term Loan A-2 Tranche are assumed to be LIBOR plus 800 bps and LIBOR

plus 900 bps, respectively.  Interest expense for both the New First Lien Term Loan A-1 Tranche and the New First Lien Term Loan A-2 Tranche accrues monthly and is paid quarterly.  LIBOR rates are projected based on a forward LIBOR curve.  Interest expense also reflects applicable commitment and letter of credit fees as set forth in the New ABL Credit Agreement.  In addition, interest expense incorporates interest associated with the Debtors' capital lease obligations.

### Note 8 – Income Taxes

The Debtors are projected to be federal and state cash tax payers based on the anticipated capital structure and tax attribute reduction as a result of the Chapter 11 Cases.  Latin America income taxes are net of the Company's joint venture partners' share of taxes.  In addition, income taxes also reflect withholding taxes associated with the Company's joint venture dividends that flow from Latin America to North America.

### Note 9 – Restructuring Related Items

Restructuring related items consist of restructuring professional advisor fees, costs related to the satisfaction of claims, taxes, duties, insurance items, and utility deposits.

### Note 10 – Other, Net

This line item is related to the Company's assumed and ongoing severance obligations.

### Note 11 – Cash and Cash Equivalents

The Company considers cash equivalents to consist of liquid investments with an original maturity of three months or less.  Cash in excess of $10 million held by the domestic entities is assumed to be swept to repay the New ABL Facility.  Cash generated by the Latin American entities and in excess of $30 million is assumed to be distributed via dividend to North America.  The timing of such dividends is based upon the meeting schedules of the Company's joint ventures' boards of directors during which such dividends are approved.  Such dividends are net of the Company's joint venture partners' shares.

### Note 12 – Working Capital Accounts

The Financial Projections assume the Company's working capital accounts, including accounts receivable (net), inventory, prepaid expenses, other current assets, accounts payable, accrued expenses, and other liabilities continue to perform according to the historical relationships with respect to sales and expense activity.  All working capital balances fluctuate significantly within years depending on seasonality.  Substantially all of the Company's inventories are finished goods.  Prepaid expenses largely relate to prepaid rent.  Fluctuations within accrued expenses and other liabilities are associated with interest and fee accruals and payments, as well as the Company's incentive compensation programs.

### Note 13 – PP&E, Net

Property, plant, and equipment ("PP&E") is composed of buildings, leasehold improvements, furniture, fixtures and equipment, and property under capital leases.  The Debtors' PP&E is subject to material change based on accounting treatments of the Debtors' financials upon emergence.

### Note 14 – Goodwill and Intangible Assets

Intangible assets consist of favorable lease rights, trademarks, customer relationships, and other intangible assets.  The Debtors' goodwill and intangible assets are subject to material change based on the potential implementation of fresh start accounting in connection with emergence.

*Note 15 – Long Term Debt*

Long term debt consists of the New ABL Facility (tranche A and tranche A-1), the New First Lien Term Loan A-1 Tranche, the New First Lien Term Loan A-2 Tranche, the Debtors' capital lease obligations, and the Latin America term loan. The New ABL Facility is based on a total commitment of up to $305 million, but borrowing ability is constrained based upon the Debtors' borrowing base calculation. The New First Lien Term Loan A-1 Tranche and the New First Lien Term Loan A-2 Tranche are in the amounts of $80 million and $200 million, respectively. Both term loan tranches are subject to a 1% annual amortization, which is paid quarterly. Collectively, the capital lease obligations and the Latin America term loan account for less than $10 million of total long term debt.

*Note 16 – Restructuring Related Liabilities*

Restructuring related liabilities are related to liabilities subject to compromise associated with prepetition accounts payable and debt obligations. Such liabilities are subject to extinguishment based upon the potential impact of fresh start accounting, which the Financial Projections do not contemplate or reflect.

*Note 17 – Net Changes in Working Capital*

Net changes in working capital are driven by changes in accounts receivable (net), inventory, prepaid expenses, accounts payable, accrued expenses, and other liabilities.

*Note 18 – Capital Expenditures*

Latin America capital expenditures are net of the Company's joint venture partners' share of such expenditures.

*Note 19 – Repayments of Long Term Debt*

Repayments of long term debt primarily relate to the 1% annual amortization associated with the New First Lien Term Loan A-1 Tranche and the New First Lien Term Loan A-2 Tranche, which are paid at quarter end. Repayments of long term debt also reflect principal payments of capital lease obligations and payoff of the Latin America term loan.

*Note 20 – ABL Proceeds / (Repayments)*

ABL proceeds and repayments are based on maintaining a minimum cash amount of $10 million at the domestic entities. Any excess cash is assumed to be swept to repay amounts outstanding under the New ABL Facility.

*Note 21 – Restructuring Activities*

Restructuring activities reflect any cash payments associated with restructuring professional advisor fees, costs related to the satisfaction of claims, taxes, duties, insurance items, and utility deposits.

**<u>Exhibit E</u>**

Liquidation Analysis

KE 47291265

## LIQUIDATION ANALYSIS FOR PAYLESS HOLDINGS LLC, *et al.*

### I.   INTRODUCTION

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the proposed plan satisfies the "best interests" of creditors test, the Debtors, with assistance from its advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis") which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Plan of Reorganization of Payless Holdings LLC and Subsidiary Debtors* (the "Disclosure Statement") to which this Liquidation Analysis is attached.

### Statement of Limitations

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH

GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

### Basis of Presentation

This Liquidation Analysis is based on estimated asset and liability values as of July 1, 2017 (except as otherwise indicated), representing the last day of the Debtors' June 2017 fiscal month end. As noted above, the actual assets available to the Debtors' estates and claims arising in the event of an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

This Liquidation Analysis was prepared before the deadline for filing claims against the Debtors' Estates, and the Debtors have therefore neither fully evaluated claims filed against the Debtors or adjudicated such claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ from the claim amounts used in this Liquidation Analysis.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of claims listed on the Debtors' Schedules of Assets and Liabilities and the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims, and chapter 7 administrative claims such as wind-down costs, trustee fees, and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total

amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

## Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis has been prepared assuming that the Debtors converted their cases from chapter 11 cases to chapter 7 cases on or about July 1, 2017 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as projected as of July 1, 2017. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' major assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with relevant law. There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest. In addition, there is a significant likelihood, and therefore it is assumed, that each of the Debtors' direct and/or indirect foreign non-debtor affiliates would commence insolvency proceedings under their respective local foreign jurisdictions because of the wind-down of the Debtors. In addition, the Debtors' interests in various joint ventures and minority investments would be sold or otherwise monetized.

## Deconsolidated Liquidations

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding. Therefore, the Liquidation Analysis considers an entity-by-entity liquidation for both domestic and international operations. The Liquidation Analysis takes into account administrative priority status of intercompany claims arising post-petition, unsecured pre-petition intercompany claims, and the equity interests of each parent and subsidiary relationship. In an iterative and sequential fashion, the Liquidation Analysis assumes that liquidation value is cycled among the Debtors and non-Debtor affiliates to satisfy these intercompany claims and interests, which in certain circumstances alters the liquidation value available to satisfy third-party claims at particular entities. The results of the individual entity-by-entity analysis have been aggregated in certain circumstances for presentation purposes as presented herein.

## Values

Unless otherwise stated, the Liquidation Analysis is based on estimated net book value ("NBV") as of the Conversion Date. Estimated NBV for certain assets was projected by rolling forward certain of the unaudited NBV for the Debtors based on the financial projections (the "Financial Projections") in the Debtors' business plan. Certain recoveries in this Liquidation

4

Analysis may be greater than NBV because certain assets are recorded on the Debtors' books and records at amounts that are lower than estimated market values for such assets.

This Liquidation Analysis uses analyses from third-party appraisers to estimate recoveries in a liquidation for the Debtors' inventory and intellectual property, specifically the Debtors' trade names. The remaining asset recovery values were estimated by the Debtors' management and their advisors.

## Additional Global Notes and Assumptions

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. *Additional unsecured claims.* The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a plan absent a liquidation. Examples of these kinds of claims include various potential employee claims (for such items as severance and potential WARN Act claims), tax liabilities, claims related to the rejection of unexpired leases (*i.e.*, real and personal property) and executory contracts, and other potential Allowed Claims. These additional claims could be significant and some will be entitled to priority in payment over General Unsecured Claims. Those priority claims likely would need to be paid in full from the liquidation proceeds before any balance would be made available to pay General Unsecured Claims or to make any distribution in respect of equity interests. No adjustment has been made for these potential claims.

2. *Significant dependence on unaudited financial statements.* This Liquidation Analysis contains numerous estimates. Proceeds available for recovery are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date, unless otherwise noted herein.

3. *Chapter 7 liquidation costs and length of liquidation process.* The Debtors have assumed that liquidation would occur over approximately six months in order to pursue orderly sales of substantially all remaining assets and collect receivables, as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the wind-down process and time-period could vary significantly, thereby impacting recoveries. For example, the potential for priority, contingent, and other claims, litigation, rejection costs, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to creditors. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, will be entitled to payment in full prior to any distribution to chapter 11 Administrative Claims and Other Priority Claims. The estimate used in the Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3% fee based upon liquidated assets payable to

5

a chapter 7 trustee.  Since the majority of the net proceeds of the liquidation of non-cash assets would be for the benefit of holders of the DIP Facility Claims and Prepetition First Lien Credit Agreement Claims, it is assumed that chapter 7 administrative and other priority claims, post-conversion operational expenses and professional fees, and chapter 7 trustee fees are entitled to payment in full prior to any distribution to holders of the DIP Facility Claims or Prepetition First Lien Credit Agreement Claims.  Parties, however, may dispute that allocation of costs.

4. *Distribution of net proceeds.*  Chapter 11 Administrative Claim amounts and Priority Claim amounts, professional fees, trustee fees, and other such claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of any proceeds will be made available to pay General Unsecured Claims.  Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

5. *Certain exclusions and assumptions.*  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

## II.    CONCLUSIONS

THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

**SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS**

| Class | Name of Class Under Plan | Status | Estimated Percentage Recovery Under the Plan | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | 100.0% | 100.0% | 100.0% |
| 2 | Other Secured Claims | Unimpaired | 100.0% | 100.0% | 100.0% |
| 3 | Prepetition First Lien Credit Agreement Claims | Impaired | 83.5% | 32.0% | 40.0% |
| 4 | Prepetition Second Lien Credit Agreement Claims | Impaired | 15.7% | 0.0% | 0.0% |
| 5A | Other General Unsecured Claims | Impaired | 0.8% | 0.0% | 0.0% |
| 5B | Worldwide General Unsecured Claims | Impaired | 15.7% | 0.0% | 0.0% |
| 5C | Canadian General Unsecured Claims | Unimpaired | 100.0% | 100.0% | 100.0% |
| 6 | Intercompany Claims | Unimpaired / Impaired | 100.0% / 0.0% | 0.0% | 0.0% |
| 7 | Existing Equity Interests | Impaired | 0.0% | 0.0% | 0.0% |
| 8 | Intercompany Interests | Unimpaired | 100.0% | 0.0% | 0.0% |
| 9 | Section 510(b) Claims | Impaired | 0.0% | 0.0% | 0.0% |

7

## III.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors.[1] While the liquidation has been conducted on an entity-by-entity basis, for presentation purposes, the results have been presented in the following groups:

A.  Debtor entities (20) that are borrowers or guarantors under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement[2]

   -  PSS Delaware Company 4, Inc. and Payless International Franchising, LLC are holding companies with no assets or liabilities (other than their obligations under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement) and no trial balances are maintained.  Accordingly, there are no individual liquidation results presented for these entities.

B.  Debtor entities (4) that relate to the Debtors' Canadian operations

C.  Debtor entities (1) that are organized in Puerto Rico

D.  Collective Brands Logistics, Limited (1)

E.  Dynamic Assets Limited (1)

F.  Payless Holdings LLC (1)

G.  Payless Intermediate Holdings LLC (1)

---

[1] The estimated claims on the following pages may differ to the estimated claims included in the Disclosure Statement as a result of differing assumptions between the going-concern and liquidation scenarios.

