## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | **Case No. 17-42267-659** |
|  | ) | **Chapter 11** |
| **PAYLESS HOLDINGS, LLC,** *et al.,*[1] | ) |  |
|  | ) | **Jointly Administered** |
|  | ) |  |
| Debtors. | ) | **Hearing Date:** June 14, 2017 |
|  | ) | **Hearing Time:** 10:00 a.m. |
|  | ) |  |
|  | ) |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DEBTORS' FIRST AMENDED DISCLOSURE STATEMENT, (II) FIXING DATES AND DEADLINES RELATED TO CONFIRMATION OF THE PLAN, (III) APPROVING CERTAIN PROCEDURES FOR SOLICITING AND TABULATING THE VOTES ON, AND FOR OBJECTING TO, THE PLAN, (IV) APPROVING THE RIGHTS OFFERING PROCEDURES, SUBSCRIPTION FORM AND AUTHORIZING THE RETENTION OF FINANCIAL BALLOTING GROUP LLC IN CONNECTION THEREWITH, AND (V) APPROVING THE MANNER AND FORM OF THE NOTICES AND OTHER DOCUMENTS RELATED THERETO**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Payless Holdings LLC [5704]; Payless Intermediate Holdings LLC [N/A]; WBG-PSS Holdings LLC [N/A]; Payless Inc. [3160]; Payless Finance, Inc. [2101]; Collective Brands Services, Inc. [7266]; PSS Delaware Company 4, Inc. [1466]; Shoe Sourcing, Inc. [4075]; Payless ShoeSource, Inc. [4097]; Eastborough, Inc. [2803]; Payless Purchasing Services, Inc. [3043]; Payless ShoeSource Merchandising, Inc. [0946]; Payless Gold Value CO, Inc. [3581]; Payless ShoeSource Distribution, Inc. [0944]; Payless ShoeSource Worldwide, Inc. [6884]; Payless NYC, Inc. [4126]; Payless ShoeSource of Puerto Rico, Inc. [9017]; Payless Collective GP, LLC [N/A]; Collective Licensing, LP [1256]; Collective Licensing International LLC [5451]; Clinch, LLC [9836]; Collective Brands Franchising Services, LLC [3636]; Payless International Franchising, LLC [6448]; Collective Brands Logistics, Limited [6466]; Dynamic Assets Limited [1978]; PSS Canada, Inc. [4969]; Payless ShoeSource Canada Inc. [4180]; Payless ShoeSource Canada GP Inc. [4182]; and Payless ShoeSource Canada LP [4179]. The location of Debtor Payless Holdings LLC's corporate headquarters and the Debtors' service address is: c/o Payless ShoeSource, Inc., 3231 SE 6th Avenue, Topeka, KS 66607, United States.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. PRELIMINARY STATEMENT ................................................................................1

II. BACKGROUND ..................................................................................................7

    A.    General ..............................................................................................7

    B.    The Proposed Plan and Disclosure Statement ........................................8

    C.    The Sponsor Claims and the Description of the Sponsor Claims in
the Disclosure Statement ..................................................................10

    D.    The Debtors' Investigation and the Disclosure Related Thereto.........13

    E.    The Committee's Investigation of the Sponsor Claims and the
Shaked Report..................................................................................16

III. DISCLOSURE OBJECTIONS ...........................................................................17

    A.    The Disclosure Statement Should Not Be Approved Because It
Does Not Contain Adequate Information as Required by Section
1125 of the Bankruptcy Code ...........................................................17

    B.    The Description of the Sponsor Claims, the Committee
Investigation, and the Independent Director Investigation is
Woefully Inadequate ........................................................................18

    C.    The Go-Forward Valuation Analysis Is Inadequate ...........................21

    D.    The Disclosure Statement Contains Inadequate Disclosure
Regarding the Projections and the Risks to the Plan and the
Business...........................................................................................23

    E.    The Liquidation Analysis is Inadequate.............................................24

    F.    The Disclosure Statement Contains Insufficient Information
Regarding Classification and Treatment of Claims and Impacts on
Creditor Recoveries..........................................................................26

    G.    The Disclosure Statement Contains No Disclosure Regarding the
Terms of the Management Equity Incentive Plan ...............................27

IV. THE PLAN IS NOT CONFIRMABLE ................................................................28

A.      Certain Solicitation and Tabulation Procedures Improperly
Disenfranchise Creditors ................................................................................ 31

V. RESERVATIONS OF RIGHTS ......................................................................... 34

VI. CONCLUSION ................................................................................................. 35

59102618.1

The Official Committee of Unsecured Creditors (the "Committee") of Payless Holdings, LLC ("Payless Holdings"), *et al.* (the "Debtors") hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Fixing Dates and Deadlines Related to Confirmation of the Plan, (III) Approving Certain Procedures for Soliciting and Tabulating the Votes On, and for Objecting to, the Plan, (IV) Approving the Rights Offering Procedures, Subscription Form and Authorizing the Retention of Financial Balloting Group LLC in Connection Therewith, and (V) Approving the Manner and Form of the Notices and Other Documents Related Thereto* [Docket No. 377] (the "DS Motion") and the *Disclosure Statement for the First Amended Joint Plan of Reorganization of Payless Holdings LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 978] (the "Disclosure Statement").[2]  In support of its Objection, the Committee respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT

1.      By the Debtors' own admission, the initial plan and initial disclosure statement were simply placeholders filed to meet the fast-track milestones contained in the prepetition Restructuring Support Agreement (the "RSA").  In an attempt to remedy the obvious deficiencies in their initial filings, the Debtors filed the current Disclosure Statement.  The amended Disclosure Statement fills in some blanks and adds 55 pages of new exhibits.

---

[2] Original versions of the Plan and Disclosure Statement were filed on April 25, 2017.  At the direction of the Court, corrected versions of the Plan and Disclosure Statement were filed on April 27, 2017 (at Docket Nos. 415 and 416) to include signatures for the Debtors' CFO, Michael Schwindle.  Certain typographical errors were also corrected with those filings.  The First Amended Joint Plan of Reorganization of Payless Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Amended Plan") was filed at Docket 979 on June 5, 2017.

59102618.1

Notwithstanding the volume of the pages added, the Disclosure Statement and the Amended Plan remain completely inadequate in critical respects.

2.      There are many serious flaws in the Disclosure Statement even as amended.  However, the most significant deficiency is one that cannot be remedied at this time no matter how many words or pages of exhibits are added.  ***Specifically, the Amended Plan proposes to grant broad releases of the Debtors' claims (the "*<u>Sponsor Claims</u>*") against two private equity firms – Golden Gate Capital and Blum Capital – and their affiliates or representatives, including the board of directors appointed by the Sponsors (collectively, the "*<u>Sponsor Group</u>*") for no consideration before the Debtors' investigation of the Sponsor Claims has been completed.***

3.      The Sponsor Group acquired the Debtors in October 2012 through a leveraged buyout (the "2012 LBO") which increased the Debtors' debt from approximately $125 million as of the fiscal year end immediately prior to the leveraged buyout to approximately $400 million.  After the 2012 LBO, the Sponsor group siphoned over $400 million out of the Debtors.  The Debtors' purportedly independent director (Charles Cremens) was appointed in January 2017 to conduct an investigation of this conduct.  Nearly six months later, Mr. Cremens has not "concluded" his investigation, and yet the Debtors propose to proceed with solicitation while that critical matter is unresolved.