[2] For illustrative purposes, net proceeds allocated to satisfaction of Secured Claims are based on a pro-rata split for all borrower and guarantor entities.

**A. Debtor Entities (20) that are Borrowers or Guarantors under the Prepetition First and Second Lien Credit Agreements (Aggregated Results – Individual Results by Entity are Set Forth on the Following Pages)**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s Low | Middle | High | Total Estimated Recovery %'s Low | Middle | High | See Note |
|---|---|---|---|---|---|---|---|---|
| **A. Gross Liquidation Proceeds:** | | | | | | | | |
| Cash and Cash Equivalents | $ 10.2 | $ 9.7 | $ 10.0 | $ 10.2 | 95% | 98% | 100% | 1 |
| Accounts Receivable, Net | 8.8 | 7.5 | 7.9 | 8.4 | 85% | 90% | 95% | 2 |
| Inventory | 265.1 | 397.6 | 424.2 | 450.7 | 150% | 160% | 170% | 3 |
| Prepaid Expenses | 23.6 | 0.2 | 0.2 | 0.2 | 1% | 1% | 1% | 4 |
| Other Current Assets | 5.3 | 0.3 | 0.4 | 0.5 | 6% | 8% | 10% | 5 |
| Land | 2.5 | 1.1 | 1.2 | 1.4 | 45% | 50% | 55% | 6 |
| Buildings | 12.6 | 5.7 | 6.3 | 6.9 | 45% | 50% | 55% | 6 |
| PP&E | 147.8 | 2.2 | 2.9 | 3.7 | 1% | 2% | 2% | 6 |
| Intangibles | 66.4 | 95.2 | 100.4 | 105.6 | 143% | 151% | 159% | 7 |
| Other Long Term Assets | 8.4 | 0.3 | 0.5 | 0.6 | 4% | 6% | 7% | 8 |
| Intercompany Balances | 25.8 | 20.7 | 20.7 | 20.7 | 80% | 80% | 80% | 9 |
| Investments in Subsidiaries | - | 14.2 | 16.5 | 19.1 | 0% | 0% | 0% | 10 |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% | 11 |
| **Total Assets and Estimated Gross Proceeds** | 576.5 | 554.8 | 591.2 | 628.0 | 96% | 103% | 109% | |
| **B. Expenses for Creditor Recovery:** | | | | | | | | |
| Operating Expenses - Inventory | | (184.9) | (199.4) | (211.8) | | | | 12 |
| Operating Expenses - Corporate / Other | | (25.9) | (26.5) | (27.0) | | | | 12 |
| Chapter 7 - Professional Fees | | (7.8) | (7.8) | (7.6) | | | | 12 |
| Chapter 7 - Trustee Fees | | (15.3) | (16.3) | (17.3) | | | | 12 |
| **Total Estimated Expenses for Creditor Recovery** | | $ (233.9) | $ (249.9) | $ (263.8) | | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $ 320.9 | $ 341.3 | $ 364.2 | | | | |
| **D. Distribution to Creditors** | | $ 320.9 | $ 341.3 | $ 364.2 | | | | |
| Less: DIP Facility Claims | (159.7) | (159.7) | (159.7) | (159.7) | 100% | 100% | 100% | 13 |
| **Proceeds Available for Next Priority of Creditors** | | 161.2 | 181.6 | 204.5 | | | | |
| Less: Class 2 - Other Secured Claims | - | - | - | - | 100% | 100% | 100% | 14 |
| **Proceeds Available for Next Priority of Creditors** | | 161.2 | 181.6 | 204.5 | | | | |
| Less: Secured Claims | | | | | | | | |
| Class 3: Prepetition First Lien Credit Agreement Claims | (506.3) | (161.2) | (181.6) | (204.5) | 32% | 36% | 40% | 15 |
| Class 4: Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | 0% | 0% | 0% | 15 |
| Total Secured Claims | (651.3) | (161.2) | (181.6) | (204.5) | 25% | 28% | 31% | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | | |
| Add: Unencumbered Assets - Net Proceeds | | 6.1 | 6.8 | 7.6 | | | | 16 |
| **Proceeds Available for Next Priority of Creditors** | | 6.1 | 6.8 | 7.6 | | | | |
| Less: Other Administrative and Priority Claims | | | | | | | | |
| Class 3: Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% | 17 |
| Chapter 11 - Administrative Claims | (109.7) | (5.3) | (5.9) | (6.6) | 5% | 5% | 6% | 17 |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% | 17 |
| Chapter 11 - Employee Claims | (10.6) | (0.5) | (0.6) | (0.6) | 5% | 5% | 6% | 17 |
| Priority Tax Claims | (0.9) | (0.0) | (0.0) | (0.1) | 5% | 5% | 6% | 17 |
| 503(b)(9) Claims (20 Day Shipments) | (5.0) | (0.2) | (0.3) | (0.3) | 5% | 5% | 6% | 17 |
| Total Other Administrative and Priority Claims | (126.2) | (6.1) | (6.8) | (7.6) | 5% | 5% | 6% | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | | |
| Less: Unsecured Claims | | | | | | | | |
| Class 5A: Other General Unsecured Claims | (43.7) | - | - | - | 0% | 0% | 0% | 18 |
| Class 5B: Worldwide General Unsecured Claims | (52.4) | - | - | - | 0% | 0% | 0% | 18 |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% | 18 |
| Class 3: First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% | 18 |
| Class 4: Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% | 18 |
| Lease Rejection Claims | (300.0) | - | - | - | 0% | 0% | 0% | 18 |
| Class 6: Intercompany Claims | (290.3) | - | - | - | 0% | 0% | 0% | 18 |
| Class 7: Existing Equity Interests | - | - | - | - | 0% | 0% | 0% | 19 |
| Total Unsecured Claims | (1,156.2) | - | - | - | 0% | 0% | 0% | |

| Summary of Estimated Recoveries | Class | Claims (Middle) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DIP Facility Claims | | 159.7 | 159.7 | 159.7 | 159.7 | 100% | 100% | 100% |
| Secured Claims - Other | 2 | - | - | - | - | 100% | 100% | 100% |
| Secured Claims - Term Loans | 3, 4 | 651.3 | 161.2 | 181.6 | 204.5 | 25% | 28% | 31% |
| Other Administrative and Priority Tax Claims | | 126.2 | 6.1 | 6.8 | 7.6 | 5% | 5% | 6% |
| Unsecured Claims | 5, 6, 7 | 1,156.2 | - | - | - | 0% | 0% | 0% |
| **Total Estimated Recoveries** | | $ 2,093.4 | $ 327.0 | $ 348.1 | $ 371.8 | 16% | 17% | 18% |

**A1. WBG – PSS Holdings LLC**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 274.2 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | tbd | tbd | tbd | tbd | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **274.2** | **-** | **-** | **-** | **0%** | **0%** | **0%** |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ - | $ - | $ - | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $ - | $ - | $ - | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | $ - | $ - | $ - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

10

**A2. Payless Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 5.4 | 0.2 | 0.3 | 0.4 | 4% | 6% | 7% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | tbd | tbd | tbd | tbd | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **5.4** | **0.2** | **0.3** | **0.4** | **4%** | **6%** | **7%** |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ (0.0) | $ (0.0) | $ (0.0) | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $ 0.2 | $ 0.3 | $ 0.3 | | | |
| **D. Distribution to Creditors** | | $ 0.2 | $ 0.3 | $ 0.3 | | | |
| Less: DIP Facility Claims | (159.7) | (0.1) | (0.1) | (0.1) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 0.1 | 0.1 | 0.2 | | | |
| Less: Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 0.1 | 0.1 | 0.2 | | | |
| Less: Secured Claims | | | | | | | |
| Class 3: Prepetition First Lien Credit Agreement Claims | (506.3) | (0.1) | (0.1) | (0.2) | | | |
| Class 4: Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (0.1) | (0.1) | (0.2) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add: Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less: Other Administrative and Priority Claims | | | | | | | |
| Class 3: Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less: Unsecured Claims | | | | | | | |
| Class 5A: Other General Unsecured Claims | (28.0) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | | | | 0% | 0% | 0% |
| Class 3: First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4: Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6: Intercompany Claims | (2,023.7) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (2,521.5) | - | - | - | 0% | 0% | 0% |

11

**A3. Payless Finance, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $    3.3 | $    3.1 | $    3.2 | $    3.3 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.6 | 0.5 | 0.5 | 0.6 | 85% | 90% | 95% |
| Inventory | - | | | | 0% | 0% | 0% |
| Prepaid Expenses | 0.1 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | 0.8 | 0.0 | 0.1 | 0.1 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 784.3 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **789.0** | **3.7** | **3.8** | **3.9** | **0%** | **0%** | **0%** |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.1) | (0.1) | (0.1) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.1) | (0.1) | (0.1) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $    (0.2) | (0.2) | $    (0.2) | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $    3.4 | $    3.5 | $    3.7 | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | $    3.4 | $    3.5 | $    3.7 | | | |
| Less:  DIP Facility Claims | (159.7) | (1.8) | (1.8) | (1.8) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **1.6** | **1.7** | **1.8** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **1.6** | **1.7** | **1.8** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (1.6) | (1.7) | (1.8) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (1.6) | (1.7) | (1.8) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (2.7) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (116.3) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (588.8) | - | - | - | 0% | 0% | 0% |

12

**A4. Collective Brands Services, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $          - | $          - | $          - | $          - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 0.0 | 0.0 | 0.0 | 0.0 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **0.0** | **0.0** | **0.0** | **0.0** | **1%** | **2%** | **2%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$   (0.0)** | **$   (0.0)** | **$   (0.0)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$    0.0** | **$    0.0** | **$    0.0** | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | **$    0.0** | **$    0.0** | **$    0.0** | | | |
| Less:  DIP Facility Claims | (159.7) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **0.0** | **0.0** | **0.0** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **0.0** | **0.0** | **0.0** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (0.0) | (0.0) | (0.0) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (0.0) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (9.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (478.8) | - | - | - | 0% | 0% | 0% |

13

**A5. Payless ShoeSource, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $      7.0 | $      6.6 | $      6.8 | $      7.0 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.7 | 0.6 | 0.6 | 0.7 | 85% | 90% | 95% |
| Inventory | 199.7 | 299.5 | 319.5 | 339.5 | 150% | 160% | 170% |
| Prepaid Expenses | 9.2 | 0.1 | 0.1 | 0.1 | 1% | 1% | 1% |
| Other Current Assets | 1.7 | 0.1 | 0.1 | 0.2 | 6% | 8% | 10% |
| Land | 2.4 | 1.1 | 1.2 | 1.3 | 45% | 50% | 55% |
| Buildings | 2.6 | 1.2 | 1.3 | 1.4 | 45% | 50% | 55% |
| PP&E | 76.4 | 1.1 | 1.5 | 1.9 | 1% | 2% | 2% |
| Intangibles | 5.0 | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.5 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany | 287.2 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **592.3** | **310.3** | **331.1** | **352.0** | **52%** | **56%** | **59%** |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (139.3) | (150.2) | (159.5) | | | |
| Operating Expenses - Other | | (12.1) | (12.3) | (12.3) | | | |
| Sale Expenses - Non-Inventory | | (0.2) | (0.2) | (0.3) | | | |
| Chapter 7 - Professional Fees | | (4.7) | (4.6) | (4.6) | | | |
| Chapter 7 - Trustee Fees | | (9.1) | (9.7) | (10.4) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $   (165.4) | $   (177.0) | $   (187.1) | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $    144.9 | $    154.1 | $    164.9 | | | |
| **D.  Distribution to Creditors** | | $    144.9 | $    154.1 | $    164.9 | | | |
| Less:  DIP Facility Claims | (159.7) | (80.3) | (80.3) | (80.3) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **64.6** | **73.8** | **84.6** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **64.6** | **73.8** | **84.6** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (64.6) | (73.8) | (84.6) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (64.6) | (73.8) | (84.6) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | (11.3) | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | (8.7) | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | (0.9) | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | (21.0) | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (7.4) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | (300.0) | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (7.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (784.1) | - | - | - | 0% | 0% | 0% |