4.      The Committee has accomplished in six weeks what Mr. Cremens has apparently been unable, *or unwilling*, to do in six months – reach a conclusion that the Sponsor Claims are valuable assets of these estates and must be pursued.  The Committee has shared the results of its investigation of the Sponsor Claims with the Debtors, Cremens, his counsel, key lender representatives and the Sponsor Group, including a 160-page expert report that was

2

prepared by Dr. Israel Shaked (the "Shaked Report")[3], the Committee's proposed expert consultant. The Committee has prepared a complaint asserting the Sponsor Claims and shortly will be filing a motion for standing to pursue claims against the Sponsors and others (including the Debtors' officers and directors who approved the massive dividends) on behalf of the estates.[4]

5.     Given the magnitude of the Sponsor Claims, creditors simply cannot cast an informed vote on the Plan based on the current disclosures. The Debtors attempt a "workaround" to the lack of any conclusions by Cremens by advising creditors asked to vote on the Plan to assume that there are no claims but at the same time say that Cremens may announce the results of his investigation after voting us underway.  That is unworkable. In order to consider the Plan and any alternatives to the Plan, creditors must be able to evaluate the impact on their recoveries if Cremens decides not to release the Sponsor Claims, or if this Court refuses to approve the proposed release or if the Committee's motion for standing is granted. Creditors need to understand the size of the Sponsor Claims (which the Committee believes to be in the hundreds of millions of dollars), the nature of the specific causes of action that would be asserted in connection therewith, who would control the prosecution of the Sponsor Claims post-confirmation, how such prosecution would be funded, which creditors would be beneficiaries of the recovery on account of such claims and how a hypothetical recovery on account of those potentially massive claims would impact the distributions to creditors and the liquidation analysis. Moreover, against the backdrop of Cremens' indecisiveness, the outcome of the Committee's investigation determining that viable claims exist should be fully disclosed, including the conclusions in the Shaked Report.

---

[3] Subject to Court approval, the Shaked Report will be filed under seal as Exhibit "A" to this Opposition.

3

6.      The Debtors also fail to disclose the nature and extent of the relationships between Cremens, the "independent" director, and one of the Sponsor Parties – Golden Gate Capital.  These facts are germane to the credibility of that report, as is the fact that Cremens apparently did not engage a financial expert as the Committee did to evaluate the nature of the claims against the Sponsors.

7.      Rather than providing the required disclosure, the Debtors instruct creditors as follows:  "[f]or purposes of voting on the Plan, Holders should vote as if the Debtor Release is being granted," *Disclosure Statement* at p. 22.  Notwithstanding the directive to creditors to vote based on the assumption that the Sponsor Claims will be released, the Debtors reserve the right to change their minds at any time.  This is not acceptable.  Disclosure regarding the ***actual*** treatment of the Sponsor Claims is critical inasmuch as the Debtors' claims against the Sponsor Group and other parties are unencumbered and may provide the only source of meaningful recovery for certain classes of general unsecured claims in these chapter 11 cases.

8.      Until the Debtors decide to stake out a position on the Sponsor Claims, they cannot provide this critical disclosure.  Without it, creditors cannot be asked to vote on the Plan, and the Disclosure Statement should not be approved.

9.      In addition to the defective disclosure regarding the Sponsor Claims, the Disclosure Statement contains the following deficiencies:

- The Valuation Analysis is incomplete (Exhibit A).

- The Projections are based on overly optimistic assumptions and the Disclosure Statement contains no discussion of the risks associated with any failure of the Debtors to perform in accordance with key assumptions (Exhibit B).

---

[4] Subject to Court approval, at the Debtors' request, the motion for authority to sue and the complaint will be filed under seal and kept under seal for a period of 10 days unless otherwise agreed.

4

- Even though the Plan does not provide for substantive consolidation, the liquidation analysis is presented on a partially consolidated basis and is missing critical information that would enable creditors to review and evaluate the analysis.  Among other things, the Liquidation Analysis completely ignores the Sponsor Claims (Exhibit C).

- The description of the treatment of Class 5A creditors provides for a different recovery  "if Class 5A votes to accept the Plan" or "Class 5A votes to reject the Plan" but there is no description or explanation of what happens if Class 5A of some entities accept the Plan and Class 5A of other entities do not accept the Plan.  The "lumping" of consideration across estates is *de facto* substantive consolidation without any disclosure or discussion of the justification for such consolidation

- The Disclosure Statement fails to provide any information regarding the basis for the Worldwide New Equity Recovery of 2.9% of the New Equity and is misleading in its statement this treatment represents a *pro rata* distribution of distributable unencumbered value.  In addition, because the amount of the MEIP and the exit fees which dilute the Class 5B recoveries are not disclosed, creditors cannot tell what they are receiving.

- The Disclosure Statement contains insufficient details regarding the terms of the Management Equity Incentive Plan.

- The Disclosure Statement contains no breakdown of assets and liabilities of the separate Debtors that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

- The Claims estimates are also presented on a consolidated basis except as to Class 5B.  Inasmuch as the Claims Bar Date has not yet passed, the claims estimates could be understated.

- There is no description of each of the Debtor entities, their purpose, the corporate structure, intercompany claims and how the Debtors propose to transfer funds by and among the entities to fund obligations under the Plan.

- No disclosure as to the relationship between the Debtor entities and why there should not be substantive consolidation of certain Debtors for Plan or operating purposes.

- There is no information to allow creditors to evaluate the Rule

5

9019 settlement incorporated into the Plan, as the words of Rule 9019 are invoked but there is simply no description of what is being settled and on what terms.

- The DS Motion seeks (in the title of the DS Motion) approval of procedures related to a rights offering but the Motion itself and the Plan and Disclosure Statement do not provide any details about the proposed rights offering.  (The Committee raised this in its preliminary objection and curiously the Debtors did nothing to correct this curious and confusing reference to a rights offering.)

- The Solicitation Package should include a letter from the Committee (in the form of Exhibit "B" attached hereto), regarding the Committee's recommendation that creditors vote against the Plan.

10.     Furthermore, the Plan is unconfirmable because, among other things, it is not feasible, fails the "best interests of creditors" test, unfairly discriminates against certain classes of unsecured creditors, provides for a partial substantive consolidation with no justification, includes improper third party releases, and is not proposed in good faith.

11.     Based on the foregoing and as set forth more fully below, the Court should deny approval of the Disclosure Statement unless and until the defects described herein are corrected.

## II.

## BACKGROUND

A.    **General**

12.    On April 4, 2017 (the "Petition Date"), each of the Debtors filed a

voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are

operating their businesses and managing their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed

in these cases.

13.    On April 14, 2017, the Office of the United States Trustee appointed the

Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of: (i)

Moda Shoe, Ltd.; (ii) Qingdao Doublestar Mingren Imp. And Exp. Co.; (iii) C and C Accord,

Ltd.; (iv) The Asean Corporation, Ltd.; (v) GGP Limited Partnership; (vi) Simon Property

Group, Inc.; and (vii) Brixmor Property Group, Inc.

14.    On May 17, 2017, the Court entered the *Final Order (I) Authorizing the

Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral,

(III) Granting Liens and Providing Superpriority Administrative Expenses Status, (IV) Granting

Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and

(V) Granting Related Relief* [Docket No. 778] (the "Final DIP Order").  The Final DIP Order

memorializes the resolution of concerns raised by the Committee.  It provides, among other

things, that certain of the estates' causes of action, including those relating to the 2012 LBO and

Dividend Recaps (each as defined below) remain unencumbered.