**A6. Payless ShoeSource Worldwide, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $       0.0 | $      0.0 | $      0.0 | $      0.0 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.1 | 0.0 | 0.0 | 0.0 | 85% | 90% | 95% |
| Inventory | 35.0 | 52.5 | 56.1 | 59.6 | 150% | 160% | 170% |
| Prepaid Expenses | 14.0 | 0.1 | 0.1 | 0.1 | 1% | 1% | 1% |
| Other Current Assets | 0.8 | 0.1 | 0.1 | 0.1 | 6% | 8% | 10% |
| Land | 0.1 | 0.1 | 0.1 | 0.1 | 45% | 50% | 55% |
| Buildings | 9.8 | 4.4 | 4.9 | 5.4 | 45% | 50% | 55% |
| PP&E | 59.9 | 0.9 | 1.2 | 1.5 | 1% | 2% | 2% |
| Intangibles | 61.4 | 95.2 | 100.4 | 105.6 | 155% | 164% | 172% |
| Other Long Term Assets | 2.4 | 0.1 | 0.1 | 0.2 | 4% | 6% | 7% |
| Intercompany | 663.2 | 20.7 | 20.7 | 20.7 | 3% | 3% | 3% |
| Investments in Subsidiaries | - | 14.2 | 16.5 | 19.1 | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **846.7** | **188.3** | **200.2** | **212.4** | **22%** | **24%** | **25%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (24.4) | (26.3) | (28.0) | | | |
| Operating Expenses - Other | | (6.0) | (6.0) | (6.0) | | | |
| Sale Expenses - Non-Inventory | | (5.0) | (5.3) | (5.7) | | | |
| Chapter 7 - Professional Fees | | (2.3) | (2.3) | (2.2) | | | |
| Chapter 7 - Trustee Fees | | (4.6) | (4.9) | (5.2) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $   (42.4) | $   (44.9) | $   (47.1) | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $   145.9 | $   155.3 | $   165.3 | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $   145.9 | $   155.3 | $   165.3 | | | |
| Less:  DIP Facility Claims | (159.7) | (61.6) | (61.6) | (61.6) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **84.4** | **93.7** | **103.7** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **84.4** | **93.7** | **103.7** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (84.4) | (93.7) | (103.7) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (84.4) | (93.7) | (103.7) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | 6.1 | 6.8 | 7.6 | | | |
| **Proceeds Available for Next Priority of Creditors** | | **6.1** | **6.8** | **7.6** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | (50.1) | (5.5) | (6.1) | (6.8) | 11% | 12% | 14% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | (1.8) | (0.2) | (0.2) | (0.3) | 11% | 12% | 14% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | (4.0) | (0.4) | (0.5) | (0.5) | 11% | 12% | 14% |
| Total Other Administrative and Priority Claims | (56.0) | (6.1) | (6.8) | (7.6) | 11% | 12% | 14% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5B:  Worldwide General Unsecured Claims | (52.4) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | | | | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (522.1) | - | - | - | 0% | 0% | 0% |

**A7. Payless ShoeSource Merchandising, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | - | - | - | - | 0% | 0% | 0% |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ - | $ - | $ - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $ - | $ - | $ - | | | |
| **D.  Distribution to Creditors** | | $ - | $ - | $ - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (0.6) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (170.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (640.3) | - | - | - | 0% | 0% | 0% |

16

**A8. Payless Gold Value Co., Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | 95% | 98% | 100% |
| Accounts Receivable, Net | 7.3 | 6.2 | 6.6 | 7.0 | 85% | 90% | 95% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 3.0 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **10.3** | **6.2** | **6.6** | **7.0** | **60%** | **64%** | **67%** |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.2) | (0.2) | (0.2) | | | |
| Sale Expenses - Non-Inventory | | (0.3) | (0.3) | (0.3) | | | |
| Chapter 7 - Professional Fees | | (0.1) | (0.1) | (0.1) | | | |
| Chapter 7 - Trustee Fees | | (0.2) | (0.2) | (0.2) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$ (0.8)** | **$ (0.9)** | **$ (0.9)** | | | |
| **C. Proceeds Available for Distribution to Creditors** | | **$ 5.4** | **$ 5.7** | **$ 6.1** | | | |
| **D. Distribution to Creditors** | | **$ 5.4** | **$ 5.7** | **$ 6.1** | | | |
| Less: DIP Facility Claims | (159.7) | (3.0) | (3.0) | (3.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **2.4** | **2.8** | **3.1** | | | |
| Less: Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **2.4** | **2.8** | **3.1** | | | |
| Less: Secured Claims | | | | | | | |
| Class 3: Prepetition First Lien Credit Agreement Claims | (506.3) | (2.4) | (2.8) | (3.1) | | | |
| Class 4: Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (2.4) | (2.8) | (3.1) | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Add: Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less: Other Administrative and Priority Claims | | | | | | | |
| Class 3: Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less: Unsecured Claims | | | | | | | |
| Class 5A: Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3: First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4: Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6: Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

17

**A9. Payless NYC, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $          - | $          - | $          - | $          - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 0.1 | 0.0 | 0.0 | 0.0 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **0.2** | **0.0** | **0.0** | **0.0** | **2%** | **2%** | **3%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$          (0.0)** | **$          (0.0)** | **$          (0.0)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$          0.0** | **$          0.0** | **$          0.0** | | | |
| **D.  Distribution to Creditors** | | **$          0.0** | **$          0.0** | **$          0.0** | | | |
| Less:  DIP Facility Claims | (159.7) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **0.0** | **0.0** | **0.0** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **0.0** | **0.0** | **0.0** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (0.0) | (0.0) | (0.0) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (0.0) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (34.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (503.8) | - | - | - | 0% | 0% | 0% |

**A10.  Eastborough, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | - | - | - | - | 0% | 0% | 0% |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ - | $ - | $ - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $ - | $ - | $ - | | | |
| **D.  Distribution to Creditors** | | $ - | $ - | $ - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (34.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (503.7) | - | - | - | 0% | 0% | 0% |

19

**A11.  Payless Purchasing Services, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | 0.2 | 0.0 | 0.0 | 0.0 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 2.6 | 0.0 | 0.1 | 0.1 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **2.8** | **0.0** | **0.1** | **0.1** | **2%** | **2%** | **3%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$ (0.0)** | **$ (0.0)** | **$ (0.0)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$ 0.0** | **$ 0.1** | **$ 0.1** | | | |
| **D.  Distribution to Creditors** | | **$ 0.0** | **$ 0.1** | **$ 0.1** | | | |
| Less:  DIP Facility Claims | (159.7) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **0.0** | **0.0** | **0.0** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | **0.0** | **0.0** | **0.0** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (0.0) | (0.0) | (0.0) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (0.0) | (0.0) | (0.0) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (2.9) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (7.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (479.6) | - | - | - | 0% | 0% | 0% |

**A12.  Payless ShoeSource Distribution, Inc.**

| | Estimated | Total Estimated | | | Total Estimated | | |
| | Net Book Value | Recovery $'s | | | Recovery %'s | | |
| Assets / Claims ($'s in millions) | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
|---|---|---|---|---|---|---|---|
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $          - | $          - | $          - | $          - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | | | | 0% | 0% | 0% |
| Inventory | 31.3 | 46.9 | 50.0 | 53.2 | 150% | 160% | 170% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | 1.6 | 0.1 | 0.1 | 0.2 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 529.3 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **562.2** | **47.0** | **50.2** | **53.3** | **8%** | **9%** | **9%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (21.8) | (23.5) | (25.0) | | | |
| Operating Expenses - Other | | (1.8) | (1.9) | (1.9) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.7) | (0.7) | (0.7) | | | |
| Chapter 7 - Trustee Fees | | (1.4) | (1.5) | (1.6) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $   (25.8) | $   (27.6) | $   (29.1) | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $    21.2 | $    22.6 | $    24.2 | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $    21.2 | $    22.6 | $    24.2 | | | |
| Less:  DIP Facility Claims | (159.7) | (11.8) | (11.8) | (11.8) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 9.5 | 10.8 | 12.4 | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 9.5 | 10.8 | 12.4 | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | (9.5) | (10.8) | (12.4) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | (9.5) | (10.8) | (12.4) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (1.4) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | | | | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (471.1) | - | - | - | 0% | 0% | 0% |

21

**A13.  Shoe Sourcing, Inc.**

| Assets / Claims ($'s in millions) | Estimated Book Value As of July 1, 2017 | Total Estimated Recovery $'s Low | Middle | High | Total Estimated Recovery %'s Low | Middle | High |
|---|---|---|---|---|---|---|---|
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | 0 | 0 | 0 | 0 | 85% | 90% | 95% |
| Inventory | 0 | 0 | 0 | 0 | 150% | 160% | 170% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 3 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | 3 | 0 | 0 | 0 | 6% | 6% | 7% |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (0) | (0) | (0) | | | |
| Operating Expenses - Other | | (0) | (0) | (0) | | | |
| Sale Expenses - Non-Inventory | | (0) | (0) | (0) | | | |
| Chapter 7 - Professional Fees | | (0) | (0) | (0) | | | |
| Chapter 7 - Trustee Fees | | (0) | (0) | (0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ (0) | $ (0) | $ (0) | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $ 0 | $ 0 | $ 0 | | | |
| **D.  Distribution to Creditors** | | $ 0 | $ 0 | $ 0 | | | |
| Less:  DIP Facility Claims | (160) | (0) | (0) | (0) | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 0 | 0 | 0 | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | 0 | 0 | 0 | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506) | (0) | (0) | (0) | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145) | - | - | - | | | |
| Total Secured Claims | (651) | (0) | (0) | (0) | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 95% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (0) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (325) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (470) | - | - | - | 0% | 0% | 0% |

**A14.  Collective Brands Franchising Services, LLC**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $    - | $    - | $    - | $    - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 1.1 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | 1.1 | - | - | - | 0% | 0% | 0% |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $    - | $    - | $    - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $    - | $    - | $    - | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $    - | $    - | $    - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (0.1) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | | | | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.8) | - | - | - | 0% | 0% | 0% |

**A15.  Payless Collective GP, LLC**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $        - | $        - | $        - | $        - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | - | - | - | - | **0%** | **0%** | **0%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $        - | $        - | $        - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $        - | $        - | $        - | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $        - | $        - | $        - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (0.0) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

**A16.  Collective Licensing, LP**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s Low | Middle | High | Total Estimated Recovery %'s Low | Middle | High |
|---|---|---|---|---|---|---|---|
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $      - | $      - | $      - | $      - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 3.1 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **3.1** | **-** | **-** | **-** | **0%** | **0%** | **0%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$      -** | **$      -** | **$      -** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$      -** | **$      -** | **$      -** | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | **$      -** | **$      -** | **$      -** | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **-** | **-** | **-** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **-** | **-** | **-** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

**A17.  Collective Licensing International, LLC**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 1.1 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | 1.1 | - | - | - | 0% | 0% | 0% |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ - | $ - | $ - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $ - | $ - | $ - | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $ - | $ - | $ - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | - | - | - | - | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

**A18.  Clinch, LLC**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $        - | $        - | $        - | $        - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 0.6 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **0.6** | **-** | **-** | **-** | **0%** | **0%** | **0%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $        - | $        - | $        - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $        - | $        - | $        - | | | |
| **D.  Distribution to Creditors** | | $        - | $        - | $        - | | | |
| Less:  DIP Facility Claims | (159.7) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **-** | **-** | **-** | | | |
| Less:  Class 2 - Other Secured Claims | - | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | **-** | **-** | **-** | **-** | | | |
| Less:  Secured Claims | | | | | | | |
| Class 3:  Prepetition First Lien Credit Agreement Claims | (506.3) | - | - | - | | | |
| Class 4:  Prepetition Second Lien Credit Agreement Claims | (145.0) | - | - | - | | | |
| Total Secured Claims | (651.3) | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Add:  Unencumbered Assets - Net Proceeds | | - | - | - | | | |
| **Proceeds Available for Next Priority of Creditors** | | **-** | **-** | **-** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Class 3:  Diminution in Value Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Class 3:  First Lien Term Loan Deficiency Claims | (324.7) | - | - | - | 0% | 0% | 0% |
| Class 4:  Second Lien Term Loan Deficiency Claims | (145.0) | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (469.7) | - | - | - | 0% | 0% | 0% |