B.      **The Proposed Plan and Disclosure Statement**

15.     On April 4, 2017, the Debtors entered into the RSA.  The Debtors also secured the DIP Facilities from their Prepetition ABL Facility Lenders and certain of the consenting lenders under the RSA.  The intent of the RSA, coupled with the DIP, plainly was to put the Debtors irrevocably on course for confirmation of the Plan that would, *inter alia*, hand over ownership of the Company to the term lenders and provide for gratuitous releases of the Sponsors and all past and present officers and directors, agents, attorneys, etc.  Not surprisingly, general unsecured creditors had no input on the terms of the RSA prepetition and were presented with the transactions contemplated therein upon the filing of the Debtors' bankruptcy cases as a done deal with virtually no ability to negotiate meaningful improvements of the treatment to general unsecured creditors.

16.     On April 25, 2017, the Debtors filed with this Court their proposed plan of reorganization [Docket No. 415] as amended on June 6, 2017 [Docket No. 978] and the accompanying Disclosure Statement.  The Debtors have not sought to assume the RSA.  The Debtors conclude that they "believe that the terms of the Restructuring Support Agreement, which are built into the Plan, are fair, equitable, and maximize the value of the Debtors' estates, providing the best available recovery for the Debtors [sic] stakeholders." *Disclosure Statement* at 16.

17.     The Plan is a debt-for-equity plan, which essentially provides the following:

        a.      ABL DIP Claims will be paid in full from proceeds of  a
                replacement revolving exit financing credit facility which together
                with cash on hand, will finance the repayment of the ABL DIP
                Claims.

8

b.   Holders of the Term DIP Facility Claims will receive, on a dollar-for-dollar-basis, their pro rata share of the New First Lien Term Loan A-1 Tranche.

c.   First Lien Term Lenders' claims are allowed in the amount of $506.3 million and holders thereof will receive their pro rata share of 91% of the new equity of the Reorganized Debtors (the "New Equity"), subject to reduction by the equity recovery to holders of unsecured claims against Payless ShoeSource Worldwide ("Worldwide"), and subject to dilution from (a) the management equity incentive plan (6-10% of the New Equity on a fully diluted basis) (the "MEIP"), and (b) the exit commitment fee (which is New Equity of a value equal to 2.5% of the amount of the Term DIP Facility as of the Effective Date).  Holders of such claims also will receive a pro rata share of the New First Lien Term Loan A-2 Tranche.

d.   Second Lien Term Lenders' claims are allowed in the amount of $145 million and holders thereof will receive on account of such claims (which include the unsecured deficiency portion of such claims) the remaining pro rata share of 9% of the New Equity (subject to dilution from the MEIP and the exit commitment fee).

e.   The Debtors propose three different classifications and disparate treatment for general unsecured claims, as follows:

- Other General Unsecured Claims (Class 5A) consist of unsecured claims against one or more of the Debtors other than Worldwide General Unsecured Claims, or Canadian General Unsecured Claims.  The Plan contains a "death trap provision" in that it provides that those creditors will receive a *pro rata* share of the Other General Unsecured Claims Recovery Pool, which is $1,000,000 if the class accepts the Plan and $250,000 if the class rejects the Plan.

- Worldwide General Unsecured Claims (Class 5B) consist of unsecured claims against Worldwide.  The Plan provides alternative treatment depending on whether the holder of a Worldwide claim has made an election (*i.e.*, the Worldwide GUC Cash-Out Election) to receive cash on account of the holder's claim or a pro rata share of the Worldwide New Equity Recovery.  If the holder does not make the Worldwide GUC Cash-Out Election, the holder will receive its pro rata share of 2.9 % of New Equity (subject to dilution from the MEIP and the exit commitment fee).  The Worldwide GUC Cash-Out Option Payment is defined as cash payment no less than the lesser of 50% of the value of

9

the Worldwide New Equity Recovery a Holder would otherwise have been entitled to receive had it not made a Worldwide GUC Cash-Out Election and (b) such Holder's Pro Rata share of $3.66 million.

- <u>Canadian General Unsecured Claims</u> (Class 5C) are general unsecured claims against Payless ShoeSource Canada, Inc., Payless ShoeSource Canada GP Inc., and Payless ShoeSource Canada, LP and will be reinstated and rendered unimpaired.

f.    Intercompany claims held by a Debtor against another Debtor or affiliate of a Debtor or by an affiliate of a Debtor against a Debtor will be canceled, reinstated or compromised in the Debtors' determination with the consent of the requisite consenting lenders. In other words, the Debtors have retained complete optionality with respect to these claims and, as set forth below, fail treat them appropriately.

g.    The Plan includes broad releases by the Debtors of various parties (the "<u>Released Parties</u>") which include the Debtors, current and former officers and directors, Prepetition First and Second Lien Lenders and Agents, other lenders and agents, Sponsors (defined as Golden Gate Capital Inc. and Blum Capital Partners including each such entity's current and former Affiliates who own Equity in the Debtors), parties to the RSA and all successors, assigns, principals, members, shareholders, etc. of the foregoing entities.

h.    The Plan also provides for Third Party Releases of the Released Parties along with the Debtors, the "Releasing Parties" include the lenders, the Sponsors, holders of claims and interests (a) who vote in favor of the Plan, (b) are deemed unimpaired and presumed to accept the Plan, or (c) do not expressly opt out of the releases. The Plan provides no consideration for the releases and the Disclosure Statement provides **no** analysis whatsoever of the nature, extent or value of the claims that are proposed to be released or the justification for creditors to be required to give the third party release in order to accept the Plan.

C.    **The Sponsor Claims and the Description of the Sponsor Claims in the Disclosure Statement**

18.    In May 2012, Collective Brands, Inc. split into two groups of companies: (i) Payless Inc. and subsidiaries (*i.e.*, the Debtors); and (ii) a group of subsidiaries that were sold to Wolverine World Wide Inc. Payless Inc. was acquired by Golden Gate Capital ("<u>Golden</u>

Gate") and Blum Capital ("Blum").  In order to fund the acquisition, the Debtors incurred $382

million of new debt.  In connection with the 2012 LBO, the Debtors' ownership was rearranged

such that Payless Holdings became the ultimate parent of Payless Inc., and Golden Gate and

Blum held the membership interests in Payless Holdings.  In addition, the Debtors entered into

an advisory agreement with Golden Gate and Blum pursuant to which Golden Gate and Blum

have been paid millions of dollars in fees.

          19.      The majority of the Sponsor Claims arise out of two pre-petition dividend

recapitalizations ("Dividend Recaps") which took place shortly after the 2012 LBO, the

cumulative effect of which was to increase the Debtors' secured debt burden from $382 million

in October 2012 to $838 million at the Petition Date, with no corresponding benefit to the

Debtors as all of the increased debt proceeds were paid out as dividends to the Sponsors.  First,

in February 2013, just over four months after acquiring the Debtors in the 2012 LBO, the

Sponsor Group caused the Debtors to incur an additional $225 million of secured debt.  All of

the proceeds from that transaction were paid to the Sponsor Group as special dividends in

February 2013, with an additional $15 million of the Debtors' cash paid as fees to close the 2013

transaction.  At least one member of the Sponsor Group was a lender in the 2013 dividend

recapitalization.  Thus, in effect, the Sponsor Group (i) caused the Debtors to borrow $225

million, and then immediately took that $225 million back from the Debtors, (ii) imposed

obligations on the Debtors to repay the $225 million (again) to the Sponsor Group and the other

lenders, which obligations were guaranteed and secured by the Debtors' assets, and (iii) required

the Debtors to pay approximately $15 million of the Debtors' cash for the privilege of lining the

Sponsor Group's pockets.  As of the closing of the 2013 transaction, the Sponsors had put in

11

$200 million of new money while they took out $225 million. But that was not the end of the siphoning of cash.