**B.  Debtor Entities (4) that relate to the Debtors' Canadian Operations**
   **(Aggregated Results – Individual Results by Entity are Set Forth on the Following Pages)**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ 1.6 | $ 1.5 | $ 1.5 | $ 1.6 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.0 | 0.0 | 0.0 | 0.0 | 85% | 90% | 95% |
| Inventory | 20.7 | 31.0 | 33.1 | 35.2 | 150% | 160% | 170% |
| Prepaid Expenses | 0.6 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | 1.2 | 0.1 | 0.1 | 0.1 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 8.7 | 0.1 | 0.2 | 0.2 | 1% | 2% | 2% |
| Intangibles | 0.4 | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany Balances | 190.7 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **224.0** | **32.8** | **34.9** | **37.1** | **15%** | **16%** | **17%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (14.4) | (15.6) | (16.5) | | | |
| Operating Expenses - Corporate / Other | | (1.3) | (1.3) | (1.3) | | | |
| Chapter 7 - Professional Fees | | (0.5) | (0.5) | (0.5) | | | |
| Chapter 7 - Trustee Fees | | (0.9) | (1.0) | (1.1) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$ (17.1)** | **$ (18.4)** | **$ (19.4)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$ 15.6** | **$ 16.6** | **$ 17.7** | | | |
| **D.  Distribution to Creditors** | | $ 15.6 | $ 16.6 | $ 17.7 | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | (3.0) | (3.0) | (3.0) | (3.0) | 100% | 100% | 100% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | (3.0) | (3.0) | (3.0) | (3.0) | 100% | 100% | 100% |
| **Proceeds Available for Next Priority of Creditors** | | **12.6** | **13.6** | **14.7** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5C: Canadian General Unsecured Claims | (1.6) | (1.6) | (1.6) | (1.6) | 100% | 100% | 100% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6: Intercompany Claims | (69.5) | (9.3) | (9.3) | (9.3) | 13% | 13% | 13% |
| Total Unsecured Claims | (71.1) | (10.9) | (10.9) | (10.9) | 15% | 15% | 15% |

**B1. Payless ShoeSource Canada, LP**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s Low | Middle | High | Total Estimated Recovery %'s Low | Middle | High |
|---|---|---|---|---|---|---|---|
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ 1.6 | $ 1.5 | $ 1.5 | $ 1.6 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.0 | 0.0 | 0.0 | 0.0 | 85% | 90% | 95% |
| Inventory | 20.7 | 31.0 | 33.1 | 35.2 | 150% | 160% | 170% |
| Prepaid Expenses | 0.6 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | 1.2 | 0.1 | 0.1 | 0.1 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 8.7 | 0.1 | 0.2 | 0.2 | 1% | 2% | 2% |
| Intangibles | 0.4 | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany | 2.5 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **35.7** | **32.7** | **34.9** | **37.1** | **92%** | **98%** | **104%** |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (14.4) | (15.6) | (16.5) | | | |
| Operating Expenses - Other | | (1.3) | (1.3) | (1.3) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.5) | (0.5) | (0.5) | | | |
| Chapter 7 - Trustee Fees | | (0.9) | (1.0) | (1.1) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$ (17.1)** | **$ (18.4)** | **$ (19.4)** | | | |
| **C. Proceeds Available for Distribution to Creditors** | | **$ 15.6** | **$ 16.6** | **$ 17.7** | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | **$ 15.6** | **$ 16.6** | **$ 17.7** | | | |
| Less: Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | (3.0) | (3.0) | (3.0) | (3.0) | 100% | 100% | 100% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | (3.0) | (3.0) | (3.0) | (3.0) | 100% | 100% | 100% |
| **Proceeds Available for Next Priority of Creditors** | | **12.6** | **13.6** | **14.7** | | | |
| Less: Unsecured Claims | | | | | | | |
| Class 5C: Canadian General Unsecured Claims | (1.6) | (1.6) | (1.6) | (1.6) | 100% | 100% | 100% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6: Intercompany Claims | (9.3) | (9.3) | (9.3) | (9.3) | 100% | 100% | 100% |
| Total Unsecured Claims | (10.9) | (10.9) | (10.9) | (10.9) | 100% | 100% | 100% |

29

**B2. Payless ShoeSource Canada, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $        0.0 | $      0.0 | $      0.0 | $      0.0 | 95% | 98% | 100% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany | 90.0 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **90.0** | **0.0** | **0.0** | **0.0** | **0%** | **0%** | **0%** |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $    (0.0) | $    (0.0) | $    (0.0) | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $      0.0 | $      0.0 | $      0.0 | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | $      0.0 | $      0.0 | $      0.0 | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | 0.0 | 0.0 | 0.0 | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5C:  Canadian General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (60.2) | (0.0) | (0.0) | (0.0) | 0% | 0% | 0% |
| Total Unsecured Claims | (60.2) | (0.0) | (0.0) | (0.0) | 0% | 0% | 0% |

30

**B3. Payless ShoeSource Canada GP, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | 95% | 98% | 100% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | 0.0 | 0.0 | 0.0 | 0.0 | 95% | 98% | 100% |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | (0.0) | (0.0) | (0.0) | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $ (0.0) | $ (0.0) | $ (0.0) | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $ 0.0 | $ 0.0 | $ 0.0 | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | $ 0.0 | $ 0.0 | $ 0.0 | | | |
| | | | | | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | 0.0 | 0.0 | 0.0 | | | |
| | | | | | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5C:  Canadian General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (0.0) | (0.0) | (0.0) | (0.0) | 100% | 100% | 100% |
| Total Unsecured Claims | (0.0) | (0.0) | (0.0) | (0.0) | 100% | 100% | 100% |

**B4.  PSS Canada, Inc.**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $        - | $        - | $        - | $        - | 0% | 0% | 0% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany | 98.2 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **98.2** | **-** | **-** | **-** | **0%** | **0%** | **0%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Other | | - | - | - | | | |
| Sale Expenses - Non-Inventory | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Creditor Recovery** | | $        - | $        - | $        - | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $        - | $        - | $        - | | | |
| **D.  Distribution to Creditors** | | $        - | $        - | $        - | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | - | - | - | - | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5C:  Canadian General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | - | - | - | - | 0% | 0% | 0% |

**C.   Debtor Entities (1) that are Organized in Puerto Rico**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $         0.1 | $     0.1 | $     0.1 | $     0.1 | 95% | 98% | 100% |
| Accounts Receivable, Net | 0.0 | 0.0 | 0.0 | 0.0 | 85% | 90% | 95% |
| Inventory | 2.9 | 4.4 | 4.7 | 5.0 | 150% | 160% | 170% |
| Prepaid Expenses | 0.2 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | 0.0 | 0.0 | 0.0 | 0.0 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 0.9 | 0.0 | 0.0 | 0.0 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.4 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany Balances | 3.9 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **8.5** | **4.6** | **4.9** | **5.2** | **54%** | **57%** | **61%** |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (2.0) | (2.2) | (2.3) | | | |
| Operating Expenses - Corporate / Other | | (0.2) | (0.2) | (0.2) | | | |
| Chapter 7 - Professional Fees | | (0.1) | (0.1) | (0.1) | | | |
| Chapter 7 - Trustee Fees | | (0.1) | (0.1) | (0.2) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **$   (2.4)** | **$   (2.6)** | **$   (2.7)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | **$     2.1** | **$     2.3** | **$     2.4** | | | |
| **D.  Distribution to Creditors** | | **$     2.1** | **$     2.3** | **$     2.4** | | | |
| Less:  DIP Facility Claims | (159.7) | (1.2) | (1.2) | (1.2) | | | |
| **Proceeds Available for Next Priority of Creditors** | **(159.7)** | **0.9** | **1.1** | **1.2** | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | (1.3) | (0.9) | (1.1) | (1.2) | 73% | 83% | 96% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | - | - | - | - | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | (1.3) | (0.9) | (1.1) | (1.2) | 73% | 83% | 96% |
| **Proceeds Available for Next Priority of Creditors** | **-** | **-** | **-** | **-** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class SA:  Other General Unsecured Claims | (0.1) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | - | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (0.1) | - | - | - | 0% | 0% | 0% |

### D.  Collective Brands Logistics, Limited (1)

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s Low | Middle | High | Total Estimated Recovery %'s Low | Middle | High |
|---|---|---|---|---|---|---|---|
| **A. Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | 95% | 98% | 100% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | 0.1 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | 0.0 | 0.0 | 0.0 | 0.0 | 6% | 8% | 10% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 0.0 | 0.0 | 0.0 | 0.0 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany Balances | 23.2 | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **23.4** | **0.1** | **0.1** | **0.1** | **1%** | **1%** | **1%** |
| | | | | | | | |
| **B. Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Corporate / Other | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Professional Fees | | (0.0) | (0.0) | (0.0) | | | |
| Chapter 7 - Trustee Fees | | (0.0) | (0.0) | (0.0) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **(0.0)** | **(0.0)** | **(0.0)** | | | |
| **C. Proceeds Available for Distribution to Creditors** | | $ 0.1 | $ 0.1 | $ 0.1 | | | |
| | | | | | | | |
| **D. Distribution to Creditors** | | $ 0.1 | $ 0.1 | $ 0.1 | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | (38.4) | (0.0) | (0.0) | (0.0) | 0% | 0% | 0% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | (0.6) | (0.0) | (0.0) | (0.0) | 0% | 0% | 0% |
| Total Other Administrative and Priority Claims | (39.0) | (0.0) | (0.0) | (0.0) | 0% | 0% | 0% |
| **Proceeds Available for Next Priority of Creditors** | - | **0.1** | **0.1** | **0.1** | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (9.1) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (21.5) | (0.1) | (0.1) | (0.1) | 0% | 0% | 0% |
| Total Unsecured Claims | (30.7) | (0.1) | (0.1) | (0.1) | 0% | 0% | 0% |

**E.   Dynamic Assets Limited (1)**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $    0.3 | $    0.3 | $    0.3 | $    0.3 | 95% | 98% | 100% |
| Accounts Receivable, Net | 1.5 | 1.2 | 1.3 | 1.4 | 85% | 90% | 95% |
| Inventory | 1.3 | 1.9 | 2.1 | 2.2 | 150% | 160% | 170% |
| Prepaid Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 1% | 1% | 1% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | 0.1 | 0.0 | 0.0 | 0.0 | 1% | 2% | 2% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 0.0 | 0.0 | 0.0 | 0.0 | 4% | 6% | 7% |
| Intercompany Balances | 36.0 | 4.4 | 4.4 | 4.4 | 12% | 12% | 12% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | - | - | - | - | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **39.1** | **7.8** | **8.0** | **8.2** | **20%** | **21%** | **21%** |
| | | | | | | | |
| **B.  Expenses for Creditor Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | (0.9) | (1.0) | (1.0) | | | |
| Operating Expenses - Corporate / Other | | (0.2) | (0.2) | (0.2) | | | |
| Chapter 7 - Professional Fees | | (0.1) | (0.1) | (0.1) | | | |
| Chapter 7 - Trustee Fees | | (0.1) | (0.1) | (0.1) | | | |
| **Total Estimated Expenses for Creditor Recovery** | | **(1.2)** | **(1.3)** | **(1.4)** | | | |
| **C.  Proceeds Available for Distribution to Creditors** | | $    6.6 | $    6.7 | $    6.9 | | | |
| | | | | | | | |
| **D.  Distribution to Creditors** | | $    6.6 | $    6.7 | $    6.9 | | | |
| Less:  Other Administrative and Priority Claims | | | | | | | |
| Chapter 11 - Administrative Claims | (9.3) | (6.4) | (6.5) | (6.6) | 68% | 69% | 71% |
| Chapter 11 - Professional Fee Claims | - | - | - | - | 0% | 0% | 0% |
| Chapter 11 - Employee Claims | - | - | - | - | 0% | 0% | 0% |
| Priority Tax Claims | - | - | - | - | 0% | 0% | 0% |
| 503(b)(9) Claims (20 Day Shipments) | (0.3) | (0.2) | (0.2) | (0.2) | 68% | 69% | 71% |
| Total Other Administrative and Priority Claims | (9.7) | (6.6) | (6.7) | (6.9) | 68% | 69% | 71% |
| **Proceeds Available for Next Priority of Creditors** | | - | - | - | | | |
| Less:  Unsecured Claims | | | | | | | |
| Class 5A:  Other General Unsecured Claims | (4.8) | - | - | - | 0% | 0% | 0% |
| Other General Unsecured Claims | - | - | - | - | 0% | 0% | 0% |
| Lease Rejection Claims | - | - | - | - | 0% | 0% | 0% |
| Class 6:  Intercompany Claims | (11.9) | - | - | - | 0% | 0% | 0% |
| Total Unsecured Claims | (16.8) | - | - | - | 0% | 0% | 0% |