20.    The second dividend recapitalization occurred in 2014, approximately one year after the 2013 transaction.  In March 2014, the Sponsor Group once again forced the Debtors to incur additional secured debt (styled as second lien term debt) to fund another special dividend and other payments to the Sponsor Group.  The secured debt incurred by the Debtors in the 2014 transaction was used (i) to fund a $127 million special dividend to the Sponsor Group, (ii) to refinance the Debtors' existing term loan indebtedness, all of which had been incurred for the benefit of the Sponsor Group, and (iii) to pay approximately $14 million in fees to the Sponsor Group and other parties.  As with the 2013 transaction, the Debtors received nothing of value in connection with the 2014 transaction, and the depletion of their coffers put the company on a dangerous path that ultimately led to this instant bankruptcy filing.

21.    The Sponsor Claims are unencumbered under the Final DIP Order and would be available to satisfy unsecured claims absent the Debtors' proposed release of such claims under the Plan.

22.    The description of the Sponsor Claims in the Disclosure Statement consists simply of five lines in the middle of page 21.   In an attempt to gloss over the significance of these claims, the Debtors simply describe them as:

> [d]ividends paid by certain of the Debtors on February 28, 2013 and March 10, 2014 ("Dividends"), the 2012 acquisition of Payless by the Sponsors, and the management and transaction fees paid to the Sponsors under that certain Advisory Agreement dated as of October 9, 2012 among certain of the Debtors, GGC Administration, LLC and Blum Capital Partners (collectively with the Dividends, the "Transactions").

12

Given the magnitude these claims could have on creditor distributions were they not to be

gratuitously released, the omission of any further description of the claims that may arise

from these transactions – against the Sponsors, the Board of Directors, and third parties –

the lack of any further explanation of the facts and circumstances surrounding the

Dividends is a glaring omission in the Disclosure Statement that must be rectified.

Tellingly, after this defect was pointed out by the Committee in its preliminary objection,

the Debtors still provide no meaningful disclosure about this matter, and the Disclosure

Statement should not be approved until they provide a meaningful discussion of the

Sponsor Claims and other claims arising out of the dividend transactions.

D.     **The Debtors'**
       **Investigation and the Disclosure Related Thereto**

           23.     The Debtors assert in the Disclosure Statement that Cremens is

independent and is conducting a full and complete investigation of the Sponsor Claims.  The

Disclosure Statement includes a little over one page describing the six month investigation which

according to the Debtors "has not been concluded at this time."  However, there are a number of

"red flags" regarding that investigation that draw into question its thoroughness and

independence, which should be fully disclosed, including the following:

> • According to the Debtors, Cremens has extensive experience as an
> "independent or disinterested" director for financially distressed
> companies. The Disclosure Statement lists a number of these relationships.
> Disclosure Statement at p. 21.  However, the Debtors fail to list a number
> of other relationships with key parties in these cases that the Committee
> believes has a direct impact on Cremens' objectivity and disinterestedness.
> Among other things, Cremens has extensive ties to at least one member of
> the Sponsor Group (Golden Gate Capital).  For instance, (i) Cremens has
> served on the boards of Aspect Software and/or Bluestem Group with at
> least three managing directors of Golden Gate Capital, (ii) Aspect
> Software is owned in part by Angel Island Capital, an affiliate of Golden
> Gate Capital that currently holds part of the Debtors' term loan debt, (iii)
> Cremens was on the board of Conexant Systems, which was acquired by

13

an affiliate of Golden Gate Capital, and (iv) Cremens was on the board of Tactical Holdings, which is a portfolio company of Golden Gate Capital. These facts, if disclosed, would alert creditors that the investigation may not be as "independent" as the Debtors profess it to be.

- The Debtors did not obtain tolling agreements from Golden Gate Capital and Blum Capital with respect to the certain statute of limitations that may apply to claims against Golden Gate Capital and Blum Capital, nor did the Debtors obtain tolling agreements from their directors and officers with respect to breach of fiduciary duty statute of limitations. The Debtors offer no explanation how or why they failed to preserve all of the possible claims.

- Cremens has not retained an independent expert to evaluate the key issue of whether the Debtors were solvent at the times of the 2013-2014 Dividend Recaps and that Cremens is relying solely on the Debtors' financial advisors. Moreover, the retention applications for the Debtors' financial advisors do not disclose that they have been tasked with evaluating the Debtors' solvency in 2013-2014.

- Critically, the discussion of the Independent Director Investigation fails to state that the Debtors' financial advisors have not analyzed the Debtors' solvency in 2013-2014. Instead, the Debtors' financial advisors are evaluating solvency opinions prepared in 2012, 2013 and 2014 by Duff & Phelps LLC ("D&P").

24.    The Disclosure Statement does not disclose that the D&P analyses, upon which the 2012 LBO and the 2013 and 2014 Dividend Transactions were premised, are questionable for at least the following reasons:

- D&P was retained by the Sponsor Group in 2012, and itself has significant ties to Golden Gate that draw into question its independence. For instance, the opinions prepared by D&P stated that "during the two years preceding the date of this Opinion, Duff & Phelps has been engaged to provide valuation services and render solvency opinions for several other companies that are affiliates of Golden Gate Private Equity, Inc., and may do so in the future. During the years from 2010 to the present, D&P frequently provided solvency opinions for Golden Gate with respect to companies owned by Golden Gate Capital and earned substantial fees for providing these solvency opinions.

- The Debtors state in a conclusory way that the "investigation has included an evaluation of the work of Duff & Phelps" and that they are "evaluating external factors that potentially bear on the reasonableness of the prior solvency determinations by Duff & Phelps or the Board. *Disclosure*

14

*Statement* at p.21.  These statements are misleading in that factors that arose after the 2013-2014 transactions – e.g., the market conditions and other issues in 2015 and 2016 cited in the Debtors' first day declaration [Docket No. 34] – have no bearing on the Debtors' solvency in 2013 and 2014.  *See Mellon Bank, N.A. v. Official Comm. Unsecured Creditors*, 92 F.3d 139, 154 (3d Cir. 1996) ("For purposes of § 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time….The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike."); *CitiMortgage, Inc. v. Chi. Bancorp, Inc.*, 2016 U.S. Dist. LEXIS 87215, at *29 (E.D. Mo. July 6, 2016) (assessing the debtor's solvency "at the time of the transfers" with respect to a claim asserted under the UFTA); *In re Commercial Fin. Servs.,* 350 B.R. 520, 541 (Bankr. D. Okla. 2005) ("[f]or the purpose of a solvency analysis,…assets and liabilities must be valued based upon information known or knowable as of the date of the challenged transfer").

- As noted in the Shaked Report, D&P relied without question on projections provided by the Debtors' management, which included members of the Sponsor Group. D&P has been criticized in the past for relying on management's information and projections.  In the chapter 11 case of  *In re Caesars Entertainment Operating Company, Inc., et al.,* Case No. 15-01145 (ABG) (Bankr. N.D. Ill.), the appointed examiner concluded in his final report (the "Caesars Report") that D&P's valuation opinion was "not definitive or entitled to great weight" because (among other reasons) D&P relied on projections provided by management, which were based "in large part" on information provided by an individual who – like the Sponsor Group and certain members of the Debtors' management in this case – expected to benefit from the proposed transactions.  Caesars Report [Docket No. 3720-3] at p. 262.  The Caesars Report also criticized numerous mistakes in D&P's opinion in that case.  *See* Caesars Report at p. 578 (D&P used wrong multiples, made incorrect deductions, erroneously included assets, and failed to consider relevant facts).