**F.   Payless Holdings LLC (1)**

| Assets / Claims ($'s in millions) | Estimated Net Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High |
| **A.  Gross Liquidation Proceeds:** | | | | | | | |
| Cash and Cash Equivalents | $      5.4 | $      5.4 | $      5.4 | $      5.4 | 100% | 100% | 100% |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% |
| Inventory | - | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% |
| Land | - | - | - | - | 0% | 0% | 0% |
| Buildings | - | - | - | - | 0% | 0% | 0% |
| PP&E | - | - | - | - | 0% | 0% | 0% |
| Intangibles | - | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% |
| Intercompany Balances | - | - | - | - | 0% | 0% | 0% |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% |
| Avoidance Actions | tbd | tbd | tbd | tbd | 0% | 0% | 0% |
| **Total Assets and Estimated Gross Proceeds** | **5.4** | **5.4** | **5.4** | **5.4** | **100%** | **100%** | **100%** |
| **B.  Expenses for Recovery:** | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | |
| Operating Expenses - Corporate / Other | | - | - | - | | | |
| Chapter 7 - Professional Fees | | - | - | - | | | |
| Chapter 7 - Trustee Fees | | - | - | - | | | |
| **Total Estimated Expenses for Recovery** | | $      - | $      - | $      - | | | |
| **C.  Proceeds Available for Distribution** | | $      5.4 | $      5.4 | $      5.4 | | | |
| **D.  Distribution to Parties** | | $      5.4 | $      5.4 | $      5.4 | | | |
| Class SA:  Other General Unsecured Claims | - | - | - | - | | | |
| Class 7:  Existing Equity Interests | - | - | - | - | | | |
| **Proceeds Available after Distribution** | | **5.4** | **5.4** | **5.4** | | | |

**G.   Payless Intermediate Holdings LLC (1)**

| Assets / Claims ($'s in millions) | Estimated Book Value As of July 1, 2017 | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | | See Note |
|---|---|---|---|---|---|---|---|---|
| | | Low | Middle | High | Low | Middle | High | |
| **A.  Gross Liquidation Proceeds:** | | | | | | | | |
| Cash and Cash Equivalents | $          - | $          - | $          - | $          - | 0% | 0% | 0% | 1 |
| Accounts Receivable, Net | - | - | - | - | 0% | 0% | 0% | 2 |
| Inventory | - | - | - | - | 0% | 0% | 0% | 3 |
| Prepaid Expenses | - | - | - | - | 0% | 0% | 0% | 4 |
| Other Current Assets | - | - | - | - | 0% | 0% | 0% | 5 |
| Land | - | - | - | - | 0% | 0% | 0% | 6 |
| Buildings | - | - | - | - | 0% | 0% | 0% | 6 |
| PP&E | - | - | - | - | 0% | 0% | 0% | 6 |
| Intangibles | - | - | - | - | 0% | 0% | 0% | 7 |
| Other Long Term Assets | - | - | - | - | 0% | 0% | 0% | 8 |
| Intercompany Balances | - | - | - | - | 0% | 0% | 0% | 9 |
| Investments in Subsidiaries | - | - | - | - | 0% | 0% | 0% | 10 |
| Avoidance Actions | tbd | tbd | tbd | tbd | 0% | 0% | 0% | 11 |
| **Total Assets and Estimated Gross Proceeds** | - | - | - | - | 0% | 0% | 0% | |
| **B.  Expenses for Recovery:** | | | | | | | | |
| Operating Expenses - Inventory | | - | - | - | | | | 12 |
| Operating Expenses - Corporate / Other | | - | - | - | | | | 12 |
| Chapter 7 - Professional Fees | | - | - | - | | | | 12 |
| Chapter 7 - Trustee Fees | | - | - | - | | | | 12 |
| **Total Estimated Expenses for Recovery** | | $          - | $          - | $          - | | | | |
| **C.  Proceeds Available for Distribution** | | $          - | $          - | $          - | | | | |
| **D.  Distribution to Parties** | | $          - | $          - | $          - | | | | |
| Class 5A:  Other General Unsecured Claims | | - | - | - | | | | 18 |
| Class 7:  Existing Equity Interests | | - | - | - | | | | 19 |
| **Proceeds Available after Distribution** | | - | - | - | | | | |

## IV.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### Note 1 – Cash and Cash Equivalents

This Liquidation Analysis utilizes the Debtors' estimated cash balance, based on the Financial Projections, as of the Conversion Date.  Approximately $1 million in restricted cash deposited as assurance to utility providers is not anticipated to be recovered.  All other cash and cash equivalents on hand are assumed to be recoverable at 98% to 100% of the total balance as of the Conversion Date.

### Note 2 – Accounts Receivable, Net

Estimated proceeds from accounts receivable balances (exclusive of intercompany balances), which consist primarily of credit card and trade receivables, as of the Conversion Date, are assumed to be recoverable between 85% and 95% of net book value.  These assumed recovery rates are based on the Debtors' ability to collect on accounts receivable, taking into consideration the credit quality, aging of the accounts and any disputed amounts.   Additionally, despite historically low write-downs on accounts receivable, there is inherent risk and difficulty in collecting receivables, which may require certain concessions to facilitate recovery.  Ceasing all operations would terminate various contracts and business relationships, which may also impact collection of receivables.  As of the Conversion Date, it is assumed the Debtors will no longer honor returns nor refunds.

| *Consolidated (Debtor / Non-Debtor)* | Estimated | Total Estimated | | | Total Estimated | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Net Book Values | Recovery $'s | | | Recovery %'s | | |
| *$'s in millions* | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Accounts Receivable, Net | 16.0 | 13.6 | 14.4 | 15.2 | 85% | 90% | 95% |
| **Total Accounts Receivable, Net** | **16.0** | **13.6** | **14.4** | **15.2** | **85%** | **90%** | **95%** |

### Note 3 – Inventory

The net recoverable rates were based on a third-party appraisal, which reflects the net orderly liquidation value and realized rates in the marketplace as the Debtors reduce the store count in North America.  Gross recovery assumptions range between approximately 150% and 170% of net book value and, after deducting operating expenses such as payroll, occupancy, freight, and fees, the result is a net recoverable rate between 80% and 90% of net book value.  The assumption is the inventory is sold "as is, where is" during the wind-down period and consummated over a three-month period.

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Inventory - Merchandise in Store | 268.8 | 403.2 | 430.1 | 457.0 | 150% | 160% | 170% |
| Inventory - Warehouse | 33.1 | 49.7 | 53.0 | 56.4 | 150% | 160% | 170% |
| Inventory - In-Transit | 44.2 | 66.2 | 70.7 | 75.1 | 150% | 160% | 170% |
| Inventory - Other and Intercompany | 6.7 | 10.0 | 10.7 | 11.4 | 150% | 160% | 170% |
| **Total Inventory** | **352.8** | **529.2** | **564.5** | **599.8** | **150%** | **160%** | **170%** |

## Note 4 – Prepaid Expenses

The Debtors have prepaid certain expenses, including but not limited to: insurance, services, lease deposits, retainer deposits, and other miscellaneous deposits. This Liquidation Analysis assumes that prepaid amounts and deposits will be consumed during the liquidation period, to offset against potential liabilities, or otherwise deemed non-recoverable. This Liquidation Analysis assumes recovery rates of between 1% and 2% of net book value, with estimated recoveries coming from prepaid contracts.

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Prepaid Agreements (e.g. advertising) | 15.0 | - | - | - | 0% | 0% | 0% |
| Prepaid Rent and Taxes | 1.8 | - | - | - | 0% | 0% | 0% |
| Prepaid Expenses | 8.5 | 0.2 | 0.3 | 0.4 | 2% | 4% | 5% |
| **Total Prepaid Expenses** | **25.2** | **0.2** | **0.3** | **0.4** | **1%** | **1%** | **2%** |

## Note 5 – Other Current Assets

Other current assets include prepaid taxes, tenant allowances, supplies, and deferred income taxes and were assumed recoverable between 6% and 10% of net book value, with estimated recoveries from prepaid tax accounts and other contracts.

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Taxes - Duty and VAT | 7.6 | 0.8 | 0.9 | 1.1 | 10% | 13% | 15% |
| Tenant Allowances | 1.5 | 0.1 | 0.2 | 0.2 | 10% | 13% | 15% |
| Other Current Assets | 3.4 | 0.0 | 0.1 | 0.1 | 1% | 2% | 3% |
| Current Deferred Income Taxes | 2.4 | - | - | - | 0% | 0% | 0% |
| **Total Other Current Assets** | **14.8** | **0.9** | **1.2** | **1.5** | **6%** | **8%** | **10%** |

## Note 6 – Fixed Assets and Other

Fixed assets include all land, buildings, machinery, and equipment owned by the Debtors.  The most significant assets in this category include leasehold improvements, construction in progress, and equipment.

Land and buildings were assumed to be recoverable between 45% and 55% of their net book value based on the advance rate found in the borrowing base as set by the ABL DIP Lenders.  This represents a discount to the appraised amount, primarily related to the Debtors' headquarters building in Topeka, Kansas.

The fixtures and equipment were assumed to be recoverable at approximately $500 to $1,000 per store based on input from the third-party appraiser.  Based on the retail store count, the resulting range of recoveries are $3 million to $5 million or 1% to 2% of total net book value of fixed assets.  These assets are assumed to have a low recoverable rate to book value based on sale experience in the marketplace and the fact that the entire portfolio of the Debtors would be wound-down starting at the Conversion Date, which would inundate the market with similar assets (tables and racking) from the Debtors' stores across North America.

Management has considered all of the above factors in determining the recovery range for fixed assets.

| *Consolidated (Debtor / Non-Debtor)* | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| *$'s in millions* | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Land, Net | 2.5 | 1.1 | 1.2 | 1.4 | 45% | 50% | 55% |
| **Total Land, Net** | **2.5** | **1.1** | **1.2** | **1.4** | **45%** | **50%** | **55%** |
| Buildings, Net | 12.6 | 5.7 | 6.3 | 6.9 | 45% | 50% | 55% |
| **Total Buildings, Net** | **12.6** | **5.7** | **6.3** | **6.9** | **45%** | **50%** | **55%** |

| *Consolidated (Debtor / Non-Debtor)* | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| *$'s in millions* | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Leasehold Improvements, Net | 71.0 | - | - | - | 0% | 0% | 0% |
| Construction in Progress, Net | 52.1 | - | - | - | 0% | 0% | 0% |
| Machine Fixtures & Equipment, Net | 71.0 | 2.5 | 3.2 | 3.9 | 4% | 5% | 6% |
| Capital Inventory | 4.0 | 0.4 | 0.7 | 1.0 | 10% | 18% | 25% |
| **Total Fixed Assets, Net** | **198.2** | **2.9** | **3.9** | **4.9** | **1%** | **2%** | **2%** |

40

## Note 7 – Intangible Assets

Intellectual property owned by the Debtors is comprised of 1) Payless trademarks registered in the United States and globally, 2) Payless copyrights, patents and domain names, 3) trade names such as Brash and Fioni and perpetual paid up licenses to use certain brands (collectively, the "Debtors' I/P").