25.     Moreover, the D&P Reports are fundamentally flawed.  Of critical importance here, Dr. Shaked – like the examiner in *Caesars* – has identified numerous errors and other flaws in D&P's solvency opinions used to support the 2012 LBO and the Dividend Transactions.  Those errors and other flaws are explained in extensive detail in the Shaked Report which is being filed with the Court under seal and include a) double counting of cash flows resulting in overstatement of enterprise value in the 2014 report by almost $80 million, b) unreasonably optimistic projected revenue growth rates, c) unreasonable projections regarding

15

increases in EBITDA margins, d) unreasonably low discount rates, e) flawed selection of

"comparable" companies and transactions and f) failure to undertake appropriate sensitivity

analyses.   The Disclosure Statement should disclose that the Committee's expert believes that

D&P's solvency opinions are fundamentally flawed and unreliable, and that the Committee's

expert, who is independent, has concluded that the 2013 and 2014 Dividend Transactions by

which the Sponsors took out over $350 million left Payless insolvent, such that there are viable

claims to recover that money for the benefits of the estates and creditors who are being offered

less than one cent on the dollar under the Plan.


E.     **The Committee's Investigation of the
       <u>Sponsor Claims and the Shaked Report</u>**

26.     Since its formation, one of the most pressing tasks of the Committee has

been the investigation of the Sponsor Claims.  In connection therewith, the Committee engaged

one of the nation's foremost valuation experts – Dr. Israel Shaked and the Michel-Shaked Group

as an expert witness.  Dr. Shaked worked closely with the Committee professionals to analyze

the Sponsor Claims and produced the 160-page Shaked Report which has been provided to

counsel for the Debtors, Cremens, certain Term Loan Lenders, and the Sponsor Group, and to

the Court under seal.  In the Shaked Report, Dr. Shaked has concluded (among other things) that

(i) as of February 27, 2013, immediately following the 2013 dividend recapitalization, the

Debtors' equity value was negative by a substantial margin, and therefore the Debtors were

insolvent, (ii) as of March 10, 2014, immediately following the 2014 dividend recapitalization,

the Debtors' equity value was negative by an even more substantial margin, and therefore the

Debtors were insolvent and (iii) the Debtors were insolvent at all times after the 2013 and 2014

dividend recapitalizations.

16

59102618.1

27.     In light of the findings in the Shaked Report, the Committee believes that

the Debtors' have claims against the Sponsor Parties and others for fraudulent conveyance,

illegal dividends, breach of fiduciary duty and other state law causes of action related to the 2013

and 2014 dividend recapitalizations and related transactions that if pursued could provide robust

recoveries to general unsecured creditors offered only a token recovery under the Plan in

violation of the best interest of creditors confirmation requirement.

## III.

## DISCLOSURE OBJECTIONS

**A.     The Disclosure Statement Should Not
Be Approved Because It Does Not Contain Adequate
Information as Required by Section 1125 of the Bankruptcy Code**

28.     The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy

Code in numerous material respects.  Section 1125(b) of the Bankruptcy Code requires that a

proponent of a plan and disclosure statement demonstrate that the disclosure statement includes

"adequate information" for creditors and other parties in interest to make an informed judgment

about the plan.  In determining whether a plan proponent has provided "adequate information" to

creditors and parties in interest, the standard is not whether the failure to disclose information

would harm creditors but whether "hypothetical reasonable investors receive such information as

will enable them to evaluate for themselves what impact the information might have on their

claims and on the outcome of the case, and to decide for themselves what course of action to

take." *In re Applegate Prop., Ltd.,* 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).  Significantly,

even if more thorough disclosure would not have affected an objecting creditor's vote, that

creditor still has standing to object because inadequate disclosure may have induced other

creditors to approve the plan.  *Everett v. Perez (In re Perez),* 30 F.3d 1209, 1217 (9th Cir. 1994).

For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a

17

disclosure statement sets forth "all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986; *In re Ferretti,* 128 B.R. at 19 (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution.").

29.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote.  *See In re Phoenix Petroleum Co.,* 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (*citing In re Monroe Well Serv., Inc.,* 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); *see also* 11 Collier on Bankruptcy, 1125.03[1] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

30.     Here, as set forth below, the Disclosure Statement omits basic information about matters of primary concern to creditors.  Absent such disclosures, creditors have not been provided with "adequate information" to make an informed decision as to whether to accept or reject the Plan.

**B.     The Description of the Sponsor Claims, the Committee Investigation, and the Independent Director Investigation is Woefully Inadequate**

31.     Creditors cannot cast an informed vote on the Plan based on the current disclosures.  In order to consider the Plan and any alternatives to the Plan, creditors must be able to evaluate the impact on recoveries if Cremens decides ***not*** to release the Sponsor Claims, or if this Court refuses to approve the proposed release, or if the Committee's motion for standing to prosecute the Sponsor Claims and other claims is granted.  As set forth above, the five line generic description of the Sponsor Claims is completely lacking.  Moreover, creditors need to

18

59102618.1

understand the size of the Sponsor Claims, the nature of the specific causes of action that would

be asserted in connection therewith, who would control the prosecution of the Sponsor Claims

post-confirmation, how such prosecution would be funded, which creditors would be

beneficiaries of the recovery on account of such claims and how a hypothetical recovery on

account of those claims would impact the distributions to creditors and the liquidation analysis.

The outcome of the Committee investigation should be fully disclosed, including the conclusions

in the Committee's expert report and the deficiencies the Committee's expert noted in the D&P

valuations.   The Debtors must also disclose the nature and extent of the relationships between

Cremens, the "independent' director, and one of the Sponsor Parties – Golden Gate, and the fact

that the Cremens investigation effort suffers from material flaws.

32.    It is untenable to ask creditors to vote on a Plan while the Debtors

withhold judgment on the release of the Sponsor Claims and other significant claims arising out

of the 2012 LBO and the Dividend Transactions to some unspecified date in the future while

voting is underway.  Until the Debtors take a position on the Sponsor Claims, they cannot

provide this critical disclosure, and without it the Disclosure Statement should not be approved.

33.    Applicable law regarding plan releases underscores the glaring

deficiencies in the Debtors' minimal disclosures.  In *In re Master Mortgage Investment Fund,*

*Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), the court cited the following five factors to consider

with respect to determining the propriety of releases under a plan:

> 1.    There must be an identity of interest between the
> debtor and the third party such that a suit against the
> third party is, in essence, a suit against the debtor or
> will deplete assets of the estate;
>
> 2.    The third party must contribute "substantial assets"
> to the reorganization;

19

3.    The injunction is essential to reorganization.
Without it, there is little likelihood of success;

4.    A substantial majority of the creditors agree to such
injunction, specifically, the impacted class, or
classes, has overwhelmingly voted to accept the
proposed plan treatment; and

5.    The plan must provide for payment of all or
substantially of the claims of the classes affected the
third party release.

None of the *Master Mortgage* requirements are satisfied by the information provided in the

Disclosure Statement.