Management based the net recoverable value on a third-party appraisal report. The net recoverable value of the Debtors' I/P was developed using the income approach. This Liquidation Analysis uses the forced liquidation value from the appraisal report which assumed recoverable rates between 145% and 165% of net book value of the trademarks. The value is assumed to be realized through a marketing process administered by the chapter 7 trustee to third-party buyers in the first two months of the liquidation period.

The Debtors lease most of their stores and distribution centers. Based upon preliminary review of existing lease terms relative to market, it was determined that no existing real property leases contained material value in an assignment scenario. This assessment is based on the small footprint of the Debtors' stores, locations predominately in class B and C commercial areas, and the general market environment for retail.

Management assumed there is no recoverable value to the customer contracts for this Liquidation Analysis as these balances relate to franchise agreements that would be rejected during the wind-down.

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Intangibles - Trademark (Payless) | 34.3 | 49.9 | 53.4 | 56.8 | 145% | 155% | 165% |
| Intangibles - Trademark (Other Brands) | 32.3 | 47.0 | 50.2 | 53.5 | 145% | 155% | 165% |
| Favorable Lease Rights, Net | 5.9 | - | - | - | 0% | 0% | 0% |
| Customer Contracts, Net | 12.3 | - | - | - | 0% | 0% | 0% |
| **Total Intangibles** | **84.8** | **96.9** | **103.6** | **110.3** | **114%** | **122%** | **130%** |

## Note 8 – Other Long Term Assets

Other long term assets consist of rent and utility deposits and miscellaneous receivables.  These assets were assumed recoverable between 4% and 7% of book value, with the recoveries coming from prepaid contracts and other receivables.

| *Consolidated (Debtor / Non-Debtor)* | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| *$'s in millions* | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Deposits - Rent and Utilities | 2.5 | - | - | - | 0% | 0% | 0% |
| Other Long Term Assets | 7.4 | 0.4 | 0.6 | 0.7 | 5% | 8% | 10% |
| **Total Other Long Term Assets** | **10.0** | **0.4** | **0.6** | **0.7** | **4%** | **6%** | **7%** |

## Note 9 and 10 – Intercompany and Investment in Subsidiaries

Management assumed the foreign affiliates of the Debtors ("Foreign Affiliates") would commence wind-downs as of the Conversion Date.  The Foreign Affiliates have operations located within Latin America, Europe, Middle East, and Asia.  The assumption is that the Foreign Affiliates would not have the infrastructure nor capabilities to operate their businesses as the Debtors wound-down over the liquidation period.  The recoverable value for the Debtors' interest in its Foreign Affiliates is through (a) the net intercompany balances owed to the Debtors and (b) the Debtors' equity interests in the Foreign Affiliates.  Net liquidation proceeds were first allocated to claims (*i.e.*, third party claims, intercompany debt, intercompany payables) then as distributions to the joint venture partners and then the remaining proceeds, if any, were allocated to investment in subsidiaries.  Based on the equity pledges that are limited under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement to 65% of the value of certain first-tier foreign subsidiaries,[3] 65% of available proceeds of the equity interests of such first-tier foreign subsidiaries collateral are assets distributed to the Prepetition Lenders and the residual 35% of available proceeds constitute unencumbered assets and are distributed in accordance with the priority waterfall.  Note, the intercompany claims are pledged as collateral to the Prepetition First Credit Agreement and Prepetition Second Lien Credit Agreement.

---

[3] Legal entities that are subject to the 65% equity pledge are: (1) PSS International Holdings, Limited (including numerous subsidiaries), (2) Import Solutions de Mexico, S. de R.L. de C.V., (3) Internacional Serviçios Técnicos E Inspetoria de Calçados Ltda., (4) Payless ShoeSource of Puerto Rico, Inc., (5) Payless ShoeSource Saipan, Inc., (6) Lifestyle Brands Corporation, and (7) Collective Franchising, Ltd.

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| Latin America | 11.8 | 9.9 | 9.9 | 9.9 | 84% | 84% | 84% |
| Canada | 9.3 | 9.3 | 9.3 | 9.3 | 100% | 100% | 100% |
| Other Affiliates | 4.7 | 1.5 | 1.5 | 1.5 | 32% | 32% | 32% |
| **Total Intercompany Balances** | 25.8 | 20.7 | 20.7 | 20.7 | 80% | 80% | 80% |

| Consolidated (Debtor / Non-Debtor) | Estimated Net Book Values | Total Estimated Recovery $'s | | | Total Estimated Recovery %'s | | |
|---|---|---|---|---|---|---|---|
| $'s in millions | As of July 1, 2017 | Low | Middle | High | Low | Middle | High |
| *Investment in Subsidiaries* | | | | | | | |
| Encumbered - 65% Equity Pledge | - | 14.2 | 16.5 | 19.1 | | | |
| Unencumbered - 35% Equity Pledge | - | 6.1 | 6.8 | 7.6 | | | |
| **Total Investment in Subsidiaries** | - | 20.3 | 23.3 | 26.7 | | | |

## Note 11 – Avoidance Actions

As described in the Disclosure Statement, the Debtors' independent director (Mr. Charles Cremens) has been conducting an investigation into any estate claims and estate causes of action the Debtors may have with respect to transactions between the Debtors and the equity holders of Payless Holdings LLC (the "Sponsors"). In particular, MTO, at the direction of Mr. Cremens and with the assistance of the existing financial professionals of the Debtors, has been investigating, dividends paid by certain of the Debtors on February 28, 2013 and March 10, 2014 ("Dividends"), the 2012 acquisition of Payless by the Sponsors, and management and transaction fees paid to the Sponsors under certain Advisory Agreement dated as of October 9, 2012 among certain of the Debtors, GGC Administration, LLC, and Blum Capital Partners (collectively with the Dividends, the "Transactions"). For purposes of this Liquidation Analysis, no recovery values have been ascribed to any potential claims related to the Transactions or related to any other Avoidance Actions. The Debtor entities who may hold potential claims related to the Dividends (Payless Holdings LLC, Payless Intermediate Holdings LLC, WBG - PSS Holdings LLC, and Payless Inc.) have a "TBD" in the Avoidance Action line item to reflect that the investigation by Mr. Cremens has not concluded.

Any amounts recovered in a liquidation on account of Avoidance Actions, including preferences, would be paid first to holders of administrative and priority claims (until paid in full) and then to holders of General Unsecured Claims, if any, against the Debtor entity that made the avoided transfer.

43

**Note 12 – Expenses for Creditor Recovery**

Creditor Recovery Expenses include the following:

- Operating Expenses:  Operating expenses consist of estimated costs developed by the third-party appraiser to wind-down the Debtors' stores, including payroll and benefits, occupancy, advertising, agent's fees, and other operating costs.  Any operating losses are inclusive of all operating costs incurred during the wind-down period. Corporate / other costs include accounting, IT, insurance, occupancy, incentive compensation, and other critical personnel needed to collect receivables and assist the chapter 7 trustee with the wind-down.  Wind-down costs do not include severance, as WARN notices are assumed to be given sufficiently in advance of the wind-down.  Fees for the recovery of accounts receivable and the auction of owned fixtures, equipment, machinery, land, and real estate were estimated at 5% of gross proceeds.  Total corporate operational expenses and fees range from $25 million to $30 million for the liquidation period.

- Chapter 7 Professional Fees:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee. Professional fees were estimated at approximately $8 million for the liquidation period, based on an estimate of approximately $1 million to $2 million per month.

- Chapter 7 Trustee Fees:  In a chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed 3% of such proceeds greater than $1 million, upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of gross liquidation proceeds, excluding recoveries related to cash and cash equivalents and capital lease obligations.

**Note 13 – DIP Facility Claims**

DIP Facility Claims outstanding as projected at the Conversion Date included the following:

- DIP ABL Credit Facility:  Consisting of amount borrowed, accrued and unpaid interest and accrued and unpaid chapter 11 Professional Fee Claims for the DIP Facilities and Letters of Credit outstanding of approximately $130 million (inclusive of amounts drawn to fund the Carve-Out under the Final DIP Order, as defined therein); and

- DIP Term Facility:  Approximately $30 million.

**Note 14 – Other Secured Claims**

Other Secured Claims are estimated to be $0 million as of Conversion Date.

**Note 15 – Prepetition Credit Agreement Claims (Term Loans)**

Prepetition Credit Agreement Claims (*i.e.*, Prepetition First Lien Credit Agreement Claims and Prepetition Second Lien Credit Agreement Claims) outstanding at the Conversion Date included the following:

- Prepetition First Lien Credit Agreement Claims:  Approximately $506 million of aggregate principal amount outstanding on the First Lien Term Loan (inclusive of any MSCS Swap Claim).

- Prepetition Second Lien Credit Agreement Claims:  Approximately $145 million of aggregate principal amount outstanding on the Second Lien Term Loan.

**Note 16 – Net Proceeds from Unencumbered Assets**

Estimated net proceeds from unencumbered assets consist of:

- 35% equity share of the Foreign Affiliates:  Estimated proceeds of $6 million to $8 million to be realized during the liquidation period and available for chapter 11 administrative and unsecured claims in accordance with the priority waterfall.

**Note 17 – Other Administrative and Priority Claims**

Other Administrative and Priority Claims consist of:

- Class 3 – Diminution in Value Administrative Claims:  The Liquidation Analysis assumes that no super-priority administrative expense claims are Allowed on account of any Diminution in Value (as defined in the Final DIP Order) ("Diminution in Value Claims"). If Diminution in Value Claims are Allowed, the recoveries set forth in the Liquidation Analysis for all other holders of Claims and Interests junior to such Diminution in Value Claims would be reduced.

- Chapter 11 Post-petition Administrative Claims:  $110 million of post-petition trade payables, payroll, and related accruals were estimated to remain outstanding at the Conversion Date.

- Chapter 11 Post-petition Professional Fees Claims:  Post-petition professional fees that remain outstanding at the Conversion Date are funded through the carve-out provision in paragraph # 39 of the DIP Order.

- Chapter 11 Employee and Tax-Related Priority Claims:  Approximately $12 million of priority claims related to accrued and unpaid employee benefit amounts, in addition to outstanding prepetition tax balances, were estimated to remain outstanding at the Conversion Date.

45

▪ <u>503(b)(9) Claims</u>:   Approximately \$5 million of prepetition 503(b)(9) claims were estimated to remain outstanding at the Conversion Date.

## Note 18 – General Unsecured Claims

General Unsecured Claims consist of the following:

▪ <u>Other General Unsecured Claims</u>:   Claims outstanding at the Conversion Date were estimated to be \$58 million for the Debtors.

▪ <u>Worldwide General Unsecured Claims</u>:  Claims outstanding at the Conversion Date were estimated to be \$52 million for the Debtors.

▪ <u>Canadian General Unsecured Claims</u>:  Claims outstanding at the Conversion Date were estimated to be \$2 million for the Debtors.

▪ <u>Other General Unsecured Claims</u> including the following:

- <u>Deficiency Claims</u>:  The deficiency claims under the First Lien Term Loan range from approximately \$300 million to \$350 million and the deficiency claims under the Second Lien Term Loan totals \$145 million (*i.e.* all claims under the Second Lien Term Loan are unsecured).  For presentation purposes, the deficiency claims have been illustrated as the same amount at each entity.

- <u>Lease Rejection Claims</u>:  These claims primarily include contract rejection claims related to the store leases as the Debtors' operations are wound-down and are preliminarily estimated at \$300 million at the Conversion Date.

- <u>Intercompany Claims</u>:  These claims primarily relate to activity between the Debtors and affiliates such as merchandise, service fees, interest allocation, investments, and other.  These prepetition claims are estimated to be greater than \$200 million at the Conversion Date.

In the event of liquidation, the aggregate amount of general unsecured claims will likely increase significantly.  For example, employees likely will file claims for wages and other benefits, some of which will be entitled to priority.  Landlords may file large claims for both unsecured and priority amounts which could include lease rejection damages.  The resulting increase in both general unsecured and priority claims could significantly dilute the unsecured claims pool included in this Liquidation Analysis.