34.    Adding insult to injury, the Plan proposes that all unreleased causes of

action (which would include preference actions against general unsecured creditors) will be

retained by the Reorganized Debtors, such that the proceeds of such claims will inure only to the

benefit of existing lenders as the new owners of the Reorganized Debtors.  To make matters

more confusing and misleading, the Disclosure Statement indicates in boilerplate fashion that:

> The Plan shall be deemed a motion to approve the good-
> faith compromise and settlement of all such Claims,
> Interests, Causes of Action, and controversies pursuant to
> Bankruptcy Rule 9019, and the entry of the Confirmation
> Order shall constitute the Bankruptcy Court's approval of
> such compromise and settlement under section 1123 of the
> Bankruptcy Code and Bankruptcy Rule 9019, as well as a
> finding by the Bankruptcy Court that such settlement and
> compromise is fair, equitable, reasonable, and in the best
> interests of the Debtors and their Estates.

*Disclosure Statement* at 30.

35.    While readers are left to guess why there is any reference to a compromise

and settlement under Bankruptcy Rule 9019, presumably the Debtors are invoking Bankruptcy

Rule 9019 to justify the proposed releases, but there is **no** description whatsoever of the Causes

of Action that are being "settled" as opposed to released, what the consideration is, or any facts

to satisfy the typical Bankruptcy Rule 9019 factors, including, but not limited to, why the releases are in the best interests of the general unsecured creditors who stand to receive an inconsequential recovery under the Plan.   This disclosure falls far below the "adequate information" requirement of section 1125 of the Bankruptcy Code.

## C.    **The Go-Forward Valuation Analysis Is Inadequate**

36.    Valuation is a key issue in these cases, retrospectively in the case of evaluating the merits of the Sponsor Claims, and prospectively in terms of the Plan's proposed distribution of reorganized equity to creditors.   In regard to the latter, the initial Disclosure Statement had **no** valuation analysis in it at all.   The amended Disclosure Statement includes a document titled "Estimation of Payless' Enterprise Value" but that document provides very little information and virtually no disclosure of key assumptions that would permit a creditor to understand and evaluate the reasonableness of the analysis.   The Debtors indicate that "Guggenheim Securities' estimate of the Enterprise Value of Payless is a range between $580 and $700 million, with a midpoint of $640 million."   The Debtors also disclose that Guggenheim Securities employed two commonly used valuation methodologies, the Selected Public Company Analysis and the Discounted Cash Flow Analysis.   Thereafter, the Disclosure Statement only explains how each of the two analyses function *theoretically* while failing to provide the *actual* analyses as applied to these cases including the underlying assumptions.   As such, the conclusory information provided is insufficient for creditors and other parties in interest to make an informed judgment about the reasonableness of the valuation.   In order to properly assess the reasonableness of the estimate of the Enterprise Value of Payless, the Debtors must disclose the critical assumptions underlying each valuation methodology, as well as the weighting applied to each methodology in obtaining the final valuation range.

21

37.     With respect to the Selected Public Company Analysis, the Debtors offer it up but remarkably have failed to provide the set of comparable companies that were used in the analysis or the public market trading valuation multiples chosen, each of which could have a material impact on the valuation range produced by this methodology.  In assessing whether the valuation range produced by the Selected Public Company Analysis is reasonable, creditors and other parties in interest should be given the opportunity to assess the comparability of each company selected as part of the analysis.  If the companies ultimately selected in the Debtors' analysis are not reasonably comparable, this valuation methodology may need to be discarded altogether, or alternatively, given a smaller weighing in the final valuation range.

38.     Similarly, with respect to the Discounted Cash Flow Analysis, the Debtors have provided no detail as to any of the underlying assumptions other than the fact that "Guggenheim Securities based its Discounted Cash Flow Analyses on the Projections for Payless as furnished to Guggenheim Securities by the Debtors' senior management and the Debtors' other advisors."  Any valuation range produced by a Discounted Cash Flow Analysis, however, is highly dependent on its underlying assumptions.  Specifically, the resulting valuation is especially dependent on assumptions incorporated into the calculation of the weighted average cost of capital ("WACC").  The WACC in and of itself is composed of numerous assumptions, including, but not limited to: (i) the risk-free rate, (ii) the equity market risk premium, (iii) beta, (iv) the size premium, and (v) the target capital structure. Changes to any of these underlying assumptions will produce changes in the WACC, which may materially change the estimate of the Enterprise Value.

39.     Both valuation methodologies also suffer from that fact that they inherently rely on the Debtors' financial projections, which appear to be overstated.  As set forth

22

in Section D, the Debtors' financial projections assume a meaningful turnaround of North American Brick & Mortar segment, which over the last couple of years has deteriorated.

40.     The Debtors have also failed to provide a breakdown of Enterprise Value across its reporting segments.  This disclosure is necessary to properly evaluate the reasonableness of the recovery to holders of unsecured claims against Payless ShoeSource Worldwide.  As certain of the Debtors' direct and indirect foreign subsidiaries are subject to only 65% equity interest pledges for the benefit of the Prepetition Lenders, 35% of the equity interests in these foreign subsidiaries is unencumbered.  In addition to its other infirmities, the Disclosure Statement provides no information as to the portion of the Enterprise Value that is derived from encumbered assets versus the portion that is derived from unencumbered assets.

**D.     The Disclosure Statement Contains Inadequate
        Disclosure Regarding the Projections and the Risks to
        the Plan and the Business**

41.     The initial Disclosure Statement failed to include any financial projections.  The amended Disclosure Statement remedies that failure but fails to disclose some critical assumptions and the risks to the Debtors if those assumptions are wrong.

42.     Most significantly, North American same store sales ("SSS") estimates appear to be highly optimistic.  Notwithstanding the lack of any historical precedent or explanation, the Debtors have assumed positive North American SSS growth as early as fiscal year 2018, and assume SSS growth in each year of the projections thereafter, through fiscal year 2021.  The Committee believes that the risks of failing to meet these targets must be disclosed because these projections underpin the Company's valuation, debt structure, capital adequacy, solvency and recoveries.

43.     The Disclosure Statement should explain that if the Debtors do not achieve the projected levels of same store sales, they may have inadequate capital to operate their

23

business and service their debt during the periods covered by the financial projections, and there could be a need for further restructuring. *In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983); *see also In re Cardinal Congregate I*, 121 B.R. at 767 (a disclosure statement "should clearly identify all assumptions made in calculating pro forma information and should set forth those facts supporting all estimates," especially when plan depends on debtor's ability to improve its financial performance); *In re Dakota Rail, Inc*., 104 B.R. 138, 148-149 (Bankr. D. Minn. 1989) ("A disclosure statement is misleading where it contains glowing opinions or projections, having little or no basis in fact and/or contradicted by known fact"); *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981) (mere allegations or opinions unsupported by factual information in the disclosure statement do not meet the standard of adequate information).

### E.    The Liquidation Analysis is Inadequate

44.    The initial Disclosure Statement failed to include a liquidation analysis. The amended Disclosure Statement purports to remedy that failure but the liquidation analysis they provide raised more questions than it answers.

45.    A disclosure statement must contain a detailed liquidation analysis that explains any assumptions made in the preparation of such analysis so that creditors can make an informed decision about the alternatives to a debtor's plan. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300-301 (Bankr. S.D.N.Y. 1990). Here, the liquidation analysis is defective for a variety of reasons. First, the analysis ignores the potentially significant, standalone value of the Debtors' Latin American and international franchise operations and instead assumes that the foreign affiliates, many of which are not wholly-owned by the Debtors and therefore may be subject to consent rights of their respective JV partners, "would commence wind-downs as of the Conversion Date." The Committee takes issue with the liquidation assumption that "Foreign

24

Affiliates would not have the infrastructure or capabilities to operate their businesses as Debtors wound down over the liquidation period." Using the Debtors' estimated standalone cost assumptions, and assuming a three to six month marketing and sale period the Committee estimates the Debtors' stake in the Latin American operations would be valued well in excess of the value provided by the Debtors' Liquidation Analysis. The assumptions regarding the growing international franchise operations are also subject to challenge. The viability of these operations may have a significant impact on the sale of Debtors' intellectual property, whose value depends on ongoing royalty and other value streams from the franchises and international JV operations.