**Note 19 – Existing Equity Interests at Payless Holdings LLC**

As set forth in the Schedules, Payless Holdings LLC is a holding company whose only assets are the equity interests it owns in Payless Intermediate Holdings LLC and certain assets with an approximate value of $5 million.  There are no known creditors at Payless holdings LLC.  For purposes of this Liquidation Analysis, the Debtors assume that the asset values are reserved to satisfy contingent or other liabilities that may be prosecuted by a liquidating trustee.

**Exhibit F**

Estimation of Payless' Enterprise Value

# ESTIMATION OF PAYLESS' ENTERPRISE VALUE[1]

**Overview**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE REGARDING, AND GUGGENHEIM SECURITIES, LLC ("GUGGENHEIM SECURITIES") DOES NOT EXPRESS ANY VIEW OR OPINION AS TO, THE PRICE OR RANGE OF PRICES AT WHICH THE SHARES OF COMMON STOCK OR OTHER SECURITIES OF PAYLESS MAY TRADE, BE SALEABLE OR OTHERWISE BE TRANSFERABLE AT ANY TIME, INCLUDING SUBSEQUENT TO CONSUMMATION OF THE PLAN. THE SUMMARY SET FORTH BELOW DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE INDICATIVE FINANCIAL ANALYSES PERFORMED BY GUGGENHEIM SECURITIES. THE PREPARATION OF SUCH ANALYSES INVOLVES VARIOUS COMPLEX DETERMINATIONS AND JUDGMENTS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSES ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

MOREOVER, THE ESTIMATED ENTERPRISE VALUE AND ESTIMATED EQUITY VALUE (EACH AS DEFINED BELOW) OF AN OPERATING BUSINESS SUCH AS PAYLESS ARE SUBJECT TO VARIOUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN VARIOUS FACTORS AFFECTING THE FINANCIAL CONDITION, FINANCIAL PERFORMANCE AND FINANCIAL PROSPECTS OF SUCH A BUSINESS (INCLUDING, WITHOUT LIMITATION, GENERAL BUSINESS AND ECONOMIC CONDITIONS, CAPITAL MARKETS CONDITIONS AND INDUSTRY-SPECIFIC AND COMPANY-SPECIFIC FACTORS, ALL OF WHICH ARE BEYOND THE CONTROL OF PAYLESS AND GUGGENHEIM SECURITIES). ACCORDINGLY, THE ESTIMATES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES (INCLUDING ANY ESTIMATE OF THE ENTERPRISE VALUE OR EQUITY VALUE SET FORTH HEREIN) ARE INHERENTLY SUBJECT TO SUCH UNCERTAINTIES AND CONTINGENCIES, NONE OF THE DEBTORS, GUGGENHEIM SECURITIES OR ANY OTHER PERSON ASSUMES ANY RESPONSIBILITY FOR THEIR ACCURACY OR ACHIEVABILITY.

THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS AND OTHER STAKEHOLDERS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), to which this "Estimation of Payless' Enterprise Value" is attached as **Exhibit F**.

With authorization from the Bankruptcy Court, the Debtors' retained Guggenheim Securities as their investment banker in connection with the Chapter 11 Cases. Solely for purposes of the Plan and Disclosure Statement, Guggenheim Securities performed various indicative financial analyses to assess the estimated enterprise value of Payless on a going-concern basis upon emergence from these Chapter 11 Cases pursuant to the Plan (the "Enterprise Value").

**Estimated Enterprise Value of Payless**

Based on the indicative financial analyses outlined herein, Guggenheim Securities' estimate of the Enterprise Value of Payless is a range between $580 and $700 million, with a midpoint of $640 million. In connection with assessing the estimated Enterprise Value of Payless, Guggenheim Securities assumed an August 26, 2017 effective date under the Plan at which time the Debtors would emerge from the Chapter 11 Cases (the "Assumed Effective Date"). After deducting *pro forma* funded net debt of $387[2] million as of the Assumed Effective Date, Guggenheim Securities' estimated Enterprise Value implies an estimated Equity Value of Payless (the "Equity Value") ranging from $193 million and $313 million, with a midpoint of $253 million.

**Certain Caveats and Considerations**

Guggenheim Securities' analyses (and any materials provided in connection therewith) do not constitute a recommendation to the Debtors' Board of Directors with respect to the Plan, nor do they constitute an opinion as to fairness, from a financial point of view, of the consideration to be received under the Plan or of the terms and provisions thereof or advice or a recommendation to any Holder of any Claim or Interest or any of the Debtors' other stakeholders as to how to vote or act in connection with the Plan. More specifically, Guggenheim Securities' analyses (i) do not address the Debtors' or any Claim or Interest Holder's (or other stakeholder's) underlying business or financial decision to pursue the Plan (and any transactions contemplated thereby), the relative merits of the Plan and such transactions as compared to any alternative business or financial strategies that might exist for the Debtors or such Holders (or other stakeholders) or the effects of any other transaction in which the Debtors or such Holders (or other stakeholders) might engage; (ii) express no view or opinion as to (a) any term, aspect or implication of the Plan (including, without limitation, the form or structure of any transaction contemplated thereby) or any agreement, transaction document or instrument contemplated by the Plan or to be entered into or amended in connection with the Plan or (b) the fairness, financial or otherwise, of the Plan to, or of any consideration to be paid to or received by, the Holders of any Claim or Interest, creditors or other stakeholders of the Debtors or the Reorganized Debtors; (iii) express no view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable to or to be received by any of the Debtors or Reorganized Debtors' officers, directors or employees, or any class of such persons, in connection with the Plan relative to the consideration to be received pursuant to the Plan or otherwise; and (iv) do not constitute a solvency opinion, a fair value opinion or a liquidation analysis prepared in connection with the Chapter 11 Cases or any other purpose.

---

2   *Pro forma* funded net debt is calculated assuming $110 million of funded revolver draw (assuming a $1 million cash payment to the non-Worldwide General Unsecured Claims), $280 million of Tranche A-1 and Tranche A-2 Term Loans, $6 million in capital leases and $1 million of other debt less $10 million of estimated North American cash.

In the course of performing its various indicative financial analyses to assess the estimated Enterprise Value of Payless, Guggenheim Securities:

- reviewed the Restructuring Support Agreement;

- reviewed drafts of the Plan and Disclosure Statement, each dated as of June 5, 2017;

- reviewed certain business and financial information regarding the business and prospects of Payless (including financial projections for the fiscal years 2017 through 2021 (the "Projections")), all as prepared and provided to Guggenheim Securities by the Debtors' senior management and the Debtors' other advisors;

- discussed with the Debtors' senior management and the Debtors' other advisors (as applicable) their respective views of the business, operations, historical and projected financial results and future prospects of Payless, as well as the key assumptions related to the Projections;

- compared the financial performance of Payless with corresponding data for certain publicly traded companies that Guggenheim Securities deemed relevant in evaluating Payless;

- performed discounted cash flow analyses based on the Projections for Payless as furnished to Guggenheim Securities by the Debtors' senior management and the Debtors' other advisors; and

- conducted such other studies, analyses, inquiries and investigations as Guggenheim Securities deemed appropriate.

With respect to the information used in performing the indicative financial analyses described herein, Guggenheim Securities notes that:

- Guggenheim Securities relied upon and assumed the accuracy, completeness and reasonableness of all industry, business, financial, legal, regulatory, tax, accounting, actuarial and other information (including, without limitation, the Projections, other estimates and other forward-looking information) furnished by or discussed with the Debtors and their other advisors or obtained from public sources, data suppliers and other third parties.

- Guggenheim Securities (i) does not assume any responsibility, obligation or liability for the accuracy, completeness, reasonableness, achievability or independent verification of, and Guggenheim Securities did not independently verify, any such information (including, without limitation, the Projections and any other estimates and other forward-looking information), (ii) expresses no view, opinion, representation, guaranty or warranty (in each case, express or implied) regarding the reasonableness or achievability of the Projections, other estimates and other forward-looking information or the assumptions upon which they are based and (iii) relied upon the assurances of Payless' senior management that they were unaware of any facts or circumstances that would make such information (including, without limitation, the Projections and any other estimates or forward-looking information) incomplete, inaccurate or misleading.

3

- ▪ Specifically, with respect to (i) the Projections, any other estimates and any other forward-looking information furnished by or discussed with the Debtors and their other advisors, (a) Guggenheim Securities was advised by the Debtors' senior management, and Guggenheim Securities assumed, that such Projections, other estimates and other forward-looking information utilized in its analyses had been reasonably prepared on bases reflecting the best then-currently available estimates and judgments of the Debtors' senior management as to the expected future performance of Payless and the corporate income tax rates applicable to such Projections, other estimates and other forward-looking information and (b) Guggenheim Securities assumed that such Projections, other estimates and other forward-looking information had been reviewed by the Debtors' senior management with the understanding that such information would be used and relied upon by Guggenheim Securities in connection with performing the analyses described herein and (ii) any financial projections, other estimates and/or other forward-looking information obtained by Guggenheim Securities from public sources, data suppliers and other third parties, Guggenheim Securities assumed that such information was reasonable and reliable.

- ▪ Guggenheim Securities further assumed that (i) in all respects meaningful to its analyses, (x) the final executed form of the Plan and the Disclosure Statement will not differ from the drafts that Guggenheim Securities reviewed, (y) the Debtors will comply with all terms and conditions of the Plan, the Disclosure Statement and the Restructuring Support Agreement and (z) the representations and warranties of the Debtors contained in the Restructuring Support Agreement and the information in the Disclosure Statement are and shall at all times remain true and correct and all conditions to the obligations of each party to the aforementioned agreements and documents will be satisfied without any waiver, amendment or modification thereof; and (ii) the Plan will be consummated in a timely manner in accordance with its terms and the terms of the Restructuring Support Agreement and in compliance with all applicable laws, documents and other requirements, without any delays, limitations, restrictions, conditions, waivers, amendments or modifications (regulatory, tax-related or otherwise) that would have an effect on the Debtors in any way meaningful to Guggenheim Securities' analyses.

Guggenheim Securities did not perform or obtain any independent appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of the Debtors or any other entity and did not evaluate the solvency, the fair value or the liquidation value of the Debtors or any other entity under any relevant laws relating to bankruptcy, insolvency or similar matters.

Guggenheim Securities' professionals are not legal, regulatory, tax, consulting, accounting, appraisal or actuarial experts and Guggenheim Securities' analyses should not be construed as constituting advice with respect to such matters; accordingly, Guggenheim Securities relied on the assessments of the Debtors' senior management and the Debtor's other advisors with respect to such matters. The Debtors' senior management advised Guggenheim Securities that all tax-affected financial projections, other estimates and other forward-looking information reflect the current US federal corporate income tax regime pursuant to the Internal Revenue Code of 1986, as amended; Guggenheim Securities did not consider or analyze the impacts of any potential or proposed reform thereof in connection with its analyses. Guggenheim Securities did not express any view or render any opinion regarding the tax consequences to the Debtors', any Holders of

Claims or Interests or any of the Debtors' other stakeholders of the Plan becoming effective.

**Summary of Indicative Financial Analyses**

This "Summary of Indicative Financial Analyses" presents a summary of the principal indicative financial analyses performed by Guggenheim Securities in connection with assessing the Enterprise Value of Payless as described elsewhere herein.

Guggenheim Securities' indicative financial analyses, particularly those based on estimates and projections, are themselves estimates and are not assurances of actual values or actual future results, which may be significantly more or less favorable than suggested by these analyses.

In assessing the estimated Enterprise Value of Payless, Guggenheim Securities:

- based its indicative financial analyses on various assumptions, including assumptions concerning general business and economic conditions, capital markets conditions and industry-specific and company-specific factors, all of which are beyond the control of Payless and Guggenheim Securities;

- did not form a view or opinion as to whether any individual analysis or factor, whether positive or negative, considered in isolation, supported or failed to support its analysis; and

- ultimately arrived at its assessment based on the results of all of its indicative financial analyses assessed as a whole and believes that the totality of the factors considered and the various indicative financial analyses performed by Guggenheim Securities in connection with its assessment of estimated Enterprise Value of Payless operated collectively to support its assessment.