46.    Second, the liquidation analysis is presented on a partially consolidated basis although the Plan does not propose to consolidate any of the Debtors. Moreover, not only is there no explanation of how recoveries on intercompany claims have been incorporated and calculated in the analysis but given the apparent consolidation, there is no explanation as to which gross claims have been canceled or the rationale for those potential cancellations.

47.    Third, the Sponsor Claims, which could provide a significant source of value to the estates, are completely ignored.

48.    Finally, there is inadequate information regarding certain key assumptions including (i) assumptions related to discounts and wind down costs under a North American inventory liquidation, (ii) appraised value of the real estate and why a normal course sale process could not be effected to enhance value, and (iii) assumptions regarding the value of the Debtors' intellectual property and the interplay with revenue streams from ongoing international JV and franchise operations.

25

49.     Until a corrected liquidation analysis addressing all of these flaws and omissions is provided, the Disclosure Statement should not be approved.

**F.     The Disclosure Statement Contains
Insufficient Information Regarding Classification and
Treatment of Claims and Impacts on Creditor Recoveries**

50.     Page 6 of the Disclosure Statement includes incorrect statements about the recoveries on account of Worldwide General Unsecured Claims (Class 5B).  Specifically, because the Debtors are providing a fixed pool (2.9% of the New Equity) of equity to this Class, if the claims in Class 5B are higher than projected, then it would be untrue that this treatment "reflects the Holders of Worldwide General Unsecured Claims' Pro Rata share of distributable unencumbered value."  As such, depending on the final allowed amount of the Class 5B claims the Plan could discriminate unfairly against these creditors by treating them less favorably than the Holders of Class 4 claims.

51.     The Plan does not propose to substantively consolidate the Debtors' assets and liabilities.  As set forth above, general unsecured claims are relegated to three separate classes and provided disparate treatment.  Intercompany claims will be canceled or reinstated at the Debtors' discretion, with the Consenting Lenders' consent.  The Disclosure Statement does not contain sufficient information as to the relationship between the Debtor entities, the description of intercompany claims, and why there should not be substantive consolidation of certain Debtors for Plan or operating purposes.  However, as noted above, although the Debtors' propose to vote on a case by case basis, the treatment of Class 5A appears to be based on collective voting.  Absent such information, creditors cannot discern the impact on their recoveries.

**G.      The Disclosure Statement Contains No Disclosure
Regarding the Terms of the Management Equity Incentive Plan**

52.      The Disclosure Statement provides that the MEIP will be granted to "continuing employees of the Debtors and members of the New Board with pricing, vesting and exercise terms to be determined by the New Board upon consultation with the Chief Executive Officer of Reorganized Holdings."  Equity awards for 6-10% of the New Equity (on a fully diluted basis) will be provided to recipients under the MEIP.  Such recipients will not be disclosed until the New Board members are identified in the Plan Supplement.  Creditors should be provided with adequate disclosure regarding the rich rewards to be handed out post-confirmation to insiders while general unsecured creditors presumably will receive meager recoveries.

53.      In a case such as this, where the Debtors, their insiders, and lenders are aggressively pushing forward on a Plan that gives general unsecured creditors so little, and where unencumbered assets are not being made available for general unsecured creditors, creditors should know exactly the state of affairs as to whether the Debtors' current management team is going to be part of the Reorganized Debtors' management team, and receive valuable stock grants under the MEIP, the terms of which are not disclosed.  There is no meaningful discussion of this topic at all in the Disclosure Statement.  Rather, such information will be provided prior to the confirmation hearing.

54.      It is hard to imagine that the Debtors have nothing more to disclose at this time about the contemplated post-effective date management and their compensation and incentive awards, when they are on a truncated confirmation timeline and accordingly are so close to a confirmation hearing.  Simply because such disclosures are also disclosures that must be made pursuant to section 1129(a)(5) in order to confirm any plan does not obviate the need to

27

make such disclosures in the Disclosure Statement if they are material, as they clearly are in this case.  Again, the Committee is concerned that disclosure is not being made as a strategic decision.  After all do the Debtors want creditors to take into account the incongruity of rich compensation packages at the same time they are asking creditors to vote on a plan that pay the majority of the creditors 0.8% of their claims?

## IV.

## <u>THE PLAN IS NOT CONFIRMABLE</u>

55.    The Committee believes that the following preliminary obstacles to confirmation of the Plan exist.[5]

56.    <u>The Plan is not feasible</u>.  Section 1129(a)(11) of the Bankruptcy Code requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. §1129(a)(11).  Debtors are required to provide "ample evidence" to demonstrate that the Plan has a reasonable probability of success.  *See In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  Here, the Debtors propose to exit with $397 million of secured debt on their balance sheet at emergence, but the Committee believes that the Debtors may not be able to service this level of debt.

57.    <u>The Plan Fails the Best Interests of Creditors Test.</u>  The Plan will presumably be rejected by holders of general unsecured claims, and cannot be confirmed over their objection because it violates the best interest test.  Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests of creditors test."  Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, (A) each holder of a claim or interest in

---

[5] The Committee reserves its right to object to confirmation of the Plan (or any amended plan) on the grounds set forth herein and any other grounds.

such class (i) has accepted the plan, or (ii) will receive or retain under the plan property of a value that is not less than the amount that holder would receive or retain if the debtor liquidated under chapter 7.  11 U.S.C. §1129(a)(7).  The best interests test is based on a hypothetical liquidation.  7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009)  ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution….").  In order to carry their burden, the Debtors must produce sufficient financial information about themselves, their assets and liabilities and their prospects to permit the bankruptcy court to judge whether the best interest test for confirmation has been satisfied.  *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000).  As set forth above, the liquidation analysis completely ignores the value of the Sponsor Claims and does not properly account for the value of the unencumbered assets. As such the Debtors cannot show that their plan provides at least as much to creditors as creditors would receive if the Debtors were liquidated.[6]

58.    <u>The Plan Discriminates Unfairly and  is Not Fair and Equitable</u>.  The Plan cannot be confirmed over the rejection of an impaired class because it discriminates unfairly and is not fair and equitable.  Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an impaired class, also known as a cramdown, only if, among other things, "the plan does not discriminate unfairly and is fair and equitable."  11 U.S.C. § 1129(b)(1).  The "unfair discrimination" standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.  Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes.  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part,*

---

[6] In addition, the Committee has requested, but has not been provided, information from the Debtors that would allow the Committee to perform a preference analysis.

*rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *Kane v. Johns-Manville*

*Corp.*, 843 F.2d 636 (2d Cir. 1988).  This Plan is discriminatory insofar as it provides disparate

treatment of creditors who hold unsecured claims.  Here, the Second Lien claims are vastly

undersecured.  However, the Second Lien Lenders will receive 9% of the New Equity, which is

more on a prorated basis than the Class 5(B) creditors receive unless the Class 5B claims are

ultimately allowed at *exactly* the amount estimated by the Debtors. .  The Debtors must

demonstrate that the recovery to each of the unsecured creditor classes is justified by the debt

structure and asset values of the Debtor entities and that the corporate structure of the Debtors is

justified for business purposes and not set up as a mechanism to unfairly treat similarly situated

creditors.