Guggenheim Securities employed two valuation methodologies (commonly used by investment bankers and other finance practitioners) to estimate the Enterprise Value of Payless: (i) Selected Public Company Analysis and (ii) Discounted Cash Flow Analysis.

*Selected Public Company Analysis*

Selected Public Company Analysis involves estimating a subject company's stand-alone fully distributed public market trading value based on both qualitative and quantitative reviews and analyses of the subject company versus certain publicly traded companies which are deemed to be reasonably comparable to the subject company. Among other things, such quantitative analyses typically include calculating various prevailing public market trading valuation multiples (based on various financial metrics considered appropriate given the subject company's and its peer group's industry or sector) and then assessing such public market trading valuation multiples in the context of both historical and projected/forecasted financial performance.

With respect to its Selected Public Company Analysis related to Payless, Guggenheim Securities notes that:

- None of the selected publicly traded companies used in the Selected Public Company Analysis is identical or directly comparable to Payless; however, such companies were

5

selected by Guggenheim Securities, among other reasons, because they represented publicly traded companies which may be considered broadly similar, for purposes of Guggenheim Securities' indicative financial analyses, to Payless based on Guggenheim Securities' familiarity with the global footwear retail industry.

- In any event, the Selected Public Company Analysis is not mathematical; rather, such analysis involves complex considerations and judgments concerning the differences in business, financial, operating and capital markets-related characteristics and other factors regarding the selected publicly traded companies to which Payless was compared.

*Discounted Cash Flow Analysis*

Discounted Cash Flow Analysis involves estimating a subject company's "intrinsic value" based on the sum of the present values of its (i) projected/forecasted annual unlevered after-tax free cash flows during an explicit projection/forecast period and (ii) terminal/continuing value beyond the explicit projection/forecast horizon. Guggenheim Securities typically estimates the subject company's terminal/continuing value by applying a range of assumed perpetual growth rates to the subject company's projected/forecasted normalized unlevered after-tax free cash flow in the terminal year. The present values of such projected/forecasted annual unlevered after-tax free cash flows and terminal/continuing value are then calculated by discounting them back to the present date based on the subject company's estimated weighted average cost of capital.

With respect to its Discounted Cash Flow Analysis of Payless, Guggenheim Securities notes that:

- Guggenheim Securities based its Discounted Cash Flow Analyses on the Projections for Payless as furnished to Guggenheim Securities by the Debtors' senior management and the Debtors' other advisors.

- As mentioned elsewhere herein, the Projections are subject to various uncertainties and contingencies that are difficult to predict and depend on various factors affecting the financial condition, financial performance and financial prospects of Payless (including, without limitation, general business and economic conditions, capital markets conditions and industry-specific and company-specific factors, all of which are beyond the control of Payless and Guggenheim Securities).

- Accordingly, the Projections and the Discounted Cash Flow Analysis are not necessarily indicative of actual outcomes or values, which may be significantly more or less favorable than as set forth in or implied by such Projections.

UNLESS OTHERWISE INDICATED HEREIN, THE FOREGOING INDICATIVE FINANCIAL ANALYSES ARE BASED ON THE PROJECTIONS AND ON MARKET DATA AS OF JUNE 2, 2017, REFLECT INFORMATION MADE AVAILABLE TO GUGGENHEIM SECURITIES AS OF OR PRIOR TO SUCH DATE AND ARE BASED ON ECONOMIC, CAPITAL MARKETS AND OTHER CONDITIONS AS OF SUCH DATE. ALTHOUGH THE FOREGOING INDICATIVE FINANCIAL ANALYSES MAY BE AFFECTED BY SUBSEQUENT DEVELOPMENTS, GUGGENHEIM SECURITIES ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING PAYLESS' ESTIMATED ENTERPRISE VALUE OR ESTIMATED EQUITY VALUE FOR ANY REASON, WHETHER

6

DUE TO FACTS, CIRCUMSTANCES OR EVENTS OCCURRING AFTER SUCH DATE OR
OTHERWISE.

**<u>Exhibit G</u>**

Restructuring Support Agreement (together with the Restructuring Term Sheet)

[No changes from version filed at Docket No. 376]

**<u>Exhibit H</u>**

Cash Incentive Plan Term Sheet

**Payless ShoeSource Inc.**
**2017 AIP Summary**

The Annual Incentive Plan for fiscal year 2017 (the "AIP") has the following key features:

| Key Terms of 2017 Annual Incentive Plan ("AIP") | |
|---|---|
| **Eligibility** | The 685 participants are broken out into the following 5 groups:<br>• Senior Leadership Team ("SLT"): 12 debtor participants (all insiders)<br>• Critical Retention Group ("CRG"): 87 debtor participants (4 insiders)<br>• Other AIP Participants - U.S. & Canada: 324 debtor participants (1 insider)<br>• Other AIP Participants - Asia: 27 debtor participants, 190 non-debtor participants (0 insiders)<br>• Other AIP Participants - Latin America: 45 non-debtor participants (0 insiders) |
| **Cost** | • Plan Cost<br><br>_(table below)_<br><br>• As shown above, the AIP includes a $1 million discretionary pool. Approval by the lenders is required for award amounts in excess of $50,000 or once cumulative awards exceed $500,000. |
| **Performance Metrics, Periods, & Goals** | SLT:<br>• EBITDA (50%): Annual<br>• Rent Concessions (25%): Through emergence<br>• Net Trade Payables (25%): Annual<br>CRG & Other AIP Participants:<br>• EBITDA (100%): Annual<br><br>_(table below)_ |
| **Payout Range** | SLT:<br>• Threshold: 25% of target (EBITDA only)<br>• Maximum: 150% of target<br>CRG:<br>• Threshold: 75% of target<br>• Maximum: 100% of target<br>Other AIP Participants:<br>• Threshold: 25% of target<br>• Maximum: 100% of target (150% for Latin America) |
| **Payout Floor** | SLT:<br>• No payout floor – 100% performance-based.<br>CRG:<br>• Threshold level is guaranteed if they remain employed through the applicable payment dates.<br>• Approximately 18 select members will be entitled to an Additional Retention Payment subject to a clawback requiring repayment upon voluntary termination within 2 years of the payment date.<br>Other AIP Participants (except Latin America):<br>• Threshold level is guaranteed if they remain employed through the applicable payment dates. |

Cost – Plan Cost:

| Group | Threshold | Target | Maximum |
|---|---|---|---|
| SLT | $ 537,712 | $ 4,301,696 | $ 6,452,544 |
| CRG | 3,115,453 | 3,930,604 | 3,930,604 |
| Other AIP Participants - U.S. & Canada | 1,631,729 | 6,526,914 | 6,526,914 |
| Other AIP Participants - Asia | 195,945 | 783,779 | 783,779 |
| Other AIP Participants - Latin America | 125,339 | 501,357 | 752,036 |
| Discretionary Pool | 1,000,000 | 1,000,000 | 1,000,000 |
| **Total** | **$ 6,606,177** | **$ 17,044,350** | **$ 19,445,877** |

Performance Metrics, Periods, & Goals:

| Goals ($MMs) | Threshold | Target | Maximum |
|---|---|---|---|
| EBITDA | $ 95.85 | $ 106.50 | $ 122.50 |
| Rent Concessions | n/a | Levels agreed to with the Board of Directors | |
| Net Trade Payables | n/a | | |

**Payless ShoeSource Inc.**
**2017 AIP Summary**

| Type & Timing of Compensation | SLT:<br>• Earned amounts will be paid in cash following the end of the fiscal year.<br>CRG:<br>• A certain portion of the Guaranteed Minimum Payments (35% of target) and the Additional Retention Payments will be paid in cash following emergence.  Remaining incremental earned or guaranteed amounts will be paid in cash following the end of the fiscal year.<br>Other AIP Participants:<br>• For U.S., Canada, and Asia only, a certain portion of the Guaranteed Minimum Payments (10% of target) will be paid in cash following emergence.  Remaining incremental earned or guaranteed amounts will be paid in cash following the end of the fiscal year.  For Latin America, earned amounts will be paid in cash following the end of the fiscal year. |
| --- | --- |

**Exhibit I**

New First Lien Term Loan Facility Term Sheet

**WBG – PSS Holdings LLC**
**Payless Inc.**
**Payless Finance, Inc.**
**Payless Shoesource, Inc.**
**Payless Shoesource Distribution, Inc.**

**EXIT FIRST LIEN TERM LOAN FACILITY**

**Summary of Proposed Terms and Conditions[1]**

- Principal:[2]

    o Tranche A-1 Term Loan: $80,000,000; and

    o Tranche A-2 Term Loan: $200,000,000.

- Interest:

    o Tranche A-1 Term Loan: LIBOR (1.00% floor)+8.00%, payable quarterly, in cash; and

    o Tranche A-2 Term Loan: LIBOR (1.00% floor) + 9.00% payable quarterly, in cash.

- Default Interest: 2%.

- Amortization:

    o Tranche A-1 Term Loan: 1.00% per year; 0.25% per quarter; and

    o Tranche A-2 Term Loan: 1.00% per year; 0.25% per quarter

- Fees:

    o Administrative Agent's Fee: (a) $35,000 payable in cash to the First Lien Exit Term Agent on the Closing Date (minus any unused or unearned portion of the Administrative Agency Fee payable in connection with the Term DIP Facility) and (b) $35,000 each anniversary thereof; and

    - Exit Fee:  To each Term DIP Lender, for itself, a fee (the "Exit Fee") equal to 2.50% of the amount of any relevant Borrowing (a) with respect to the Initial DIP Borrowing (i) earned on the date of the Final Order and (ii) due and payable on the Effective Date, and (b) with respect to any Subsequent DIP Borrowings (i) earned after the entry of the Disclosure Statement Order on the date such Subsequent DIP Borrowing is made and (ii) due and payable on the Effective Date; provided that if the Effective Date occurs, each Term DIP Lender agrees to convert the cash payment of such fee into New Equity on the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement Term Sheet or Term DIP Credit Agreement, as applicable.

[2] As set forth in the Restructuring Support Agreement Term Sheet, the size of the Tranche A-1 Term Loan shall be equal to the outstanding balance of the Term DIP Facility on the Effective Date.  The size of the Tranche A 2 Term Loan shall be $280 million less the amount of the Tranche A-1 Term Loan.

Effective Date. Notwithstanding anything to the contrary herein, if the Effective Date has not occurred, upon the DIP Termination Date, any such Exit Fee earned and not paid shall be payable immediately in cash on the DIP Termination Date.  For the avoidance of doubt, no Exit Fee shall be payable on any amount of the Final DIP Term Commitments that are not borrowed or any amounts that are borrowed substantially concurrently with the Effective Date.

- Prepayment premium:

  - Tranche A-1:

    - <u>Effective Date to First Anniversary of Effective Date</u>: No call;

    - <u>Through Second Anniversary of Effective Date</u>: 102%; and

    - <u>Through Stated Maturity</u>: 100%.

  - Tranche A-2:

    - <u>Effective Date to First Anniversary of Effective Date</u>:  No call.

    - <u>Through Second Anniversary of Effective Date</u>: 103%.

    - <u>Through Third Anniversary of Effective Date</u>: 102%.

    - <u>Through Fourth Anniversary of Effective Date</u>: 101%.

    - <u>Through Stated Maturity</u>: 100%.

- Maturity:

  - Tranche A-1 Term Loan: 3 years; and

  - Tranche A-2 Term Loan: 5 years.

- Mandatory Prepayments:

  - Mandatory prepayment in respect of 75% Excess Cash Flow with step downs at leverage ratios to TBD (commencing in FY 2018).

  - 100% of debt and asset sale proceeds with customary exceptions.

  - All prepayments applied first to Tranche A-1 until Tranche A-1 obligations are discharged and then to Tranche A-2.

- Financial Covenants:

  - Net Leverage TBD with step downs, measured quarterly (joint venture & store cash excluded from calculation).

  - Maximum Capital Expenditures, measured annually (unused may be carried forward 1 year)

- Other Covenants, Representations and Warranties, Events of Default, Expenses, Indemnity, Cost and Assignment as determined by the Requisite Consenting First Lien Lenders in their reasonable discretion.