       59.     The "fair and equitable" standard "has at least two key components: the

absolute priority rule; and the rule that no creditor be paid more than it is owed."  7 Collier on

Bankruptcy ¶1129.03[4][a].  In this case, without being able to test the Debtors' valuation and its

underlying assumption—based on the inadequate disclosure described above—there is no way to

determine whether the allocation of New Equity under the Plan violates the absolute priority rule

and is not fair and equitable because it provides the Class 3 Secured Lien Lenders value in

excess of the amount of their claims.  For this reason, it is critical that the Committee's

professionals conduct an independent valuation and carefully review and scrutinize the Debtors'

valuation once all the assumptions are provided.

       60.     <u>The Direct and Third Party Releases in the Plan are Impermissible</u>.  The

Plan also contains broad, gratuitous and otherwise inappropriate direct and third party releases in

favor of all the lenders and Debtors' current and former officers.  These releases improperly take

away their litigation right adequately compensating them for such treatment.  The "Opt-out"

59102618.1

provisions of the third party releases are inappropriate.  A creditor that votes to accept the Plan should be able to nonetheless "Opt-out" of the third party releases.  Creditors that do not vote on the Plan should not be deemed to have provided the third party releases.  The third party releases cannot be forced on creditors because there is no consideration being provided for the releases. They must be crafted in a way that is truly voluntary and the solicitation materials must clearly explain the rights of any creditors to Opt-out of the third party release.

61.    <u>The Plan is Not Proposed in Good Faith</u>.  Based upon the proposed inappropriate treatment of the Sponsor Claims and the failure of the Debtors to conduct a truly independent investigation thereof, the Committee believes that the Plan, which proposes to release the Sponsor Claims and grant broad additional releases for no consideration, was not and cannot be proposed in good faith.

**A.    Certain Solicitation and Tabulation**
**Procedures Improperly Disenfranchise Creditors**

62.    Finally, the Committee objects to certain of the solicitation and ballot tabulation procedures proposed in the DS Motion.  At the time the DS Motion was filed, the Debtors had proposed a general claims bar date (the "<u>Bar Date</u>") that would have occurred prior to solicitation.  Since then the Court has entered an order (the "<u>Bar Date Order</u>") establishing June 19, 2017 as the Bar Date.  Although the Debtors agreed that such timing required modifications to the proposed solicitation procedures, they have not yet posted a revised order containing any such modifications.  Accordingly, the Committee respectfully requests that any order contain the modifications set forth below in order to preserve creditors' fundamental right to vote to accept or reject the Plan.  The Committee's objections to the solicitation and tabulation procedures are as follows:

- The Debtors propose that the solicitation deadline be June 7, 2017[7] "or as soon as reasonably practicable thereafter." Proposed Order at ¶¶ 7.b.; 10. The Debtors should not be permitted to vary from the solicitation deadline because it will result in less time for creditors to submit votes.

- The voting and tabulation procedures should apply only absent a contrary order of this Court in the event unforeseen circumstances arise that require Court intervention. The Committee proposes that the provision "absent a contrary order of the Court" be added at the beginning of paragraphs 16 and 17 of the Proposed Order.

- The proposed procedures enabling creditors to file motions pursuant to Bankruptcy Rule 3018 are flawed. Specifically, the Proposed Order states that such motions must be filed by the "Voting Resolution Deadline" but does not indicate what that date is. *See* Proposed Order at ¶19.b. In addition, the Debtors also are not required to file any responses to such motions, but may present them at the confirmation hearing. The Debtors must provide a reasonable timeline for the filing of motions and objections that affect a creditor's right to vote, and must inform creditors who file such motions of any basis for objecting to them by way of a written response in advance of the confirmation hearing.

- The Proposed Order provides for the possibility that the Debtors could object to a filed proof of claim and thereby affect the amount in which the vote on any such claim is counted, but do not provide a deadline for objecting to claims that will affect the amount of a creditor's vote. *See* Proposed Order at ¶16.c. If the Debtors plan to object to claims prior to the voting deadline, they should be required to do so by a certain deadline that will provide such creditors with adequate time to file a motion pursuant to Bankruptcy Rule 3018.

- The Proposed Order provides that a vote cast by the holder of a claim scheduled as contingent, unliquidated or disputed for which the Bar Date has not passed <u>will be counted</u> in the amount of <u>$1.00</u> solely for purposes of section 1126(c). Proposed Order at ¶16.e. It then provides that a "Disputed Claim Notice" will be sent to entities with claims scheduled or filed as contingent, unliquidated or disputed, or for $0.00 or in an unknown amount. Such notice states, contrary to the foregoing provision that the holders of such claims are <u>not entitled to vote at all</u>. *See* Proposed Order at Exhibit 4. Such notice should be revised to provide that votes cast by such holders will be counted in the amount of $1.00 and should

---

[7] The Debtors have not provided a new proposed date based on the continued Disclosure Statement Hearing date.

59102618.1

explicitly provide notice of the opportunity for such holders to file Bankruptcy Rule 3018 motions and the deadline to do so rather than a generic reference to their right to contest their status "in accordance with the Disclosure Statement Order." *Id.*

• The Bar Date Order provides that counterparties to unexpired leases may submit a cure statement to the Debtors by the Bar Date in lieu of a proof of claim in accordance with the terms of the Bar Date Order. In the event a cure statement is provided prior to the voting deadline, any vote cast by such a counterparty should be counted in the amount set forth in the cure statement as the prepetition amount owed.

63.     Given all of the issues with the Plan addressed above, in the event that the Court is inclined to approve the Disclosure Statement and permit solicitation to proceed, it is entirely appropriate for the Debtors to be required to include a letter from the Committee (the "Committee Letter") as part of the solicitation packages. *See In re Boomerang Tube, LLC*, Case No. 15-11247 (Bankr. D. Del. 2015), Tr. of Proceedings held August 11, 2015 at 5:17-20 (allowing inclusion of Committee letter by agreement among parties); *In re Motor Coach Indus., Inc.*, No. 08-12136 (Bankr. D. Del. 2008), Tr. of Proceedings held Dec. 17, 2008 at 44:7-46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); *In re Federated Dep't Stores, Inc.*, Consolidated Case No. 1-90-00130, 1992 Bankr. LEXIS 392, at *21 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included a letter from the appropriate creditors' committee recommending a vote in favor of the plan); *In re JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) [Docket No. 302] (disclosure statement included bold, all capital letters recommendation by creditors' committee summarizing concerns

33

and urging creditors to reject the plan).  Attached hereto as **Exhibit "B"** is the proposed

Committee Letter.

## V.

## RESERVATIONS OF RIGHTS

64.    The Committee reserves its right to supplement this Objection at or prior

to the hearing or continued hearing on the Disclosure Statement.

# VI.

## <u>CONCLUSION</u>

65.    Based on the foregoing, the Court should deny approval of the Disclosure Statement and direct the Debtors to notice a new disclosure statement hearing only after the actual document that they are seeking to have approved is on file.

Dated:  June 12, 2017                          POLSINELLI P.C.

*/s/ Matthew S. Layfield*
Matthew S. Layfield, Esq.
100 S. Fourth Street, Suite 1000
St. Louis, MO 63102
Telephone: (314) 889-8000

*Local Counsel for the Official Committee of
Unsecured Creditors*

PACHULSKI STANG ZIEHL & JONES LLP

Robert J. Feinstein, Esq. (admitted *pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700

Bradford J. Sandler, Esq. (admitted *pro hac vice*)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100

Jeffrey N. Pomerantz, Esq. (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067-4100
Telephone:  (310) 227-6910

*Lead Counsel for the Official Committee of
Unsecured Creditors*

35